IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEAN LAWNICZAK, Personal Representative of the ESTATE OF JOHN ORLANDO, *Deceased* | Civil Action No. 2:17-cv-00185 |
| Plaintiff, | |
| v. | |
| ALLEGHENY COUNTY, et al. | |
| Defendants. | |

**BRIEF SUPPORTING
COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**NOW COME** Defendants Allegheny County, Orlando Harper, Simon Wainwright, Marguerite Bonenberger, Andrew Haburjak, and Tricia Corrado. (the "County Defendants"), by counsel, John A. Bacharach, Assistant Allegheny County Solicitor, and file this Brief Supporting County Defendants' Motion for Summary Judgment.

### I. Facts

The facts on which this brief relies are set forth in detail in Defendants' Concise Statement of Material Facts filed pursuant to LCvR 56(B)(1). Defendants incorporate that Concise Statement and its recitation of facts as though set forth completely herein.

### II. The Individual Defendants

#### A. The Relevant Law

#### 1. Prison Suicide Generally

In general, a plaintiff in a prison-suicide case involving a pretrial detainee has the burden to prove three elements: (1) the detainee had a vulnerability to suicide; (2) the custodial officers

1

knew or should have known of that vulnerability; and (3) those officers acted with reckless or deliberate indifference to the detainee's particular vulnerability. *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023-24 (3d Cir. 1991) (*Colburn II*).[1]

A particular vulnerability to suicide means there is a strong likelihood, rather than just a mere possibility, that self-inflicted harm will occur. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319-20 (3d Cir. 2005). The "should-have-known" element is not simply a failure to note a risk that would be perceived through ordinary prudence. *Id*. Instead, it is something more than a negligent failure to appreciate the risk of suicide presented by a particular detainee. *Id.* Along these lines, the strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative action. *Id.*

As to the element of indifference, there can be no reckless or deliberate indifference if the custodians are merely negligent. *Colburn II*, 946 F.2d at 1024. That is, for liability to attach, there must be something more culpable on the part of the custodians than a negligent failure to protect a vulnerable detainee from suicide. *Id.* For example, conduct would likely rise to the level of reckless indifference where custodians take no steps whatsoever to protect a detainee

---

[1] Case law usually characterizes the "indifference" requirement in suicide cases as being "reckless," *see Colburn II*, 946 F.2d at 1023, but other times characterizes it as being "reckless or deliberate," *see id.* at 1024. In this vein, some opinions appear to use the terms "reckless" and "deliberate" interchangeably. *See Ferencz v. Medlock*, 2014 WL 3339639, 3 (W.D.Pa., filed July 8, 2014) (defining the element as "reckless indifference" to a detainee who is particularly vulnerable to suicide and then stating that a plaintiff must establish the defendant acted with "deliberate indifference" to the inmate's particular vulnerability to suicide.) Similarly, in a recent Federal Appendix case, the court articulated the required element as being "reckless indifference," but then referred to it as being the "requirement of reckless or deliberate indifference." *Green v. Coleman*, 575 Fed.Appx. 44, 48 (3d Cir. 2014). Other case law indicates that, in the suicide context, the concepts of "reckless indifference" and "deliberate indifference" have not been distinguished or precisely defined. *Colburn II*, 946 F.2d at 1024. Whether reckless indifference and deliberate indifference are meant to be the same or different standards, a defendant cannot be held liable in a prison-suicide case unless his culpability is greater than negligence. *Id.*

they know to be suicidal. *Colburn v. Upper Darby Township*, 838 F.2d 663, 669 (3d Cir. 1988) (*Colburn I*). For example, reckless indifference has been found where an inmate told a prison psychologist that he was contemplating suicide, the psychologist did not place the inmate in a suicide cell because those cells were full, the psychologist merely counseled the inmate to "be cool," and the psychologist then stated that he was getting ready to leave work (on a Friday) and could not do anything more until Monday. *Hinton v. Mark*, 544 Fed.Appx. 75, 77 (3d Cir. 2013).

