IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEAN LAWNICZAK, as Personal Representative of the ESTATE OF JOHN ORLANDO, Deceased, | ) ) ) ) | Civil Action No. 2:17-cv-00185 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| ALLEGHENY COUNTY, *et. al*, | ) ) | HONORABLE LISA PUPO LENIHAN |
| Defendants. | ) | *Electronically Filed.* |

PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS

COMES NOW, the Plaintiff, JEAN LAWNICZAK, as Personal Representative of the Estate of John Orlando, by and through her attorneys, LAW OFFICES OF JOEL SANSONE, JOEL S. SANSONE, ESQUIRE, MASSIMO A. TERZIGNI, ESQUIRE, and ELIZABETH A. TUTTLE, ESQUIRE, and hereby submits her Counter Statement of Material Facts as follows:

I. RESPONSE TO CONSCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted. By way of further response, Plaintiff's Decedent, John Orlando ("Orlando"), was forcibly restrained as a direct result of threatening to harm himself and/or others. (Review Checklist: Unplanned Use of Force Comments at Exhibit "A" of Plaintiff's Appendix; County of

Allegheny Bureau of Corrections Employee Report of Incident at Exhibit "B" of Plaintiff's Appendix; Document entitled County of Allegheny Intake Sally Port at Exhibit "C" of Plaintiff's Appendix; County of Allegheny Incident Report at Exhibit "D" of Plaintiff's Appendix; Restraint Chair Report at Exhibit "E" of Plaintiff's Appendix).

8. Admitted.

9. Admitted.

10. Admitted.

11. Admitted.

12. Admitted. By way of further response, Defendant Tricia Corrado, R.N., ("Corrado") also noted in her report that Mr. Orlando disclosed to her a history of mental health issues. (Allegheny County Bureau of Corrections Jail Healthcare Services form at Exhibit "F" of Plaintiff's Appendix).

13. Admitted.

14. Admitted.

15. Admitted.

16. Admitted.

17. It is admitted that the report reads as stated.

18. Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph. Therefore, the same are denied and strict proof thereof is demanded at the time of trial. By way of further response, the report containing this information was completed by Laura Williams on or about March 31, 2018, after Mr. Orlando's death. (Medical Incident Report at Exhibit "G" of Plaintiff's Appendix).

19. Admitted.

20.     It is admitted the report reads as stated.  However, Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph.  Therefore, the same are denied and strict proof thereof is demanded at the time of trial.  By way of further response, Mr. Orlando disclosed the following information to Defendant Teresa Latham, R.N., ("Latham"), during the intake process and as part of his inmate medical survey report: Mr. Orlando suffered from current mental health complaints; Mr. Orlando had a history of mental health problems; Mr. Orlando had a history of outpatient therapy; Mr. Orlando had a history of psychotropic medications; Mr. Orlando had a history of psychotropic hospitalization; Mr. Orlando had suffered a recent significant loss; and Mr. Orlando had a history of violent behavior.  (Allegheny County Jail Inmate Medical Survey Report at Exhibit "H" of Plaintiff's Appendix; Allegheny County Jail Inmate Medical Survey Report at Exhibit "I" of Plaintiff's Appendix).

21.     It is admitted the report reads as stated.  However, Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Denied.  Dr. D.W. Stechschulte, Jr., M.D., cleared Mr. Orlando to be transferred to general population sometime on March 29, 2016.  (Practitioner's Orders at Exhibit "J" of Plaintiff's Appendix; Medical Housing Classification at Exhibit "K" of Plaintiff's Appendix).

