# EXHIBIT L



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - -

JEAN LAWNICZAK, as Personal           )
Representative of the ESTATE          )
OF JOHN ORLANDO, Deceased,            )
                                      )
        Plaintiff,                    ) Civil
                                      ) Action No.:
        -vs-                          ) 2:17-cv-001
                                      ) 85
ALLEGHENY COUNTY, et al.,             )
                                      )
        Defendants.                   )

- - - -

DEPOSITION OF: TRICIA CORRADO

- - - -

DATE:    May 25, 2018
         Friday, 2:24 p.m.

LOCATION:   LAW OFFICES OF JOEL SANSONE
            Two Gateway Center
            603 Stanwix Street
            Suite 1290
            Pittsburgh, PA  15222

TAKEN BY:   Plaintiff

REPORTED BY:   Beth E. Welsh
               Notary Public
               QCR Reference No. BW2908

**Page 2**

DEPOSITION OF TRICIA CORRADO,
a witness, called by the Plaintiff for examination,
in accordance with the Federal Rules of Civil
Procedure, taken by and before Beth E. Welsh, a Court
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania, at the offices of
LAW OFFICES OF JOEL SANSONE, Two Gateway Center,
603 Stanwix Street, Suite 1290, Pittsburgh,
Pennsylvania, on Friday, May 25, 2018, commencing at
2:24 p.m.

- - - -

APPEARANCES:

  FOR THE PLAINTIFF:

Massimo A. Terzigni, Esquire
terzignim@gmail.com
LAW OFFICES OF JOEL SANSONE
Two Gateway Center
603 Stanwix Street
Suite 1290
Pittsburgh, PA  15222
412.281.9194

  FOR THE DEFENDANTS:

John A. Bacharach, Esquire
john.bacharach@alleghenycounty.us
Allegheny County Law Department
300 Fort Pitt Commons Building
445 Fort Pitt Boulevard
Pittsburgh, PA  15219
412.350.1150

**Page 3**

*INDEX*

Examination by Mr. Terzigni . . . . . . . . . .  4
Examination by Mr. Bacharach . . . . . . . . .  51
Re-Examination by Mr. Terzigni . . . . . . . .  54

Certificate of Court Reporter . . . . . . . . .  60
Errata Sheet . . . . . . . . . . . . . . . . .  61
Notice of Non-Waiver of Signature . . . . . . .  62

* INDEX OF EXHIBITS *

Deposition Exhibit 1 . . . . . . . . . . . . .  29
Deposition Exhibit 2 . . . . . . . . . . . . .  33
Deposition Exhibit 3 . . . . . . . . . . . . .  40

**Page 4**

TRICIA CORRADO,

having been duly sworn,

was examined and testified as follows:

- - - -

EXAMINATION

- - - -

BY MR. TERZIGNI:

Q.   Is it Ms. Corrado?

A.   Yes.

Q.   Have you ever been deposed before?

A.   Once.

Q.   So you know how these things go?

A.   Generally, yeah.

Q.   Okay.  I just ask that you wait until I finish
     asking the question before you start to answer.

A.   Okay.

Q.   And if you need a break at any time, just let me
     know.  If there's a question pending, I'll
     probably ask you to answer the question before
     we take the break.

A.   Okay.

Q.   Did you review anything in preparation of this
     deposition?

A.   I no longer work at the jail, no.

Q.   Any documentation, reports, the Complaint in the

5

1　case?
2　A.　Well, I got the Subpoena.
3　Q.　Okay. But you didn't review any -- maybe a
4　　　report that you did in the case?
5　A.　Oh, this (indicating), yes.
6　Q.　You reviewed that report?
7　A.　Yes.
8　Q.　Okay. You just testified that you no longer
9　　　work for ACJ; correct?
10　A.　Correct.
11　Q.　When were you hired at ACJ?
12　A.　November of 2015, but I don't remember the exact
13　　　date.
14　Q.　Now, were you employed by Corizon before?
15　A.　No.
16　Q.　So you were hired in November of 2015; correct?
17　A.　Correct.
18　Q.　When did you leave Allegheny County Jail?
19　A.　I left April of 2017.
20　Q.　Did you leave voluntarily?
21　A.　Yes.
22　Q.　Why did you leave?
23　A.　I went to an agency. I had control over my
24　　　schedule.
25　Q.　Where did you work prior to working at ACJ?

6

1　A.　Canonsburg General Hospital in the ICU.
2　Q.　How long did you work at Canonsburg General
3　　　Hospital?
4　A.　Not long. I don't think it was a full year.
5　Q.　That's fine, I don't need the exact dates.
6　A.　Less than a year. They were calling me off all
7　　　the time.
8　Q.　Where did you work before Canonsburg?
9　A.　Jefferson Hospital ER.
10　Q.　How long did you work at Jefferson Hospital?
11　A.　Seven years.
12　Q.　Were you in the ER the entire seven years?
13　A.　For the last two and then the first five I was
14　　　upstairs on the floors.
15　Q.　Where did you go to school?
16　A.　CCAC South.
17　Q.　Was that both for undergrad and nursing?
18　A.　Yes.
19　Q.　Did you get any specialized certificates after
20　　　graduating a nursing degree?
21　A.　Well, just my -- I had a PALS and an ACLS and a
22　　　BLS.
23　Q.　Any other graduate degree?
24　A.　No.
25　Q.　When did you graduated from CCAC?

7

1　A.　1999.
2　Q.　Was Allegheny County Jail the first jail that
3　　　you worked at?
4　A.　Yes.
5　Q.　Who was your supervisor?
6　A.　Molike Green.
7　Q.　What was Molike Green's title?
8　A.　He's an RN. He was the DON there.
9　Q.　What does DON stand for?
10　A.　Oh, director of nursing.
11　Q.　What was your title at ACJ?
12　A.　I was an RN.
13　Q.　Just a nurse?
14　A.　Yeah. Well, at this time. In May I became
15　　　assistant director of nursing.
16　Q.　Okay. And when you say at this time?
17　A.　At the time of this.
18　Q.　Of the incident here?
19　A.　Yeah.
20　Q.　March 2016?
21　A.　Correct.
22　Q.　Were you trained in suicide prevention at ACJ?
23　A.　Well, I mean I know that if they said they were
24　　　going to -- if they made comments that they were
25　　　going to harm themselves, they were to be put in

8

1　　　a suicide gown.
2　Q.　Was there any other training?
3　A.　I was part of no formal class or orientation of
4　　　just suicide.
5　Q.　Are you familiar with Allegheny County Jail's
6　　　suicide prevention policy?
7　A.　Are you referring to like the steps that they
8　　　take?
9　Q.　They have an actual written policy and they did
10　　　have one at the time in March of 2016. I'm
11　　　asking if you're familiar with that policy?
12　A.　I don't recall it.
13　Q.　I believe you testified to this, but you did not
14　　　receive any formal training regarding that
15　　　policy; correct?
16　A.　Correct.
17　Q.　Were you trained regarding warning signs of
18　　　suicide?
19　A.　No.
20　Q.　Were you trained in risks of alcohol or drug
21　　　withdraw?
22　A.　Just what I know from nursing, but not by
23　　　Allegheny County Jail.
24　Q.　Did you receive any specialized training from
25　　　Allegheny County Jail?

1  A.  No.

2  Q.  While you were employed at ACJ, and I'll talk

3      specifically March 2016, were you responsible

4      for inmate intake?

5  A.  Well, yes.

6  Q.  You said well, yes.  Was that your primary

7      function?

8  A.  If I was assigned to intake on that shift, then,

9      yes, I was to ask the questions.

10  Q.  Do you recall that process, the intake process

11      at the Allegheny County Jail?

12  A.  Yes.

13  Q.  I'm referring just to your role in that process

14      as a nurse, okay?

15  A.  Okay.

16  Q.  Can you walk me through that process that you

17      would go through when an inmate would come in,

18      what your role would be?

19  A.  I would receive a phone call from one of the COs

20      in the front saying there was one at the door,

21      which would tell me that a new person has

22      arrived.  So I would go out with my clipboard

23      and we had a series of questions to ask, have

24      you ever been in jail before, are you pregnant,

25      are you detoxing from any drugs or alcohol, do

1      you feel like you want to harm yourself or

2      others, are you on any medications, what medical

3      disorders do you have, and then we were supposed

4      to observe them for any visible wounds.

5  Q.  The questions that you just listed, was that the

6      extent of the questioning?

7  A.  Yes.

8  Q.  You also said you would observe them for visible

9      wounds; correct?

10  A.  Yes.

11  Q.  Was there any other physical examination?

12  A.  No.

13  Q.  When an inmate would answer one of those

14      questions in the affirmative, what response, if

15      any, would you have?

16  A.  If it was a pregnant female and they said yes to

17      detoxing, they had to go to West Penn Hospital.

18      If it was suicide, then the COs took them in the

19      showers and put them in a suicide gown.

20  Q.  If an inmate answered the question -- I'm sorry,

21      what was the question regarding suicide that you

22      would ask?

23  A.  Do you feel like you want to harm yourself or

24      others?

25  Q.  So if an inmate answers that question yes, would

1      you then refer that inmate to somebody else?

2  A.  Not at that time because they -- they weren't

3      fully -- I don't know the wording, then weren't

4      fully ours yet, we just had to keep them safe.

5      The way I understood it we couldn't really treat

6      them because the judge might see them and

7      release them.  They weren't arraigned yet.

8  Q.  Okay.  So there is no response in that situation

9      until the inmate is arraigned?

10  A.  Correct.  I mean other than to put them in a

11      suicide gown and keep them visible, yeah.

12  Q.  That was my question.  Who would you talk to to

13      have an inmate placed in a suicide gown?

14  A.  The COs are standing right there and the minute

15      he or she says yes to that question, the COs

16      take it from there.

17  Q.  Okay.  So do you have to say anything to the

18      COs?

19  A.  I do not.

20  Q.  When a new inmate is coming in, are you usually

21      there at the door before that inmate gets there?

22  A.  No.

23  Q.  Okay.  Do you recall an incident occurring with

24      Mr. John Orlando in March of 2016?

25  A.  I do remember him.

1  Q.  What do you remember of him?

2  A.  I remember checking his restraint straps, I

3      remember him -- he was upset.  I believe he said

4      that he actually wanted all of us to actually

5      come to harm.

6  Q.  Do you recall the specific statement?

7  A.  I probably wrote it down if I can look at this.

8  Q.  We're going to talk about that.

9  A.  Okay.  I believe he said I hope you all die in

10      here.

11  Q.  When you hear a statement like that, is that an

12      indication of a possible suicide risk?

13  A.  I mean, I -- yes.

14  Q.  Do you recall anything else about Mr. Orlando

15      that day?

16  A.  Not really.  I just checked the straps.

17  Q.  That's it?

18  A.  Yes.

19  Q.  That day, and the day I'm referring to is

20      March 24th, 2016 --

21  A.  Okay.

22  Q.  -- is the day Mr. Orlando arrived at Allegheny

23      County Jail.

24  A.  I believe so, yes.

25  Q.  When you first saw Mr. Orlando was he already in

13

1 the restraint chair?
2 A. Yes.
3 Q. Did you see Mr. Orlando being placed in the
4 chair at all?
5 A. No.
6 Q. You mentioned that you checked the straps on the
7 restraint chair.
8 A. Yes.
9 Q. Is that in accordance with a certain policy the
10 jail had?
11 A. Yes, they just like us to make sure we can get
12 fingers under there.
13 Q. And that has to be performed by medical
14 personnel?
15 A. Yes.
16 Q. You checked Mr. Orlando's straps, was there any
17 problems with the straps?
18 A. No.
19 Q. Did you go through the intake procedure with
20 Mr. Orlando?
21 A. Yes.
22 Q. Was that while Mr. Orlando was in the restraint
23 chair?
24 A. Yes.
25      MR. BACHARACH: This was the questions

14

1 that you mentioned earlier; right?
2      THE WITNESS: Yes.
3 BY MR. TERZIGNI:
4 Q. Did you ask Mr. Orlando all of those questions?
5 A. Yes. I don't think he answered the medical
6 problem question, if I remember correctly.
7 Q. I'm sorry, you mentioned the medical problem
8 question?
9 A. Yeah, the last question is do you have any
10 medical issues.
11 Q. And you're saying he did not respond to that
12 question?
13 A. I don't recall him answering that question.
14 Q. Did he respond to the question -- I'm sorry, can
15 you repeat again the suicide one, do you feel --
16 A. Do you feel like you want to harm yourself or
17 others?
18 Q. Did he answer that question?
19 A. Yes.
20 Q. What did he say?
21 A. He said something along the line that he hoped
22 we all died in there.
23 Q. Did he say anything about himself, that he hoped
24 he died in there?
25 A. No, I don't think he said specifically himself,

15

1 but he said we all, so.
2 Q. You took that to include himself?
3 A. Yes.
4 Q. Did you ask him a question regarding detoxing
5 from drugs or alcohol?
6 A. Yes. I believe he said Benzos, like Klonopin or
7 Xanax.
8 Q. What medical risks are created by withdrawing
9 from Benzos. Just so the record's clear, that's
10 Benzodiazepines?
11 A. Yes.
12 Q. Okay.
13 A. Well, you're going to feel sick, you're probably
14 going to throw up, get sweaty, agitated, mad,
15 possibly you could have a seizure.
16 Q. Was there anything else that stuck out to you
17 during that intake process with Mr. Orlando?
18 A. No.
19 Q. Besides the already eventful situation?
20 A. Correct, yes.
21 Q. As the medical intake person, did you have the
22 ability to place somebody on suicide watch?
23 A. If they said yes to that question, like I said,
24 the COs would take them and put them in a
25 suicide gown and then they would put them in the

16

1 front cell to be observed. So, I mean, in the
2 intake department I mean it was done.
3 Everything that could be done was done. Are you
4 saying like if an inmate came up to me and said
5 I feel like I want to harm myself?
6 Q. I'm saying in just that intake process, a new
7 inmate comes in and maybe answers a few of the
8 questions in a suspicious manner or something,
9 but something that would give you cause to think
10 that they were potentially at risk for suicide,
11 did you have the authority to place that person
12 in suicide watch?
13      MR. BACHARACH: I'm going to object to
14 the form of the question. You can answer it if
15 you understand it.
16 BY MR. TERZIGNI:
17 Q. Do you understand the question?
18 A. Well, I mean if they answered the question --
19 are you saying if they're a little vague?
20 Q. At the conclusion of the intake process did you
21 have the authority to recommend somebody be
22 placed in suicide watch?
23 A. They would have to indicate that they wanted to
24 harm themselves.
25 Q. Okay.