Courts have also held that deliberate indifference can be found only if prison officials know of and disregard an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Deliberate indifference is an exacting standard. *Sadelmyer v. Peltzer*, 2013 WL 4766517, 4 (W.D.Pa., filed September 4, 2013). Moreover, the deliberate or reckless indifference required for liability under § 1983 is a subjective indifference, not merely an objective one. *Farmer*, 511 U.S. at 837-38; *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 323 (3d Cir. 2014).

Keeping in mind that a particular vulnerability to suicide constitutes a serious medical need, *see Colburn II*, 946 F.2d at 1023, it is also worth noting that a prison official is not deliberately indifferent to that need if the official defers to the judgment of medical personnel about what medical services a detainee requires. *Durmer v. O'Carroll*, 911 F.2d 64, 67-69 (3d Cir. 1993). Accordingly, unsuccessful medical decisions, negligence, or even medical malpractice by a medical provider is insufficient to establish that a prison official was deliberately indifferent to a detainee's serious medical need (*e.g.*, a particular vulnerability to suicide). *Id.*

Consistent with the aforesaid concepts, a non-medical prison official is usually justified in believing that a prisoner is receiving appropriate care if that prisoner is under the care of

medical experts. *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Prisoner health and safety are promoted, not hindered, by dividing responsibility for the prisoner among corrections officers, administrators, and medical personnel. *Id.* Consequently, a prison official will not be chargeable with deliberate indifference to a prisoner's medical needs absent either (1) actual knowledge that the prisoner is being mistreated/not treated or (2) reason to believe that such is the case. *Id.* Reason to believe that a prisoner is not being treated appropriately may arise if the plaintiff proves the prison officials failed to correct specific, known deficiencies in the provision of medical care to the inmate population. *Barkes*, 766 F.3d at 324. As such, deliberate indifference may be shown by evidence that the officials failed to respond to a known pattern of injuries that are like the one allegedly suffered by the prisoner. *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). Plainly, the reason that deliberate indifference to a prisoner can be inferred in such a situation is that the failure to respond to a known pattern of specific, similar injuries among the general population would effectively expose the individual prisoner to that same type of harm. *Id.*

Finally, courts are not permitted to infer in hindsight, from the act of suicide itself, that prison officials were recklessly or deliberately indifferent to their obligation to take reasonable precautions to protect the prisoner's safety. *Freedman v. City of Allentown*, 853 F.2d 1111, 1115 (3d Cir. 1988); *Ferencz*, 2014 WL 3339639 at 3.

### 2. Supervisory Liability

While the foregoing three-element test sets forth the general requirements for finding that a state actor has violated an individual's rights in the prison-suicide context, there may be additional considerations if, for example, a plaintiff seeks to establish the liability of a supervisor. More particularly, courts have identified two general instances in which either the

conduct of a supervisor-defendant or a particular policy or procedure of that supervisor warrants a finding of supervisory liability for a constitutional tort. *Barkes*, 766 F.3d at 316. First, supervisory liability may attach if the supervisor personally participated in violating the prisoner's rights, personally directed others to violate them, or had personal knowledge of and acquiesced in a subordinate's unconstitutional conduct. *Id*. Second, liability may attach if the supervisor, with deliberate indifference to the consequences of a policy or procedure, established and maintained that policy or procedure which, in turn, directly caused constitutional harm. *Id.*

In the second instance—*i.e.*, the policy/procedure context—a plaintiff must prove the following four elements to establish supervisory liability:

1. the supervisor's policy or procedure in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation;

2. the defendant-supervisor was aware that the policy or procedure created the aforesaid unreasonable risk;

3. the defendant-supervisor was indifferent to that risk; and

4. the constitutional injury was caused by the failure to implement an appropriate supervisory policy or procedure.

*Id.* at 317-323.