27.     Admitted.

28. Admitted.

29. It is admitted the report reads as stated. However, Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph.

30. Admitted.

31. Admitted.

32. Admitted.

33. Admitted. By way of further response, members of the Millvale Police Department immediately informed Defendant Marguerite Bonenberger, a corrections officer, that Mr. Orlando had stated that he wanted to hang himself. (Exhibit D). Thereafter, various corrections officers, including Defendants, Corrections Officer Bonenberger and Sergeant Andrew Haburjak, forcibly confined Mr. Orlando to a chair with wrist, waist and ankle restraints as a direct result of Mr. Orlando's threats to harm himself and/or others. (Exhibit A; Exhibit B; Exhibit C; Exhibit D; Exhibit E). Such threats included, but were not limited to, Mr. Orlando stating that he "just wanted to die" and that he "hopes he dies in here." (*Id*.; Exhibit F). While restrained, Mr. Orlando indicated to Ms. Corrado that he suffered from a history of mental health issues and that he was currently using various drugs, including, but not limited to, Klonopin, Xanax and Fentanyl. (Exhibit F). Furthermore, Mr. Orlando disclosed the following information to Ms. Latham during the intake process and as part of his inmate medical survey report: Mr. Orlando suffered from current mental health complaints; Mr. Orlando had a history of mental health problems; Mr. Orlando had a history of outpatient therapy; Mr. Orlando had a history of psychotropic medications; Mr. Orlando had a history of psychotropic hospitalization; Mr.

Orlando had suffered a recent significant loss; and Mr. Orlando had a history of violent behavior. (Exhibit H; Exhibit I).

34. Admitted.

35. Denied. Mr. Orlando threatened self-harm immediately upon his arrival to Allegheny County Jail ("ACJ"). (Exhibit A; Exhibit B; Exhibit C; Exhibit D; Exhibit E; Exhibit F). Such threats included, but were not limited to, Mr. Orlando stating that he "just wanted to die" and that he "hopes he dies in here." (*Id*.)

36. Paragraph 36 is merely a demonstrative aid created in support of Defendants' Motion for Summary Judgment. To the extent any response is appropriate, it is admitted that Paragraph 36 purports to set forth a timeline of events.

37. Admitted.

38. Admitted.

39. Admitted.

40. Admitted.

41. Admitted.

42. Admitted.

43. Admitted.

44. Admitted.

45. Admitted.

46. Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph. Therefore, the same are denied and strict proof thereof is demanded at the time of trial.

47. Admitted, to the extent that Paragraph 47 purports to state that a person who identified himself as Deputy Warden Simon Wainwright spoke to Mr. Orlando's mother, Plaintiff Jean Lawniczak, after his death.

48. Admitted.

49. Paragraph 49 presents a factual question which can only be answered by the trier of fact in this matter. To the extent any response is appropriate, Paragraph 49 is denied.

50. *See* Plaintiff's answer to Paragraph 49, above.

51. Admitted.

52. Admitted.

53. Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph. Therefore, the same are denied and strict proof thereof is demanded at the time of trial.

54. Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph. Therefore, the same are denied and strict proof thereof is demanded at the time of trial.

55. Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph. Therefore, the same are denied and strict proof thereof is demanded at the time of trial.

56. Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph. Therefore, the same are denied and strict proof thereof is demanded at the time of trial.

57. Admitted.

58. Denied as stated. Ms. Corrado testified that she felt that Mr. Orlando was "a harm to himself" and "suicidal" because of the responses Mr. Orlando provided to her while he was restrained. (Deposition of Tricia Corrado at Exhibit "L" of Plaintiff's Appendix ("Corrado"), p. 21:13-21; pp. 41:21-42:22). While restrained, Mr. Orlando screamed that he "hopes he dies in here" and "we are all gonna die." (Exhibit F). At that time, Mr. Orlando also indicated to Ms. Corrado that he suffered from a history of mental health issues and that he was currently using various drugs, including, but not limited to, Klonopin, Xanax and Fentanyl. (Exhibit F).

59. Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph. Therefore, the same are denied and strict proof thereof is demanded at the time of trial.

60. Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph. Therefore, the same are denied and strict proof thereof is demanded at the time of trial.

61. It is admitted that Ms. Corrado testified as stated.

62. It is admitted that Ms. Corrado testified as stated.

63. It is admitted that Ms. Corrado testified as stated.

64. Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph. Therefore, the same are denied and strict proof thereof is demanded at the time of trial.

65. To the extent that a response is appropriate, it is admitted that Defendants' Exhibit K contains the Incident Package Report.

66. Admitted.

67. Denied. Defendant Warden Orlando Harper testified that he discussed Mr. Orlando's condition with various ACJ intake personnel on or about March 26, 2016. (Deposition of Orlando Harper at Exhibit "T" of Plaintiff's Appendix ("Harper"), pp. 35:9-36:18).