17

1 A. They would have to indicate. I couldn't just
2 randomly point out someone and say I want that
3 person in there.
4 Q. I hope that wouldn't happen, but if there was
5 somebody that said I want to harm myself and,
6 you know, maybe got the suicide gown, would you
7 have the authority to recommend that person be
8 placed in suicide watch?
9 MR. BACHARACH: I'm going to object to
10 the form. I think the problem is you're
11 referring to suicide watch, and I don't know
12 exactly what that means. I think she said if
13 somebody threatens suicide they explained what
14 would occur at her level at that time.
15 BY MR. TERZIGNI:
16 Q. I am reading Section 13 of Allegheny County
17 Bureau of Corrections Suicide Behavior Detection
18 and Prevention Policy. This section is titled
19 Suicide Watch and Suicide Precaution, Section
20 13A, a physician qualified mental health
21 professional may place an inmate on close
22 observation or suicide precaution. The
23 referring provider shall consult with the
24 on-call psychiatrist, physician or mental health
25 practitioner, physician assistant within one

18

1 hour of taking this action and the psychiatrist
2 or mental health practitioner or physician
3 assistant shall conduct a face-to-face interview
4 with the inmate within twenty-four hours.
5 So my question is did you have the
6 authority to recommend an inmate on suicide
7 watch or suicide precaution?
8 A. Not as I understand that. I didn't have a
9 physician -- not as I understand what you just
10 read.
11 Q. Did you have the authority to place an inmate in
12 any type of different housing --
13 A. Oh, no.
14 Q. Okay.
15 A. No. I'm sorry. That actually got through to
16 me. No, I did not have authority to put him in
17 any kind of different housing.
18 Q. After Mr. Orlando's intake did you recommend
19 that he be placed on suicide precautions?
20 A. He was already in the chair, which means he was
21 put in a front cell. He was already on suicide
22 precautions at that time because that's -- if
23 they can't get you in a suicide gown -- let's
24 say you go to jail and you say something and you
25 refuse to go in a gown, then you go in a chair.

19

1 He was already on the precautions.
2 Q. Do you know if they attempted to put him in a
3 gown?
4 A. I do not. I wasn't out there. He was already
5 in the --
6 MR. BACHARACH: You meant already in
7 the chair; right?
8 THE WITNESS: Yeah. What did I say?
9 MR. BACHARACH: You just said already
10 in the --
11 THE WITNESS: Oh, okay. In the chair.
12 I'm sorry.
13 BY MR. TERZIGNI:
14 Q. I imagine that an inmate could stay in a gown
15 longer than he could stay in a restraint chair;
16 correct?
17 A. Yes.
18 Q. Do you know how long an inmate can stay in a
19 restraint chair?
20 A. I don't recall the exact amount. I know at a
21 certain point they call a captain down, but I
22 can't tell you the exact hour.
23 Q. Do you know if it's longer than twenty-four
24 hours?
25 A. Longer than twenty-four? I doubt it.

20

1 Q. I hope it isn't.
2 A. I doubt it.
3 Q. Do you know if it's longer than eight hours?
4 A. I can tell you that I've never seen anyone stay
5 in a chair eight hours.
6 Q. What's the longest you've ever seen somebody
7 stay in a chair?
8 A. Usually a couple hours.
9 Q. Now, in Mr. Orlando's situation after he was
10 removed from the chair, should he have been
11 placed in a suicide gown based on those
12 questions?
13 A. I mean, I wasn't there when he was removed from
14 the chair. I don't know if somebody asked him
15 the questions again and what he answered at that
16 point, I don't know. I don't know.
17 Q. Let's even say if it was eight hours later that
18 Mr. Orlando was released from the restraint
19 chair, would his responses to your questions
20 earlier still put him at risk or at least
21 indicate that he may be at risk for suicide?
22 MR. BACHARACH: I'm going to object to
23 the form of the question. I think it's
24 hypothetical, but you can answer if you can,
25 it's up to you, if you understand it.

21

```
1   BY MR. TERZIGNI:
2   A.   I think it's a matter of -- it's a matter of
3        judgment.  I don't know how he was when he came
4        out of the restraint chair, I don't know.  I
5        don't know how he was when he came out of the
6        restraint chair.  I've seen people come in livid
7        and saying things and then turn around and be
8        perfectly fine.  I don't know.  I honestly don't
9        know.  I wasn't there when he came out.  I don't
10       even know how long he was in the chair.
11  Q.   His responses to those questions --
12  A.   To my questions?
13  Q.   To your questions, would you say that his
14       response to the question do you feel as if
15       you're a harm to yourself or others, do I have
16       that right?
17  A.   Yes.  I mean when he answered my questions, yes,
18       I felt he was a harm to himself.
19  Q.   When he answered that question he gave, is it
20       fair to say, a strong response to that question?
21  A.   Yes.
22  Q.   Would that response alone warrant him to be kept
23       a close eye on medically?
24            MR. BACHARACH:  I object to the form.
25       At what point in time?
```

22

```
1            MR. TERZIGNI:  During his
2        incarceration.
3            MR. BACHARACH:  During his entire
4        incarceration?
5            MR. TERZIGNI:  Yes.
6            MR. BACHARACH:  She can answer.  I
7        think it's beyond her -- she can answer without
8        speculating.
9   BY MR. TERZIGNI:
10  Q.   In your professional opinion?
11  A.   I --
12            MR. BACHARACH:  Go ahead.  You can
13       answer.
14            MR. TERZIGNI:  She can answer.
15            MR. BACHARACH:  I, again, object to
16       that.
17  BY MR. TERZIGNI:
18  A.   I mean he went -- I have to assume at some point
19       he was interviewed and someone -- yes.
20  Q.   Did you have the ability based on the intake
21       process to recommend an inmate to a mental
22       health physician?
23  A.   No.
24  Q.   Are there mental health nurses or physicians
25       employed by Allegheny County Jail?
```

23

```
1   A.   Yes.
2   Q.   Did you work with those people during the course
3        of your employment?
4   A.   Yes.
5   Q.   In what capacity?
6   A.   If I was working upstairs.
7   Q.   What does that mean?
8   A.   Like on the floors, not in intake.  If I was
9        stationed in the medical housing unit, I would
10       see them then.
11  Q.   I'm sorry, did you say the medical housing unit?
12  A.   The infirmary.
13  Q.   But as far as intake goes, you wouldn't be able
14       to refer an inmate to a mental health nurse or
15       physician?
16  A.   No.
17  Q.   Do you know whose responsibility that was?
18  A.   You get referred to the better health
19       specialist.  Once you get into the back and you
20       answer all your three-page questions and then
21       you see the mental health specialist who
22       evaluates you and then it proceeds from there.
23  Q.   Did you clear Mr. Orlando medically?
24  A.   Well, yes.
25  Q.   Why did you clear him medically?
```

24

```
1   A.   Because I had no -- I had no medical reason at
2        that point to refuse him.
3   Q.   What does that mean to refuse him?
4   A.   He didn't have a head wound, he didn't complain
5        of chest pain, he didn't have any bites, he
6        didn't have marks on him, there was no medical
7        reason to refuse him.
8   Q.   And you mean physical medical reason to refuse
9        him?
10  A.   Correct.
11  Q.   What do you mean by refuse him?
12  A.   Meaning I would say that we can't accept this
13       inmate, you have to take him to a hospital.
14  Q.   Okay.  Did you ever refuse an inmate for mental
15       health concerns?
16  A.   No.
17  Q.   Did you have the ability to refuse an inmate for
18       mental health concerns?
19  A.   No.
20  Q.   Do you know why that is?
21  A.   Because -- actually, no.
22  Q.   Would you say that Mr. Orlando was in severe
23       mental distress when he was in the intake
24       process?
25  A.   He was angry, so yes.
```

25

1  Q.  When you're interviewing an inmate, do you have

2      the ability to look at their medical history at

3      all?

4  A.  No.

5  Q.  So all of the information you receive in the

6      intake process is from firsthand interaction

7      with the inmate?

8  A.  Yes.

9  Q.  Did you hear from either a coworker or

10     Mr. Orlando himself, a comment that he wanted to

11     hang himself?

12  A.  No.

13  Q.  Were you working on March 29th, 2016, the day

14     Mr. Orlando hung himself?

15  A.  I honestly don't know.

16  Q.  Do you recall if you responded to that incident?

17  A.  No.  I would remember if I had responded to the

18     incident.

19  Q.  In your employment at ACJ did you ever have to

20     respond to a hanging?

21  A.  No.

22  Q.  Do you recall answering some questions that we

23     sent to Mr. Bacharach --

24  A.  Yes.

25  Q.  -- that I believe he passed on to you?

26

1  A.  Yes.

2  Q.  There were a few written questions.  I'm going

3     to go to question Number 2.  Please identify

4     whether you came into contact with, spoke with

5     and/or heard the plaintiff's decedent, John

6     Orlando, on March 24th, 2016 at the Allegheny

7     County Jail.  If the answer is yes, please

8     describe your interaction with Mr. Orlando in

9     detail.

10        You responded I believe I asked him intake

11     questions at the door upon his arrival.

12        In question 4 you answered and it was the

13     question regarding Mr. Orlando's statement that

14     he wanted to harm himself, but you responded

15     Mr. Orlando was placed into a restraint chair by

16     correctional staff prior to my interaction with

17     him.

18        I just wanted to clarify between the

19     responses of those two questions, okay.  So the

20     first one was I believe I asked him intake

21     questions when he arrived at the door.

22  A.  I see where you're --

23  Q.  And then the other one is you asked him -- or

24     you came into contact with him after he was in

25     the restraint chair.

27

1  A.  I see where you're going.  I should have been

2     more specific.  When I say at the door --

3     because there's a little sally port area.

4  Q.  Okay.

5  A.  That's where the police bring him in.  I am not

6     allowed in there.  And then when they call me

7     and say there's a person at the door, the person

8     is already here out of that sally port.

9  Q.  Okay.

10  A.  So they call this at the door.

11  Q.  Okay.

12  A.  I was not in the sally port when he was first

13     brought in because they don't let medical staff

14     in there.

15  Q.  My interpretation of your response was that you

16     were there prior to him being placed n the

17     restraint chair.

18  A.  No, that is not at all how it was.  I used a

19     term that if I was talking to another nune in

20     the jail, they would have known what I meant,

21     and I shouldn't have done that.

22  Q.  That's fine, just for my clarification I want to

23     know if it was two separate instances or just,

24     you know, all the same?

25  A.  It was all the same.

28

1  Q.  Okay.  So you didn't come into contact with

2     Mr. Orlando until he was already in the

3     restraint chair?

4  A.  Correct.

5  Q.  And I believe you testified that he was already

6     fully placed in the chair by the time you came

7     in contact with him?

8  A.  Yes.

9  Q.  In question 5 we asked if you had any other

10     interactions with Mr. Orlando during his

11     incarceration from March 24th to March 29th,

12     2016.  You answered that you didn't recall

13     having any interactions with him.

14  A.  No, I really don't think that I did.

15  Q.  Okay.  In question 6 we ask if you were ever

16     questioned as part of an investigation into this

17     incident about Mr. Orlando, and you answered you

18     don't recall.

19  A.  I don't recall being questioned by or spoken to

20     by anybody.

21  Q.  I'm going to ask you to give that piece of paper

22     to Mr. Bacharach just so we don't get confused

23     here or so I don't get confused.

24        MR. BACHARACH:  You and the United

25     States representative for the United Nations.

29

1 MR. TERZIGNI: Yes, exactly.
2 - - - -
3 (Deposition Exhibit No. 1 was marked
4 for identification.)
5 - - - -
6 BY MR. TERZIGNI:
7 Q. Ms. Corrado, take your time, read that over and
8 just let me know when you're done.
9
10 (Whereupon, the witness reviewed the
11 document.)
12 - - - -
13 BY MR. TERZIGNI:
14 A. I --
15 Q. I'll ask you some questions about it. Did you
16 have a chance to read through this document that
17 was just handed to you?
18 A. Yes.
19 Q. It's been marked as Exhibit 1. It is a County
20 of Allegheny Incident Report. Are you familiar
21 with these documents in general?
22 A. Yes.
23 Q. Have you ever read this specific one?
24 A. No.
25 Q. This one is dated March 24th, 2016, the time is

30

1 10:25 p.m. There's a question here that says
2 where did it happen, intake. There's also a
3 question at the top who is involved, it says
4 N/CT John Orlando.
5 What does that mean N/CT?
6 A. I think that is CO speak for new court.
7 Q. There's a section here what happened, and it
8 states on the above date and approximate time
9 Millvale Police brought N/CT John Orlando in who
10 was very agitated and appeared to be under the
11 influence. When the N/CT entered the sally port
12 he started to say that he was going to fight
13 anybody and he was on crystal meth.
14 MR. BACHARACH: Crystal myth.
15 BY MR. TERZIGNI:
16 Q. I think myth should be M-E-T-H.
17 A. It should be meth.
18 Q. The Millvale Police brought it to my attention
19 that he also stated that he wanted to hang
20 himself.
21 Was that information ever relayed to you?
22 A. No.
23 Q. Now this report was written by CO Marguerite
24 Bonenberger?
25 A. Bonenberger, yes.

31

1 Q. Are you familiar with Ms. Bonenberger?
2 A. I am.
3 Q. Do you recall her being present that night when
4 you did the intake process with Mr. Orlando?
5 A. I mean we tended to work the same shifts, but I
6 don't recall specifically who all was there.
7 Q. That night did anybody tell you that there was a
8 statement made that Mr. Orlando was high on
9 crystal meth?
10 A. No. Crystal meth -- this is the first time I'm
11 even hearing crystal meth. No, I never heard
12 that.
13 Q. The last sentence of the narrative portion says
14 all assisting officers placed the N/CT in the
15 chair and his restraints were checked for
16 tightness by the intake nurse.
17 Do you know if that's you?
18 A. Yes.
19 Q. Was there any other nurses there that night?
20 A. I mean yes. They just weren't there there. I
21 think they were in the back.
22 Q. I mean any nurses actively assisting or involved
23 in the scene?
24 A. No.
25 Q. It says he was then placed in H-9 without

32

1 further incident.
2 Do you know what H-9 means?
3 A. It's the cell directly in front of the -- where
4 the COs sit at the desk.
5 Q. Is that a suicide precaution cell?
6 A. Yes. Well, that's where they put anyone that's
7 either in a gown or in a chair so they can have
8 a direct visual of them.
9 Q. Are there other places in the jail for suicide
10 precaution or suicide observation?
11 A. Well, once you're arraigned and whatever, you go
12 to -- is it 5-C? It's on the fifth floor. If
13 you're a male, you go on the fifth floor, and if
14 you're a female, you go to 5-MD I think.
15 Q. And what's on the fifth floor?
16 A. The mental housing unit, the infirmary and then
17 there's a -- like a middle level where the
18 females -- they don't put the females and the
19 males in the same area.
20 Q. Is the detox unit included in that area?
21 A. You can't be detoxing and in the mental health.
22 Q. I asked a different question. There is a detox
23 unit; correct?
24 A. Yes, that's on 4.
25 Q. So that's in a different area?