Once again, there can be no liability without a subjective, deliberate indifference by the supervisor. *Id.* at 323.  An objective indifference is insufficient. *Id.*

### 3. Qualified Immunity

Qualified immunity may protect government officials, including supervisors, from suit. *Id.* at 325-26. More particularly, a government official performing discretionary functions is generally immune from suit and/or shielded from civil liability if his actions do not violate a clearly established constitutional right of which a reasonable person would have been aware. *Id.*

A qualified immunity analysis usually begins, therefore, with the threshold question of whether the facts, viewed most favorably to the party asserting the injury, show the official's conduct violated a certain right. *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). If the plaintiff cannot establish that the official's conduct violated the plaintiff's constitutional right(s), then no further inquiry (*i.e.*, an inquiry into whether the right was a clearly established one) is necessary. *Id.*

Considering these concerns, the Court has held that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). To determine whether a given officer falls into either of those two categories, a court must ask whether it would have been clear to a reasonable officer that the alleged conduct "was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001). If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however—i.e., if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). Moreover, courts must be cautious not to treat general statements regarding constitutional law as settled law or to read decisional law too broadly in deciding "whether a new set of facts is governed by clearly established law." *Kisela,* 138 S. Ct. 1148 (2018).

### 4. Summary Judgment

Summary judgment is appropriate if, making all inferences in favor of the non-moving party, the record reveals that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). Accordingly, summary judgment should be granted against a plaintiff who fails to adduce facts sufficient to establish the

necessary elements of the plaintiff's case, elements on which the plaintiff will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548 (1986).

The party seeking summary judgment has the initial burden to identify the lack of evidence that demonstrates the absence of a genuine issue of material fact. *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992). Once the movant meets this initial burden, the non-moving party must reply with specific facts showing there is a genuine issue for trial. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the non-moving party fails to articulate facts establishing a genuine trial issue, the court will take the record as presented by the moving party. Id. Moreover, the court will then grant judgment as a matter of law. *Id.*

An issue is genuine only if there is evidence such that a reasonable jury could reach a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The essential inquiry, therefore, involves deciding whether the evidence shows a sufficient disagreement to require submission of the case to the jurors or whether the matter is so one-sided that one party must prevail as a matter of law. *Brown v. Grabowski,* 922 F.2d 1097, 1106, 1110-11 (3d Cir. 1990). If a court, after reviewing the record, concludes the evidence is colorable but not significantly probative, then the court must grant summary judgment. *Anderson,* 477 U.S. at 249-50. Lastly, while evidence used to support a summary judgment motion must be admissible evidence, it need not be presented in admissible form during the summary judgment proceedings. *See J.F. Feeser, Inc., v. Serv-A-Portion, Inc.,* 909 F.2d 1524, 1542 (3d Cir. 1990); Fed.R.Civ.P. 56(c)(2).

### III. Argument

### A. Corrections Officer Marguerite Bonenberger

Bonenberger had two points of contact with Orlando, both on March 24, 2016 at or about 10:30 p.m. She was present when the Millvale Police delivered Orlando to the ACJ. CSMF ¶¶ 37-40. They informed her, or she heard the Millvale Police say, that Orlando stated that he wanted to hang himself. *Id.* She also participated in placing Orlando in the restraint chair and she heard him make the statements that he would die in the ACJ. Appendix, Exhibit C. There is no evidence that Bonenberger had any contact with Orlando after the evening of March 24, 2016. There is no evidence that Bonenberger took any action that could rise to the level of deliberate indifference. She did not conceal information. Appendix, Exhibit B. She did not have authority to place Orlando on suicide precaution, and she is not identified as a medical provider. The evidence is that the last time she saw Orlando he was in the restraint chair-safe from self-harm. CSMF ¶¶ 7-14.