67.[1] Admitted.

68. Denied as stated. At the time of Mr. Orlando's suicide, an inmate was only seen by a mental health specialist if he was referred to one by another member of ACJ's medical staff. (Deposition of Teresa Latham at Exhibit "M" of Plaintiff's Appendix ("Latham"), pp. 29:8-31:12; Latham Dep., pp. 45:19-46:14, 52:16-53:17).

69. Plaintiff is without knowledge or information sufficient to form an opinion as to the truth or falsity of the allegations set forth in this paragraph. Therefore, the same are denied and strict proof thereof is demanded at the time of trial.

70. Admitted in part and denied in part. It is admitted that ACJ's policy permits healthcare providers to determine whether an inmate is suicidal. The remainder of Paragraph 70 is denied, as the sentence is vague, confusing and indecipherable to the Plaintiff.

71. It is admitted that Warden Orlando Harper testified as stated. The veracity of that testimony is denied. (Newspaper Articles at Exhibit "W" of Plaintiff's Appendix).

## II. ADDITIONAL MATERIAL FACTS

For the most part, the following facts do not appear in Defendants' recitation of the factual record.

72. On March 24, 2016, John Orlando, a forty-year-old male, was arrested and transported to ACJ by members of the Millvale Police Department. (Exhibit D).

---

[1] Defendants' Concise Statement of Material Facts contains two (2) paragraphs numbered as 67.

8

73. Upon their arrival, the arresting officers immediately informed Corrections Officer Marguerite Bonenberger that Mr. Orlando had stated that he wanted to hang himself. (*Id.*)

74. Thereafter, various corrections officers, including Corrections Officer Bonenberger and Sergeant Andrew Haburjak, forcibly confined Mr. Orlando to a chair with wrist, waist and ankle restraints as a direct result of Mr. Orlando's threats to harm himself and/or others. (Exhibit A; Exhibit B; Exhibit C; Exhibit D; Exhibit E). Such threats included, but were not limited to, Mr. Orlando stating that he "just wanted to die" and that he "hopes he dies in here." (*Id.*; Exhibit F).

75. While Mr. Orlando was restrained, Sergeant Haburjak expressly acknowledged Mr. Orlando's need for a suicide gown. (Defendants' Exhibit C).

76. Defendant Deputy Wainwright testified that Mr. Orlando was confined to a restraint chair to prevent self-harm and/or suicide. (Deposition of Simon Wainwright at Exhibit "O" of Plaintiff's Appendix ("Wainwright"), p. 21:14-17; Defendants' Exhibit C). However, Warden Harper testified that Mr. Orlando was confined to a restraint chair because he was "threatening himself and others," not as a precaution against Mr. Orlando's suicide. (Harper, pp. 108:16-109:15).

77. As part of ACJ's intake process, Ms. Corrado interviewed Mr. Orlando while he was restrained. (Corrado Dep., pp. 9:2-11:18).

78. While restrained, Mr. Orlando disclosed to Ms. Corrado that he suffered from a history of mental health issues and that he was currently using various drugs, including, but not limited to, Klonopin, Xanax and Fentanyl. (Exhibit F). During the interview, Mr. Orlando screamed that he "hopes he dies in here" and "we are all gonna die." (*Id.*)

79. Ms. Corrado testified that she was unaware of Mr. Orlando's previous statements indicating a desire and/or plan for self-harm and/or suicide, despite their preservation in various ACJ reports. (Corrado, pp. 38:17-39:10; Exhibit B).

80. Ms. Corrado also testified that she felt that Mr. Orlando was "a harm to himself" and "suicidal" because of the responses Mr. Orlando provided to her while he was restrained.[2] (Corrado, pp. 21:13-21, 41:21-42:22).

81. Despite these qualms, Ms. Corrado medically cleared Mr. Orlando for admittance to ACJ, notwithstanding Mr. Orlando's responses to Ms. Corrado's inquiries.[3] (*Id.* at pp. 34:10-37:13).

82. Mr. Orlando was released from the restraint chair approximately eight (8) hours later, during the morning hours of March 25, 2016. (Exhibit E).

83. Mr. Orlando was not examined by a mental health specialist prior to his release from the restraint chair. (Wainwright, pp. 29:24-30:2).