33

1   A.   Correct.

2                    - - - -

3        (Deposition Exhibit No. 2 was marked

4   for identification, and the witness reviewed the

5   document.)

6                    - - - -

7   BY MR. TERZIGNI:

8   Q.   Did you have a chance to look through this

9   document?

10  A.   Yes.

11  Q.   It has been marked Exhibit 2.  It is a County of

12  Allegheny Bureau of Corrections Employee Report

13  of Incident.  I'll ask you the same question

14  that I asked you with the other document, are

15  you familiar with this form in general?

16  A.   No.

17  Q.   You've never seen this form before?

18  A.   Correct.

19  Q.   So I take it specifically this form you've never

20  read it?

21  A.   I've never read it.

22  Q.   Okay.  This one is dated March 24th, 2016, the

23  hours of 2230.  I'm going to direct your

24  attention to the third to last sentence in the

25  Section 1, detailed description of the

34

1   occurrence.

2        MR. BACHARACH:  What's it begin with?

3        MR. TERZIGNI:  N/A Orlando's straps.

4        MR. BACHARACH:  Okay.

5   BY MR. TERZIGNI:

6   Q.   Do you see where that is?

7   A.   Okay.

8        MR. BACHARACH:  (Indicating.)

9   BY MR. TERZIGNI:

10  Q.   This sentence says N/A Orlando's straps were

11  then checked for tightness by intake medical

12  staff and he was medically cleared.

13       My first question is the intake medical

14  staff here, was that just you?

15  A.   That was just me.

16  Q.   Okay.  What does it mean to be medically cleared

17  in the context of this sentence?

18  A.   It means that his straps were okay, they weren't

19  too tight and that I asked him the questions.

20  Q.   Can an inmate be medically cleared and also on

21  suicide precautions?

22  A.   Yes.

23  Q.   Is that what happened here?

24  A.   Yes, he was put in a restraint chair.

25  Q.   Again, when you're saying medically cleared, do

35

1   you mean just physically medically cleared?

2   A.   Correct.

3   Q.   When I asked you what does it mean to be

4   medically cleared you said that you checked the

5   straps?

6   A.   Yes.

7   Q.   And also that you asked him the questions?

8   A.   Yes.

9   Q.   He answered some of those questions in the

10  affirmative, especially the one having to do

11  with suicide saying we're all going to die in

12  here; correct?

13  A.   Yes.

14  Q.   Even with that answer he was able to be

15  medically cleared?

16  A.   Yes.

17  Q.   So did the responses to the question have

18  anything to do with an inmate being medically

19  cleared?

20       MR. BACHARACH:  I'm going to object to

21  the form of the question.  If understand it, you

22  can answer it.

23  BY MR. TERZIGNI:

24  A.   I don't actually.  I'm not sure what -- are you

25  asking me why we ask the questions?

36

1   Q.   Do you want the question to be repeated?

2   A.   Yes, please.

3        MR. TERZIGNI:  Beth, could you read it

4   back?

5                    - - - -

6        (Whereupon, the record was read back

7   by the court reporter.)

8                    - - - -

9        MR. BACHARACH:  If you don't -- if you

10  understand the question, you can answer it.  If

11  you don't understand it, then you can say you

12  don't understand it or if you just don't know,

13  you can say I don't know.  You can answer it,

14  just don't guess or speculate, if you understand

15  it.  It's not a crime -- you know, it's not a

16  crime to say you don't understand it.

17       MR. TERZIGNI:  All right, all right,

18  that's enough.

19  BY MR. TERZIGNI:

20  A.   Well, the answers to the questions led us to

21  know that he needed to be kept safe and he -- I

22  mean there was no injury.  That's supposed to be

23  their opportunity to tell us what they need.

24  That's the whole point of asking the questions.

25  Q.   What did Mr. Orlando need by his response of

37

1   we're all going to die?
2   A.   At that moment he needed to be kept safe from
3        harm.
4   Q.   I'm struggling to understand how somebody in
5        that condition can be also medically cleared.
6        Can you help me understand that?
7   A.   I don't know.
8   Q.   So in answer to that question, do you feel like
9        you're a harm to yourself or others, an answer
10       in the affirmative or the negative doesn't
11       affect the designation that an inmate could be
12       medically cleared?
13  A.   No, it doesn't.
14  Q.   Any of the other questions that you listed
15       earlier as being part of the intake process, do
16       the responses to those questions have an affect
17       on the designation of being medically cleared?
18  A.   In you're a pregnant female -- if you tell us
19       you're pregnant and detoxing, that will get you
20       sent to West Penn.
21  Q.   Okay.
22  A.   If you tell me you have an injury somewhere, an
23       open wound or if I visibly see something, that
24       will get you sent to the hospital.
25  Q.   I forget, was there a question specifically

38

1        about whether you are detoxing?
2   A.   Yes.
3   Q.   If an inmate answers that question yes, can they
4        be medically cleared?
5   A.   As long as they're not a female and pregnant.
6   Q.   What if an inmate is having active withdraws?
7   A.   I've refused alcohol withdraw, so yes.
8   Q.   What did you observe that caused you to refuse
9        an alcohol withdraw?
10  A.   If they come in the door and they're already --
11  Q.   Shaking.
12  A.   -- shaking and their eyes are kind of bugged out
13       and they can't -- that's pretty much what you
14       can see, and they tell me that they're -- well,
15       usually you can tell just by looking, but they
16       tell me that they're on alcohol.
17  Q.   I'm going to direct you to the top of the second
18       page of Exhibit 2.  There's a section actions
19       taken, it says New Arrest Orlando was making
20       threats of hurting himself and other people.
21          Do you see that?
22  A.   Yes.
23  Q.   Do you see where it says New Arrest made
24       statements of killing himself while in the
25       arresting officer's custody?

39

1   A.   Well, he -- like I said, he didn't say
2        specifically that he was going to kill himself
3        in front of me.
4   Q.   My question was going to be --
5   A.   I'm sorry.
6   Q.   -- did anybody make you aware of that
7        statement --
8   A.   No.
9   Q.   -- at any point?
10  A.   (Shaking head from side to side.)
11  Q.   Should you have been made aware of that
12       statement?
13  A.   Should I have been?
14  Q.   Yes.
15  A.   I mean, I don't know that it --
16  Q.   If Mr. Orlando made the statement I'm going to
17       hang myself, should you have been made aware of
18       it?
19  A.   The only reason I'm taking so long is because he
20       was aiready in the restraint chair, so I'm not
21       sure they thought -- I though the answer to the
22       question that he wanted to hurt himself was a
23       yes just because he said we.  So even though I
24       didn't hear him and no one told me that he said
25       he wanted to harm himself, I already marked yes

40

1        to the question.
2                     - - - -
3           (Deposition Exhibit No. 3 was marked
4        for identification, and the witness reviewed the
5        document.)
6                     - - - -
7   BY MR. TERZIGNI:
8   Q.   Ma'am, have you had a chance to review this
9        document?
10  A.   Yes.
11  Q.   This has been marked Exhibit 3.  This is an
12       Allegheny County Bureau of Corrections Jail
13       Healthcare Services document.  I believe this
14       was the same document you were referring to at
15       the beginning of the deposition; correct?
16  A.   Yes.
17  Q.   That's the one that you reviewed in preparation;
18       correct?
19  A.   Yes.
20  Q.   Is this the normal form that you fill out during
21       the intake process?
22  A.   This is what we fill out if they go in a suicide
23       gown or a restraint chair.
24  Q.   Do you recall if you filled this form out that
25       night?

41

1  A.  Oh, yes.

2  Q.  At the top of the form it says Orlando, John.

3     Is that your handwriting?

4  A.  Yes.

5  Q.  Date and time it says March 24th, 2016, 2230,

6     and that's actually the exact same time written

7     on Exhibit 2.  Is this reflective of the time

8     that you filled out this form or the time that

9     the incident occurred?

10  A.  This was probably going by the clock on the

11     little -- on the panel on the wall.  So the time

12     I was filling out -- because usually I will like

13     look over the thing as I was filling it out.

14  Q.  So that was the time that you were filling this

15     form out?

16  A.  Yes.

17  Q.  Okay.  And it's just a coincidence that it's the

18     same time as Exhibit 2 I guess?

19  A.  Yeah.  I don't know whoever wrote this thing,

20     what he was doing at the moment.

21  Q.  So the first section here says does the inmate

22     have any injuries?  If yes, explain.  And then

23     you wrote, I believe, I/M?

24  A.  That's inmate.

25  Q.  Inmate screaming he hopes he dies in here.

42

1     Inmate shouting that we are all going to die.

2        First, where did you get that information?

3  A.  From him.

4  Q.  So you heard him screaming that he hopes he dies

5     in here?

6  A.  I must have.

7  Q.  That statement, do you take it as a suicide

8     threat?

9  A.  Well, yes.  I mean I took this whole -- I took

10     the whole thing as he was suicidal.

11  Q.  You also heard him shout that we are all going

12     die?

13  A.  Yes.

14  Q.  And that's what you testified to earlier;

15     correct?

16  A.  Yes.

17  Q.  Earlier you testified that you didn't believe

18     that you heard him say that he was going to die;

19     correct?

20  A.  Yes.

21  Q.  Do you want to change that testimony now?

22  A.  Well, I guess I have to, yes.

23  Q.  The next line says inmate has possible seizure

24     history.

25        Where did you get that from?

43

1  A.  Part of the questions.

2  Q.  So when you asked him that question he answered

3     yes?

4  A.  No, I think he actually said possibly.

5  Q.  Does that response, having a seizure history,

6     does that affect his ability to be medically

7     cleared?

8  A.  No.

9  Q.  Going to the next section, does the inmate have

10     any medical issues, you wrote inmate states back

11     issues and mental health issues, states he is on

12     Klonopin, Xanax, Fentanyl patch?

13  A.  Yes.

14  Q.  Does that response of having back issues, mental

15     health issues and being on Klonopin, Xanax and a

16     Fentanyl patch affect an inmate's ability to be

17     medically cleared?

18  A.  No.

19  Q.  Is it concerning or was it concerning that

20     Mr. Orlando was on Klonopin, Xanax and a

21     Fentanyl patch?

22        MR. BACHARACH:  I object to the form.

23     You can answer.

24  BY MR. TERZIGNI:

25  Q.  The better question is does that combination of

44

1     drugs cause concern medically?

2        MR. BACHARACH:  I object to the form,

3     but you can answer if you understand.

4  BY MR. TERZIGNI:

5  A.  I -- I mean -- I would be concerned, yes.

6  Q.  Why is that?

7  A.  I mean that's a lot of medications.

8  Q.  When an inmate such as Mr. Orlando is on these

9     medications, Klonopin and Xanax, I'm assuming

10     they're prescription.

11  A.  They can be.

12  Q.  How would an inmate go about getting those

13     medications?

14        MR. BACHARACH:  I object to the form.

15     Do you mean getting the medications from where?

16     Do you mean in the jail?

17        MR. TERZIGNI:  Yes.

18  BY MR. TERZIGNI:

19  A.  He wouldn't.  We detox off of those.

20  Q.  Are drugs like Klonopin, Xanax and a Fentanyl

21     patch, those are medications that you have

22     physical withdraws from?

23  A.  Yes.

24  Q.  Are there also mental health symptoms from

25     withdrawing from medications like that?

45

1  A.  I'm not really a mental health nurse.  Anxiety.
2  Q.  Did you actually see Mr. Orlando's Fentanyl
3      patch?
4  A.  No.
5  Q.  So you didn't take Mr. Orlando's Fentanyl patch
6      off?
7  A.  No.
8  Q.  Is that something that is done by another nurse
9      do you know?
10 A.  We're not allowed to undress them.
11 Q.  I think I asked you this already, but I just
12     want make sure, the medical issues listed in
13     that section, back issues, mental health issues
14     states that he is on Klonopin, Xanax, a Fentanyl
15     patch, that didn't affect his designation as
16     being medically cleared?
17 A.  No.
18 Q.  Why not?
19 A.  Because when you go through the process you get
20     the -- you see the mental health specialist, you
21     get the detox meds.
22 Q.  So he was -- Mr. Orlando was supposed to see a
23     mental health specialist?
24         MR. BACHARACH:  I object to the form.
25 BY MR. TERZIGNI:

46

1  Q.  Is that part of the intake process?
2  A.  Not part of the intake.  Once he gets through
3      the front part and sees the judge and then goes
4      in the back and answers the three-page, then all
5      that starts.
6  Q.  When you say all that, what do you mean?
7  A.  Well, you know, he answers the questions, you
8      know, they ask you what medications you're on
9      specifically, what medical disorders you have,
10     allergies, then they refer you to a mental
11     health specialist who then sees you and then
12     determines whether you can be housed wherever or
13     if you have to go to 5-C or if you have to go to
14     just the detox unit and get your detox meds.
15 Q.  Okay.  The next section says intake will contact
16     medical or mental health for any change in
17     status or for any requests.
18 A.  Wait, where?
19 Q.  In the middle of the page here (indicating).
20 A.  Oh, okay.  I thought you meant I wrote that.
21 Q.  Then it says inmate is cleared for segregation
22     and then your name is right there.  Is that your
23     handwriting?
24 A.  It is.
25 Q.  What does that mean, inmate is cleared for

47

1      segregation?
2  A.  That means that they can put him in a cell by
3      himself, which they would have to any way
4      because he's in a chair.  Like he wouldn't have
5      other inmates milling around him.
6  Q.  In what instance would an inmate not be cleared
7      for segregation?
8  A.  Pregnant girls.
9  Q.  What about somebody that's suicidal?
10 A.  No, that's --
11 Q.  Segregation?
12 A.  Yeah.  I mean you don't want them in the midst
13     of other inmates when they're wearing a suicide
14     gown or in a chair.
15 Q.  And you did not talk to Mr. Orlando again after
16     he was removed from the chair; correct?
17 A.  Correct.
18 Q.  Would that have been another nurse?
19 A.  Yeah.
20 Q.  Does an inmate have to talk to a nurse before
21     being removed from a chair?
22 A.  No.
23 Q.  So who makes the decision to remove an inmate
24     from a chair?
25 A.  Corrections.