Bonenberger's conduct was not deliberately indifferent. Moreover, the law is far from clear regarding a corrections officer's duty when an inmate makes threats that are or can be interpreted as an intention to injure himself when medical personnel are present and when additional screening will be conducted by other medical personnel, including mental health specialists. *See, Spruill, supra.* Bonenberger is entitled to summary judgment based on qualified immunity.

### B. Sergeant Andrew Haburjak

The facts as to Haburjak are substantially the same as those that pertain to Bonenberger with some exceptions. Haburjak was a Sergeant and so he had some supervisory role on March

24, 2016. CSMF ¶ 13. However, there is no evidence that he engaged in any conduct that could be characterized as deliberately indifferent to Orlando's risk of suicide on March 24, 2016. He prepared reports that documented Orlando's behavior and statements on March 24, 2016. Exhibit B. These were reviewed by at least some command staff on March 25, 2016. Appendix Exhibit B, AC-0001.

After he was in the restraint chair, Habujak placed Orlando in cell H-9, which is directly in front of the corrections officer's desk where they could directly observe him. CSMF ¶ 44. This is where inmates on suicide precaution are placed. *Id.* When Orlando was in Haburjak's presence he was safe from self-harm in a restraint chair in a cell where he could be directly observed by officers. CSMF ¶ 57. Orlando's suicide occurred days later in another part of the jail and after Orlando had been seen by Nurse Latham, Mental Health Specialist Harrison and twice by Dr. Stechschulte. CSMF ¶¶ 11,16,18,19,23,26 and 27.

Haburjak's conduct was not deliberately indifferent. Moreover, the law is far from clear regarding a corrections officer's duty when an inmate makes threats that are or can be interpreted as an intention to injure himself when medical personnel are present and when additional screening will be conducted by other medical personnel, including mental health specialists. *See, Spruill, supra.* Haburjak is entitled to summary judgment based on qualified immunity.

### C. Deputy Warden Simon Wainwright

Simon Wainwright was a deputy warden in 2016. He was not personally involved with Orlando's medical care or his classification before March 30, 2018. Wainwright's only alleged involvement was that a person who identified himself as Wainwright allegedly had a telephone conversation with Jean Lawniczak, Orlando's mother, after his death. Exhibit L, Lawniczak Depo. Tr. Pp. 37-38. Lawniczak testified that when she asked, "Well how could this [Orlando's

death] happen?" 'Wainwright allegedly replied,' "... And he said something to the term of, "Well apparently you know, we wish we had more manpower than what we do." That's all I remember." *Ibid.*

Regardless of whether a manpower shortage existed generally, there is no evidence that there was a shortage of manpower on Pod 5F on March 29, 2016, or that was a cause of Orlando's death. CSMF ¶ 49. More significantly, there is no evidence that Wainwright had the power to correct any of these alleged deficiencies or that Wainwright was deliberate indifferent to them.

Wainwright's conduct was not deliberately indifferent. Moreover, the law is far from clear regarding a supervisory officer's duty when an inmate makes threats that are or can be interpreted as an intention to injure himself, when medical personnel are present, and when additional screening will be conducted by other medical personnel, including mental health specialists. See, Section II (A)(1), *supra*. Similarly, there is no clear law regarding what are proper staffing levels in a jail. In this case, there were at least two and possibly three correction officers on Pod 5C when Orlando committed suicide and there is no evidence that even having only one officer on duty created an unreasonable risk of suicide. Wainwright is entitled to summary judgment based on qualified immunity.

### D. **Tricia Corrado, R.N.**

Tricia Corrado is a Registered Nurse who worked at the ACJ in March 2016. CSMF ¶¶ 51-52. She was on duty the night Orlando came into the ACJ. *Id*. at p. 12. When she first saw Orlando, he was in the restraint chair. *Ibid.* Orlando was agitated and said he was under the influence of drugs. *Id.* at p. It is not uncommon for inmates to arrive at the ACJ angry, agitated, combative, on drugs or alcohol, nor is it unusual for new arrivals to speak of self-harm. Exhibit

J, at pp. 51-58.