84. Pursuant to ACJ policies and procedures, Mr. Orlando should not have been released from the restraint chair without the approval of a mental health specialist. (*Id.* at p. 22:4-18).

85. At the time of his release from the restraint chair, Mr. Orlando was experiencing symptoms associated with detoxification from various substances; he had informed members of the Millvale Police Department that he wanted to hang himself; he had become extremely agitated, emotionally distraught and violent during the initial intake process; and he had made threatening statements in the presence of numerous ACJ employees indicating that he wanted to

---

[2] Ms. Corrado was not provided with any formal training regarding ACJ's suicide prevention and intervention policy, despite its existence. (*Id.*, pp. 7:22-9:1).

[3] Ms. Latham testified that a potential inmate could be referred to an outside source for treatment prior to admission to ACJ and after the initial interview if "he was a threat to himself or someone else." (Latham, p. 7:5-8:10). This testimony contradicts Ms. Corrado's assertion that an inmate could not be refused admission to ACJ as a result of his mental health status. (Corrado, pp. 10:13-11:11, pp.23:23-24:21).

harm and/or kill himself, all of which are recognized by ACJ as factors indicating the increased risk for self-harm and/or suicide. (*Id*. at pp. 23:11- 25, 46:11-24, 51:3-9; Harper, pp. 100:14-108:7; Suicide Prevention and Intervention Policy at Exhibit "P" of Plaintiff's Appendix).

86. Despite presenting several acknowledged risk factors indicating the potential for self-harm and/or suicide, Mr. Orlando was not placed in a suicide gown upon his release from the restraint chair.[4] (Wainwright, p. 36:21-24).

87. Deputy Wainwright admitted that Mr. Orlando should have been placed in a suicide gown as a preventative measure, pursuant to ACJ's policies and procedures. (Wainwright, p. 61:8-13; Exhibit P).

88. Thereafter, Mr. Orlando continued to be processed as an inmate.[5] During his formal admission to ACJ, Mr. Orlando responded "yes" to the following booking questions:

- Do you have a serious medical condition that may require attention while you are here?

- Do you have a serious mental health condition that may require attention while you are here?

- Have you ever attempted suicide?

- Have you ever experienced serious withdrawal symptoms from alcohol or drugs?

- Have you recently taken or been prescribed medication for emotional problems?

(Booking Observation Report at Exhibit "N" of Plaintiff's Appendix).

---

[4] A "suicide gown" is a thick, inflexible smock made from quilted cloth. (Wainwright, pp. 17:20-18:22).

[5] Although Ms. Corrado cleared Mr. Orlando for segregation, Mr. Orlando was not placed in a segregated housing unit during the remainder of his time in processing. (Exhibit F; Harper, pp. 116:21-120:24).

11

89. Mr. Orlando was interviewed by Ms. Latham on March 26, 2016, over twenty-four (24) hours after his arrival at ACJ. (Latham, p. 12:14-22).

90. Although Ms. Latham had access to Mr. Orlando's records, Ms. Latham did not access them prior to her interview with Mr. Orlando on March 26, 2018. (*Id*. at pp. 12:23-16:8). Those records included Mr. Orlando's previous statements indicating a desire and/or plan for self-harm and/or suicide. (*Id*.)

90. Ms. Latham had the authority to place Mr. Orlando on suicide precautions, but she failed to do so.[6] (*Id*., p. 17:3-12).

91. Ms. Latham explained that she did not place Mr. Orlando on suicide precautions because he did not disclose any "suicidal ideations" during their interview, nor did he disclose any past suicide attempts.[7] (*Id*. at p. 17:10-16).

92. Mr. Orlando disclosed the following information to Ms. Latham as part of his inmate medical survey report: Mr. Orlando suffered from current mental health complaints; Mr. Orlando had a history of mental health problems; Mr. Orlando had a history of outpatient therapy; Mr. Orlando had a history of psychotropic medications; Mr. Orlando had a history of psychotropic hospitalization; Mr. Orlando had suffered a recent significant loss; and Mr. Orlando had a history of violent behavior. (Exhibit H; Exhibit I).