48

1  Q.  So if Mr. Orlando is removed from the chair by
2      corrections eight hours later and not placed in
3      a suicide gown, he would have no suicide
4      precautions; correct?
5  A.  If he wasn't put in a suicide gown, no.
6  Q.  Should he have been placed in a gown after being
7      removed from the chair in your opinion?
8  A.  It's so hard for me to answer because I don't
9      know how he was presenting when he got out of
10     the chair or if he spoke to anyone or if -- I
11     don't know who was there.
12 Q.  Even if he's presenting fine, given his earlier
13     statements that he wants to die, would that
14     cause him to be placed or should he have been
15     placed in a suicide gown after being removed
16     from the chair?
17         MR. BACHARACH:  I object to the form.
18     I object to the hypothetical.  It's incomplete.
19     But you can answer if you can without
20     speculating.
21 BY MR. TERZIGNI:
22 A.  The only people that can clear somebody from
23     suicide precautions is a mental health
24     specialist.  I can't take someone out of a
25     suicide gown.  You know what I mean?  So I don't

49

1  know who spoke to him.  I don't know if he did
2  speak to a mental health -- I don't know at what
3  point he was -- was he ever in a gown?
4  Q.  No.
5  A.  Okay.  See, I didn't even know that.
6  Q.  You said the only person that could remove
7  someone from suicide precautions is a mental
8  health --
9  A.  From a suicide gown.  Corrections can take you
10  out of a chair.
11  Q.  So what's the difference between a chair and the
12  suicide gown, if you know?
13  A.  The chair -- if you calm down and you're
14  cooperating, they take you out of the chair as
15  soon as possible because they want you to be
16  able to walk around a little bit and not be
17  restrained, but still keeping you safe from
18  doing anything to yourself as well.
19  Q.  How so?
20  A.  Because you can't -- you can't really hurt
21  yourself.  How are you going to do anything to
22  yourself in a restraint chair?
23  Q.  You said while keeping them safe when they're
24  out of the chair; right?
25  A.  Well, if you get out of the chair, then to keep

50

1  them safe you put them in a suicide gown.
2  Q.  Okay.  But if a suicide gown isn't put on the
3  inmate, how are you keeping that inmate safe?
4  A.  I mean, like I said, wasn't there.
5  Q.  Is the answer you're not keeping that inmate
6  safe?
7         MR. BACHARACH:  I object to the form.
8  BY MR. TERZIGNI:
9  Q.  Was Mr. Orlando kept safe when he was taken out
10  of the restraint chair and not given a suicide
11  gown?
12         MR. BACHARACH:  I object to the form.
13  You can answer if you can.
14  BY MR. TERZIGNI:
15  A.  I don't feel it's a fair question to ask me, I
16  wasn't there, I don't know.
17  Q.  Knowing what you know, that Mr. Orlando was
18  screaming he hopes he dies in here --
19  A.  If he was acting like this, then he should have
20  been in a suicide gown.
21  Q.  Eight hours later?
22  A.  Yes, if he was still making these comments --
23  Q.  What if he wasn't?
24  A.  If he wasn't --
25  Q.  Is there any more a suicide concern?

51

1  A.  If he wasn't -- if he recants and says, no, I'm
2  not going to hurt myself, no, they probably
3  don't have to put him in a suicide gown.
4         MR. TERZIGNI:  Just give me a couple
5  minutes.  I think I'm pretty much done.
6               - - - -
7         (Whereupon, there was a brief pause in
8  the proceedings.)
9               - - - -
10         MR. TERZIGNI:  I don't have anything
11  else.
12               - - - -
13               EXAMINATION
14               - - - -
15  BY MR. BACHARACH:
16  Q.  I do have a couple questions.  There was mention
17  of a Fentanyl patch.  Are inmates allowed to
18  have Fentanyl patches in the jail?
19  A.  No.
20  Q.  Is there a reason for that?
21  A.  Because the patch -- they can take it off
22  themselves and fold it up and put it in the
23  doorway and then when the COs think the door is
24  locked, it's not and they can get out.
25  Q.  You talked about the medical routine that you do

52

1  at the door.
2  A.  Yes.
3  Q.  And this is right after the new inmate comes in,
4  the police or whoever brings them in?
5  A.  Yes.
6  Q.  And I think you said that at some point in time
7  there's an arraignment?
8  A.  Yes.
9  Q.  And at that point somebody, a judge makes a
10  decision whether they're staying or going?
11  A.  Correct.
12  Q.  If they stay, is there an additional medical
13  procedure that's done at intake before they
14  would go upstairs?
15  A.  Yes.
16  Q.  Just generally can you describe what's done?
17  A.  After you see the judge you go into the back
18  area, you get your picture taken by the COs, you
19  get a little card, it gets put over in a pile,
20  the nurse comes out, picks the card up they have
21  there, you call out the inmate's name, they come
22  in, you make sure you're talking to the correct
23  inmate, you ask them are you on any medications,
24  what are they specifically, do you remember the
25  doses, sometimes you have to get their pharmacy

53

1  and then you can call and find out what they are
2  and then you ask them their mental health
3  history, do you feel suicidal right now, have
4  you ever made any prior attempts, if so, what
5  were they, allergies, there's a box at the end
6  where you can ask them is there anything I
7  didn't ask you that you want to tell me, if
8  they're female you ask about their periods, if
9  they have any of those issues, you ask
10 specifically what they might be withdrawing
11 from, and then if they say yes to the mental
12 health questions, they get a referral to the
13 mental health specialist and they get put back
14 out in the pile and then she comes and gets
15 them, if they say yes to the withdraw questions,
16 then you call their provider and they tell you
17 what medications you are to give them.
18 Q.  This is all after you see them?
19 A.  Yeah, this is all after the --
20 Q.  And this could be a short time or hours or even
21    days later?
22 A.  Hopefully not days, but it can be a while.
23 Q.  If an inmate tells you that they're on a
24    particular drug when you were out front like you
25    described, is there a way you have to confirm

54

1  that one way or another, whether what they're
2  telling you is correct?
3  A.  We don't usually drug test anyone until we get
4     to the bigger process if we feel the need to
5     verify that they're actually on those
6     medications.  The females that come in who say
7     that they're pregnant and detoxing, we do make
8     them pee in a cup and do a pregnancy test to
9     verify that they are pregnant.
10 Q.  As far as testing to verify if somebody says
11    they're on heroin or something, is that test
12    done at the level you described?
13 A.  No.
14 Q.  Can you give some kind of estimate as far as the
15    number or percentage of people who come into the
16    jail who either are by observation or indicate
17    verbally that they are on some type of drugs?
18 A.  At least half of them.
19 Q.  Is it unusual or uncommon for people to come
20    into the jail being agitated and angry?
21 A.  It's not unusual, no.
22        MR. BACHARACH:  I don't have any other
23    questions.
24            - - - -
25        RE-EXAMINATION

55

1            - - - -
2  BY MR. TERZIGNI:
3  Q.  I have just a few follow-up.  You described like
4     a second intake process after arraignment;
5     correct?
6  A.  Correct, but it's -- they don't refer to it as
7     intake, they refer to it as processing.
8  Q.  Okay, processing.
9  A.  Yeah.
10 Q.  Did you work in processing?
11 A.  Yes.
12 Q.  When you are in processing, do you review that
13    inmate's first -- or those initial documents of
14    the intake process?
15 A.  I have rarely had access.  I certainly didn't
16    have access -- well, you know, like I said.
17        MR. BACHARACH:  I'm going to object to
18    the form because I'm not sure what documents
19    you're referring to.
20 BY MR. TERZIGNI:
21 Q.  The intake procedure that you did, when an
22    inmate comes in you ask them questions about his
23    or her medical history; correct?
24 A.  Those first initial questions?
25 Q.  Yes.

56

1  A.  No, we don't.
2  Q.  You don't have access to those?
3  A.  No.
4  Q.  You made the comment that hopefully that the
5     processing step is not days later?
6  A.  Correct.
7  Q.  Why did you say that?
8  A.  I mean I wouldn't want to be sitting there for
9     days.
10 Q.  And by sitting there, do you mean intake?
11 A.  Yes.
12 Q.  You estimated that more than half of the inmates
13    coming in are withdrawing or mention some form
14    of drugs --
15 A.  Yes.
16 Q.  -- when they come into the jail; correct?
17 A.  Correct.
18 Q.  Was your answer based on any scientific study or
19    statistics, anything like that?
20 A.  No, that's just my --
21 Q.  Just based on your observation?
22 A.  Yes.
23 Q.  You made the comment that I believe it was a lot
24    of inmates are agitated or angry when they come
25    into the jail; correct?

57

1  A.  Correct.

2  Q.  And that's not unusual?

3  A.  No.

4  Q.  Was Mr. Orlando, that instance, unusual?

5  A.  No.

6  Q.  So for somebody to be in a restraint chair

7      yelling about dying and killing himself, that

8      wasn't unusual?

9          MR. BACHARACH:  Object to the form.

10     You can answer.

11 BY MR. TERZIGNI:

12 A.  It's not unusual for someone to be that angry --

13 Q.  Okay.

14 A.  -- that they're yelling.

15 Q.  I'm talking about his situation, him coming in

16     there and everything that happened with that

17     instance, was that unusual?

18 A.  No.  I've had -- I've had inmates lunge for me.

19     I mean no, it's not unusual for them to come in

20     ready to, you know, fight.

21 Q.  I don't know if unusual or surprising, what the

22     right word is here, maybe is it the norm for an

23     inmate to be in the condition that Mr. Orlando

24     was in?

25 A.  It wasn't surprising.

58

1  Q.  I know it wasn't surprising obviously by your

2      statement.  Was it the norm?

3          MR. BACHARACH:  I object to the form.

4          MR. TERZIGNI:  That's okay, he made

5      his objection, so you can answer.

6  BY MR. TERZIGNI:

7  A.  I mean it wasn't like every single inmate that

8      came in needed to be put in a restraint chair.

9  Q.  Or talking about killing themselves?

10 A.  Or -- you know, it wouldn't surprise me one or

11     two a night, which in eight hours is --

12 Q.  One or two inmates a night would talk about

13     killing themselves?

14 A.  Yes or even get into the chair.  Yeah, I mean

15     maybe more talking about hurting themselves.

16 Q.  Okay.  That night that you did Mr. Orlando's

17     intake, do you recall if there were other

18     inmates that mentioned --

19 A.  I don't know if there were others that

20     particular night.

21         MR. TERZIGNI:  I think that's all I

22     have.

23         MR. BACHARACH:  I don't have anything

24     else.  We'll read it.

25         The court reporter is going to type up

59

1      a booklet with all of what was said, and I'll

2      send it to you to read.  I'm sure she's

3      right, but I always like to send it to people

4      just to make sure.

5          THE COURT REPORTER:  Would you like

6      the full size or the compressed or e-mail?

7          MR. BACHARACH:  I don't want the

8      compressed.

9          THE COURT REPORTER:  So just full size

10     or electronic only?

11         MR. BACHARACH:  One full size and

12     electronic.

13         THE COURT REPORTER:  Do you want hard

14     copies of the exhibits or just e-mailed

15     exhibits?

16         MR. BACHARACH:  E-mails fine.

17         THE COURT REPORTER:  Thank you.

18                    - - - -

19         (Whereupon, the proceedings were

20     concluded at 4:12 p.m.)

21                    - - - -

22

23

24

25

60

1  COMMONWEALTH OF PENNSYLVANIA  )     CERTIFICATE

2  COUNTY OF ALLEGHENY           )  SS:

3          I, Beth E. Welsh, a Court Reporter and

4  Notary Public in and for the Commonwealth of

5  Pennsylvania, do hereby certify that the witness,

6  TRICIA CORRADO, was by me first duly sworn to testify

7  to the truth, the whole truth, and nothing but the

8  truth; that the foregoing deposition was taken at the

9  time and place stated herein; and that the said

10 deposition was recorded stenographically by me and

11 then reduced to printing under my direction, and

12 constitutes a true record of the testimony given by

13 said witness.

14         I further certify that the inspection,

15 reading and signing of said deposition were NOT

16 waived by counsel for the respective parties and by

17 the witness.  I further certify that I am not a

18 relative or employee of any of the parties, or a

19 relative or employee of either counsel, and that I am

20 in no way interested in this action.