Corrado asked Orlando normal intake questions while he was in the restraint chair. *Id*. at pp. 13-14. The inquiry included questions about whether Orlando was contemplating harming himself. *Id*. at pp. 10-11. Corrado did not have the ability in intake to recommend an inmate to a mental health nurse or physician. *Id*. at pp. 22-23. Later in the process, an inmate sees another nurse and a mental health specialist who evaluate and provide needed treatment for the inmate. CSMF ¶¶ 1-34.

After Orlando was in the restraint chair, he was placed in the cell directly in front of the correction officers where inmates on suicide prevention are placed. Id. at ¶ 57. Orlando never specifically said he was going to kill himself to Corrado and no one told her that he had said that. CSMF ¶ 58.

Corrado did not talk to Orlando after he got out of the restraint chair. *Id*. at ¶ 59. Another nurse would have would have seen him. *Id*. at ¶ 59. He was in fact seen by Teresa Latham, RN and Ruth Harrison a Mental Health Specialist on March 26th. *Ibid.*

Corrado's contact with Orlando was limited to a short period of time while he was in intake. While he was there, he was safe from self-harm. She also knew that after his arraignment by the court, he would either be released or he would be seen by other medical personnel, including a mental health specialist. *CSMF ¶¶ 51-64*.

Corrado's conduct regarding Orlando that night does not approach the conduct that is required to establish deliberate indifference, which would require her to be virtually certain that harm would come to Orlando based on her actions or her failure to act.

**E. Orlando Harper**

Plaintiff has sued Orlando Harper individually, Harper having been Warden of the Allegheny County Jail ("ACJ") at all times relevant to this matter**.** CSMF ¶ 66**.** Once more, based on numerous allegations in the Amended Complaint, supervisory liability would appear to be one of Plaintiff's theories of fault against Harper**.** Plaintiff has not, however, adduced facts establishing the elements of that type of liability. For example, the evidence produced during the discovery process does not demonstrate Harper had personal involvement with Orlando, personally directed anyone to violate Orlando's rights, acquiesced in any supposed violation of Orlando's rights, knew of any supposed violation of Orlando's rights, or even knew of Orlando at all while he was jailed at the ACJ.  Additionally, Plaintiff has failed to produce evidence indicating that Warden Harper established and/or maintained a policy or procedure that created an unreasonable risk to Orlando's safety, that Harper was aware of such a risk, that Harper was subjectively indifferent (recklessly or deliberately) to any risk, and/or that Orlando was harmed because of an alleged policy-or-procedure failure on Harper's part. The facts in this case simply do not demonstrate the elements of supervisory liability that Plaintiff would need to prove at trial against Harper. *See, Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014), cert. granted, judgment rev'd on other grounds sub nom. Barkes*, Taylor v. Barkes, 135 S. Ct. 2042 (2015).

Plaintiff's additional theory against Harper is alleged liability for conduct satisfying the general three-element test for suicide cases set forth in *Colburn II*, 946 F.2d at 1023-24. *See* CSMF. at ¶ 80; S.J.Ex. V at ¶¶ 43-49. However, as already discussed *supra*, the facts adduced during discovery do not show that Harper had any personal knowledge or reason to know anything about Orlando or that Harper acted with reckless or indifference toward Orlando.

**Training and Procedures**

The evidence in this case is that when new inmates arrive at the Allegheny County Jail they are seen by a nurse. CSMF ¶¶ 52-64. If the new inmate is committed to the jail after arraignment by the court, he is seen by another nurse and a mental health specialist. *Id.* In addition, in this case Orlando was seen by a physician on Pod 5F at least twice before he hung himself. CSMF ¶34. The jail's policy is that medical providers determine whether an inmate is suicidal. If that decision is made, suicide precautions are to be taken. CSMF ¶ 70.