93. Ms. Latham testified that she was unaware of Mr. Orlando's previous statements indicating a desire and/or plan for self-harm and/or suicide; that she was unaware of Mr. Orlando's disclosure of extensive mental health issues that included a prior suicide attempt; and

---

[6] Ms. Latham testified that she was not familiar with ACJ's suicide prevention and intervention policy. (*Id*. at pp. 8:11-16). In fact, Ms. Latham could not say with any degree of certainty that ACJ's suicide prevention and intervention policy even existed. (*Id*.)

[7] However, Ms. Latham also testified that she felt that Mr. Orlando may have been withholding information during the interview process. (*Id*. at p. 12:6-13, p. 17:17-19).

that she was unaware that Mr. Orlando had been confined to a restraint chair. (Latham, pp. 19:6-20:16; pp. 38:12-42:5).

94. Pursuant to ACJ policies and procedures, Ms. Latham should have been informed as to Mr. Orlando's prior statements, disclosures and confinement through a shift-to-shift report. (*Id.* at pp. 20:17-22:2, 44:5-47:19; Harper, pp. 41:20-41:3, pp. 77:9-79:9).

95. Ms. Latham referred Mr. Orlando to a mental health specialist at the conclusion of his interview. (Latham, pp. 28:11-31:16; Exhibit H; Exhibit I; Mental Health Referral at Exhibit "Q" of Plaintiff's Appendix). At that time, Ms. Latham also prescribed detox medications to Mr. Orlando.[8] (Latham, pp. 28:11-33:3; Exhibit H; Exhibit I; Jail Healthcare Services Practitioner's Order at Exhibit "R" of Plaintiff's Appendix).

96. Mr. Orlando was not placed on suicide precautions prior to, or upon referral to a mental health specialist. (Latham, p. 34:10-14).

97. Pursuant to ACJ policies and procedures, and as a result of Ms. Latham's referral, Mr. Orlando should have been evaluated by a mental health specialist prior to his assignment to any housing pod.[9] (Latham, p. 29:8-29:12).

98. Aside from a specialist's acknowledgment of receipt of the referral, the record is devoid of any documents evidencing that Mr. Orlando was actually evaluated by a psychiatrist, pursuant to ACJ's policies and procedures. (Exhibit Q; Latham, pp. 36:22-38:3, 51:16-53:15; Harper, pp. 90:23-96:13; Exhibit P).

---

[8] As described hereinbefore above, symptoms of detoxification are recognized by ACJ as a factor that increases the risk of inmate suicide. (Wainwright, pp. 46:11-24, 67:8-14).

[9] At the time of this incident, ACJ's policy was to treat every mental health referral as "urgent." (Latham, p. 36:121).

13

99. Shortly thereafter, Mr. Orlando was "cleared to population" by Ruth Harrison, a mental health specialist. (Exhibit Q). However, there is no record evidence as to why Mr. Orlando was "cleared to population." (*Id*.)

100. Mr. Orlando was not placed on suicide precautions at the time of his clearance. (Latham, p. 37:9-21).

101. Mr. Orlando was then assigned to housing pod 5-F. (Wainwright, pp. 37:14-23, 73:11-74:7). Pod 5-F is a mental health unit. (*Id*., Defendant's Answers to Plaintiff's First Set of Interrogatories, Responses to Requests for Production of Documents, Request for Admission and Request for Inspection at Exhibit "S" of Plaintiff's Appendix, Request for Production Nos. 15, 16).

102. Although Pod 5-F is a mental health unit, it is not an acute mental health unit, nor are inmates on 5-F on "suicide watch." (Exhibit S, Request for Production Nos. 15, 16 and Request for Admission No. 4; Wainwright, p. 100:5-9).

103. Inmates housed on 5-F, including Mr. Orlando, are "double-celled," meaning that they are assigned a cellmate. (Wainwright, p. 98:8-19, 104:11-105:2). Inmates are double-celled as a precaution against self-harm. (*Id*.)

104. Pursuant to ACJ policies and procedures, guards on 5-F are to required make their rounds every fifteen (15) minutes. (Wainwright, p. 105:15-25).

105. Mr. Orlando was evaluated by Charlotte Wright ("Wright"), sometime between March 24, 2016, and March 26, 2016. (Incident Report at Exhibit "U" of Plaintiff's Appendix).