21         IN WITNESS WHEREOF, I have hereunto set my

22 hand and affixed my seal of office this 4th day of

23 June, 2018.

24         _____

25                    Notary Public



61

| | |
|---|---|
| 1 | COMMONWEALTH OF PENNSYLVANIA        )   E R R A T A |
| | COUNTY OF ALLEGHENY                        )   S H E E T |
| 2 | |
| | I, TRICIA CORRADO, have read the foregoing pages |
| 3 | of my deposition given on Friday, May 25, 2018, and |
| | wish to make the following, if any, amendments, |
| 4 | additions, deletions or corrections: |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | In all other respects, the transcript is true and |
| 20 | correct. |
| 21 | _____ |
| | TRICIA CORRADO |
| 22 | Subscribed and sworn to before me this |
| 23 | _____ day of _____, 2018. |
| 24 | _____ |
| | Notary Public |
| 25 | QCR Reference No. BW2908 |

62

| | |
|---|---|
| 1 | QUALITY COURT REPORTING |
| | 7012 Kevin Drive |
| 2 | Bethel Park, PA  15102 |
| | 412.833.3434 |
| 3 | |
| 4 | June 4, 2018 |
| 5 | |
| 6 | TO:  John A. Bacharach, Esquire |
| | Allegheny County Law Department |
| 7 | 300 Fort Pitt Commons Building |
| | 445 Fort Pitt Boulevard |
| 8 | Pittsburgh, PA  15219 |
| 9 | RE:  DEPOSITION OF TRICIA CORRADO |
| 10 | NOTICE OF NON-WAIVER OF SIGNATURE |
| 11 | Please have the deponent read her deposition |
| 12 | transcript.  All corrections are to be noted on the |
| | preceding Errata Sheet. |
| 13 | Upon completion of the above, the Deponent must |
| 14 | affix her signature on the Errata Sheet, and it is to |
| | then be notarized. |
| 15 | Please forward the signed original of the Errata |
| 16 | Sheet to Massimo Terzigni, Esquire for attachment to |
| | the original transcript, which is in his possession. |
| 17 | Send a copy of same to me. |
| | Please return the completed Errata Sheet within |
| 18 | thirty (30) days of receipt hereof. |
| 19 | Beth E. Welsh |
| | Court Reporter |
| 20 | |
| 21 | cc:  Massimo Terzigni, Esquire |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

## A

ability (15:22)(22:20)(24:17)(25:2)(43:6)(43:16)
able (23:13)(35:14)(49:16)
above (30:8)(62:13)
accept (24:12)
access (55:15)(55:16)(56:2)
accordance (2:2)(13:9)
ACJ (5:9)(5:11)(5:25)(7:11)(7:22)(9:2)(25:19)
ACLS (6:21)
acting (50:19)
action (18:1)(60:20)
actions (38:18)
active (38:6)
actively (31:22)
actual (8:9)
actually (12:4)(18:15)(24:21)(35:24)(41:6)(43:4)(45:2)(54:5)
additional (52:12)
additions (61:4)
affect (37:11)(37:16)(43:6)(43:16)(45:15)
affirmative (10:14)(35:10)(37:10)
affix (62:13)
affixed (60:22)
after (6:19)(18:18)(20:9)(26:24)(47:15)(48:6)(48:15)(52:3)(52:17)(53:18)(53:19)(55:4)
agency (5:23)
agitated (15:14)(30:10)(54:20)(56:24)
ahead (22:12)
alcohol (8:20)(9:25)(15:5)(38:7)(38:9)(38:16)
ALLEGHENY (1:7)(2:16)(5:18)(7:2)(8:5)(8:23)(8:25)(9:11)(12:22)(17:16)(22:25)(26:6)(29:20)(33:12)(40:12)(60:2)(61:1)(62:6)
alleghenycounty (2:15)
allergies (46:10)(53:5)
allowed (27:6)(45:10)(51:17)
alone (21:22)
along (14:21)
already (12:25)(15:19)(18:20)(18:21)(19:1)(19:4)(19:6)(19:9)(27:8)(28:2)(28:5)(38:10)(39:20)(39:25)(45:11)
always (59:3)
amendments (61:3)
amount (19:20)
angry (24:25)(54:20)(56:24)(57:12)
another (27:19)(45:8)(47:18)(54:1)
answer (4:15)(4:19)(10:13)(14:18)(16:14)(20:24)(22:6)(22:7)(22:13)(22:14)(23:20)(26:7)(35:14)(35:22)(36:10)(36:13)(37:8)(37:9)(39:21)(43:23)

(44:3)(48:8)(48:19)(50:5)(50:13)(56:18)(57:10)(58:5)
answered (10:20)(14:5)(16:18)(20:15)(21:17)(21:19)(26:12)(28:12)(28:17)(35:9)(43:2)
answering (14:13)(25:22)
answers (10:25)(16:7)(36:20)(38:3)(46:4)(46:7)
Anxiety (45:1)
anybody (28:20)(30:13)(31:7)(39:6)
anyone (20:4)(32:6)(48:10)(54:3)
anything (4:22)(11:17)(12:14)(14:23)(15:16)(35:18)(49:18)(49:21)(51:10)(53:6)(56:19)(58:23)
APPEARANCES (2:7)
appeared (30:10)
approximate (30:8)
April (5:19)
area (27:3)(32:19)(32:20)(32:25)(52:18)
around (21:7)(47:5)(49:16)
arraigned (11:7)(11:9)(32:11)
arraignment (52:7)(55:4)
Arrest (38:19)(38:23)
arresting (38:25)
arrival (26:11)
arrived (9:22)(12:22)(26:21)
ask (4:14)(4:19)(9:9)(9:23)(10:22)(14:4)(15:4)(28:15)(28:21)(29:15)(33:13)(35:25)(46:8)(50:15)(52:23)(53:2)(53:6)(53:7)(53:8)(53:9)(55:22)
asked (20:14)(26:10)(26:20)(26:23)(28:9)(32:22)(33:14)(34:19)(35:3)(35:7)(43:2)(45:11)
asking (4:15)(8:11)(35:25)(36:24)
assigned (9:8)
assistant (7:15)(17:25)(18:3)
assisting (31:14)(31:22)
assume (22:18)
assuming (44:9)
attachment (62:15)
attempted (19:2)
attempts (53:4)
attention (30:18)(33:24)
authority (16:11)(16:21)(17:7)(18:6)(18:11)(18:16)
aware (39:6)(39:11)(39:17)

## B

Bacharach (2:15)(3:2)(13:25)(16:13)(17:9)(19:6)(19:9)(20:22)(21:24)(22:3)(22:6)(22:12)(22:15)(25:23)(28:22)(28:24)(30:14)

(34:2)(34:4)(34:8)(35:20)(36:9)(43:22)(44:2)(44:14)(45:24)(48:17)(50:7)(50:12)(51:15)(54:22)(55:17)(57:9)(58:3)(58:23)(59:7)(59:11)(59:16)(62:5)
back (23:19)(31:21)(36:4)(36:6)(43:10)(43:14)(45:13)(46:4)(52:17)(53:13)
based (20:11)(22:20)(56:18)(56:21)
became (7:14)
begin (34:2)
beginning (40:15)
Behavior (17:17)
believe (8:13)(12:3)(12:9)(12:24)(15:6)(25:25)(26:10)(26:20)(28:5)(40:13)(41:23)(42:17)(56:23)
Benzodiazepines (15:10)
Benzos (15:6)(15:9)
Besides (15:19)
Beth (1:21)(2:2)(36:3)(60:3)(62:19)
Bethel (62:2)
better (23:18)(43:25)
between (26:18)(49:11)
beyond (22:7)
bigger (54:4)
bit (49:16)
bites (24:5)
BLS (6:22)
Bonenberger (30:24)(30:25)(31:1)
booklet (59:1)
Boulevard (2:17)(62:7)
box (53:5)
break (4:17)(4:20)
brief (51:7)
bring (27:5)
brings (52:4)
brought (27:13)(30:9)(30:18)
bugged (38:12)
Building (2:16)(62:6)
Bureau (17:17)(33:12)(40:12)

## -

-BY (29:6)(29:13)(33:7)(40:7)(51:15)(55:2)

## C

call (9:19)(19:21)(27:6)(27:10)(52:21)(53:1)(53:16)
called (2:1)
calling (6:6)
calm (49:13)
Canonsburg (6:1)(6:2)(6:8)
capacity (23:5)
captain (19:21)
card (52:19)(52:20)
case (5:1)(5:4)
cause (16:9)(44:1)(48:14)
caused (38:8)
CCAC (6:16)(6:25)
cell (16:1)(18:21)(32:3)(32:5)(47:2)
Center (1:17)(2:4)(2:11)

certain (13:9)(19:21)
certainly (55:15)
Certificate (3:4)(60:1)
certificates (6:19)
certify (60:5)(60:14)(60:17)
chair (13:1)(13:4)(13:7)(13:23)(18:20)(18:25)(19:7)(19:11)(19:15)(19:19)(20:5)(20:7)(20:10)(20:14)(20:19)(21:4)(21:6)(21:10)(26:15)(26:25)(27:17)(28:3)(28:6)(31:15)(32:7)(34:24)(39:20)(40:23)(47:4)(47:14)(47:16)(47:21)(47:24)(48:1)(48:7)(48:10)(48:16)(49:10)(49:11)(49:13)(49:14)(49:22)(49:24)(49:25)(50:10)(57:6)(58:8)(58:14)
chance (29:16)(33:8)(40:8)
change (42:1)(46:16)
checked (12:16)(13:6)(13:16)(31:15)(34:11)(35:4)
checking (12:2)
chest (24:5)
Civil (2:2)
clarification (27:22)
clarify (26:18)
class (8:3)
clear (15:9)(23:23)(23:25)(48:22)
cleared (34:12)(34:16)(34:20)(34:25)(35:1)(35:4)(35:15)(35:19)(37:5)(37:12)(37:17)(38:4)(43:7)(43:17)(45:16)(46:21)(46:25)(47:6)
clipboard (9:22)
clock (41:10)
close (17:21)(21:23)
coincidence (41:17)
com (2:10)
combination (43:25)
comes (16:7)(52:3)(52:20)(53:14)(55:24)
coming (11:20)(56:13)(57:15)
commencing (2:5)
comment (25:10)(56:4)(56:23)
comments (7:24)(50:22)
Commons (2:16)(62:6)
Commonwealth (2:3)(60:1)(60:4)(61:1)
complain (24:4)
Complaint (4:25)
completed (62:17)
completion (62:13)
compressed (59:6)(59:8)
concern (44:1)(50:25)
concerned (44:5)
concerning (43:19)
concerns (24:15)(24:18)
concluded (59:20)
conclusion (16:20)
condition (37:5)(57:23)
conduct (18:3)
confirm (53:25)
confused (28:22)(28:23)

constitutes (60:12)
consult (17:23)
contact (26:4)(26:24)
(28:1)(28:7)(46:15)
context (34:17)
control (5:23)
cooperating (49:14)
copies (59:14)
copy (62:16)
Corizon (5:14)
CORRADO (1:12)(2:1)
(4:1)(4:8)(29:7)(60:6)
(61:2)(61:21)(62:9)
correctional (26:16)
Corrections (17:17)
(33:12)(40:12)(47:25)
(48:2)(49:9)(61:4)
(62:11)
correctly (14:6)
COs (9:19)(10:18)
(11:14)(11:15)(11:18)
(15:24)(32:4)(51:23)
(52:18)
counsel (60:16)(60:19)
COUNTY (1:7)(2:16)
(5:18)(7:2)(8:5)(8:23)
(8:25)(9:11)(12:23)
(17:16)(22:25)(26:7)
(29:19)(33:11)(40:12)
(60:2)(61:1)(62:6)
couple (20:8)(51:4)
(51:16)
course (23:2)
COURT (1:1)(2:2)(3:4)
(30:6)(36:7)(58:25)
(59:5)(59:9)(59:13)
(59:17)(60:3)(62:1)
(62:19)
coworker (25:9)
created (15:8)
crime (36:15)(36:16)
crystal (30:13)(30:14)
(31:9)(31:10)(31:11)
cup (54:8)
custody (38:25)

**D**

DATE (1:15)(5:13)
(30:8)(41:5)
dated (29:25)(33:22)
dates (6:5)
day (12:15)(12:19)
(12:22)(25:13)(60:22)
(61:22)
days (53:21)(53:22)
(56:5)(56:9)(62:18)
Deceased (1:4)
decedent (26:5)
decision (47:23)(52:10)
Defendants (1:8)(2:14)
degree (6:20)(6:23)
deletions (61:4)
Department (2:16)
(16:2)(62:6)
deponent (62:11)(62:13)
deposed (4:10)
DEPOSITION (1:12)
(2:1)(3:6)(3:8)(3:9)(4:23)
(29:3)(33:3)(40:3)
(40:15)(60:8)(60:10)
(60:15)(61:3)(62:9)
(62:11)
describe (26:8)(52:16)
described (53:25)
(54:12)(55:3)
description (33:25)

designation (37:11)
(37:17)(45:15)
desk (32:4)
detail (26:9)
detailed (33:25)
Detection (17:17)
determines (46:12)
detox (32:20)(32:22)
(44:19)(45:21)(46:14)
detoxing (9:25)(10:17)
(15:4)(32:21)(37:19)
(38:1)(54:7)
didn't (5:3)(18:8)(24:4)
(24:5)(24:6)(28:1)
(28:12)(39:1)(39:24)
(42:17)(45:5)(45:15)
(49:5)(53:7)(55:15)
die (12:9)(35:11)(37:1)
(42:1)(42:12)(42:18)
(48:13)
died (14:22)(14:24)
dies (41:25)(42:4)
(50:18)
difference (49:11)
different (18:12)(18:17)
(32:22)(32:25)
direct (32:8)(33:23)
(38:17)
direction (60:11)
directly (32:3)
director (7:10)(7:15)
disorders (10:3)(46:9)
distress (24:23)
DISTRICT (1:1)
document (29:11)
(29:16)(33:5)(33:9)
(33:14)(40:5)(40:9)
(40:13)(40:14)
documentation (4:25)
documents (29:21)
(55:13)(55:18)
does (7:9)(23:7)(24:3)
(30:5)(34:16)(35:3)
(41:21)(43:5)(43:6)
(43:9)(43:14)(43:25)
(46:25)(47:20)
doesn't (37:10)(37:13)
DON (7:8)(7:9)
done (16:2)(16:3)
(27:21)(29:8)(45:8)
(51:5)(52:13)(52:16)
(54:12)
door (9:20)(11:21)
(26:11)(26:21)(27:2)
(27:7)(27:10)(38:10)
(51:23)(52:1)
doorway (51:23)
doses (52:25)
doubt (19:25)(20:2)
down (12:7)(19:21)
(49:13)
Drive (62:1)
drug (8:20)(53:24)(54:3)
drugs (9:25)(15:5)
(44:1)(44:20)(54:17)
(56:14)
duly (4:2)(60:6)
during (15:17)(22:1)
(22:3)(23:2)(28:10)
(40:20)
dying (57:7)

**E**

earlier (14:1)(20:20)
(37:15)(42:14)(42:17)
(48:12)

eight (20:3)(20:5)
(20:17)(48:2)(50:21)
(58:11)
either (25:9)(32:7)
(54:16)(60:19)
electronic (59:10)
(59:12)
else (11:1)(12:14)
(15:16)(51:11)(58:24)
e-mail (59:6)
e-mailed (59:14)
E-mails (59:16)
employed (5:14)(9:2)
(22:25)
Employee (33:12)
(60:18)(60:19)
employment (23:3)
(25:19)
end (53:5)
enough (36:18)
entered (30:11)
entire (6:12)(22:3)
Errata (3:4)(62:12)
(62:13)(62:15)(62:17)
especially (35:10)
Esquire (2:9)(2:15)
(62:5)(62:15)(62:20)
ESTATE (1:4)
estimate (54:14)
estimated (56:12)
evaluates (23:22)
even (20:17)(21:10)
(31:11)(35:14)(39:23)
(48:12)(49:5)(53:20)
(58:14)
eventful (15:19)
ever (4:10)(9:24)(20:6)
(24:14)(25:19)(28:15)
(29:23)(30:21)(49:3)
(53:4)
every (58:7)
Everything (16:3)(57:16)
exact (5:12)(6:5)
(19:20)(19:22)(41:6)
exactly (17:12)(29:1)
examination (2:1)(3:2)
(4:5)(10:11)(51:13)
examined (4:3)
Exhibit (3:8)(3:9)(29:3)
(29:19)(33:3)(33:11)
(38:18)(40:3)(40:11)
(41:7)(41:18)
EXHIBITS (3:7)(59:14)
(59:15)
explain (41:22)
explained (17:13)
extent (10:6)
eye (21:23)
eyes (38:12)