In the absence of facts demonstrating liability on Harper's part, no reasonable juror could reach a verdict against Harper and for Plaintiff. Because no reasonable juror could reach a verdict against Harper, there remains no genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 249-50 (indicating a genuine issue exists only if a jury could reasonably reach a verdict for the non-moving party). As there is no genuine issue of fact for trial, there is no sufficient disagreement to submit the question of Harper's liability to a jury. *Brown*, 922 F.2d at 1106, 1110-11. Harper is therefore entitled to summary judgment as a matter of law. *Celotex*, 477 U.S. at 322; *Matsushita*, 475 U.S. at 587; Fed.R.Civ.P. 56(a).

Furthermore, as the evidence does not demonstrate that Harper in any way violated Orlando's constitutional rights, Harper is entitled to qualified immunity from suit in his role as Warden. *Curley v Klem*, 298 F.3d 271 at 277 (3rd Cir. 2002).

### IV.  Municipal Defendant:  Allegheny County

#### A. The Relevant Law

A local government unit such as Allegheny County is not subject to civil rights liability under the theory of *respondeat superior. Monell v. Dept. of Soc. Servs. of City New York,* 436

U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a government unit can be subject to liability if the plaintiff proves the government unit had an official policy or custom that caused a constitutional violation. *Id.* at 690-91. There must be a direct causal link between the policy or custom and the constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385-86, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Along these lines, the plaintiff must show that the government unit, through deliberate conduct, was the moving force behind the claimed injury. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). In short, the plaintiff must prove a constitutionally defective policy or custom, deliberate indifference, and causation**.** *Id.*

Consequently, in the prison-suicide context, the plaintiff cannot prevail on a policy-or-custom claim without proving that the government entity, by its policy or custom, was deliberately indifferent to the inmate's serious medical needs—*i.e.*, a particular vulnerability to suicide—and did, in fact, cause the detainee's injury. *City of Canton,* 489 U.S. at 385-86; *Colburn II*, 946 F.2d at 1027-28.

### B. Argument

Plaintiff seeks to prove that Allegheny County, by policy or custom, failed to provide Orlando constitutionally adequate protection from the risk of suicide. Primarily, it appears Plaintiff contends that, because of some County policy or custom, Orlando was not properly assessed and monitored. Plaintiff contends the County is therefore liable for Orlando's death. For the reasons that follow, Plaintiff's policy-or-custom claim must fail at this summary judgment stage.

The facts adduced during discovery do not support the conclusion that there existed a County policy or custom that denied Orlando access to appropriate medical care (*e.g.*,

assessment, treatment, suicide precautions) or that denied him proper monitoring (*e.g.*, housing, oversight) stoprotect him from the risk of suicide. Indeed, the numerous facts detailed in Defendants' Concise Statement of Material Facts demonstrate that the County afforded Orlando assessment for medical and mental health conditions, including suicide risk, by medical and mental health professionals from the time he entered the ACJ to a few hours before he was found hanging in his cell. CSMF ¶¶ 1-65. The ACJ, the County, had in place medical personnel who saw Orlando repeatedly. *Ibid.* More specifically, the care and monitoring provided directly by the ACJ included the following:

1. An initial medical examination shortly after an inmate arrived at the jail. CSMF ¶¶ 51-64.

2. A second examination by a nurse after a court arraignment. CSMF ¶¶ 19-22.

3. An examination by a mental health specialist. CSMF ¶¶ 22-23.

4. Detoxification medication. CSMF ¶22.

5. Examination by a physician after arriving at the detoxification pod. CSMF ¶ 34.

Moreover, the County—specifically the ACJ—deferred to the judgments made by medical providers regarding Orlando. *See Spruill*, 372 F.3d at 236 (indicating non-medical officials are generally justified in believing a prisoner is receiving appropriate medical care from medical providers). Plaintiff has not, for example, produced any facts suggesting that the County knew of any supposed deficiencies, and/or that County personnel failed to correct any system-wide deficiencies to make the County liable for Orlando's death. *See id.* (indicating officials are not chargeable with deliberate indifference unless they have actual knowledge of mistreatment of a prisoner or unless they fail to correct known, prison-wide deficiencies that resulted in injuries

like what the plaintiff suffered). Accordingly, the facts do not support a finding that the County, by deferring to medical decisions and orders, engaged in any constitutionally defective policy or custom, effectively exposed Orlando to a suicide risk, was indifferent (deliberately or recklessly) to Orlando's need for protection from suicide, or caused his suicide. *See id.*