106. Ms. Wright evaluated Mr. Orlando in her capacity as a diversion specialist for Justice Related Services ("JRS"). (*Id*.) As a result of Ms. Wright's evaluation, Mr. Orlando was referred to JRS. (*Id*.)

107. JRS is an external agency that provides services, including outside housing, to individuals suffering from mental health issues. (Wainwright, pp. 34:8-35:8, 90:7-97:23).

108. Despite Mr. Orlando's accepted referral to JRS, Mr. Orlando was processed and admitted to ACJ as an inmate without being placed on suicide precautions. (Exhibit U).

109. On March 29, 2016, Dr. D.W. Stechschulte, Jr., M.D., discontinued Mr. Orlando's detoxification treatment and cleared him to be transferred to general population.[10] (Exhibit J; Exhibit K).

110. On that same date, but prior to Mr. Orlando's transfer, Mr. Orlando's cellmate was released and/or removed from their shared cell. (Wainwright, 98:8-99:3; Harper, pp. 14:18-24, 54:9-22).

111. On March 29, 2016, at approximately 1:30 pm, Mr. Orlando hanged himself while he was alone in his cell.[11] (Defendants' Exhibit K).

112. Mr. Orlando was not on suicide precautions at the time of his hanging. (Wainwright, p. 30:3-6, 100:5-9). Mr. Orlando was not provided with a suicide gown, nor was his cell equipped with an observation bed, a safety blanket or a safety mattress. (*Id*. at pp. 35:9-37:23; Harper, pp. 107:19-108:7).

113. Mr. Orlando was transported to the hospital for emergency medical care. He was admitted to the intensive care unit and later died from his injuries on March 30, 2018. (Defendants' Exhibit K).

---

[10] As described hereinbefore above, symptoms of detoxification are recognized by ACJ as a factor that increases the risk of inmate suicide. (Wainwright, pp. 46:11-24, 67:8-14).

[11] ACJ's policies and procedures relating to double-celled inmates were changed after Mr. Orlando's suicide to prevent an inmate from being left alone and unsupervised when his or her cellmate was removed and/or released. (Harper, pp. 53:7-55:6).

114. Deputy Wainwright spoke to Mr. Orlando's mother, Jean Lawniczak, on or about March 31, 2016.[12] (Deposition of Jean Lawniczak at Exhibit "U" of Plaintiff's Appendix ("Lawniczak"), p. 37:9-38:11).

115. During that conversation, Deputy Wainwright extended his condolences to Ms. Lawniczak and explained that ACJ did not have enough "manpower" to adequately monitor the inmates on 5-F. (*Id*.)

116. Prior to Mr. Orlando's suicide, Warden Harper received complaints from "a couple" corrections officers indicating that staffing levels at ACJ were inadequate. (Harper, pp. 50:10-25). Warden Harper found these complaints to be invalid and did not take any action to increase staff at ACJ. (*Id*. at p. 52:10:24).

117. Deputy Warden Wainwright testified that ACJ "may need to reevaluate the way that [it] handles mental health people." (Wainwright pp. 58:4-59:20). Deputy Warden Wainwright further testified that the treatment of such inmates could be qualified as "inadequate." (*Id*.)

118. Warden Harper testified that he was unaware if ACJ's intake staff are properly trained in suicide prevention. (Harper, p. 68:1-13).

---

[12] Ms. Lawniczak spoke with her son approximately four (4) times throughout the course of his incarceration at ACJ. (*Id*. at pp. 30:3-31:3). During those conversations, Mr. Orlando disclosed to Ms. Lawniczak a desire and/or plan for self-harm and/or suicide. (*Id*.) On one occasion, he stated that he "couldn't take it in here" and that he was "not going to make it in here." (*Id*).

Respectfully submitted,

LAW OFFICES OF JOEL SANSONE

s/ Joel S. Sansone
Joel S. Sansone, Esquire
PA ID No. 41008
Massimo A. Terzigni, Esquire
PA ID No. 317165
Elizabeth A. Tuttle, Esquire
PA ID No. 322888
*Counsel for Plaintiff*

Two Gateway Center, Suite 1290
603 Stanwix Street
Pittsburgh, Pennsylvania 15222
412.281.9194

Dated: September 26, 2018