**F**

face-to-face (18:3)
fair (21:20)(50:15)
familiar (8:5)(8:11)
(29:20)(31:1)(33:15)
far (23:13)(54:10)
(54:14)
Federal (2:2)
feel (10:1)(10:23)
(14:15)(14:16)(15:13)
(16:5)(21:14)(37:8)
(50:15)(53:3)(54:4)
felt (21:18)
female (10:16)(32:14)
(37:18)(38:5)(53:8)
females (32:18)(54:6)

Fentanyl (43:12)(43:16)
(43:21)(44:20)(45:2)
(45:5)(45:14)(51:17)
(51:18)
few (16:7)(26:2)(55:3)
(58:24)
fifth (32:12)(32:13)
(32:15)
fight (30:12)(57:20)
fill (40:20)(40:22)
filled (40:24)(41:8)
filling (41:12)(41:13)
(41:14)
find (53:1)
fine (6:5)(21:8)(27:22)
(48:12)(59:16)
fingers (13:12)
finish (4:14)
first (6:13)(7:2)(12:25)
(26:20)(27:12)(31:10)
(34:13)(41:21)(42:2)
(55:13)(55:24)(60:6)
firsthand (25:6)
five (6:13)
floor (32:12)(32:13)
(32:15)
floors (6:14)(23:8)
fold (51:22)
following (61:3)
follows (4:3)
follow-up (55:3)
foregoing (60:8)(61:2)
forget (37:25)
form (16:14)(17:10)
(20:23)(21:24)(33:15)
(33:17)(33:19)(35:21)
(40:20)(40:24)(41:2)
(41:8)(41:15)(43:22)
(44:2)(44:14)(45:24)
(48:17)(50:7)(50:12)
(55:18)(56:13)(57:9)
(58:3)
formal (8:3)(8:14)
Fort (2:16)(2:17)(62:6)
(62:7)
forward (62:15)
Friday (1:16)(2:5)(61:3)
from (6:25)(8:22)(8:24)
(9:19)(9:25)(11:16)
(15:5)(15:9)(20:10)
(20:13)(20:18)(23:22)
(25:6)(25:9)(28:11)
(37:2)(39:10)(42:3)
(42:25)(44:15)(44:22)
(44:24)(44:25)(47:16)
(47:21)(47:24)(48:1)
(48:7)(48:16)(48:22)
(49:7)(49:9)(49:17)
(53:11)
front (9:20)(16:1)
(18:21)(32:3)(39:3)
(46:3)(53:24)
full (6:4)(59:6)(59:9)
(59:11)
fully (11:3)(11:4)(28:6)
function (9:7)
further (32:1)(60:14)
(60:17)

**G**

Gateway (1:17)(2:4)
(2:11)
gave (21:19)
General (6:1)(6:2)
(29:21)(33:15)
Generally (4:13)(52:16)
get (6:19)(13:11)

(15:14)(18:23)(23:18)
(23:19)(28:22)(28:23)
(37:19)(37:24)(42:2)
(42:25)(45:19)(45:21)
(46:14)(49:25)(51:24)
(52:18)(52:19)(52:25)
(53:12)(53:13)(54:3)
(58:14)
**gets**  (11:21)(46:2)
(52:19)(53:14)
**getting**  (44:12)(44:15)
**girls**  (47:8)
**gmail**  (2:10)
**goes**  (23:13)(46:3)
**got**  (5:2)(17:6)(18:15)
(48:9)
**gown**  (8:1)(10:19)
(11:11)(11:13)(15:25)
(17:6)(18:23)(18:25)
(19:3)(19:14)(20:11)
(32:7)(40:23)(47:14)
(48:3)(48:5)(48:6)
(48:15)(48:25)(49:3)
(49:9)(49:12)(50:1)
(50:2)(50:11)(50:20)
(51:3)
**graduate**  (6:23)
**graduated**  (6:25)
**graduating**  (6:20)
**Green**  (7:6)
**Green's**  (7:7)
**guess**  (36:14)(41:18)
(42:22)

## H

**half**  (54:18)(56:12)
**hand**  (60:22)
**handed**  (29:17)
**handwriting**  (41:3)
(46:23)
**hang**  (25:11)(30:19)
(39:17)
**hanging**  (25:20)
**happen**  (17:4)(30:2)
**happened**  (30:7)(34:23)
(57:16)
**hard**  (48:8)(59:13)
**harm**  (7:25)(10:1)
(10:23)(12:5)(14:16)
(16:5)(16:24)(17:5)
(21:15)(21:18)(26:14)
(37:3)(37:9)(39:25)
**head**  (24:4)(39:10)
**health**  (17:20)(17:24)
(18:2)(22:22)(22:24)
(23:14)(23:18)(23:21)
(24:15)(24:18)(32:21)
(43:11)(43:15)(44:24)
(45:1)(45:13)(45:20)
(45:23)(46:11)(46:16)
(48:23)(49:2)(49:8)
(53:2)(53:12)(53:13)
**Healthcare**  (40:13)
**hear**  (12:11)(25:9)
(39:24)
**heard**  (26:5)(31:11)
(42:4)(42:11)(42:18)
**hearing**  (31:11)
**help**  (37:6)
**here**  (7:18)(12:10)
(27:8)(28:23)(30:1)
(30:7)(34:14)(34:23)
(35:12)(41:21)(41:25)
(42:5)(46:19)(50:18)
(57:22)
**hereby**  (60:5)

**herein**  (60:9)
**hereof**  (62:18)
**hereunto**  (60:21)
**heroin**  (54:11)
**He's**  (7:8)(47:4)(48:12)
**high**  (31:8)
**himself**  (14:23)(14:25)
(15:2)(21:18)(25:10)
(25:11)(25:14)(26:14)
(30:20)(38:20)(38:24)
(39:2)(39:22)(39:25)
(47:3)(57:7)
**hired**  (5:11)(5:16)
**history**  (25:2)(42:24)
(43:5)(53:3)(55:23)
**honestly**  (21:8)(25:15)
**hope**  (12:9)(17:4)(20:1)
**hoped**  (14:21)(14:23)
**Hopefully**  (53:22)(56:4)
**hopes**  (41:25)(42:4)
(50:18)
**Hospital**  (6:1)(6:3)(6:9)
(6:10)(10:17)(24:13)
(37:24)
**hour**  (18:1)(19:22)
**hours**  (18:4)(19:24)
(20:3)(20:5)(20:8)
(20:17)(33:23)(48:2)
(50:21)(53:20)(58:11)
**housed**  (46:12)
**housing**  (18:12)(18:17)
(23:9)(23:11)(32:16)
**hung**  (25:14)
**hurt**  (39:22)(49:20)
(51:2)
**hurting**  (38:20)(58:15)
**hypothetical**  (20:24)
(48:18)

## I

**I/M**  (41:23)
**ICU**  (6:1)
**identification**  (29:4)
(33:4)(40:4)
**identify**  (26:3)
**imagine**  (19:14)
**incarceration**  (22:2)
(22:4)(28:11)
**incident**  (7:18)(11:23)
(25:16)(25:18)(28:17)
(29:20)(32:1)(33:13)
(41:9)
**include**  (15:2)
**included**  (32:20)
**incomplete**  (48:18)
**INDEX**  (3:7)
**indicate**  (16:23)(17:1)
(20:21)(54:16)
**indicating**  (5:5)(34:8)
(46:19)
**indication**  (12:12)
**infirmary**  (23:12)(32:16)
**influence**  (30:11)
**information**  (25:5)
(30:21)(42:2)
**initial**  (55:13)(55:24)
**injuries**  (41:22)
**injury**  (36:22)(37:22)
**inmate**  (9:4)(9:17)
(10:13)(10:20)(10:25)
(11:1)(11:9)(11:13)
(11:20)(11:21)(16:4)
(16:7)(17:21)(18:4)
(18:6)(18:11)(19:14)
(19:18)(22:21)(23:14)
(24:13)(24:14)(24:17)

(25:1)(25:7)(34:20)
(35:18)(37:11)(38:3)
(38:6)(41:21)(41:24)
(41:25)(42:1)(42:23)
(43:9)(43:10)(44:8)
(44:12)(46:21)(46:25)
(47:6)(47:20)(47:23)
(50:3)(50:5)(52:3)
(52:23)(53:23)(55:22)
(57:23)(58:7)
**inmates**  (47:5)(47:13)
(51:17)(56:12)(56:24)
(57:18)(58:12)(58:18)
**inmate's**  (43:16)(52:21)
(55:13)
**inspection**  (60:14)
**instance**  (47:6)(57:4)
(57:17)
**instances**  (27:23)
**intake**  (9:4)(9:8)(9:10)
(13:19)(15:17)(15:21)
(16:2)(16:6)(16:20)
(18:18)(22:20)(23:8)
(23:13)(24:23)(25:6)
(26:10)(26:20)(30:2)
(31:4)(31:16)(34:11)
(34:13)(37:15)(40:21)
(46:1)(46:2)(46:15)
(52:13)(55:4)(55:7)
(55:14)(55:21)(56:10)
(58:17)
**interaction**  (25:6)(26:8)
(26:16)
**interactions**  (28:10)
(28:13)
**interested**  (60:20)
**interpretation**  (27:15)
**interview**  (18:3)
**interviewed**  (22:19)
**interviewing**  (25:1)
**into**  (23:19)(26:4)
(26:15)(26:24)(28:1)
(28:16)(52:17)(54:15)
(54:20)(56:16)(56:25)
(58:14)
**investigation**  (28:16)
**involved**  (30:3)(31:22)
**issues**  (14:10)(43:10)
(43:11)(43:14)(43:15)
(45:12)(45:13)(53:9)

## J

**jail**  (4:24)(5:18)(7:2)
(8:23)(8:25)(9:11)
(9:24)(12:23)(13:10)
(18:24)(22:25)(26:7)
(27:20)(32:9)(40:12)
(44:16)(51:18)(54:16)
(54:20)(56:16)(56:25)
**Jail's**  (8:5)
**JEAN**  (1:3)
**Jefferson**  (6:9)(6:10)
**JOEL**  (1:17)(2:4)(2:10)
**JOHN**  (1:4)(2:15)
(11:24)(26:5)(30:4)
(30:9)(41:2)(62:5)
**judge**  (11:6)(46:3)
(52:9)(52:17)
**judgment**  (21:3)
**June**  (60:23)(62:4)

## K

**keep**  (11:4)(11:11)
(49:25)
**keeping**  (49:17)(49:23)
(50:3)(50:5)

**kept**  (21:22)(36:21)
(37:2)(50:9)
**Kevin**  (62:1)
**kill**  (39:2)
**killing**  (38:24)(57:7)
(58:9)(58:13)
**kind**  (18:17)(38:12)
(54:14)
**Klonopin**  (15:6)(43:12)
(43:15)(43:20)(44:9)
(44:20)(45:14)
**Knowing**  (60:1)
**known**  (27:20)

## L

**last**  (6:13)(14:9)
(31:13)(33:24)
**later**  (20:17)(48:2)
(50:21)(53:21)(56:5)
**LAW**  (1:17)(2:4)(2:10)
(2:16)(62:6)
**LAWNICZAK**  (1:3)
**least**  (20:20)(54:18)
**leave**  (5:18)(5:20)(5:22)
**led**  (36:20)
**left**  (5:19)
**Less**  (6:6)
**level**  (17:14)(32:17)
(54:12)
**line**  (14:21)(42:23)
**listed**  (10:5)(37:14)
(45:12)
**little**  (16:19)(27:3)
(41:11)(49:16)(52:19)
**livid**  (21:6)
**LOCATION**  (1:17)
**locked**  (51:24)
**long**  (6:2)(6:4)(6:10)
(19:18)(21:10)(38:5)
(39:19)
**longer**  (4:24)(5:8)
(19:15)(19:23)(19:25)
(20:3)
**longest**  (20:6)
**looking**  (38:15)
**lot**  (44:7)(56:23)
**lunge**  (57:18)

## M

**Ma'am**  (40:8)
**mad**  (15:14)
**made**  (7:24)(31:8)
(38:23)(39:11)(39:16)
(39:17)(53:4)(56:4)
(56:23)(58:4)
**making**  (38:19)(50:22)
**male**  (32:13)
**males**  (32:13)
**manner**  (16:8)
**March**  (7:20)(8:10)(9:3)
(11:24)(12:20)(25:13)
(26:6)(28:11)(29:25)
(33:22)(41:5)
**Marguerite**  (30:23)
**marked**  (29:3)(29:19)
(33:3)(33:11)(39:25)
(40:3)(40:11)
**marks**  (24:6)
**Massimo**  (2:9)(62:15)
(62:20)
**matter**  (21:2)
**mean**  (7:23)(11:10)
(12:13)(16:1)(16:2)
(16:18)(20:13)(21:17)
(22:18)(23:7)(24:3)
(24:8)(24:11)(30:5)