To the extent Plaintiff contends that the care directed by medical personnel officers, and adhered to by the County, was unsuccessful, Plaintiff's complaint is more in the nature of a negligence or medical malpractice claim, not a constitutional tort. *See Durmer,* 911 F.2d at 68-69. (holding unsuccessful medical decisions do not establish deliberate indifference). Additionally, while the County contends the evidence does not even support a claim of negligence, it is certainly true that the facts do not reasonably support a finding that the County, through some policy or custom, acted with some subjective deliberate or subjective recklessness or indifference. That Orlando ultimately chose to kill himself is not a fact sufficient to infer, in hindsight, that the County was recklessly or deliberately indifferent to him, his serious medical needs, or any of his rights. *Freedman*, 853 F.2d at 1115; *Ferencz*, 2014 WL 3339639 at 3.

Because the facts adduced during discovery do not demonstrate deliberate or reckless indifference to Orlando's needs/rights, a constitutionally defective policy or custom, or causation, Plaintiff's policy-or-custom claim must fail. *Monell,* 436 U.S. at 690-91; *City of Canton,* 489 U.S. at 385-86; *Colburn II*, 946 F.2d at 1027-28. No reasonable jury could find Defendant Allegheny County liable. Consequently, summary judgment for Allegheny County is warranted. *Anderson,* 477 U.S. at 249-50; *Brown,* 922 F.2d at 1111.

## V. Damages

### A. Punitive Damages

Plaintiff demands, *inter alia*, punitive damages against the County Defendants.

While there is a lack of evidence establishing any liability for any type of damages on Defendants' parts, Defendants note that punitive damages are not permitted against government units in actions under 42 U.S.C. § 1983. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 267-71, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Accordingly, Defendants seek summary judgment on Plaintiff's claim for such damages against the County.

Because the record contains no evidence that individual Defendants were indifferent to Orlando's rights or acted with any reckless or callous disregard thereof, Plaintiff's claims for punitive damages against the individual Defendants must likewise be dismissed. *Keenan v. Philadelphia*, 983 F.2d 459, 469-70 (3d Cir. 1992) (indicating punitive damages against individual defendants are appropriate only if the plaintiff proves that the individuals acted with reckless or callous disregard of, or indifference to, the rights and safety of the plaintiff).

## VI. Conclusion

This case is significantly different than those in which courts have found that the facts could support a finding of reckless and/or deliberate indifference.

Because Plaintiffs have not shown facts essential to their cause of action, summary judgment should be granted for the County Defendants and against Plaintiff on all issues of liability**.** *Brown*, 922 F.2d at 1106, 1110-11. Defendants thus request summary judgment. *Celotex*, 477 U.S. at 322-23; *Anderson,* 477 U.S. at 249-50; *Matsushita*, 475 U.S. at 587; Fed.R.Civ.P. 56(a). In any event, Plaintiff's claims for punitive damages and loss of future

earnings fail as a matter of law even aside from the overall grant of summary judgment. *Anderson*, 477 U.S. at 249-50.

Respectfully submitted,

/s/ John A. Bacharach
PA ID 19665
Allegheny County Ass't Solicitor
Allegheny County Law Department
300 Fort Pitt Commons Building
445 Fort Pitt Boulevard
Pittsburgh, PA 15219
(412) 350-1150
jbacharach@AlleghenyCounty.us