(31:5)(31:20)(31:22)
(34:16)(35:1)(35:3)
(36:22)(39:15)(42:9)
(44:5)(44:7)(44:15)
(44:16)(46:6)(46:25)
(47:12)(48:25)(50:4)
(56:8)(56:10)(57:19)
(58:7)(58:14)
**Meaning** (24:12)
**means** (17:12)(18:20)
(32:2)(34:18)(47:2)
**meant** (19:6)(27:20)
(46:20)
**medical** (10:2)(13:13)
(14:5)(14:7)(14:10)
(15:8)(15:21)(23:9)
(23:11)(24:1)(24:6)
(24:8)(25:2)(27:13)
(34:11)(34:13)(43:10)
(45:12)(46:9)(46:16)
(51:25)(52:12)(55:23)
**medically** (21:23)
(23:23)(23:25)(34:12)
(34:16)(34:20)(34:25)
(35:1)(35:4)(35:15)
(35:18)(37:5)(37:12)
(37:17)(38:4)(43:6)
(43:17)(44:1)(45:16)
**medications** (10:2)
(44:7)(44:9)(44:13)
(44:15)(44:21)(44:25)
(46:8)(52:23)(53:17)
(54:6)
**meds** (45:21)(46:14)
**mental** (17:20)(17:24)
(18:2)(22:21)(22:24)
(23:14)(23:21)(24:14)
(24:18)(24:23)(32:16)
(32:21)(43:11)(43:14)
(44:24)(45:1)(45:13)
(45:20)(45:23)(46:10)
(46:16)(48:23)(49:2)
(49:7)(53:2)(53:11)
(53:13)
**mention** (51:16)(56:13)
**mentioned** (13:6)(14:1)
(14:7)(58:18)
**meth** (30:13)(30:17)
(31:9)(31:10)(31:11)
**M-E-T-H** (30:16)
**middle** (32:17)(46:19)
**midst** (47:12)
**milling** (47:5)
**Millvale** (30:9)(30:18)
**minute** (11:14)
**minutes** (51:5)
**Molike** (7:6)(7:7)
**moment** (37:2)(41:20)
**more** (27:2)(50:25)
(56:12)(58:15)

**-**

**-MR** (51:10)

**M**

**much** (38:13)(51:5)
**must** (42:6)(62:13)
**myself** (16:5)(17:5)
(39:17)(51:2)
**myth** (30:14)(30:16)

**N**

**N/A** (34:3)(34:10)
**N/CT** (30:4)(30:5)
(30:9)(30:11)(31:14)
**name** (46:22)(52:21)

**narrative** (31:13)
**Nations** (28:25)
**need** (4:17)(6:5)(36:23)
(36:25)(54:4)
**needed** (36:21)(37:2)
(58:8)
**negative** (37:10)
**never** (20:4)(31:11)
(33:17)(33:19)(33:21)
**new** (9:21)(11:20)
(16:6)(30:6)(38:19)
(38:23)(52:3)
**next** (42:23)(43:9)
(46:15)
**night** (31:3)(31:7)
(31:19)(40:25)(58:11)
(58:12)(58:16)(58:20)
**Non-Waiver** (3:5)(62:10)
**norm** (57:22)(58:2)
**normal** (40:20)
**notarized** (62:14)
**Notary** (1:21)(2:3)
(60:4)(60:25)(61:24)
**noted** (62:11)
**nothing** (60:7)
**Notice** (3:5)(62:10)
**November** (5:12)(5:16)
**Number** (26:3)(54:15)
**nurse** (7:13)(9:14)
(23:14)(27:19)(31:16)
(45:1)(45:8)(47:18)
(47:20)(52:20)
**nurses** (22:24)(31:19)
(31:22)
**nursing** (6:17)(6:20)
(7:10)(7:15)(8:22)

**O**

**object** (16:13)(17:9)
(20:22)(21:24)(22:15)
(35:20)(43:22)(44:2)
(44:14)(45:24)(48:17)
(48:18)(50:7)(50:12)
(55:17)(57:9)(58:3)
**objection** (58:5)
**observation** (17:22)
(32:10)(54:16)(56:21)
**observe** (10:4)(10:8)
(38:8)
**observed** (16:1)
**obviously** (58:1)
**occur** (17:14)
**occurred** (41:9)
**occurrence** (34:1)
**occurring** (11:23)
**off** (6:6)(44:19)(45:6)
(51:21)
**office** (60:22)
**officers** (31:14)
**officer's** (38:25)
**OFFICES** (1:17)(2:3)
(2:4)(2:10)
**on-call** (17:24)
**Once** (4:11)(23:19)
(32:11)(46:2)
**one** (8:10)(9:19)(9:20)
(10:13)(14:15)(17:25)
(26:20)(26:23)(29:23)
(29:25)(33:22)(35:10)
(39:24)(40:17)(54:1)
(58:10)(58:12)(59:11)
**only** (39:19)(48:22)
(49:6)(59:10)
**open** (37:23)
**opinion** (22:10)(48:7)
**opportunity** (36:23)

**orientation** (8:3)
**original** (62:15)(62:16)
**ORLANDO** (1:4)(11:24)
(12:14)(12:22)(12:25)
(13:3)(13:20)(13:22)
(14:4)(15:17)(20:18)
(23:23)(24:22)(25:10)
(25:14)(26:6)(26:8)
(26:15)(28:2)(28:10)
(28:17)(30:4)(30:9)
(31:4)(31:8)(36:25)
(38:19)(39:16)(41:2)
(43:20)(44:8)(45:22)
(47:15)(48:1)(50:9)
(50:17)(57:4)(57:23)
**Orlando's** (13:16)
(18:18)(20:9)(26:13)
(34:3)(34:10)(45:2)
(45:5)(58:16)
**others** (10:2)(10:24)
(14:17)(21:15)(37:9)
(58:19)
**out** (9:22)(15:16)(17:2)
(19:4)(21:4)(21:5)
(21:9)(27:8)(38:12)
(40:20)(40:22)(40:24)
(41:8)(41:12)(41:13)
(41:15)(48:9)(48:24)
(49:10)(49:14)(49:24)
(49:25)(50:9)(51:24)
(52:20)(52:21)(53:1)
(53:14)(53:24)
**over** (5:23)(29:7)
(41:13)(52:19)

**P**

**page** (38:18)(46:19)
**pages** (61:2)
**pain** (24:5)
**PALS** (6:21)
**panel** (41:11)
**paper** (28:21)
**Park** (62:2)
**part** (8:3)(28:16)
(37:15)(43:1)(46:1)
(46:2)(46:3)
**particular** (53:24)(58:20)
**parties** (60:16)(60:18)
**passed** (25:25)
**patch** (43:12)(43:16)
(43:21)(44:21)(45:3)
(45:5)(45:15)(51:17)
(51:21)
**patches** (51:18)
**pause** (51:7)
**pee** (54:8)
**pending** (4:18)
**Penn** (10:17)(37:20)
**PENNSYLVANIA** (1:1)
(2:3)(2:5)(60:1)(60:5)
(61:1)
**people** (21:6)(23:2)
(38:20)(48:22)(54:15)
(54:19)(59:3)
**percentage** (54:15)
**perfectly** (21:8)
**performed** (13:13)
**periods** (53:8)
**person** (9:21)(15:21)
(16:11)(17:3)(17:7)
(27:7)(49:6)
**Personal** (1:3)
**personnel** (13:14)
**pharmacy** (52:25)
**phone** (9:19)
**physical** (10:11)(24:8)

(44:22)
**physically** (35:1)
**physician** (17:20)
(17:24)(17:25)(18:2)
(18:9)(22:22)(23:15)
**physicians** (22:24)
**picks** (52:20)
**picture** (52:18)
**piece** (28:21)
**pile** (52:19)(53:14)
**Pitt** (2:16)(2:17)(62:6)
(62:7)
**Pittsburgh** (1:19)(2:4)
(2:12)(2:17)(62:7)
**place** (15:22)(16:11)
(17:21)(18:11)(60:9)
**placed** (11:13)(13:3)
(16:22)(17:8)(18:19)
(20:11)(26:15)(27:16)
(28:6)(31:14)(31:25)
(48:2)(48:6)(48:15)
**placed or** (48:14)
**places** (32:9)
**Plaintiff** (1:5)(1:20)
(2:1)(2:8)
**plaintiff's** (26:5)
**Please** (26:3)(26:7)
(36:2)(62:11)(62:15)
(62:17)
**point** (17:2)(19:21)
(20:16)(21:25)(22:18)
(24:2)(36:24)(39:9)
(49:3)(52:6)(52:9)
**police** (27:5)(30:9)
(30:18)(52:4)
**policy** (8:6)(8:9)(8:11)
(8:15)(13:9)(17:18)
**port** (27:3)(27:8)
(27:12)(30:11)
**portion** (31:13)
**possession** (62:16)
**possible** (12:12)(42:23)
(49:15)
**possibly** (15:15)(43:4)
**potentially** (16:10)
**practitioner** (17:25)
(18:2)
**Precaution** (17:19)
(17:22)(18:7)(32:5)
(32:10)
**precautions** (18:19)
(18:22)(19:1)(34:21)
(48:4)(48:23)(49:7)
**preceding** (62:12)
**pregnancy** (54:8)
**pregnant** (9:24)(10:16)
(37:18)(37:19)(38:5)
(47:8)(54:7)(54:9)
**preparation** (4:22)
(40:17)
**prescription** (44:10)
**present** (31:3)
**presenting** (48:9)(48:12)
**pretty** (38:13)(51:5)
**prevention** (7:22)(8:6)
(17:19)
**primary** (9:6)
**printing** (60:11)
**prior** (5:25)(26:16)
(27:16)(53:4)
**probably** (4:19)(12:7)
(15:13)(41:10)(51:2)
**problem** (14:6)(14:7)
(17:10)
**problems** (13:17)
**Procedure** (2:2)(13:19)

(52:13) (55:21)
**proceedings**  (51:8)
(59:19)
**proceeds**  (23:22)
**process**  (9:10) (9:13)
(9:16) (15:17) (16:6)
(16:20) (22:21) (24:24)
(25:6) (31:4) (37:15)
(40:21) (45:19) (46:1)
(54:4) (55:4) (55:14)
**processing**  (55:7) (55:8)
(55:10) (55:12) (56:5)
**professional**  (17:21)
(22:10)
**provider**  (17:23) (53:16)
**psychiatrist**  (17:24)
(18:1)
**Public**  (1:21) (2:3) (60:4)
(60:25) (61:24)
**put**  (7:25) (10:19)
(11:10) (15:24) (15:25)
(18:16) (18:21) (19:2)
(20:20) (32:6) (32:18)
(34:24) (47:2) (48:5)
(50:1) (50:2) (51:3)
(51:22) (52:19) (53:13)
(58:8)

## Q

**QCR**  (1:22) (61:24)
**qualified**  (17:20)
**QUALITY**  (62:1)
**question**  (4:15) (4:18)
(4:19) (10:20) (10:21)
(10:25) (11:12) (11:15)
(14:6) (14:8) (14:9)
(14:12) (14:13) (14:14)
(14:18) (15:4) (15:23)
(16:14) (16:17) (16:18)
(18:5) (20:23) (21:14)
(21:19) (21:20) (26:3)
(26:12) (26:13) (28:9)
(28:15) (30:1) (30:3)
(32:22) (33:13) (34:13)
(35:17) (35:21) (36:1)
(36:10) (37:8) (37:25)
(38:3) (39:4) (39:22)
(40:1) (43:2) (43:25)
(50:15)
**questioned**  (28:16)
(28:19)
**questioning**  (10:6)
**questions**  (9:9) (9:23)
(10:5) (10:14) (13:25)
(14:4) (16:8) (20:12)
(20:15) (20:19) (21:11)
(21:12) (21:13) (21:17)
(23:20) (25:22) (26:2)
(26:11) (26:19) (26:21)
(29:15) (34:19) (35:7)
(35:9) (35:25) (36:20)
(36:24) (37:14) (37:16)
(43:1) (46:7) (51:16)
(53:12) (53:15) (54:23)
(55:22) (55:24)

## R

**randomly**  (17:2)
**rarely**  (55:15)
**read**  (18:10) (29:7)
(29:16) (29:23) (33:20)
(33:21) (36:3) (36:6)
(58:24) (59:2) (61:2)
(62:11)
**reading**  (17:16) (60:15)
**ready**  (57:20)

**really**  (11:5) (12:16)
(28:14) (45:1) (49:20)
**reason**  (24:1) (24:7)
(24:8) (39:19) (51:20)
**recall**  (8:12) (9:10)
(11:23) (12:6) (12:14)
(14:13) (19:20) (25:16)
(25:22) (28:12) (28:18)
(28:19) (31:3) (31:6)
(40:24) (58:17)
**recants**  (51:1)
**receipt**  (62:18)
**receive**  (8:14) (8:24)
(9:19) (25:5)
**recommend**  (16:21)
(17:7) (18:6) (18:18)
(22:21)
**record**  (36:6) (60:12)
**recorded**  (60:10)
**record's**  (15:9)
**reduced**  (60:11)
**Re-Examination**  (3:3)
(54:25)
**refer**  (11:1) (23:14)
(46:10) (55:6) (55:7)
**Reference**  (1:22) (61:24)
**referral**  (53:12)
**referred**  (23:18)
**referring**  (8:7) (9:13)
(12:19) (17:11) (17:23)
(40:14) (55:19)
**reflective**  (41:7)
**refuse**  (18:25) (24:2)
(24:3) (24:7) (24:8)
(24:11) (24:14) (24:17)
(38:8)
**refused**  (38:7)
**regarding**  (8:14) (8:17)
(10:21) (15:4) (26:13)
**relative**  (60:18) (60:19)
**relayed**  (30:21)
**release**  (11:7)
**released**  (20:18)
**remember**  (5:12)
(11:25) (12:1) (12:2)
(12:3) (14:6) (25:17)
(52:24)
**remove**  (47:23) (49:6)
**removed**  (20:10) (20:13)
(47:16) (47:21) (48:1)
(48:7) (48:15)
**repeat**  (14:15)
**repeated**  (36:1)
**report**  (5:4) (5:6)
(29:20) (30:23) (33:12)
**REPORTED**  (1:21)
**Reporter**  (2:3) (3:4)
(36:7) (58:25) (59:5)
(59:9) (59:13) (59:17)
(60:3) (62:19)
**REPORTING**  (62:1)
**reports**  (4:25)
**Representative**  (1:4)
(28:25)
**requests**  (46:17)
**respective**  (60:16)
**respects**  (61:19)
**respond**  (14:11) (14:14)
(25:20)
**responded**  (25:16)
(25:17) (26:10) (26:14)
**response**  (10:14) (11:8)
(21:14) (21:20) (21:22)
(27:15) (36:25) (43:5)
(43:14)
**responses**  (20:19)

(21:11) (26:19) (35:17)
(37:16)
**responsibility**  (23:17)
**responsible**  (9:3)
**restrained**  (49:17)
**restraint**  (12:2) (13:1)
(13:7) (13:22) (19:15)
(19:19) (20:18) (21:4)
(21:6) (26:15) (26:25)
(27:17) (28:3) (34:24)
(39:20) (40:23) (49:22)
(50:10) (57:6) (58:8)
**restraints**  (31:15)
**return**  (62:17)
**review**  (4:22) (5:3)
(40:8) (55:12)
**reviewed**  (5:6) (29:10)
(33:4) (40:4) (40:17)
**risk**  (12:12) (16:10)
(20:20) (20:21)
**risks**  (8:20) (15:8)
**role**  (9:13) (9:18)
**routine**  (51:25)
**Rules**  (2:2)

## S

**safe**  (11:4) (36:21)
(37:2) (49:17) (49:23)
(50:1) (50:3) (50:6) (50:9)
**sally**  (27:3) (27:8) (27:12)
(30:11)
**same**  (27:24) (27:25)
(31:5) (32:19) (33:13)
(40:14) (41:6) (41:18)
(62:16)
**SANSONE**  (1:17) (2:4)
(2:10)
**saw**  (12:25)
**say**  (7:16) (11:17)
(14:20) (14:23) (17:2)
(18:24) (19:8) (20:17)
(21:13) (21:20) (23:11)
(24:12) (24:22) (27:2)
(27:7) (30:12) (36:11)
(36:13) (36:16) (39:1)
(42:18) (46:6) (53:11)
(53:15) (54:6) (56:7)
**saying**  (9:20) (14:11)
(16:4) (16:6) (16:19)
(21:7) (34:25) (35:11)
**says**  (11:15) (30:1)
(30:3) (31:13) (31:25)
(34:10) (38:19) (38:23)
(41:2) (41:5) (41:21)
(42:23) (46:15) (46:21)
(51:1) (54:10)
**scene**  (31:23)
**schedule**  (5:24)
**school**  (6:15)
**scientific**  (56:18)
**screaming**  (41:25)
(42:4) (50:18)
**seal**  (60:22)
**second**  (38:17) (55:4)
**Section**  (17:16) (17:18)
(17:19) (30:7) (33:25)
(38:18) (41:21) (43:9)
(45:13) (46:15)
**see**  (11:6) (13:3) (23:10)
(23:21) (26:22) (27:1)
(34:6) (37:23) (38:14)
(38:21) (38:23) (45:2)
(45:20) (45:22) (49:5)
(52:17) (53:18)
**seen**  (20:4) (20:6) (21:6)
(33:17)

**sees**  (46:3) (46:11)
**segregation**  (46:21)
(47:1) (47:7) (47:11)
**seizure**  (15:15) (42:23)
(43:5)
**send**  (59:2) (59:3)
(62:16)
**sent**  (25:23) (37:20)
(37:24)
**sentence**  (31:13)
(33:24) (34:10) (34:17)
**separate**  (27:23)
**series**  (9:23)
**Services**  (40:13)
**set**  (60:21)
**Seven**  (6:11) (6:12)
**severe**  (24:22)
**Shaking**  (38:11) (38:12)
(39:10)
**shall**  (17:23) (18:3)
**Sheet**  (3:4) (62:12)
(62:13) (62:15) (62:17)
**she's**  (59:2)
**shift**  (9:8)
**shifts**  (31:5)
**short**  (53:20)
**shout**  (42:11)
**shouting**  (42:1)
**showers**  (10:19)
**sick**  (15:13)
**side**  (39:10)
**Signature**  (3:5) (62:10)
(62:13)
**signed**  (62:15)
**signing**  (60:15)
**signs**  (8:17)
**single**  (58:7)
**sit**  (32:4)
**sitting**  (56:8) (56:10)
**situation**  (11:8) (15:19)
(20:9) (57:15)
**size**  (59:6) (59:9) (59:11)
**somebody**  (11:1)
(15:22) (16:21) (17:5)
(17:13) (20:6) (20:14)
(37:4) (47:9) (48:22)
(52:9) (54:10) (57:6)
**someone**  (17:2) (22:19)
(48:24) (49:7) (57:12)
**something**  (14:21)
(16:8) (16:9) (18:24)
(37:23) (45:8) (54:11)
**sometimes**  (52:25)
**somewhere**  (37:22)
**soon**  (49:15)
**sorry**  (10:20) (14:7)
(14:14) (18:15) (19:12)
(23:11) (39:5)
**South**  (6:16)
**speak**  (30:6) (49:2)
**specialist**  (23:19)
(23:21) (45:20) (45:23)
(46:11) (48:24) (53:13)
**specialized**  (6:19) (8:24)
**specific**  (12:6) (27:2)
(29:23)
**specifically**  (9:3) (14:25)
(31:6) (33:19) (37:25)
(39:2) (46:9) (52:24)
(53:10)
**speculate**  (36:14)
**speculating**  (22:8)
(48:20)
**spoke**  (26:4) (48:10)
(49:1)
**spoken**  (28:19)

**staff** (26:16)(27:13)(34:12)(34:14)
**stand** (7:9)
**standing** (11:14)
**Stanwix** (1:18)(2:4)(2:11)
**start** (4:15)
**started** (30:12)
**starts** (46:5)
**stated** (30:19)(60:9)
**statement** (12:6)(12:11)(26:13)(31:8)(39:7)(39:12)(39:16)(42:7)(58:2)
**statements** (38:24)(48:13)
**STATES** (1:1)(28:25)(30:8)(43:10)(43:11)(45:14)
**stationed** (23:9)
**statistics** (56:19)
**status** (46:17)
**stay** (19:14)(19:15)(19:18)(20:4)(20:7)(52:12)
**staying** (52:10)
**stenographically** (60:10)
**step** (56:5)
**steps** (8:7)
**still** (20:20)(49:17)(50:22)
**straps** (12:2)(12:16)(13:6)(13:16)(13:17)(34:3)(34:10)(34:18)(35:5)
**Street** (1:18)(2:4)(2:11)
**strong** (21:20)
**struggling** (37:4)
**stuck** (15:16)
**study** (56:18)
**Subpoena** (5:2)
**Subscribed** (61:22)
**suicidal** (42:10)(47:9)(53:3)
**suicide** (7:22)(8:1)(8:4)(8:6)(8:18)(10:18)(10:19)(10:21)(11:11)(11:13)(12:12)(14:15)(15:22)(15:25)(16:10)(16:12)(16:22)(17:6)(17:8)(17:11)(17:13)(17:17)(17:19)(17:22)(18:6)(18:7)(18:19)(18:21)(18:23)(20:11)(20:21)(32:5)(32:9)(32:10)(34:21)(35:11)(40:22)(42:7)(47:13)(48:3)(48:5)(48:15)(48:23)(48:25)(49:7)(49:9)(49:12)(50:1)(50:2)(50:10)(50:20)(50:25)(51:3)
**Suite** (1:18)(2:4)(2:12)
**supervisor** (4:7)
**supposed** (10:3)(36:22)(45:22)
**sure** (13:11)(35:24)(39:21)(45:12)(52:22)(55:18)(59:2)(59:4)
**surprise** (58:10)
**surprising** (57:21)(57:25)(58:1)
**suspicious** (16:8)
**sweaty** (15:14)
**sworn** (4:2)(60:6)(61:22)

**symptoms** (44:24)

## T

**talk** (9:2)(11:12)(12:8)(47:15)(47:20)(58:12)
**talked** (51:25)
**talking** (27:19)(52:22)(57:15)(58:9)(58:14)
**tell** (9:21)(19:22)(20:4)(31:7)(36:23)(37:18)(37:22)(38:14)(38:15)(38:16)(53:7)(53:16)
**telling** (54:2)
**tells** (53:23)
**tended** (31:5)
**term** (27:19)
**Terzigni** (2:9)(3:2)(3:3)(4:7)(14:3)(16:16)(17:15)(19:13)(21:1)(22:1)(22:5)(22:9)(22:14)(22:17)(29:1)(29:6)(29:13)(30:15)(33:7)(34:3)(34:5)(34:9)(35:23)(36:3)(36:17)(36:19)(40:7)(43:24)(44:4)(44:17)(44:18)(45:25)(48:21)(50:8)(50:14)(51:4)(51:10)(55:2)(55:20)(57:11)(58:4)(58:6)(58:21)(62:15)(62:20)
**terzignim** (2:10)
**test** (54:3)(54:8)(54:11)
**testified** (4:3)(5:8)(8:13)(28:5)(42:14)(42:17)
**testify** (60:6)
**testimony** (42:21)(60:12)
**testing** (54:10)
**than** (6:6)(11:10)(19:15)(19:23)(19:25)(20:3)(56:12)
**Thank** (59:17)
**them** (9:14)(10:8)(10:18)(10:19)(11:4)(11:6)(11:7)(11:10)(11:11)(15:24)(15:25)(23:10)(32:8)(45:10)(47:12)(49:23)(50:1)(52:4)(52:23)(53:2)(53:6)(53:15)(53:17)(53:18)(54:8)(54:18)(55:22)(57:19)
**themselves** (7:25)(16:24)(51:22)(58:9)(58:13)(58:15)
**there's** (4:18)(27:3)(27:7)(30:1)(30:2)(30:7)(32:17)(38:18)(52:7)(53:5)
**these** (14:2)(29:21)(44:8)(50:22)
**they're** (16:19)(38:5)(38:10)(38:14)(38:16)(44:10)(47:13)(49:23)(52:10)(53:8)(53:23)(54:1)(54:5)(54:7)(54:11)(57:14)
**thing** (41:13)(41:19)(42:10)
**things** (4:12)(21:7)
**think** (6:4)(14:5)(14:25)(16:9)(17:10)(17:12)(20:23)(21:2)(22:7)(28:14)(30:6)

**(30:16)(31:21)(32:14)(43:4)(45:11)(51:5)(51:23)(52:6)(58:21)**
**third** (33:24)
**thirty** (62:18)
**though** (39:21)(39:23)
**thought** (39:21)(46:20)
**threat** (42:8)
**threatens** (17:13)
**threats** (38:20)
**three-page** (23:20)(46:4)
**through** (9:16)(9:17)(13:19)(18:15)(29:16)(33:8)(45:19)(46:2)
**throw** (15:14)
**tight** (34:19)
**tightness** (31:16)(34:11)
**time** (4:17)(6:7)(7:14)(7:16)(7:17)(8:10)(11:2)(17:14)(18:22)(21:25)(28:6)(29:7)(29:25)(30:8)(31:10)(41:5)(41:6)(41:7)(41:8)(41:11)(41:14)(41:18)(52:6)(53:20)(60:9)
**title** (7:7)(7:11)
**titled** (17:18)
**told** (39:24)
**took** (10:18)(15:2)(42:9)
**top** (30:3)(38:17)(41:2)
**trained** (7:22)(8:17)(8:20)
**training** (8:2)(8:14)(8:24)
**transcript** (61:19)(62:11)(62:16)
**treat** (11:5)
**TRICIA** (1:12)(2:1)(4:1)(60:6)(61:2)(61:21)(62:9)
**true** (60:12)(61:19)
**truth** (60:7)(60:8)
**turn** (21:7)
**twenty-four** (18:4)(19:23)(19:25)
**Two** (1:17)(2:4)(2:11)(6:13)(26:19)(27:23)(58:11)(58:12)
**type** (18:12)(54:17)(58:25)

## U

**uncommon** (54:19)
**under** (13:12)(30:10)(60:11)
**undergrad** (6:17)
**understand** (16:15)(16:17)(18:8)(18:9)(20:25)(35:21)(36:10)(36:11)(36:12)(36:14)(36:16)(37:4)(37:6)(44:3)
**understood** (11:5)
**undress** (45:10)
**unit** (23:9)(23:11)(32:16)(32:20)(32:23)(46:14)
**UNITED** (1:1)(28:24)(28:25)
**until** (4:14)(11:9)(28:2)(54:3)
**unusual** (54:19)(54:21)(57:2)(57:4)(57:8)(57:12)(57:17)(57:19)(57:21)

**upset** (12:3)
**upstairs** (6:14)(23:6)(52:14)
**used** (27:18)
**usually** (11:20)(20:8)(38:15)(41:12)(54:3)

## V

**vague** (16:19)
**verbally** (54:17)
**verify** (54:5)(54:9)(54:10)
**visible** (10:4)(10:8)(11:11)
**visibly** (37:23)
**visual** (32:8)
**voluntarily** (5:20)

## -

**-vs-** (1:6)

## W

**wait** (4:14)(46:18)
**waived** (60:16)
**walk** (9:16)(49:16)
**wall** (41:11)
**want** (10:1)(10:23)(14:16)(16:5)(17:2)(17:5)(27:22)(36:1)(42:21)(45:12)(47:12)(49:15)(53:7)(56:8)(59:7)(59:13)
**wanted** (12:4)(16:23)(25:10)(26:14)(26:18)(30:19)(39:22)(39:25)
**wants** (48:13)
**warning** (8:17)
**warrant** (21:22)
**watch** (15:22)(16:12)(16:22)(17:8)(17:11)(17:19)(18:7)
**wearing** (47:13)
**Welsh** (1:21)(2:2)(60:3)(62:19)
**We're** (12:8)(35:11)(37:1)(45:10)
**West** (10:17)(37:20)
**WESTERN** (1:1)
**whatever** (32:11)
**What's** (20:6)(32:15)(34:2)(49:11)(52:16)
**WHEREOF** (60:21)
**wherever** (46:12)
**whoever** (41:19)(52:4)
**whole** (36:24)(42:9)(42:10)(60:7)
**whose** (23:17)
**wish** (61:3)
**withdraw** (8:21)(38:7)(38:9)(53:15)
**withdrawing** (15:8)(44:25)(53:10)(56:13)
**withdraws** (38:6)(44:22)
**witness** (2:1)(14:2)(19:8)(19:11)(29:10)(33:4)(40:4)(60:5)(60:13)(60:17)(60:21)
**word** (57:22)
**wording** (11:3)
**work** (4:24)(5:9)(5:25)(6:2)(6:8)(6:10)(23:2)(31:5)(55:10)
**worked** (7:3)
**working** (5:25)(23:6)(25:13)
**wound** (24:4)(37:23)

**wounds** (10:4)(10:9)
**written** (8:9)(26:2)
(30:23)(41:6)
**wrote** (12:7)(41:19)
(41:23)(43:10)(46:20)

## X

**Xanax** (15:7)(43:12)
(43:15)(43:20)(44:9)
(44:20)(45:14)

## Y

**year** (6:4)(6:6)
**years** (6:11)(6:12)
**yelling** (57:7)(57:14)
**yet** (11:4)(11:7)
**yourself** (10:1)(10:23)
(14:16)(21:15)(37:9)
(49:18)(49:21)(49:22)