# EXHIBIT M



**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3                    - - - -
4   JEAN LAWNICZAK, as Personal      )
    Representative of the ESTATE     )
    OF JOHN ORLANDO, Deceased,       )
5                                    )
        Plaintiff,                   ) Civil
6                                    ) Action No.:
        -vs-                         ) 2:17-cv-001
7                                    ) 85
    ALLEGHENY COUNTY, et al.,        )
8                                    )
        Defendants.                  )
9
10                   - - - -
11
12         DEPOSITION OF:  TERESA LATHAM
13                   - - - -
14
15   DATE:    May 29, 2018
16           Tuesday, 12:59 p.m.
17   LOCATION:   LAW OFFICES OF JOEL SANSONE
18               Two Gateway Center
                 603 Stanwix Street
                 Suite 1290
19               Pittsburgh, PA  15222
20   TAKEN BY:    Plaintiff
21   REPORTED BY:   Beth E. Welsh
22               Notary Public
                 QCR Reference No. BW2909
23
24
25
```

**Page 2**

```
1            DEPOSITION OF TERESA LATHAM,
     a witness, called by the Plaintiff for examination,
2    in accordance with the Federal Rules of Civil
     Procedure, taken by and before Beth E. Welsh, a Court
3    Reporter and Notary Public in and for the
     Commonwealth of Pennsylvania, at the offices of
4    LAW OFFICES OF JOEL SANSONE, Two Gateway Center,
     603 Stanwix Street, Suite 1290, Pittsburgh,
5    Pennsylvania, on Tuesday, May 29, 2018, commencing at
     12:59 p.m.
6
7                    - - - -
8    APPEARANCES:
9    FOR THE PLAINTIFF:
10   Massimo A. Terzigni, Esquire
     terzignim@gmail.com
11   LAW OFFICES OF JOEL SANSONE
     Two Gateway Center
12   603 Stanwix Street
     Suite 1290
13   Pittsburgh, PA  15222
     412.281.9194
14   FOR THE DEFENDANTS:
15   John A. Bacharach, Esquire
     john.bacharach@alleghenycounty.us
16   Allegheny County Law Department
     300 Fort Pitt Commons Building
17   445 Fort Pitt Boulevard
     Pittsburgh, PA  15219
18   412.350.1150
19
20
21
22
23
24
25
```

**Page 3**

```
1
2
3                    * I N D E X *
4    Examination by Mr. Terzigni . . . . . . . . .   4
     Examination by Mr. Bacharach . . . . . . . .   53
5
     Certificate of Court Reporter . . . . . . . .   57
6    Errata Sheet . . . . . . . . . . . . . . . .   58
     Notice of Non-Waiver of Signature . . . . . .   59
7
8             * INDEX OF EXHIBITS *
9
10   Deposition Exhibit 1 . . . . . . . . . . .   25
     Deposition Exhibit 2 . . . . . . . . . . .   31
     Deposition Exhibit 3 . . . . . . . . . . .   33
11   Deposition Exhibit 4 . . . . . . . . . . .   38
     Deposition Exhibit 5 . . . . . . . . . . .   43
12   Deposition Exhibit 6 . . . . . . . . . . .   46
     Deposition Exhibit 7 . . . . . . . . . . .   48
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                TERESA LATHAM,
2          having been duly sworn,
3        was examined and testified as follows:
4                    - - - -
5                EXAMINATION
6                    - - - -
7    BY MR. TERZIGNI:
8    Q.  Ma'am, could you please pronounce your name for
9        me?
10   A.  Teresa Latham.
11   Q.  Ms. Latham, have you ever been deposed before?
12   A.  Yes.
13   Q.  Did you prepare for this deposition today?
14   A.  No.
15   Q.  You didn't review any documents?
16   A.  I did review the old interview.
17   Q.  The intake interview?
18   A.  Yes.
19   Q.  And that's the intake interview you did with
20       John Orlando?
21   A.  Yes.
22   Q.  How long have you been employed by Allegheny
23       County Jail?
24   A.  Seventeen years.
25   Q.  What positions have you held?
```

5

1  A.  RN.
2  Q.  Did you work for Corizon at all or always
3      Allegheny County Jail?
4  A.  I worked for Corizon.
5  Q.  How long did you work for Corizon?
6  A.  For the length of time they were there, two
7      years.
8  Q.  Two years?
9  A.  However long they were there.
10 Q.  Can you please describe your general
11     responsibilities as a nurse?
12 A.  My responsibilities as a nurse was comprehensive
13     assessment of the individual and that would be
14     appropriateness for admission to the jail,
15     triaging any immediate injuries or concerns,
16     then comprehensive assessment, first aid if that
17     was indicated, responding to emergencies, like I
18     said, the assessment and anything that happened
19     on the ground level, response to that.
20 Q.  By ground level do you mean the intake area?
21 A.  Yes.
22 Q.  What is a comprehensive assessment?
23 A.  That would be assessing physical status,
24     injuries, dental, mental health and trying to
25     get a baseline assessment of the patient.

6

1  Q.  Now, it's my understanding that there are two
2      intakes in the jail, one when the inmate first
3      comes in and one after the arraignment.  Do I
4      have that right?
5  A.  I'm not sure what you mean by two intakes.  I
6      don't know what you mean.
7  Q.  When did you complete the assessment of the
8      inmates?
9  A.  When he came to the nursing office for his
10     nursing assessment.
11 Q.  At what point in his stay was that?
12 A.  It was when he was ready for his nursing
13     interview.
14 Q.  So that was after I guess his initial intake;
15     correct?
16 A.  After admission to the jail do you mean?
17 Q.  Yes.
18 A.  It was after admission to the jail.
19 Q.  Does the assessment usually take place after the
20     arraignment?
21 A.  Yes.
22 Q.  So when an inmate is admitted to the jail there
23     is an initial intake procedure; correct?
24 A.  That's correct.
25 Q.  Did you ever work in that initial intake

7

1      process?
2  A.  Yes.
3  Q.  What's the difference between that intake and
4      the comprehensive assessment?
5  A.  Well, for admission to the jail all you're doing
6      is essentially clearing the person for admission
7      to jail.
8  Q.  What would lead to an inmate not being cleared
9      to the jail?
10 A.  If he had injuries or any condition that could
11     not be safely taken care of in our environment.
12 Q.  What about a mental health issue?
13 A.  It would include mental health.  If the person
14     was acting out or a threat to himself or someone
15     else, something we couldn't handle, then that
16     person would be referred out until a time when
17     he was cleared and safe for us to take care of.
18 Q.  So if an inmate arrives and the arresting
19     officer that is bringing the inmate in says that
20     this person said he's going to hang himself,
21     would that be something that could lead to him
22     not being cleared?
23 A.  It would depend.  If the person said that and
24     the nurse questioned and it seemed that that was
25     a valid threat, not to just a person being angry

8

1      or something that happened between the officers
2      and the inmate before they got there, really
3      something that we needed to act upon, it could
4      result in his being sent out to be cleared.
5  Q.  If you had an inmate that was suicidal, where
6      would he be sent out to, would it be Western
7      Psych?
8  A.  Some mental health facility, I don't know if it
9      would exactly be Western Psych, but somewhere
10     where he would receive psychiatric care.
11 Q.  Does Allegheny County Jail have a policy on
12     suicide prevention?
13 A.  There are -- I believe they have a policy.  I
14     can't say certainly -- with certainty though.
15 Q.  Are you familiar with that policy?
16 A.  I'm not familiar.
17 Q.  Did you receive any training on that policy?
18 A.  We've had suicide prevention classes and
19     in-services.
20 Q.  In those suicide prevention classes are you
21     taught about warning signs?
22 A.  Yes.
23 Q.  Do you recall what some warning signs of
24     suicidality are?
25 A.  Do I recall?  Do you want them listed, what I

**9**

1    recall?

2  Q.  Yes.

3  A.  Sudden change in demeanor from whatever it was

4    the person had been prior to that change, giving

5    away possessions, making statements that

6    everything's going to be all right now.  That's

7    basically.

8  Q.  Do you recall why that is a warning sign making

9    the statement everything's going to be all

10    right?

11  A.  Well, in my opinion it's because they know that

12    they don't have to worry about whatever it is or

13    was that was troubling them anymore.

14  Q.  In those classes do you recall if alcohol or

15    drug withdraw was discussed as possibly having

16    an affect on suicidality?

17  A.  Yes.

18  Q.  Do you recall why that is?

19  A.  It's a time when the person's not usually

20    feeling well and because of that they're likely

21    to say or do things because of that that they

22    wouldn't do otherwise.

23  Q.  If you are performing an intake or an assessment

24    on an inmate and he makes a statement about

25    harming himself or other people, how is that

**10**

1    handled under the suicide policy?

2          MR. BACHARACH:  I'm going to object to

3    the form of the question.  You can answer it.

4  BY MR. TERZIGNI:

5  A.  Not necessarily according to any policy.  Again,

6    I don't recall what any policy the County might

7    have states, but what I would do is to make a

8    referral to have the person evaluated and if he

9    had actually -- he or she had actually made a

10    statement stating that intent, then they would

11    be placed in a suicide prevention gown and

12    observed until that mental health evaluation is

13    completed.

14  Q.  Do inmates receive mental health evaluation as

15    part of the intake process automatically?

16  A.  Yes.

17  Q.  Do you perform that mental health evaluation?

18  A.  I do not.

19  Q.  Is that performed by a mental health nurse?

20  A.  A mental health specialist.

21  Q.  So every inmate sees a mental health specialist?

22  A.  Every inmate does.

23  Q.  Is that considered part of the intake process?

24  A.  Yes.

25  Q.  Is that done when the inmate arrives at the jail

**11**

1    or after arraignment?

2  A.  It's done usually after arraignment.

3  Q.  Is that done before or after the comprehensive

4    assessment?

5  A.  It can be done before, usually it's afterward.

6  Q.  Are you familiar with Mr. Orlando and the

7    incident that occurred in March of 2016?

8  A.  I recall his interview after I looked at his

9    intake interview.

10  Q.  You recalled that after -- looking at that

11    document in preparation of this deposition?

12  A.  That reminded me of who he was, otherwise I

13    didn't recall anything specific.

14  Q.  What do you recall of your interview with

15    Mr. Orlando?

16  A.  After looking at that document and seeing his

17    picture, I remember that he had been very angry.

18  Q.  Do you recall anything else from the interview?

19  A.  Just that he was angry, he was minimally

20    cooperative.  I don't know that his answers were

21    truthful.  He was curt, he was abrupt, and he

22    was withdrawing.

23  Q.  Do you recall what he was withdrawing from?

24  A.  I believe it was heroin.

25          MR. BACHARACH:  Oh, I'm sorry, I

**12**

1    thought you said drawing.

2          MR. TERZIGNI:  Oh, no.

3  BY MR. TERZIGNI:

4  Q.  Heroin?

5  A.  I believe it was heroin.

6  Q.  Was his demeanor -- did that trigger any warning

7    signs of anything that would have been

8    concerning?

9  A.  Because I felt that he wasn't telling me the

10    truth, that's why I had mental health see him,

11    to see what they came up with upon evaluation

12    and what their feeling was after speaking with

13    him and what they felt was indicated afterward.

14  Q.  Mr. Orlando arrived at the jail on March 24th,

15    and I believe you interviewed him on March 26th.

16    Is it odd that there were a couple days in

17    between his arrival at the jail and your

18    assessment?

19          MR. BACHARACH:  I object to the form.

20    You can answer.

21  BY MR. TERZIGNI:

22  A.  That's not odd, no.

23  Q.  Before performing the comprehensive assessment,

24    do you have access to any of that inmate's

25    records?

13

1   A.   No.
2   Q.   Do you have access to that initial intake
3        report?
4   A.   I don't know what report.
5   Q.   The intake report from when he first arrives at
6        the jail?
7            MR. BACHARACH:  I'm going to object to
8        the form.
9            You can answer if you know what he's
10       talking about.
11  BY MR. TERZIGNI:
12  A.   I don't know of any report.
13  Q.   Earlier we were talking about what I called two
14       intake processes, and you said you wouldn't call
15       it two intakes, but there is a questionnaire
16       that you have to ask the inmate when he's
17       arriving at the jail to be cleared; correct?
18  A.   Let me say that if you're talking about the
19       process now --
20  Q.   I'm talking about the process in March of 2016.
21  A.   It's not two processes.  At the door you're
22       asked a few cursory questions just to see if
23       you're appropriate for admission to jail.  If
24       that's what you're referring to, then, no, we
25       don't usually have access to that.  There's

14

1        really no reason for that.  So, no, I would not
2        have had or had any reason to look at that
3        before he came for his interview.
4   Q.   Okay.  What if the report had medical
5        information on it?
6            MR. BACHARACH:  Well, I'm going object
7        to the form.  I mean you -- I'm not sure --
8        okay, you can answer.
9            MR. TERZIGNI:  She said she wouldn't
10       have cause to look at the form.
11           MR. BACHARACH:  But she didn't say
12       anything about a form.  I mean I don't know.
13       She said they ask a few cursory questions, I
14       mean she didn't say there was a form for her to
15       look at is my problem with it.
16  BY MR. TERZIGNI:
17  A.   Let me just say that when he -- at the time he
18       was admitted there was a form, it had a few
19       questions, you circled yes or no in answer to
20       the questions.  If there was a need to
21       elaborate, then there was a small space to
22       indicate whatever it was.  So unless you were
23       the nurse and they -- it was medical information
24       for everyone who came in, so not just him.  So
25       if there was a need, it was there.  Unless I was

15

1        the nurse who had cleared him, I wouldn't have
2        any idea of what was on that form, I wouldn't
3        have any reason to look or question anything
4        that was on that form.
5   Q.   I understand you're testifying that you wouldn't
6        have a reason to.  My question is do you have
7        access to that form?
8   A.   I would have access to it, yes.
9   Q.   Okay.  What if that form had medical information
10       on it, would you think that you would need to
11       look at it then?
12  A.   I'm not sure what you mean by medical
13       information.
14  Q.   In this situation Mr. Orlando was talking about
15       killing himself and others.
16  A.   Uh-huh.
17  Q.   And that was documented prior to your
18       assessment.
19  A.   Okay.
20           MR. BACHARACH:  I object to the form
21       of the question.  I don't think it correctly
22       characterizes what Mr. Orlando was saying before
23       the witness saw him.
24           You can answer.
25  BY MR. TERZIGNI:

16

1   Q.   There was documentation that Mr. Orlando said
2        I'm going to die in here and we're all going to
3        die in here.
4   A.   If that was documented --
5   Q.   Yes.
6   A.   -- I didn't see it, I don't believe they would
7        write that on that clipboard.  So if it was
8        documented, it wasn't anywhere that I saw it.
9   Q.   Wouldn't that be important information for you
10       to know?
11  A.   It would be, uh-huh.
12  Q.   So how is that information relayed to you?
13  A.   Usually in report.  If someone has something
14       that needs to be referred or carried on, then
15       usually a nurse-to-nurse report or if it's
16       written communication from a hospital, discharge
17       papers, something like that, then that
18       information is brought to the back and we have a
19       board for discharge information and if there's
20       anything that's serious, relevant, pertinent
21       that needs to be communicated, then a verbal
22       report is also communicated.  So those kinds of
23       things are shared.
24  Q.   You testified that a verbal report is
25       communicated.  Is that done at like a nurse's

17

1   meeting?
2   A.   Shift-to-shift report.
3   Q.   Okay.  During the comprehensive assessment did
4        you have the authority to place an inmate on
5        suicide precautions?
6   A.   No.  Well, let me rephrase that.  I would have
7        the authority to place him in a gown, which does
8        equate to suicide precautions, so, yes, I would
9        have that authority.
10  Q.   When you were interviewing Mr. Orlando did you
11       consider placing him in a gown?
12  A.   No.
13  Q.   Do you recall why that is?
14  A.   He said no to suicidal ideation, he said no to
15       past attempts, so for those reasons I would not
16       put him in a gown.
17  Q.   You also testified that you didn't believe his
18       answers; correct?
19  A.   That's correct.
20  Q.   So did you believe his responses to those
21       questions?
22  A.   I believed it at that time, yeah.
23  Q.   But you didn't -- I'm sorry, go ahead.
24  A.   I would say that because I didn't believe what
25       he was saying does not mean that I would put him

18

1        in a gown.  He could have told me that his
2        lineage was -- he was the Prince of Arabia, but
3        I wouldn't put him in a gown for that.  I
4        wouldn't believe him, but I wouldn't put him in
5        a gown.
6   Q.   The comprehensive assessment includes a list of
7        questions; correct?
8   A.   Correct.
9   Q.   Now, are there a certain number of questions
10       that if you answer it a certain way, then are
11       you placed on suicide precautions?
12  A.   I don't believe that's true.
13  Q.   If you answer a number of questions some way,
14       does that automatically get the inmate referred
15       to mental health?
16  A.   I believe after a certain number, I'm not sure
17       what that number is that -- and, see, I think
18       you're mixing two different periods.
19  Q.   Okay.
20  A.   Because now everyone is seen, so it doesn't
21       matter what you say or do or how many questions
22       you ask, everyone is seen.  So that's --
23  Q.   Everyone is seen by mental health?
24  A.   By mental health.
25  Q.   In March of 2016 was everybody seen by mental

19

1        health?
2   A.   No.
3   Q.   So in order to be seen by a mental health nurse
4        you would have to be referred?
5   A.   That's correct.
6   Q.   When Mr. Orlando arrived at the jail he made
7        statements of dying in the jail and harming
8        other people and there were several incident
9        reports written by the different COs that were
10       present and supervisors who reviewed the
11       incident, he was placed in a restraint chair and
12       it was videotaped.  There was a lot of different
13       paperwork on this incident when he arrived at
14       the jail.  As the nurse performing his
15       comprehensive assessment, how would you be made
16       aware of that incident and all the documentation
17       surrounding that incident?
18            MR. BACHARACH:  I object to the form
19       of the question.  I don't think it characterizes
20       the testimony, the facts correctly, and it's got
21       multiple parts, but with that, you can answer.
22            MR. TERZIGNI:  Do you want to say what
23       parts I got wrong?
24            MR. BACHARACH:  Yeah, I don't think he
25       threatened to harm anybody, at least not

20

1        explicitly.  He said -- do you want me to --
2            MR. TERZIGNI:  Sure.
3            MR. BACHARACH:  He said I'm going to
4        die in here, we're all going to die.  I don't
5        remember him saying anything about directly
6        harming anyone.  I don't remember that anyway.
7            MR. TERZIGNI:  I agree that he said
8        I'm going to die in here and we're all going to
9        die in here.
10           MR. BACHARACH:  We're all going to
11       die, I don't know that he said in here.
12           MR. TERZIGNI:  Something to that
13       effect.
14           MR. BACHARACH:  To that effect, yeah.
15  BY MR. TERZIGNI:
16  A.   I was not aware of any of that.
17  Q.   Okay.  My question is why weren't you made aware
18       of that?
19  A.   I don't know.
20  Q.   Should you have been?
21  A.   I believe I should have been.
22  Q.   When an incident like that occurs at intake and
23       there's several reports regarding that incident,
24       how are you made aware, how do those documents
25       get on your desk?

21

1   A.   You're talking about corrections documents?
2   Q.   Yes.
3   A.   They're not.
4   Q.   You do not have access to any corrections
5        documents?
6   A.   No.
7   Q.   Is there ever an incident where you do have
8        access to corrections documents?
9   A.   No.
10  Q.   I asked you earlier should you have had access
11       to those, and I think my question was should you
12       have been made aware of that incident, and you
13       answered yes?
14  A.   I would believe so.  I mean knowledge is key
15       and, you know, knowing what had gone on is just
16       something that I should have known.  I mean that
17       would help with my assessment, but I didn't know
18       any of that until this came up.
19  Q.   How would you have been made aware of that
20       incident?
21  A.   Again, in shift-to-shift report, someone would
22       have said that he was in a chair, he said this,
23       he's alleged to have said this, the officer said
24       he said this, just so you could observe,
25       evaluate, assess, whatever was needed, knowing

22

1        that this was his frame of mind, but I didn't
2        get that information.
3   Q.   Mr. Orlando was placed in a restraint chair and
4        then after a certain period of time was removed
5        from the chair.  First, do you know how long an
6        inmate is allowed to stay in a restraint chair?
7   A.   I don't know.
8   Q.   Okay.  When Mr. Orlando was removed from the
9        chair he wasn't provided with a suicide gown.
10       Given the factual circumstances that I said to
11       you and Mr. Bacharach, should he have been
12       placed in a gown?
13            MR. BACHARACH:  I object to the form.
14  BY MR. TERZIGNI:
15  A.   I can't say, I don't know what the circumstances
16       were.
17  Q.   Do you recall answering some questions, written
18       questions in connection with this case?
19  A.   Questions from whom?
20  Q.   From me that I provided to your attorney and
21       then I believe he provided them to you?
22  A.   They were written?
23  Q.   Yes, they looked like this (indicating),
24       Interrogatories.
25  A.   I believe I do.

23

1   Q.   Okay.  In a question asking about your duties
2        and responsibilities you said your
3        responsibilities include, but are not limited to
4        comprehensive assessment of new arrests that
5        have been admitted to the jail.
6            You've told me about the comprehensive
7        assessments; correct?
8   A.   Uh-huh.
9            MR. BACHARACH:  You just said uh-huh,
10       you have to answer.
11  BY MR. TERZIGNI:
12  A.   I'm sorry, yes.  Sorry.
13  Q.   That's okay.
14            MR. BACHARACH:  That's all right,
15       everybody does it, almost everybody.
16  BY MR. TERZIGNI:
17  Q.   You wrote duties also include wound care,
18       medication administration, ongoing evaluation
19       assessment, treatment of all new arrests,
20       inmates, staff members as indicated on ground
21       level.
22            First, what do you consider as an ongoing
23       evaluation?
24  A.   Someone's admitted with an elevated blood
25       pressure and they're medicated at the door.  We

24

1        check them in an hour or two hours, whatever the
2        practitioners order and after that interval we
3        check again or medicate again or whatever's
4        indicated based on that blood pressure and for
5        whatever the circumstance is.  If someone had a
6        seizure and we medicate or we're doing neuro
7        checks or whatever the case.  If someone comes
8        in in alcohol withdrawal, we medicate and we
9        check again to see if that medicine has been
10       effective.  If someone comes in with bleeding
11       and we've applied a pressure dressing, we go
12       back in fifteen minutes to check to see if the
13       bleeding has stopped, if we need to reapply the
14       dressing, if we need to take further measures,
15       that's what I mean by ongoing assessment.
16  Q.   In response to another question asking about
17       your interaction with Mr. Orlando, you responded
18       I conducted a medical interview on the
19       above-named individual.
20            By medical interview did you mean
21       comprehensive assessment?
22  A.   Yes.
23  Q.   In a question asking about Mr. Orlando's intent
24       to harm himself, you responded John Orlando did
25       not at any time express the desire to harm

25

1 himself or anyone else.
2 Can you elaborate on what you meant by at
3 any time?
4 A. That means during the time he was in front of
5 me, and that's the time period where we did --
6 where I did the comprehensive interview.
7 Q. That does not include a time that he was in
8 front of anybody else?
9 A. No.
10 Q. There's another question asking about if you had
11 any other interactions with Mr. Orlando, and you
12 responded by putting N/A. Does that mean you
13 did not have any other interactions with him?
14 A. That's correct.
15 Q. Ma'am, if you could please read over this
16 document and let me know when you're ready.
17 - - - -
18 (Deposition Exhibit No. 1 was marked
19 for identification, and the witness reviewed the
20 document.)
21 - - - -
22 BY MR. TERZIGNI:
23 A. I'm ready.
24 Q. Okay. You've just been handed a document marked
25 Exhibit 1, it's an Allegheny County Jail Inmate

26

1 Medical Survey Report. Ma'am, are you familiar
2 with this document?
3 A. I am.
4 Q. Can you explain to me what this intake form is?
5 A. This is basically a transcript of the medical
6 interview.
7 Q. Towards the top of the page on the right-hand
8 side it says Ent. Date March 26, 2016. Is that
9 the date that the interview occurred?
10 A. Yes.
11 Q. Down the page on the left-hand side there's a
12 question records received and there's an "N"
13 there. Can you explain to me what that means?
14 A. It means that there were no records received.
15 Q. What are some common records that you do receive
16 prior to the comprehensive assessment?
17 MR. BACHARACH: I object to the form.
18 You can answer.
19 BY MR. TERZIGNI:
20 A. They would be hospital records or transfer
21 sheets.
22 Q. How would you receive hospital records?
23 A. If you were the person at the door, you would be
24 handed them usually by the transporting
25 officers. If you were the nurse doing the

27

1 interview, they're available in the nursing
2 office.
3 Q. Is there a database that you could type in an
4 inmate's name and pull up past medical records?
5 A. I'm not sure what you mean by past medical
6 records.
7 Q. An inmate comes in, you're doing a medical
8 assessment and maybe the inmate has been to the
9 jail before, is there a way to pull up past
10 medical records?
11 A. Formerly you could look at the old interview,
12 but that's all.
13 Q. There's no other records accessible?
14 A. No.
15 Q. On the same side of the page it says client
16 screening accepted or declined. What does that
17 mean?
18 A. It is asking or answering the question as to if
19 he refused to be interviewed or agreed.
20 Q. It's marked here accepted, so that means he
21 agreed to be interviewed.
22 A. This basically is that if the interview is
23 completed, it is assumed this isn't anything
24 that I actually checked.
25 Q. Okay. Did you complete this document?

28

1 A. I did.
2 Q. Lower on the page it says emergency contact,
3 name Jean Orlando/Lawniczak. How did you find
4 Mr. Orlando's emergency contact?
5 A. I don't remember entering that. It may have
6 been pre-populated from the officer's entry.
7 There are times when it's already in there and
8 if you ask the question who is your emergency
9 contact and it's already in there and there's no
10 change, it remains.
11 Q. If you could turn to the next page, here there
12 are a list of questions Mr. Orlando answered yes to, do
13 to the questions Mr. Orlando answered yes to, do
14 you have any current medical complaints, yes, do
15 you have a history of mental health problems,
16 yes, a history of outpatient therapy, yes,
17 within the last year, yes, history of
18 psychotropic medications, yes, history of
19 psychotropic hospitalization, yes, recent
20 significant loss within the past six months,
21 yes, history of violent behavior, yes, history
22 of victimization, yes.
23 Earlier we talked about answering a number
24 of these questions in a certain way could lead
25 to the inmate being referred; correct?

29

1  A.  Correct.
2        MR. BACHARACH:  I object to the form,
3     but go ahead, that's fine.
4  BY MR. TERZIGNI:
5  Q.  The answers to those questions that I just read,
6     did that lead you to refer Mr. Orlando?
7  A.  Yes.
8  Q.  Okay.  And you referred him to where?
9  A.  To mental health.
10 Q.  What does it mean to be referred to mental
11    health?
12 A.  It means that a mental health specialist will
13    see him before he goes to any housing pod.
14 Q.  Do you recall if that happened here with
15    Mr. Orlando?
16 A.  I don't recall his actual interview, when it
17    happened, I don't remember that.  I don't
18    remember, no.
19 Q.  Do you know if Mr. Orlando did have an interview
20    with a mental health specialists?
21 A.  I don't remember seeing it, no.
22 Q.  Usually how long after your referral does an
23    inmate see a mental health specialist?
24 A.  There wasn't any usual time.  At the time he was
25    there the mental health specialists came down

30

1     usually two times during the shift, during the
2     morning shift.  So during those two times,
3     that's when everyone who had to see the mental
4     health specialist was seen.
5  Q.  How is an inmate referred to a mental health
6     specialist?
7  A.  You write their referral, you place it in the
8     mental health specialist's bin, when the mental
9     health specialist comes to the unit, to intake,
10    he or she gets those referrals from the bin and
11    then calls each person to be seen.
12 Q.  If you could turn to the last page, under the
13    additional comments section you wrote denies any
14    private medical issue to discuss.  MH referral,
15    does that mean mental health referral?
16 A.  Yes.
17 Q.  Opioid/ETOH detox ordered and initiated.
18       Can you explain what that means?
19 A.  It means that -- what I typically do is ask the
20    person is there anything that you want to talk
21    about in a private setting, anything that you're
22    not comfortable discussing in this public forum,
23    and they will answer yes or no, and in this case
24    he said he didn't have anything, and mental
25    health referral, the alcohol and the heroin

31

1     detox were ordered and initiated in intake.
2     That means I ordered the medicines and gave it
3     to him before we left my desk.
4  Q.  Did you refer him to mental health because of
5     his responses to these questions asking him
6     about his mental health issues?
7  A.  As well as his general demeanor, some of his
8     responses to questions I asked.
9  Q.  His general demeanor you previously testified
10    was angry during that; correct?
11 A.  (Nodding head up and down.)  It was.  I'm sorry,
12    I'm nodding my head.
13 Q.  That's okay.  I believe you also testified that
14    you didn't actually believe all or some of his
15    answers; correct?
16 A.  That's correct.
17             - - - -
18       (Deposition Exhibit No. 2 was marked
19    for identification, and the witness reviewed the
20    document.)
21             - - - -
22 BY MR. TERZIGNI:
23 Q.  Ma'am, have you had a chance to review this
24    document?
25 A.  Yes.

32

1  Q.  This is a Jail Healthcare Services
2     Practitioner's Order.  Are you familiar with
3     this document?
4  A.  Yes.
5  Q.  Is this your handwriting on this document?
6  A.  Yes.
7  Q.  Can you read for me what it says here because I
8     couldn't read it?
9  A.  It says Valium 5 milligrams by mouth or it says
10    PO b.i.d. times five days, Valium 5 milligrams
11    PO q.h.s. times two days, Clonidine, 0.1
12    milligrams PO b.i.d. times seven days,
13    Loperamide 2 milligrams, PO b.i.d. p.r.n. times
14    three days, Promethazine 25 milligrams, PD
15    b.i.d. p.r.n. times days, Thiamine 100
16    milligrams PO q.d. times ten days.
17 Q.  Is this a prescription?
18 A.  It's an order for detox.
19 Q.  What is Clonidine?
20 A.  It's medicine used for heroin detox.
21 Q.  What was the next one?
22 A.  Loperamide, it's used for symptom control for
23    diarrhea associated with heroin withdraw.
24 Q.  The next one?
25 A.  Is Promethazine used for nausea associated with

33

1   heroin withdraw.
2   Q.   And the last one?
3   A.   Thiamine, it's a B Vitamin associated with
4        alcohol withdraw.
5   Q.   The date/time here is March 26, 2016, the same
6        date as the assessment form.  Did you fill out
7        the assessment?
8   A.   Yes.
9                    - - - -
10            (Deposition Exhibit No. 3 was marked
11       for identification, and the witness reviewed the
12       document.)
13                   - - - -
14  BY MR. TERZIGNI:
15  Q.   Ma'am, have you had a chance to look over this
16       document?
17  A.   I have.
18  Q.   Are you familiar with this form?
19  A.   I am.
20  Q.   This is a Mental Health Referral form, and it's
21       dated March 26, 2016, it's marked Exhibit 3.  Is
22       this your handwriting on this document?
23  A.   Yes, it is.
24  Q.   I see there's a signature or a person's name at
25       the bottom of the document.  Is that also your

34

1        handwriting?
2   A.   No, it isn't.
3   Q.   That's somebody else?
4   A.   Yes.
5   Q.   Okay.  Can you explain to me what this document
6        is?
7   A.   It's a Mental Health Referral form, it's a form
8        that I completed at the time of John Orlando's
9        comprehensive intake interview.
10  Q.   For the question is the patient currently on
11       suicide precautions you wrote no.  That was at
12       the time of the interview he was not on suicide
13       precautions; correct?
14  A.   That's correct.
15  Q.   And you were unaware at that time that he had
16       been placed in a restraint chair; correct?
17  A.   That's correct.
18  Q.   Then the bottom, reason for referral, the box
19       next to suicidal ideation was unchecked.  You
20       were unaware of Mr. Orlando's suicidal
21       ideations; correct?
22  A.   That's correct.
23            MR. BACHARACH:  I object to the form.
24            THE WITNESS:  I'm sorry.
25            MR. BACHARACH:  You're fine.  If I

35

1        don't like the answer, I'll say so.  It's
2        unlikely I'll say that.
3   BY MR. TERZIGNI:
4   Q.   You checked the box prior mental health history.
5        Can you explain to me why you did that?
6   A.   I believe he reported a diagnosis of
7        schizophrenia or some mental health diagnosis
8        and he had been on mental health medication.
9   Q.   Is that why you checked the box psychotropic
10       medication?
11  A.   That's correct.
12  Q.   In the next section, comments described below
13       and/or see attached intake screen, see attached
14       mental health screen, see attached NET/MET.
15       Why is that left blank?
16  A.   I don't usually write anything there, I just do
17       the top part.  I've never written anything
18       below.
19  Q.   Is that section just to add notations to what is
20       written above?
21  A.   I'm not really sure.  To tell you the truth, I
22       thought that was for the mental health
23       professional to document.  I've never written
24       anything there.  I would give a verbal report or
25       attach a progress note if I had anything to add.

36

1   Q.   The next section, referral classification,
2        contains four boxes, one is emergent within 24
3        hours, urgent within 48 hours, routine within 72
4        hours, mental health evaluation within fourteen
5        days.  Why are those boxes left blank?
6   A.   Because our policy at the time was that everyone
7        who was seen was considered to be urgent, and
8        that's why I say that everyone was seen before
9        they went to the housing pods.  No one with a
10       mental health referral went upstairs without
11       being seen.  So it was kind of a moot point.
12  Q.   So it was automatic that the inmate was to be
13       seen within forty-eight hours?
14  A.   Usually well before forty-eight hours.
15  Q.   So you hand in this referral form, Mr. Orlando
16       should be seen sometime less than forty-eight
17       hours later?
18  A.   Yes.
19  Q.   On average can you say how long it would take
20       for an inmate to see a mental health provider?
21  A.   Usually within two hours.
22  Q.   Is that your handwriting in that box towards the
23       bottom of the page under the referral
24       classification?
25  A.   No.

37

1   Q.   Do you know what that says?

2   A.   I don't know what that says.

3   Q.   It looks like the middle line says see message

4        March 26, '16.  Do you have any idea what that

5        means?

6   A.   See nursing maybe, I don't know.  The third line

7        looks like her signature.

8   Q.   Ruth Harrison's?

9   A.   Yes.  The first line looks like clear to

10       population.

11  Q.   See message March 26, '16 or see nursing March

12       26, '16?

13  A.   And the line above that clear to population.

14  Q.   Okay.  Do you know what that means?  Clear to

15       general population?

16  A.   And not a mental health unit.

17  Q.   Would you take that as meaning that Ruth

18       Harrison met with Mr. Orlando?

19  A.   This is -- yes.

20  Q.   Do you know who Ruth Harrison is?

21  A.   She was a mental health specialist.

22  Q.   Does she still work at the jail?

23  A.   No.

24  Q.   Do you know why?

25  A.   I believe she resigned.

38

1   Q.   Are you aware of the circumstances surrounding

2        her resignation?

3   A.   No, I'm not.

4                        - - - -

5             (Deposition Exhibit No. 4 was marked

6        for identification, and the witness reviewed the

7        document.)

8                        - - - -

9   BY MR. TERZIGNI:

10  Q.   Ma'am, have you had a chance to review this

11       document?

12  A.   I have.

13  Q.   This is a Booking Observation Report from the

14       Allegheny County Jail, it's dated March 29th,

15       2016, it's been marked Exhibit 4.  Do you know

16       what this document is?

17  A.   Yes.

18            MR. BACHARACH:  Where are you getting

19       the date?

20            MR. TERZIGNI:  Right at the top of the

21       page under the title.

22            MR. BACHARACH:  I'm not sure that

23       that --

24  BY MR. TERZIGNI:

25  A.   You said the 29th; is that correct?

39

1   Q.   I am getting that from --

2            MR. BACHARACH:  I'm not sure that --

3   BY MR. TERZIGNI:

4   Q.   -- the top of the page.

5            MR. BACHARACH:  Right, but I don't

6        know that that date means that's the date the

7        interview was conducted.  In fact --

8   BY MR. TERZIGNI:

9   A.   It's not the date.

10           MR. BACHARACH:  -- I'm virtually

11       certain it's not, but that's another story.

12           MR. TERZIGNI:  What date do you

13       believe it is?

14           MR. BACHARACH:  This would have been

15       done at or about the time when he was admitted

16       to the jail, it would have probably been done

17       somewhere between the 24th and the 26th.  It

18       wouldn't have been done the 29th.  The 29th is

19       when he did the -- after the suicide.  He was in

20       a pod already, so it wouldn't have been done

21       then.  So I suspect that what happened was, was

22       this was -- I think this came out of the police

23       investigation.  I think they probably printed

24       that after his suicide as part of the

25       investigation, that's my suspicion.  I'm not

40

1        saying that as a fact, but I just don't want to

2        leave the impression that that's the date.

3            MR. TERZIGNI:  Okay.

4   BY MR. TERZIGNI:

5   Q.   Ma'am, do you know what this report is?

6   A.   Yes.

7   Q.   Can you explain to me -- not specifically this

8        report, but generally what a Booking Observation

9        Report is?

10  A.   It's referred to as the booking questions, it's

11       basically what the officers ask the inmates as

12       they're entering them into the system.

13  Q.   Does it occur after the inmate's admission to

14       the jail?

15  A.   Yes.

16  Q.   Does it occur before the comprehensive

17       admissions report?  Is that what it's referred

18       to?

19            MR. BACHARACH:  Do you mean the report

20       that she --

21            MR. TERZIGNI:  Yes.

22  BY MR. TERZIGNI:

23  A.   The booking questions are done prior to the

24       medical interview.

25  Q.   Do you have access to the booking report prior

41

1 to the medical interview?
2 A.  Yes.
3       MR. TERZIGNI:  Let me grab you some
4 cough drops.
5       - - - -
6       (Whereupon, there was a brief pause in
7 the proceedings.)
8       - - - -
9 BY MR. TERZIGNI:
10 Q.  I believe my last question was does the Booking
11 Observation Report occur prior to the
12 comprehensive interview?
13 A.  It's prior to the interview.
14 Q.  And I asked you did you have access to this
15 report prior to Mr. Orlando's interview?
16 A.  Yes.
17 Q.  Do you recall reviewing this document prior to
18 Mr. Orlando's interview?
19 A.  I do not recall having this, and I'll say that
20 this is not always available.
21 Q.  If it is available, do you try to look at it
22 prior to the interview?
23 A.  Yes.
24 Q.  And, I'm sorry, did you testify that you're not
25 sure if you looked at it prior to Mr. Orlando's

42

1 interview?
2 A.  I don't recall looking at this.
3 Q.  You don't recall looking at it?
4 A.  I don't recall looking at it, I don't recall if
5 it was available prior to his interview.
6 Q.  Who completes a Booking Observation Report?
7 A.  The officers complete this questionnaire.
8 Q.  The corrections officers?
9 A.  Yes.
10 Q.  Are the COs directed to do anything if an inmate
11 answers eight of the questions yes?
12 A.  I'm not sure what they've been directed to do.
13 When certain officers are on they would alert us
14 to the potential for a problem I'll say.  There
15 was one officer in particular who would say a
16 Number 6 and he would have the person come and
17 sit in the nurses' station until he was
18 evaluated.  I don't recall that happening with
19 Mr. Orlando.
20 Q.  What does Number 6 mean?
21 A.  It's have you recently ingested potentially
22 dangerous levels of drugs and/or alcohol.  The
23 officer did that just so the person -- if there
24 was a need for early intervention or treatment,
25 that person would get that.

43

1 Q.  Number 5, have you ever attempted suicide, the
2 response is yes.  Does that trigger anything to
3 happen when that answer is given?
4 A.  Not that I'm aware of.  If the person says that
5 they are suicidal, then yes, they're brought
6 into the nurses' station and they remain there
7 under observation by either medical or
8 corrections until the process is completed.
9 Q.  Is that called anything, suicide watch or
10 another name?
11 A.  Suicide precautions.
12 Q.  To the best of your knowledge was Mr. Orlando
13 placed on suicide precautions?
14 A.  Not that I'm aware of.
15       - - - -
16       (Deposition Exhibit No. 5 was marked
17 for identification, and the witness reviewed the
18 document.)
19       - - - -
20 BY MR. TERZIGNI:
21 Q.  Let me know when you have had a chance to review
22 this document.
23 A.  I have.
24 Q.  This is a County of Allegheny Incident Report,
25 it's been marked Exhibit 5.  Are you familiar

44

1 with this document?
2 A.  I've seen an incident report before.
3 Q.  But not this specific one?
4 A.  Not this one.
5 Q.  I just want to confirm some of the things you
6 testified to earlier.  In the what happened
7 section of this document it says on the above
8 date and approximate time, that date and time is
9 March 24th, 2016 at 10:25 p.m., Millvale Police
10 brought new court John Orlando in who was very
11 agitated and appeared to be under the influence.
12 When the new court entered the sally port he
13 started to say that he was going to fight
14 anybody and he was on crystal meth.  The
15 Millvale Police brought it to my attention that
16 he also stated that he wanted to hang himself.
17 Sergeant Haburjak requested the chair and I
18 retrieved it.  All assisting officers place the
19 new court in the chair and his restraints were
20 checked for tightness by the intake nurse.  He
21 was then placed in H-9 without further incident.
22       Were you made aware of any of that
23 information prior to your interview with
24 Mr. Orlando?
25 A.  Not at all.

45

1  Q.  Should you have been?

2  A.  The fact that he said he was going to hang

3      himself I should have known.  The fighting part

4      I should have known just to be on alert for

5      assault, but, like I mentioned, we never see

6      corrections' incident reports.

7  Q.  Okay.  But the information that's contained in

8      this report, specifically him saying he wanted

9      to hang himself, that is some information that

10     should have been brought to your attention?

11  A.  It should have been communicated, yes.

12  Q.  You also weren't aware that he was placed in a

13     restraint chair; correct?

14  A.  Correct.

15  Q.  Should you have been made aware of that?

16  A.  Yes, I would say yes.

17  Q.  Whose duty would it have been to make you aware

18     of those things?

19          MR. BACHARACH:  I object to the form.

20  BY MR. TERZIGNI:

21  A.  It should have been carried over in the

22     shift-to-shift report, but from the time he came

23     in until the time that I actually saw him, it

24     could have been communicated to the next shift,

25     but this would have been at least five reports

46

1     that this information would have been carried.

2     So, you know, they may have figured he was

3     already through the process, I don't know.  It

4     could have been given to the next shift, but not

5     the shift after or the shift after or the shift

6     after.  This is almost two days from this

7     (indicating) till the time that I actually saw

8     him, so I can't say that it wasn't carried over.

9  Q.  But for your ability to do your job this is

10     information you should have known; correct?

11  A.  Well, I think I did do my job, but it would have

12     been helpful to know.

13          - - - -

14         (Deposition Exhibit No. 6 was marked

15     for identification, and the witness reviewed the

16     document.)

17          - - - -

18  BY MR. TERZIGNI:

19  Q.  Ma'am, have you had a chance to review this

20     document?

21  A.  I have.

22  Q.  This is an Allegheny County Bureau of

23     Corrections Jail Healthcare Services report, it

24     is marked Exhibit 6.  Are you familiar with this

25     document?

47

1  A.  I am.

2  Q.  What is this document?

3  A.  It's a segregation form, a clearance form.

4  Q.  What does that mean?

5  A.  It means that the nurse has checked on a person

6     who was in restraints or segregated in DHU

7     housing or some such restrictive housing and

8     that basically the person that is checked in is

9     doing okay.

10  Q.  The top part says inmate screaming he hopes he

11     dies in here, inmate shouting that we are all

12     going to die.  That information was not passed

13     on to you; correct?

14  A.  I've never seen this before.

15  Q.  Is that information that should have been

16     conveyed to you?

17  A.  Yes.

18  Q.  And whose job would that have been?

19  A.  Again, shift-to-shift or a nursing report.

20  Q.  When an inmate comes in and he's talking about

21     suicide, the policy that the jail has, is that

22     put into effect at all?

23          MR. BACHARACH:  I object to the form.

24         You can answer.

25  BY MR. TERZIGNI:

48

1  A.  Would you restate your question?

2  Q.  When an inmate comes into the jail and is

3     talking about suicide, does that trigger the

4     suicide policy of the jail to go into effect in

5     any way?

6  A.  If a person comes in and states suicidal

7     ideation, then yes, we would take precautions.

8  Q.  And what precautions are those?

9  A.  That person would be placed in a suicide

10     prevention gown and placed in a cell,

11     observation cell, and mental health notified to

12     evaluate that person.

13  Q.  How does a restraint chair fit into that policy?

14  A.  If the person is not following instructions, is

15     combative, assaultive, resistant, corrections

16     would have to first maintain safety, security,

17     and after that time when the person is

18     agreeable, then the suicide precautions would be

19     instituted and go on from there.

20          - - - -

21         (Deposition Exhibit No. 7 was marked

22     for identification, and the witness reviewed the

23     document.)

24          - - - -

25  BY MR. TERZIGNI:

49

1  Q.  Ma'am, have you had a chance to read this
2      document?
3  A.  I have.
4  Q.  Are you familiar with this document?
5  A.  Not until now.
6  Q.  I just have a few questions about some of the
7      terms in this document.  First, who is Charlotte
8      Wright?
9  A.  She is a former employee.  I am not sure what
10     her title is or was.
11  Q.  But she was an employee of the jail?
12  A.  She was.
13  Q.  Do you know if she was terminated?
14  A.  I'm not sure what happened to her.  She worked
15     night shift, so I didn't usually see her.  She
16     was always somewhere she was not supposed to be.
17  Q.  So you didn't get along with Ms. Wright?
18  A.  No, I didn't say that, but she just -- I don't
19     know what she did or what she was supposed to
20     do.
21  Q.  What does JRS services mean?
22  A.  Justice-related services.
23  Q.  In here she discusses that Mr. Orlando was
24     referred to JRS.  What does that mean?
25          MR. BACHARACH:  I'd just ask -- you

50

1     can answer, but I'd just ask you not to
2     speculate.
3  BY MR. TERZIGNI:
4  A.  I don't really know what that means.
5  Q.  What is justice-related services?
6  A.  I'm not sure.  That's something in mental health
7     and I don't know what they do or what that
8     really is.
9  Q.  Okay.  And you don't know what it means when an
10     inmate is referred to justice-related services?
11  A.  I don't know.
12  Q.  Okay.
13  A.  I couldn't tell you.
14  Q.  In here at about the middle of the page she
15     writes that she ran the new court in the MH
16     Database and then CIPS.  Do you know what that
17     is?
18  A.  I don't know what either of those terms or what
19     systems those are.
20  Q.  Okay.  You don't have access to a mental health
21     database?
22  A.  No, no.
23  Q.  She states in here that Mr. Orlando was wearing
24     a Fentanyl patch and that a nurse, Trish,
25     located it on his right shoulder and removed it.

51

1     Do you see that?
2  A.  Yes.
3  Q.  Is that proper to do, just to remove the
4     Fentanyl patch?
5  A.  Yes, it is.
6  Q.  I'm asking because I don't know.
7  A.  Yeah, it is.
8  Q.  Okay.
9          MR. TERZIGNI:  I need just a few more
10     minutes, but I don't think I have much more.
11          - - - -
12     (Whereupon, there was a brief pause in
13     the proceedings.)
14          - - - -
15  BY MR. TERZIGNI:
16  Q.  Ma'am, we're back on the record.  I just have
17     one, maybe two more questions for you.  Could
18     you please go to Exhibit 3, it's your referral
19     form.
20  A.  Yes.
21  Q.  I want to direct you to the box towards the
22     bottom of the page, the referral classification
23     and then the language that we were trying to
24     decipher earlier, we believe it said inmate to
25     population, was that it?

52

1          MR. BACHARACH:  That's what she said,
2     yes.
3  BY MR. TERZIGNI:
4  A.  I thought it said cleared to population.
5  Q.  Cleared to population, okay.  And then see
6     message or see nursing March 26th, 2016.
7  A.  Yes.
8  Q.  And it appears to be signed by Ruth Harrison.
9  A.  That's my assumption.
10  Q.  And below that it says received by mental health
11     staff and Ruth Harrison's name is below there.
12     So Ms. Harrison received this referral; correct?
13  A.  Yes.
14  Q.  Would there have been a form that she fills out
15     after talking with the inmate?
16  A.  I'm not sure what the mental health specialist
17     fills out in addition to the referral, I don't
18     know.
19  Q.  Okay.  And Ms. Harrison would have had to have
20     seen the inmate before making the, I guess,
21     referral to clear the inmate to population;
22     correct?
23  A.  That's correct.
24          MR. TERZIGNI:  John, do you have any
25     reports from Ruth Harrison?

53

1  MR. BACHARACH:  I gave you everything
2  I have.  I'll check again.  I mean I know I
3  don't have anything else.
4  MR. TERZIGNI:  I looked again, and I
5  didn't find anything from her.
6  MR. BACHARACH:  I know I don't have
7  any medical record other than what I gave you.
8  MR. TERZIGNI:  Okay.
9  MR. BACHARACH:  Like I said, I can
10  maybe check and see.
11  MR. TERZIGNI:  Okay.
12  MR. BACHARACH:  From what I know you
13  have what I have.
14  MR. TERZIGNI:  Okay.  That's all the
15  questions I have.
16  - - - -
17  EXAMINATION
18  - - - -
19  BY MR. BACHARACH:
20  Q.  I have just a couple things.  On Exhibit 1 in
21  the upper right corner there's a date, it says
22  Ent. Date and then below it is Ent. Time and it
23  has 11:44:15 a.m.
24  A.  Yes.
25  Q.  Do you know what that time represents?

54

1  A.  I believe it's the time that the interview was
2  concluded.
3  Q.  Is that something you enter or is it something
4  that's automatic, if you know?
5  A.  It's automatic.  When the interview is
6  completed.
7  Q.  Just at this time, what was your normal shift,
8  if there was a normal shift?
9  A.  I worked 6 to 2:30.
10  Q.  Monday through Friday?
11  A.  No, I have alternating Monday and Friday off and
12  every other weekend.
13  Q.  Is it common or uncommon for inmates you
14  interview to have mental health and/or drug and
15  alcohol issues?
16  A.  Common.
17  Q.  Would it be possible for you to give a rough
18  estimate of how common that is?
19  A.  I'd say 90 percent.
20  Q.  On Exhibit 1, again, you were asked about the
21  entry records received and then "N" for no I
22  presume was put in there.  Do you get medical
23  records like that normally when an inmate is
24  brought in by the police?  In other words, does
25  someone bring that inmate's medical records with

55

1  them when a person is brought into the jail by
2  the police?
3  A.  Only from a hospital or another facility,
4  another jail.
5  Q.  So if somebody is brought in from a hospital,
6  they might have records or if they're brought in
7  from another jail they might have medical
8  records?
9  A.  That's correct.
10  Q.  You were asked obviously a number of questions
11  and you were shown a number of documents by
12  Mr. Terzigni, some of which you had seen, some
13  of which you hadn't seen; correct?
14  A.  That's correct.
15  Q.  Knowing what you know now from these documents
16  and from the questions that were asked by
17  Mr. Terzigni, would you have done anything
18  different than what you did on that day when you
19  saw Mr. Orlando?
20  A.  No, I don't believe that I would have.
21  Q.  There was mention of -- I lost it, Exhibit 7
22  about Charlotte Wright who apparently works
23  for -- or was doing something for JRS,
24  justice-related services.  Do you know
25  specifically who she worked for?

56

1  A.  No, I don't know.
2  MR. BACHARACH:  I don't have any other
3  questions.
4  MR. TERZIGNI:  I don't have anything
5  else.
6  MR. BACHARACH:  Okay, we'll read it.
7  THE COURT REPORTER:  Do you need a
8  copy of this?
9  MR. BACHARACH:  Oh, yeah, same thing
10  as my prior order, whatever I ordered the last
11  time.
12  THE COURT REPORTER:  Thank you.
13  - - - -
14  (Whereupon, the proceedings were
15  concluded at 2:53 p.m.)
16  - - - -
17
18
19
20
21
22
23
24
25

57

| | |
|---|---|
| 1 | COMMONWEALTH OF PENNSYLVANIA   )   CERTIFICATE |
| 2 | COUNTY OF ALLEGHENY          )   SS: |
| 3 |     I, Beth E. Welsh, a Court Reporter and |
| 4 | Notary Public in and for the Commonwealth of |
| 5 | Pennsylvania, do hereby certify that the witness, |
| 6 | TERESA LATHAM, was by me first duly sworn to testify |
| 7 | to the truth, the whole truth, and nothing but the |
| 8 | truth; that the foregoing deposition was taken at the |
| 9 | time and place stated herein; and that the said |
| 10 | deposition was recorded stenographically by me and |
| 11 | then reduced to printing under my direction, and |
| 12 | constitutes a true record of the testimony given by |
| 13 | said witness. |
| 14 |     I further certify that the inspection, |
| 15 | reading and signing of said deposition were NOT |
| 16 | waived by counsel for the respective parties and by |
| 17 | the witness.  I further certify that I am not a |
| 18 | relative or employee of any of the parties, or a |
| 19 | relative or employee of either counsel, and that I am |
| 20 | in no way interested in this action. |
| 21 |     IN WITNESS WHEREOF, I have hereunto set my |
| 22 | hand and affixed my seal of office this 4th day of |
| 23 | June, 2018. |
| 24 |         _____ |
| 25 |         Notary Public |

58

| | |
|---|---|
| 1 | COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A |
| | COUNTY OF ALLEGHENY          )   S H E E T |
| 2 | |
| 3 |     I, TERESA LATHAM, have read the foregoing pages |
| | of my deposition given on Tuesday, May 29, 2018, and |
| 4 | wish to make the following, if any, amendments, |
| | additions, deletions or corrections: |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | In all other respects, the transcript is true and |
| 20 | correct. |
| 21 |         _____ |
| |         TERESA LATHAM |
| 22 | Subscribed and sworn to before me this |
| 23 | _____ day of _____, 2018. |
| 24 |     _____ |
| |     Notary Public |
| 25 | QCR Reference No. BW2909 |

59

| | |
|---|---|
| 1 | QUALITY COURT REPORTING |
| | 7012 Kevin Drive |
| 2 | Bethel Park, PA  15102 |
| | 412.833.3434 |
| 3 | |
| 4 | June 4, 2018 |
| 5 | |
| 6 | TO:  John A. Bacharach, Esquire |
| | Allegheny County Law Department |
| 7 | 300 Fort Pitt Commons Building |
| | 445 Fort Pitt Boulevard |
| 8 | Pittsburgh, PA  15219 |
| 9 |     RE:  DEPOSITION OF TERESA LATHAM |
| 10 |     NOTICE OF NON-WAIVER OF SIGNATURE |
| 11 |     Please have the deponent read her deposition |
| 12 | transcript.  All corrections are to be noted on the preceding Errata Sheet. |
| 13 |     Upon completion of the above, the Deponent must |
| 14 | affix her signature on the Errata Sheet, and it is to then be notarized. |
| 15 |     Please forward the signed original of the Errata |
| 16 | Sheet to Massimo Terzigni, Esquire for attachment to the original transcript, which is in his possession. |
| 17 | Send a copy of same to me. |
| 18 |     Please return the completed Errata Sheet within thirty (30) days of receipt hereof. |
| 19 | Beth E. Welsh |
| 20 | Court Reporter |
| 21 | cc:  Massimo Terzigni, Esquire |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

## A

**ability** (46:9)
**above** (35:20)(37:13)
(44:7)(59:13)
**above-named** (24:19)
**abrupt** (11:21)
**accepted** (27:16)(27:20)
**access** (12:24)(13:2)
(13:25)(15:7)(15:8)
(21:4)(21:8)(21:10)
(40:25)(41:14)(50:20)
**accessible** (27:13)
**accordance** (2:2)
**according** (10:5)
**act** (8:3)
**acting** (7:14)
**action** (57:20)
**actual** (29:16)
**actually** (10:9)(27:24)
(31:14)(45:23)(46:7)
**add** (35:19)(35:25)
**addition** (52:17)
**additional** (30:13)
**additions** (58:4)
**administration** (23:18)
**admission** (5:14)(6:16)
(6:18)(7:5)(7:6)(13:23)
(40:13)
**admissions** (40:17)
**admitted** (6:22)(14:18)
(23:5)(23:24)(39:15)
**affect** (9:16)
**affix** (59:13)
**affixed** (57:22)
**after** (6:3)(6:14)(6:16)
(6:18)(6:19)(11:1)
(11:2)(11:3)(11:8)
(11:10)(11:16)(12:12)
(18:16)(22:4)(24:2)
(29:22)(39:19)(39:24)
(40:13)(46:5)(46:6)
(48:17)(52:15)
**afterward** (11:5)(12:13)
**agitated** (44:11)
**agree** (20:7)
**agreeable** (48:18)
**agreed** (27:19)(27:21)
**ahead** (17:23)(29:3)
**aid** (5:16)
**alcohol** (9:14)(24:8)
(30:25)(33:4)(42:22)
(54:15)
**alert** (42:13)(45:4)
**alleged** (21:23)
**ALLEGHENY** (1:7)(2:16)
(4:22)(5:3)(8:11)
(25:25)(38:14)(43:24)
(46:22)(57:2)(58:1)
(59:6)
**alleghenycounty** (2:15)
**allowed** (22:6)
**almost** (23:15)(46:6)
**along** (49:17)
**already** (28:7)(28:9)
(39:20)(46:3)
**alternating** (54:11)
**always** (5:2)(41:20)
(49:16)
**amendments** (58:3)
**angry** (7:25)(11:17)
(11:19)(31:10)
**another** (24:16)(25:10)
(39:11)(43:10)(55:3)
(55:4)(55:7)
**answer** (10:3)(12:20)

(13:9)(14:8)(14:19)
(15:24)(18:10)(18:13)
(19:21)(23:10)(26:18)
(30:23)(35:1)(43:3)
(47:24)(50:1)
**answered** (21:13)(28:13)
**answering** (22:17)
(27:18)(28:23)
**answers** (11:20)(17:18)
(29:5)(31:15)(42:11)
**anybody** (19:25)(25:8)
(44:14)
**anymore** (9:13)
**anyone** (20:6)(25:1)
**anything** (5:18)(11:13)
(11:18)(12:7)(14:12)
(15:3)(16:20)(20:5)
(27:23)(30:20)(30:21)
(30:24)(35:16)(35:17)
(35:24)(35:25)(42:10)
(43:2)(43:9)(53:3)
(53:5)(55:17)(56:4)
**anyway** (20:6)
**anywhere** (16:8)
**apparently** (55:22)
**APPEARANCES** (2:7)
**appeared** (44:11)
**appears** (52:8)
**applied** (24:11)
**appropriate** (13:23)
**appropriateness** (5:14)
**approximate** (44:8)
**Arabia** (18:2)
**area** (5:20)
**arraignment** (6:3)(6:20)
(11:1)(11:2)
**arresting** (7:18)
**arrests** (23:4)(23:19)
**arrival** (12:17)
**arrived** (12:14)(19:6)
(19:13)
**arrives** (7:18)(10:25)
(13:5)
**arriving** (13:17)
**ask** (13:16)(14:13)
(18:22)(28:8)(30:19)
(40:11)(49:25)(50:1)
**asked** (13:22)(21:10)
(31:8)(41:14)(54:20)
(55:10)(55:16)
**asking** (23:1)(24:16)
(24:23)(25:10)(27:18)
(31:5)(51:6)
**assault** (45:5)
**assaultive** (48:15)
**assess** (21:25)
**assessing** (5:23)
**assessment** (5:13)
(5:16)(5:18)(5:22)
(5:25)(6:7)(6:10)(6:19)
(7:4)(9:23)(11:4)
(12:18)(12:23)(15:18)
(17:3)(18:6)(19:15)
(21:17)(23:4)(23:19)
(24:15)(24:21)(26:16)
(27:8)(33:6)(33:7)
**assessments** (23:7)
**assisting** (44:18)
**associated** (32:23)
(32:25)(33:3)
**assumed** (27:23)
**assumption** (52:9)
**attach** (35:25)
**attached** (35:13)(35:14)
**attachment** (59:15)
**attempted** (43:1)

**attempts** (17:15)
**attention** (44:15)(45:10)
**attorney** (22:20)
**authority** (17:4)(17:7)
(17:9)
**automatic** (36:12)(54:4)
(54:5)
**automatically** (10:15)
(18:14)
**available** (27:1)(41:20)
(41:21)(42:5)
**average** (36:19)
**aware** (19:16)(20:16)
(20:17)(20:24)(21:12)
(21:19)(38:1)(43:4)
(43:14)(44:22)(45:12)
(45:15)(45:17)
**away** (9:5)

## B

**Bacharach** (2:15)(3:2)
(10:2)(11:25)(12:19)
(13:7)(14:6)(14:11)
(15:20)(19:18)(19:24)
(20:3)(20:10)(20:14)
(22:11)(22:13)(23:9)
(23:14)(26:17)(29:2)
(34:23)(34:25)(38:18)
(38:22)(39:2)(39:5)
(39:10)(39:14)(40:19)
(45:19)(47:23)(49:25)
(52:1)(53:1)(53:6)
(53:9)(53:12)(53:19)
(56:2)(56:6)(56:9)(59:5)
**back** (16:18)(24:12)
(51:16)
**based** (24:4)
**baseline** (5:25)
**basically** (9:7)(26:5)
(27:22)(40:11)(47:8)
**behavior** (53:11)
**believe** (8:13)(11:24)
(12:5)(12:15)(15:16)
(17:17)(17:20)(17:24)
(18:4)(18:12)(18:16)
(20:21)(21:14)(22:21)
(22:25)(31:13)(31:14)
(35:6)(37:25)(39:13)
(41:10)(51:24)(54:1)
(55:20)
**believed** (17:22)
**below** (35:12)(35:18)
(52:10)(52:11)(53:22)
**best** (51:12)
**Beth** (1:21)(2:2)(57:3)
(59:19)
**Bethel** (59:2)
**between** (7:3)(8:1)
(12:17)(39:17)
**bin** (30:8)(30:10)
**blank** (35:15)(36:5)
**bleeding** (24:10)(24:13)
**blood** (23:24)(24:4)
**board** (16:19)
**Booking** (38:13)(40:8)
(40:10)(40:23)(40:25)
(41:10)(42:6)
**bottom** (33:25)(34:18)
(36:23)(51:22)
**Boulevard** (2:17)(59:7)
**box** (34:18)(35:4)(35:9)
(36:22)(51:21)
**boxes** (26:2)(36:5)
**brief** (41:6)(51:12)
**bring** (54:25)
**bringing** (7:19)

**brought** (16:18)(43:5)
(44:10)(44:15)(45:10)
(54:24)(55:1)(55:5)
(55:6)
**Building** (2:16)(59:6)
**Bureau** (46:22)

## -

**-BY** (25:22)(31:22)
(33:14)(38:9)(41:9)
(43:20)(46:18)(48:25)
(51:15)(53:19)

## C

**call** (13:14)
**called** (1:17)(13:13)(43:9)
**calls** (30:11)
**care** (7:11)(7:17)(8:10)
(23:17)
**carried** (16:14)(45:21)
(46:1)(46:8)
**case** (22:18)(24:7)
(30:23)
**cause** (11:14)
**cell** (48:10)(48:11)
**Center** (1:17)(2:4)(2:11)
(18:16)(22:4)(28:24)
(39:11)(42:13)
**certain** (18:9)(18:10)
**certainly** (8:14)
**certainty** (8:14)
**Certificate** (3:3)(57:1)
**certify** (57:5)(57:14)
(57:17)
**chair** (19:11)(21:22)
(22:3)(22:5)(22:6)
(22:9)(34:16)(44:17)
(44:19)(45:13)(48:13)
**chance** (31:23)(33:15)
(38:10)(43:21)(46:19)
(49:1)
**change** (9:3)(9:4)
(28:10)
**characterizes** (15:22)
(19:19)
**Charlotte** (49:7)(55:22)
**check** (24:1)(24:3)
(24:9)(24:12)(53:2)
(53:10)
**checked** (27:24)(35:4)
(35:9)(44:20)(47:5)
(47:8)
**checks** (24:7)
**CIPS** (50:16)
**circled** (14:19)
**circumstance** (22:10)
**circumstances** (22:10)
(22:15)(38:1)
**Civil** (2:2)
**classes** (8:18)(8:20)
(9:14)
**classification** (36:1)
(36:24)(51:22)
**clear** (37:9)(37:13)
(37:14)(52:21)
**clearance** (47:3)
**cleared** (7:8)(7:17)
(7:22)(8:4)(13:17)
(15:1)(52:4)(52:5)
**clearing** (7:6)
**client** (27:15)
**clipboard** (16:7)
**Clonidine** (32:11)(32:19)
**com** (2:10)
**combative** (48:15)
**comes** (6:3)(24:7)

comfortable (30:22)
commencing (2:5)
comments (30:13)
(35:12)
common (26:15)(54:13)
(54:16)(54:18)
Commons (2:16)(59:6)
Commonwealth (2:3)
(57:1)(57:4)(58:1)
communicated (16:21)
(16:22)(16:25)(45:11)
(45:24)
communication (16:16)
complaints (28:14)
complete (6:7)(27:25)
(42:7)
completed (10:13)
(27:23)(34:8)(43:8)
(54:6)(59:17)
completes (42:6)
completion (59:13)
comprehensive (5:12)
(5:16)(5:22)(7:4)(11:3)
(12:23)(17:3)(18:6)
(19:15)(23:4)(23:6)
(24:21)(25:6)(26:16)
(34:9)(40:16)(41:12)
concerning (12:8)
concerns (5:15)
concluded (54:2)(56:15)
condition (7:10)
conducted (24:18)(39:7)
confirm (44:5)
connection (22:18)
consider (17:11)(23:22)
considered (10:23)(36:7)
constitutes (57:12)
contact (28:2)(28:4)
(28:9)
contained (45:7)
contains (36:2)
control (32:22)
conveyed (47:16)
cooperative (11:20)
copy (56:8)(59:16)
Corizon (5:2)(5:4)(5:5)
corner (53:21)
corrections (21:1)(21:4)
(21:8)(42:8)(43:8)
(46:23)(48:15)(58:4)
(59:11)
corrections' (45:6)
correctly (15:21)(19:20)
COs (19:9)(42:10)
cough (41:4)
counsel (57:16)(57:19)
counted (28:12)
COUNTY (1:7)(2:16)
(4:23)(5:3)(8:11)(10:6)
(25:25)(38:14)(43:24)
(46:22)(57:2)(58:1)
(59:6)
couple (12:16)(53:20)
COURT (1:1)(2:2)(3:3)
(44:10)(44:12)(44:19)
(50:15)(56:7)(56:12)
(57:3)(59:1)(59:19)
crystal (44:14)
current (28:14)
currently (34:10)
cursory (13:22)(14:13)
curt (11:21)

## D

dangerous (42:22)
database (27:3)(50:16)
(50:21)
DATE (1:15)(26:8)
(26:9)(33:6)(38:19)
(39:6)(39:9)(39:12)
(40:2)(44:8)(53:21)
(53:22)
date/time (33:5)
dated (32:21)(38:14)
day (55:18)(57:22)
(58:22)
days (12:16)(32:10)
(32:11)(32:12)(32:14)
(32:15)(32:16)(36:5)
(46:6)(59:18)
Deceased (1:4)
decipher (51:24)
declined (27:16)
Defendants (1:8)(2:14)
deletions (58:4)
demeanor (9:3)(12:6)
(31:7)(31:9)
denies (30:13)
dental (5:24)
Department (2:16)(59:6)
depend (7:23)
deponent (59:11)(59:13)
deposed (4:11)
DEPOSITION (1:12)
(2:1)(3:7)(3:8)(3:9)
(3:10)(4:13)(11:11)
(25:18)(31:18)(33:10)
(38:5)(43:16)(46:14)
(48:21)(57:8)(57:10)
(57:15)(58:3)(59:9)
(59:11)
describe (5:10)
described (35:12)
desire (24:25)
desk (20:25)(31:3)
detox (30:17)(31:1)
(32:18)(32:20)
DHU (47:6)
diagnosis (35:6)(35:7)
diarrhea (32:23)
didn't (4:15)(11:13)
(14:11)(14:14)(16:6)
(17:17)(17:23)(17:24)
(21:17)(22:1)(30:24)
(31:14)(49:15)(49:17)
(49:18)(53:5)
die (16:2)(16:3)(20:4)
(20:8)(20:9)(20:11)
(47:12)
dies (47:11)
difference (7:3)
different (18:18)(19:9)
(19:12)(55:18)
direct (51:21)
directed (42:10)(42:12)
direction (57:11)
directly (20:5)
discharge (16:16)(16:19)
discuss (30:14)
discussed (9:15)
discusses (49:23)
discussing (30:22)
DISTRICT (1:1)
document (11:11)
(11:16)(25:16)(25:20)
(25:24)(26:2)(27:25)
(31:20)(31:24)(32:3)
(32:5)(33:12)(33:16)

(33:22)(33:25)(34:5)
(35:23)(38:7)(38:11)
(38:16)(41:17)(43:18)
(43:22)(44:1)(44:7)
(46:16)(46:20)(46:25)
(47:2)(48:23)(49:2)
(49:4)(49:7)
documentation (16:1)
(19:16)
documented (15:17)
(16:4)(16:8)
documents (4:15)
(20:24)(21:1)(21:5)
(21:8)(55:11)(55:15)
Does (6:19)(8:11)
(10:22)(17:7)(17:25)
(18:14)(23:15)(25:7)
(25:12)(27:16)(29:10)
(29:22)(30:15)(37:22)
(40:13)(40:16)(41:10)
(42:20)(43:2)(47:4)
(48:3)(48:13)(49:21)
(49:24)(54:24)
doesn't (18:20)
done (10:25)(11:2)
(11:3)(11:5)(16:25)
(39:15)(39:16)(39:18)
(39:20)(40:23)(55:17)
door (13:21)(23:25)
(26:23)
Down (26:11)(29:25)
(31:11)
drawing (12:1)
dressing (24:11)(24:14)
Drive (59:1)
drops (41:4)
drug (9:15)(54:14)
drugs (42:22)
duly (4:2)(57:6)
During (17:3)(25:4)
(30:1)(30:2)(31:10)
duties (23:1)(23:17)
duty (24:5)
dying (19:7)

## E

each (30:11)
Earlier (13:13)(21:10)
(28:23)(44:6)(51:24)
early (42:24)
effect (20:13)(20:14)
(47:22)(48:4)
effective (24:10)
eight (42:11)
either (43:7)(50:18)
(57:19)
elaborate (14:21)(25:2)
elevated (32:4)
else (7:15)(11:18)
(25:1)(25:8)(34:3)
(53:3)(56:5)
emergencies (5:17)
emergency (28:2)(28:4)
(28:8)
emergent (36:2)
employed (4:22)
employee (49:9)(49:11)
(57:18)(57:19)
Ent (26:8)(53:22)
enter (54:3)
entered (44:12)
entering (28:5)(40:12)
entry (28:6)(54:21)
environment (7:11)
equate (17:8)
Errata (3:4)(59:12)

(59:13)(59:15)(59:17)
Esquire (2:9)(2:15)
(59:5)(59:15)(59:20)
essentially (7:6)
ESTATE (1:4)
estimate (54:18)
evaluate (21:25)(48:12)
evaluated (10:8)(42:18)
evaluation (10:12)
(10:14)(10:17)(12:11)
(23:18)(23:23)(36:4)
ever (4:11)(6:25)(21:7)
(43:1)
every (10:21)(10:22)
(54:12)
everybody (18:25)
(23:15)
everyone (14:24)
(18:20)(18:22)(18:23)
(30:3)(36:6)(36:8)
everything (53:1)
everything's (9:6)(9:9)
exactly (8:9)
examination (2:1)(3:2)
(4:5)(53:17)
examined (4:3)
Exhibit (3:7)(3:8)(3:9)
(3:10)(25:18)(25:25)
(31:18)(33:10)(33:21)
(38:5)(38:15)(43:16)
(43:25)(46:14)(46:24)
(48:21)(51:18)(53:20)
(54:20)(55:21)
EXHIBITS (3:6)
explain (26:4)(26:13)
(30:18)(34:5)(35:5)
(40:7)
explicitly (20:1)
express (24:25)

## F

facility (8:8)(55:3)
fact (39:7)(40:1)(45:2)
facts (19:20)
factual (22:10)
familiar (8:15)(8:16)
(11:6)(26:1)(32:2)
(33:18)(43:25)(46:24)
(49:4)
Federal (2:2)
feeling (9:20)(12:12)
felt (12:9)(12:13)
Fentanyl (50:24)(51:4)
few (13:22)(14:13)
(14:18)(49:6)(51:9)
fifteen (24:12)
fight (44:13)
fighting (45:3)
figured (46:2)
fill (33:6)
fills (52:14)(52:17)
find (28:3)(53:5)
fine (29:3)(34:25)
first (5:16)(6:2)(13:5)
(22:5)(23:22)(37:9)
(48:16)(49:7)(57:6)
fit (48:13)
five (32:10)(45:25)
following (48:14)(58:3)
follows (4:3)
foregoing (57:8)(58:2)
form (10:3)(12:19)
(13:8)(14:7)(14:10)
(14:12)(14:14)(14:18)
(15:2)(15:4)(15:7)
(15:9)(15:20)(15:24)

(22:13) (26:4) (26:17)
(29:2) (33:6) (33:18)
(33:20) (34:7) (34:23)
(36:15) (45:19) (47:3)
(47:23) (51:19) (52:14)
**former** (49:9)
**Formerly** (27:11)
**Fort** (2:16) (2:17) (59:6)
(59:7)
**forty-eight** (36:13)
(36:14) (36:16)
**forum** (30:22)
**forward** (59:15)
**four** (36:2)
**fourteen** (36:4)
**frame** (22:1)
**Friday** (54:10) (54:11)
**from** (9:3) (11:18)
(11:23) (13:5) (16:16)
(22:5) (22:8) (22:19)
(22:20) (28:6) (30:10)
(38:13) (39:1) (45:22)
(46:6) (48:19) (52:25)
(53:5) (53:12) (55:3)
(55:5) (55:7) (55:15)
(55:16)
**front** (25:4) (25:8)
**further** (24:14) (44:21)
(57:14) (57:17)

**G**

**Gateway** (1:17) (2:4)
(2:11)
**gave** (31:2) (53:1) (53:7)
**general** (5:10) (31:7)
(31:9) (37:15)
**generally** (40:8)
**get** (5:25) (18:14)
(20:25) (22:2) (42:25)
(49:17) (54:22)
**gets** (30:10)
**getting** (38:18) (39:1)
**giving** (9:4)
**gmail** (2:10)
**goes** (29:13)
**gone** (21:15)
**got** (8:2) (19:20) (19:23)
**gown** (10:11) (17:7)
(17:11) (17:16) (18:1)
(18:3) (18:5) (22:9)
(22:12) (48:10)
**grab** (41:3)
**ground** (5:19) (5:20)
(23:20)
**guess** (6:14) (52:20)

**H**

**Haburjak** (44:17)
**hadn't** (55:13)
**hand** (36:15) (57:22)
**handed** (25:24) (26:24)
**handle** (7:15)
**handled** (10:1)
**handwriting** (32:5)
(33:22) (34:1) (36:22)
**hang** (7:20) (44:16)
(45:2) (45:9)
**happen** (43:3)
**happened** (5:18) (8:1)
(29:14) (29:17) (39:21)
(44:6) (49:14)
**happening** (42:18)
**harm** (19:25) (24:24)
(24:25)
**harming** (9:25) (19:7)
(20:6)

**Harrison** (37:18) (37:20)
(52:8) (52:12) (52:19)
(52:25)
**Harrison's** (37:8) (52:11)
**head** (31:11) (31:12)
**health** (5:24) (7:12)
(7:13) (8:8) (10:12)
(10:14) (10:17) (10:19)
(10:20) (10:21) (12:10)
(18:15) (18:23) (18:24)
(19:1) (19:3) (28:15)
(29:9) (29:11) (29:12)
(29:20) (29:23) (29:25)
(30:4) (30:5) (30:8)
(30:9) (30:15) (30:25)
(31:4) (31:6) (33:20)
(34:7) (35:4) (35:7)
(35:8) (35:14) (35:22)
(36:4) (36:10) (36:20)
(37:16) (37:21) (48:11)
(50:6) (50:20) (52:10)
(52:16) (54:14)
**Healthcare** (32:1) (46:23)
**held** (4:25)
**help** (21:17)
**helpful** (46:12)
**here** (16:2) (16:3) (20:4)
(20:8) (20:9) (20:11)
(27:20) (28:11) (29:14)
(32:7) (33:5) (47:11)
(49:23) (50:14) (50:23)
**hereby** (57:5)
**herein** (57:9)
**hereof** (59:18)
**hereunto** (57:21)
**heroin** (11:24) (12:4)
(12:5) (30:25) (32:20)
(32:23) (33:1)
**he's** (7:20) (13:9)
(13:16) (21:23) (47:20)
**himself** (7:14) (7:20)
(9:25) (15:15) (24:24)
(25:1) (44:16) (45:3)
(45:9)
**history** (15:5) (28:16)
(28:17) (28:18) (28:21)
(35:4)
**hopes** (47:10)
**hospital** (16:16) (26:20)
(26:22) (55:3) (55:5)
**hospitalization** (28:19)
**hour** (24:1)
**hours** (24:1) (36:3)
(36:4) (36:13) (36:14)
(36:17) (36:21)
**housing** (29:13) (36:9)
(47:7)
**However** (5:9)

**I**

**idea** (15:2) (37:4)
**ideation** (17:14) (34:19)
(48:7)
**ideations** (34:21)
**identification** (25:19)
(31:19) (33:11) (38:6)
(43:17) (46:15) (48:22)
**immediate** (5:15)
**important** (16:9)
**impression** (40:2)
**incident** (11:7) (19:8)
(19:11) (19:13) (19:16)
(19:17) (20:22) (20:23)
(21:7) (21:12) (21:20)
(43:24) (44:2) (44:21)
(45:6)

**include** (7:13) (23:3)
(23:17) (25:7)
**includes** (18:6)
**INDEX** (3:6)
**indicate** (14:22)
**indicated** (5:17) (12:13)
(23:20) (24:4)
**indicating** (22:23) (46:7)
**individual** (5:13) (24:19)
**influence** (44:11)
**information** (14:5)
(14:23) (15:9) (15:13)
(16:9) (16:12) (16:18)
(16:19) (22:2) (44:23)
(45:7) (45:9) (46:1)
(46:10) (47:12) (47:15)
**ingested** (42:21)
**initial** (6:14) (6:23)
(6:25) (13:2)
**initiated** (30:17) (31:1)
**injuries** (5:15) (5:24)
(7:10)
**inmate** (6:2) (6:22) (7:8)
(7:18) (7:19) (8:2) (8:5)
(9:24) (10:21) (10:22)
(10:25) (13:16) (17:4)
(18:14) (22:6) (25:25)
(27:7) (27:8) (28:25)
(29:23) (30:5) (36:12)
(36:20) (42:10) (47:10)
(47:11) (47:20) (48:7)
(50:10) (51:24) (52:15)
(52:20) (52:21) (54:23)
**inmates** (6:8) (10:14)
(23:20) (40:11) (54:13)
**inmate's** (12:24) (27:4)
(40:13) (54:25)
**in-services** (8:19)
**inspection** (57:14)
**instituted** (48:19)
**instructions** (48:14)
**intake** (4:17) (4:19)
(5:20) (6:14) (6:23)
(6:25) (7:3) (9:23)
(10:15) (10:23) (11:9)
(13:2) (13:5) (13:14)
(20:22) (26:4) (30:9)
(31:1) (34:9) (35:13)
(44:20)
**intakes** (6:2) (6:5)
(13:15)
**intent** (10:10) (24:23)
**interaction** (24:17)
**interactions** (25:11)
(25:13)
**interested** (57:20)
**Interrogatories** (22:24)
**interval** (24:2)
**intervention** (42:24)
**interview** (4:17) (4:19)
(6:13) (11:8) (11:9)
(14:1) (11:18) (14:3)
(24:18) (24:20) (25:6)
(26:6) (26:9) (27:1)
(27:11) (27:22) (29:16)
(29:19) (34:9) (34:12)
(39:7) (40:24) (41:1)
(41:12) (41:13) (41:15)
(41:18) (41:22) (42:1)
(42:5) (44:23) (54:1)
(54:5) (54:14)
**interviewed** (12:15)
(17:19) (27:21)
**interviewing** (17:10)
**into** (40:12) (43:6)
(47:22) (48:2) (48:4)

**(48:13) (55:1)**
**investigation** (39:23)
(39:25)
**issue** (7:12) (30:14)
**issues** (31:6) (54:15)

**J**

**Jail** (4:23) (5:3) (5:14)
(6:2) (6:16) (6:18) (6:22)
(7:5) (7:7) (7:9) (8:11)
(10:25) (12:14) (12:17)
(13:6) (13:17) (13:23)
(19:6) (19:7) (19:14)
(23:5) (25:25) (27:9)
(32:1) (37:22) (38:14)
(39:16) (40:14) (46:23)
(47:21) (48:2) (48:4)
(49:11) (55:1) (55:4)
(55:7)
**JEAN** (1:3) (28:3)
**job** (46:9) (46:11) (47:18)
**JOEL** (1:17) (2:4) (2:10)
**JOHN** (1:4) (2:15) (4:20)
(24:24) (34:8) (44:10)
(52:24) (59:5)
**JRS** (49:21) (49:24)
(55:23)
**June** (57:23) (59:4)
**Justice-related** (49:22)
(50:5) (50:10) (55:24)

**K**

**Kevin** (59:1)
**key** (21:14)
**killing** (15:15)
**kind** (36:11)
**kinds** (16:22)
**knowing** (21:15) (21:25)
(55:15)
**knowledge** (21:14)
(43:12)
**known** (21:16) (45:3)
(45:4) (46:10)

**L**

**language** (51:23)
**last** (28:17) (30:12)
(33:2) (41:10) (56:10)
**later** (5:9)
**LATHAM** (1:12) (2:1)
(4:1) (4:10) (4:11) (57:6)
(58:2) (58:21) (59:9)
**LAW** (1:17) (2:4) (2:10)
(2:16) (59:6)
**LAWNICZAK** (1:3)
**lead** (7:8) (7:21) (28:24)
(29:6)
**least** (19:25) (45:25)
**leave** (40:2)
**left** (31:3) (35:15) (36:5)
**left-hand** (26:11)
**length** (5:6)
**less** (36:16)
**level** (5:19) (5:20)
(23:21)
**levels** (42:22)
**likely** (9:20)
**limited** (23:3)
**line** (37:3) (37:6) (37:9)
(37:13)
**lineage** (18:2)
**list** (18:6) (28:12)
**listed** (8:25)
**located** (50:25)
**LOCATION** (1:17)
**long** (4:22) (5:5) (5:9)

(22:5)(29:22)(36:19)
looked   (11:8)(22:23)
(41:25)(53:4)
looking   (11:10)(11:16)
(42:2)(42:3)(42:4)
looks   (37:3)(37:7)(37:9)
Loperamide   (32:13)
(32:22)
loss   (28:20)
lost   (55:21)
lot   (19:12)
Lower   (28:2)

## M

Ma'am   (4:8)(25:15)
(26:1)(31:23)(33:15)
(38:10)(40:5)(46:19)
(49:1)(51:16)
made   (10:9)(19:6)
(19:15)(20:17)(20:24)
(21:12)(21:19)(44:22)
(45:15)
maintain   (48:16)
making   (9:5)(9:8)
(52:20)
many   (18:21)
March   (11:7)(12:14)
(12:15)(13:20)(18:25)
(26:8)(33:5)(33:21)
(37:4)(37:11)(38:14)
(44:9)(52:6)
marked   (25:18)(25:24)
(27:20)(31:18)(33:10)
(33:21)(38:5)(38:15)
(43:16)(43:25)(46:14)
(46:24)(48:21)
Massimo   (2:9)(59:15)
(59:20)
matter   (18:21)
mean   (5:20)(6:5)(6:6)
(6:16)(14:7)(14:12)
(14:14)(15:12)(17:25)
(21:14)(21:16)(24:15)
(24:20)(25:12)(27:5)
(27:17)(29:10)(30:15)
(40:19)(42:20)(47:4)
(49:21)(49:24)(53:2)
meaning   (37:17)
means   (25:4)(26:13)
(26:14)(27:20)(29:12)
(30:18)(30:19)(31:2)
(37:5)(37:14)(39:6)
(47:5)(50:4)(50:9)
meant   (25:2)
measures   (24:14)
medical   (14:4)(14:23)
(15:9)(15:12)(24:18)
(24:20)(26:1)(26:5)
(27:4)(27:5)(27:7)
(27:10)(28:14)(30:14)
(40:24)(41:1)(43:7)
(53:7)(54:22)(54:25)
(55:7)
medicate   (24:3)(24:6)
(24:8)
medicated   (23:6)
medication   (23:18)
(35:8)(35:10)
medications   (28:18)
medicine   (24:9)(32:20)
medicines   (31:2)
meeting   (17:1)
members   (23:20)
mental   (5:24)(7:12)
(7:13)(8:8)(10:12)
(10:14)(10:17)(10:19)

(10:20)(10:21)(12:10)
(18:15)(18:23)(18:24)
(18:25)(19:3)(28:15)
(29:9)(29:10)(29:12)
(29:20)(29:23)(29:25)
(30:3)(30:5)(30:8)
(30:15)(30:24)(31:4)
(31:6)(33:20)(34:7)
(35:4)(35:7)(35:8)
(35:14)(35:22)(36:4)
(36:10)(36:20)(37:16)
(37:21)(48:11)(50:6)
(50:20)(52:10)(52:16)
(54:14)
mention   (55:21)
mentioned   (45:5)
message   (37:3)(37:11)
(52:6)
met   (37:18)
meth   (44:14)
middle   (37:3)(50:14)
milligrams   (32:9)
(32:10)(32:12)(32:13)
(32:14)(32:16)
Millvale   (44:9)(44:15)
mind   (22:1)
minimally   (11:19)
minutes   (24:12)(51:10)
mixing   (18:18)
Monday   (54:10)(54:11)
months   (28:20)
moot   (36:11)
more   (51:9)(51:10)
(51:17)
morning   (30:2)
mouth   (32:9)
much   (51:10)
multiple   (19:21)
must   (59:13)

## N

N/A   (25:12)
name   (4:8)(27:4)(28:3)
(33:24)(43:10)(52:11)
nausea   (32:25)
necessarily   (10:5)
need   (14:20)(14:25)
(15:10)(24:13)(24:14)
(42:24)(51:9)(56:7)
needed   (8:3)(21:25)
needs   (16:14)(16:21)
NET/MET   (35:14)
neuro   (24:6)
never   (35:17)(35:23)
(45:5)(47:14)
new   (23:4)(23:19)
(44:10)(44:12)(44:19)
(50:15)
next   (28:11)(32:21)
(32:24)(34:19)(35:12)
(36:1)(45:24)(46:4)
night   (49:15)
nine   (28:12)
Nodding   (31:11)(31:12)
Non-Waiver   (3:4)(59:10)
normal   (54:7)(54:8)
normally   (54:23)
notarized   (59:14)
Notary   (1:21)(2:3)
(57:4)(57:25)(58:24)
notations   (35:19)
note   (35:25)
noted   (59:11)
nothing   (57:7)
Notice   (3:4)(59:10)
notified   (48:11)

number   (18:9)(18:13)
(18:16)(18:17)(28:23)
(42:16)(42:20)(43:1)
(55:10)(55:11)
nurse   (5:11)(5:12)
(7:24)(10:19)(15:1)
(19:3)(19:14)(26:25)
(44:20)(47:5)(50:24)
nurse and   (14:23)
nurse's   (16:25)
nurses'   (42:17)(43:6)
nurse-to-nurse   (16:15)
nursing   (6:9)(6:10)
(6:12)(27:1)(37:6)
(37:11)(47:19)(52:6)

## O

object   (10:2)(12:19)
(13:7)(14:6)(15:20)
(19:18)(22:13)(26:17)
(29:2)(34:23)(45:19)
(47:23)
Observation   (38:13)
(40:8)(41:11)(42:6)
(43:7)(48:11)
observe   (21:24)
observed   (10:12)
obviously   (55:10)
occur   (40:13)(40:16)
(41:11)
occurred   (11:7)(26:9)
occurs   (20:22)
odd   (12:16)(12:22)
off   (54:11)
office   (6:9)(27:2)(57:22)
officer   (7:19)(21:23)
(42:15)(42:23)
officers   (8:1)(26:25)
(40:11)(42:7)(42:8)
(42:13)(44:18)
officer's   (28:6)
OFFICES   (1:17)(2:3)
(2:4)(2:10)
old   (27:11)
old interview   (4:16)
one   (6:2)(6:3)(32:21)
(32:24)(33:2)(36:2)
(36:9)(42:15)(44:3)
(44:4)(51:17)
ongoing   (23:18)(23:22)
(24:15)
Only   (55:3)
opinion   (9:11)
Opioid/ETOH   (30:17)
order   (19:3)(24:2)
(32:2)(32:18)(56:10)
ordered   (30:17)(31:1)
(31:2)(56:10)
original   (59:15)(59:16)
ORLANDO   (1:4)(4:20)
(11:6)(11:15)(12:14)
(15:14)(15:22)(16:1)
(17:10)(19:6)(22:3)
(22:8)(24:17)(24:24)
(25:11)(28:13)(29:6)
(29:15)(29:19)(36:15)
(37:18)(42:19)(43:12)
(44:10)(44:24)(49:23)
(50:23)(55:19)
Orlando/Lawniczak
Orlando's   (24:23)(28:4)
(34:8)(34:20)(41:15)
(41:18)(41:25)
others   (15:15)
otherwise   (9:22)(11:12)
out   (7:14)(7:16)(8:4)

(8:6)(33:6)(39:22)
(52:14)(52:17)
outpatient   (28:16)
over   (25:15)(33:15)
(45:21)(46:8)

## P

page   (26:7)(26:11)
(27:15)(28:2)(28:11)
(30:12)(36:23)(38:21)
(39:4)(50:14)(51:22)
pages   (58:2)
papers   (16:17)
paperwork   (19:13)
Park   (59:2)
part   (10:15)(10:23)
(35:17)(39:24)(45:3)
(47:10)
particular   (42:15)
parties   (57:16)(57:18)
parts   (19:21)(19:23)
passed   (47:23)
past   (17:15)(27:4)
(27:5)(27:9)(28:20)
patch   (50:24)(51:4)
patient   (5:25)(34:10)
pause   (41:6)(51:12)
PENNSYLVANIA   (1:1)
(2:3)(2:5)(57:1)(57:5)
(58:1)
people   (9:25)(19:8)
percent   (54:19)
perform   (10:17)
performed   (10:19)
performing   (9:23)
(12:23)(19:14)
period   (22:4)(25:5)
periods   (18:18)
person   (7:6)(7:13)
(7:16)(7:20)(7:23)
(7:25)(9:4)(10:8)
(26:23)(30:11)(30:20)
(42:16)(42:23)(42:25)
(43:4)(47:5)(47:8)
(48:6)(48:9)(48:12)
(48:14)(48:17)(55:1)
Personal   (1:3)
person's   (9:19)(33:24)
pertinent   (16:20)
physical   (5:23)
picture   (11:17)
Pitt   (2:16)(2:17)(59:6)
(59:7)
Pittsburgh   (1:19)(2:4)
(2:12)(2:17)(59:7)
place   (6:19)(17:4)
(17:7)(30:7)(44:18)
(57:9)
placed   (10:11)(18:11)
(19:11)(22:3)(22:12)
(34:16)(43:13)(44:21)
(45:12)(48:9)(48:10)
placing   (17:11)
Plaintiff   (1:5)(1:20)
(2:1)(2:8)
please   (4:8)(5:10)
(25:15)(51:18)(59:11)
(59:15)(59:17)
pod   (29:13)(39:20)
pods   (36:9)
point   (6:11)(36:11)
police   (39:22)(44:9)
(44:15)(54:24)(55:2)
policy   (8:11)(8:13)
(8:15)(8:17)(10:1)
(10:5)(10:6)(36:6)

(47:21)(48:4)(48:13)
**population** (37:10)(37:13)(37:15)(51:25)(52:4)(52:5)(52:21)
**port** (44:12)
**positions** (4:25)
**possession** (59:16)
**possessions** (9:5)
**possible** (54:17)
**possibly** (9:15)
**potential** (42:14)
**potentially** (42:21)
**practitioners** (24:2)
**Practitioner's** (32:2)
**precautions** (17:5)(17:8)(18:11)(34:11)(34:13)(43:11)(43:13)(48:7)(48:8)(48:18)
**preceding** (59:12)
**preparation** (11:11)
**prepare** (4:13)
**pre-populated** (28:6)
**prescription** (32:17)
**present** (19:10)
**pressure** (23:25)(24:4)(24:11)
**presume** (54:22)
**prevention** (8:12)(8:18)(8:20)(10:11)(48:10)
**previously** (31:9)
**Prince** (18:2)
**printed** (39:23)
**printing** (57:11)
**prior** (9:4)(15:17)(26:16)(35:4)(40:23)(40:25)(41:11)(41:13)(41:15)(41:17)(41:22)(41:25)(42:5)(44:23)(56:10)
**private** (30:14)(30:21)
**probably** (39:16)(39:23)
**problem** (14:15)(42:14)
**problems** (28:15)
**Procedure** (2:2)(6:23)
**proceedings** (41:7)(51:13)(56:14)
**process** (7:1)(10:15)(10:23)(13:19)(13:20)(43:8)(46:3)
**processes** (13:14)(13:21)
**professional** (35:23)
**progress** (35:25)
**Promethazine** (32:14)(32:25)
**pronounce** (4:8)
**proper** (51:3)
**provided** (22:9)(22:20)(22:21)
**provider** (36:20)
**Psych** (8:7)(8:9)
**psychiatric** (8:10)
**psychotropic** (28:18)(28:19)(35:9)
**Public** (1:21)(2:3)(30:22)(57:4)(57:25)(58:24)
**pull** (27:4)(27:9)
**put** (17:16)(17:25)(18:3)(18:4)(47:22)(54:22)
**putting** (25:12)

## Q

**QCR** (1:22)(58:24)
**QUALITY** (59:1)
**question** (10:3)(15:3)(15:6)(15:21)(19:19)(20:17)(21:11)(23:1)(24:16)(24:23)(25:10)(26:12)(27:18)(28:8)(34:10)(41:10)(48:1)
**questioned** (7:24)
**questionnaire** (13:15)(42:7)
**questions** (13:22)(14:13)(14:19)(14:20)(17:21)(18:7)(18:9)(18:13)(18:21)(22:17)(22:18)(22:19)(28:12)(28:13)(28:24)(29:5)(31:5)(31:8)(40:10)(40:23)(42:11)(49:6)(51:17)(53:15)(55:10)(55:16)(56:3)

## R

**ran** (50:15)
**read** (25:15)(29:5)(32:7)(32:8)(49:1)(56:6)(58:2)(59:11)
**reading** (57:15)
**ready** (6:12)(25:16)(25:23)
**really** (8:2)(14:1)(35:21)(50:4)(50:8)
**reapply** (24:13)
**reason** (14:1)(14:2)(15:3)(15:6)(34:18)
**reasons** (17:15)
**recall** (8:23)(8:25)(9:1)(9:8)(9:14)(9:18)(10:6)(11:8)(11:13)(11:14)(11:18)(11:23)(17:13)(22:17)(29:14)(29:16)(41:17)(41:19)(42:2)(42:3)(42:4)(42:18)
**recalled** (11:10)
**receipt** (59:18)
**receive** (8:10)(8:17)(10:14)(26:15)(26:22)
**received** (26:12)(26:14)(52:10)(52:12)(54:21)
**recent** (28:19)
**recently** (42:21)
**record** (51:16)(53:7)(57:12)
**recorded** (57:10)
**records** (12:25)(26:12)(26:14)(26:15)(26:20)(26:22)(27:4)(27:6)(27:10)(27:13)(54:21)(54:23)(54:25)(55:6)(55:8)
**reduced** (57:11)
**refer** (29:6)(31:4)
**Reference** (1:22)(58:24)
**referral** (10:8)(29:22)(30:7)(30:14)(30:15)(30:25)(33:20)(34:7)(34:18)(36:1)(36:10)(36:15)(36:23)(51:18)(51:22)(52:12)(52:17)(52:21)
**referrals** (30:10)
**referred** (7:16)(16:14)(18:14)(19:4)(28:25)(29:8)(29:10)(30:5)(40:10)(40:17)(49:24)(50:10)
**referring** (13:24)
**refused** (27:19)
**regarding** (20:23)
**relative** (57:18)(57:19)
**relayed** (16:12)
**relevant** (16:20)
**remain** (43:6)
**remains** (28:10)
**remember** (11:17)(20:5)(20:6)(28:5)(29:17)(29:18)(29:21)
**reminded** (11:12)
**remove** (51:3)
**removed** (22:4)(22:8)(50:25)
**rephrase** (17:6)
**report** (13:3)(13:4)(13:5)(13:12)(14:4)(16:13)(16:15)(16:22)(16:24)(17:2)(21:21)(26:1)(35:24)(38:13)(40:5)(40:8)(40:9)(40:17)(40:19)(40:25)(41:11)(41:15)(42:6)(43:24)(44:2)(45:8)(45:22)(46:23)(47:19)
**REPORTED** (1:21)(35:6)
**Reporter** (2:3)(3:3)(56:7)(56:12)(57:3)(59:19)
**REPORTING** (59:1)
**reports** (19:9)(20:23)(45:6)(45:25)(52:25)
**Representative** (1:4)
**represents** (53:25)
**requested** (44:17)
**resignation** (38:2)
**resigned** (37:25)
**resistant** (48:15)
**respective** (57:16)
**respects** (58:19)
**responded** (24:17)(24:24)(25:12)
**responding** (5:17)
**response** (5:19)(24:16)(43:2)
**responses** (17:20)(31:5)(31:8)
**responsibilities** (5:11)(5:12)(23:2)(23:3)
**restate** (48:1)
**restraint** (19:11)(22:3)(22:6)(34:16)(45:13)(48:13)
**restraints** (44:19)(47:6)
**restrictive** (47:7)
**result** (8:4)
**retrieved** (44:18)
**return** (59:17)
**review** (4:15)(4:16)(31:23)(38:10)(43:21)(46:19)
**reviewed** (19:10)(25:19)(31:19)(33:11)(38:6)(43:17)(46:15)(48:22)
**reviewing** (41:17)
**right-hand** (26:7)
**rough** (54:17)
**routine** (36:3)
**Rules** (2:2)
**Ruth** (37:8)(37:17)(37:20)(52:8)(52:11)(52:25)

## S

**safe** (7:17)
**safely** (7:11)
**safety** (48:16)
**sally** (44:12)
**same** (27:15)(33:5)(56:9)(59:16)
**SANSONE** (1:17)(2:4)(2:10)
**saw** (15:23)(16:8)(45:23)(46:7)(55:19)
**say** (8:14)(9:21)(13:18)(14:11)(14:14)(14:17)(17:24)(18:21)(19:22)(22:15)(35:1)(35:2)(36:8)(36:19)(41:19)(42:14)(42:15)(44:13)(45:16)(46:8)(49:18)(54:19)
**saying** (15:22)(17:25)(20:5)(40:1)(45:8)
**says** (7:19)(26:8)(27:15)(28:2)(32:7)(32:9)(37:1)(37:2)(37:3)(43:4)(44:7)(47:10)(52:10)(53:21)
**schizophrenia** (35:7)
**screaming** (47:10)
**screen** (35:13)(35:14)
**screening** (27:16)
**seal** (57:22)
**section** (30:13)(35:12)(35:19)(36:1)(44:7)
**security** (48:16)
**see** (12:10)(12:11)(13:22)(16:6)(18:17)(24:9)(24:12)(29:13)(29:23)(30:3)(33:24)(35:13)(35:14)(36:20)(37:3)(37:6)(37:11)(45:5)(49:15)(51:1)(52:5)(52:6)(53:10)
**seeing** (11:16)(29:21)
**seemed** (7:24)
**seen** (18:20)(18:22)(18:23)(18:25)(19:3)(30:4)(30:11)(36:7)(36:8)(36:11)(36:13)(36:16)(44:2)(47:14)(52:20)(55:12)(55:13)
**sees** (10:21)
**segregated** (47:6)
**segregation** (47:3)
**seizure** (24:6)
**Send** (59:16)
**sent** (8:4)(8:6)
**Sergeant** (44:17)
**serious** (16:20)
**Services** (32:1)(46:23)(49:21)(49:22)(50:5)(50:10)(55:24)
**set** (57:21)
**setting** (30:21)
**seven** (32:12)
**Seventeen** (4:24)
**several** (19:8)(20:23)
**shared** (16:23)
**Sheet** (3:4)(59:12)(59:13)(59:15)(59:17)
**sheets** (26:21)
**shift** (30:1)(30:2)(45:24)(46:4)(46:5)(49:15)(54:7)(54:8)
**Shift-to-shift** (17:2)(21:21)(45:22)(47:19)
**shoulder** (50:25)
**shouting** (47:11)
**shown** (55:11)
**side** (26:8)(26:11)

QUALITY

(27:15)
**sign** (9:8)
**Signature** (3:4)(33:24)
(37:7)(59:10)(59:13)
**signed** (52:8)(59:15)
**significant** (28:20)
**signing** (57:15)
**signs** (8:21)(8:23)(12:7)
**sit** (42:17)
**situation** (15:14)
**six** (28:20)
**small** (14:21)
**somebody** (34:3)(55:5)
**someone** (7:14)(16:13)
(21:21)(24:25)(24:7)
(24:10)(54:25)
**Someone's** (23:24)
**something** (7:15)(7:21)
(8:1)(8:3)(16:13)
(16:17)(20:12)(21:16)
(50:6)(54:3)(55:23)
**sometime** (36:16)
**somewhere** (8:9)
(39:17)(49:16)
**sorry** (11:25)(17:23)
(23:12)(31:11)(34:24)
(41:24)
**space** (14:21)
**speaking** (12:12)
**specialist** (10:20)
(10:21)(29:12)(29:23)
(30:4)(30:6)(30:9)
(37:21)(52:16)
**specialists** (29:20)
(29:25)
**specialist's** (30:8)
**specific** (11:13)(44:3)
**specifically** (40:7)(45:8)
(55:25)
**speculate** (50:2)
**staff** (23:20)(52:11)
**Stanwix** (1:18)(2:4)
(2:11)
**started** (44:13)
**stated** (44:16)(57:9)
**statement** (9:9)(9:24)
(10:10)
**statements** (9:5)(19:7)
**STATES** (1:1)(10:7)
(48:6)(50:23)
**stating** (10:10)
**station** (42:17)(43:6)
**status** (5:23)
**stay** (6:11)(22:6)
**stenographically** (57:10)
**still** (37:22)
**stopped** (24:13)
**story** (39:11)
**Street** (1:18)(2:4)(2:11)
**Subscribed** (58:22)
**Sudden** (9:3)
**suicidal** (8:5)(17:14)
(34:19)(34:20)(43:5)
(48:6)
**suicidality** (8:24)(9:16)
**suicide** (8:12)(8:18)
(8:20)(10:1)(10:11)
(17:5)(17:8)(18:11)
(22:9)(34:11)(34:12)
(39:19)(39:24)(43:1)
(43:9)(43:11)(43:13)
(47:21)(48:3)(48:4)
(48:9)(48:18)
**Suite** (1:18)(2:4)(2:12)
**supervisors** (19:10)
**supposed** (49:16)(49:19)

**sure** (6:5)(14:7)(15:12)
(18:16)(20:2)(27:5)
(35:21)(38:22)(39:2)
(41:25)(42:12)(49:9)
(49:14)(50:6)(52:16)
**surrounding** (19:17)
(38:1)
**Survey** (26:1)
**suspect** (39:21)
**suspicion** (39:25)
**sworn** (4:2)(57:6)
(58:22)
**symptom** (32:22)
**system** (40:12)
**systems** (50:19)

---

## T

**talk** (30:20)
**talked** (28:23)
**talking** (13:10)(13:13)
(13:18)(13:20)(15:14)
(21:1)(47:20)(48:3)
(52:15)
**taught** (8:21)
**tell** (35:21)(50:13)
**telling** (12:9)
**ten** (32:16)
**TERESA** (1:12)(2:1)
(4:1)(4:10)(57:6)(58:2)
(58:21)(59:9)
**terminated** (49:13)
**terms** (49:7)
**terms or** (50:18)
**Terzigni** (2:9)(3:2)(4:7)
(10:4)(12:2)(12:3)
(12:21)(13:11)(14:9)
(14:16)(15:25)(19:22)
(20:2)(20:7)(20:12)
(20:15)(22:14)(23:11)
(23:16)(25:22)(26:19)
(29:4)(31:22)(33:14)
(35:3)(38:9)(38:20)
(38:24)(39:3)(39:8)
(39:12)(40:3)(40:4)
(40:21)(40:22)(41:3)
(41:9)(43:20)(45:20)
(46:18)(47:25)(48:25)
(50:3)(51:9)(51:15)
(52:3)(52:24)(53:4)
(53:8)(53:11)(53:14)
(55:12)(55:17)(56:4)
(59:15)(59:20)
**terzignim** (2:10)
**testified** (4:3)(16:24)
(17:17)(31:9)(31:13)
(44:6)
**testify** (41:24)(57:6)
**testifying** (15:5)
**testimony** (19:20)
(57:12)
**than** (36:16)(53:7)
(55:18)
**Thank** (56:12)
**them** (8:25)(9:13)
(22:21)(24:1)(26:24)
(40:12)(55:1)
**therapy** (28:16)
**There's** (13:25)(16:19)
(20:23)(25:10)(26:11)
(26:12)(27:13)(28:9)
(33:24)(53:21)
**these** (28:24)(31:5)
(55:15)
**they're** (9:20)(21:3)
(23:25)(27:1)(40:12)
(43:5)(55:6)

**they've** (42:12)
**Thiamine** (32:15)(33:3)
**thing** (56:9)
**things** (9:21)(16:23)
(44:5)(45:18)(53:20)
**think** (15:10)(15:21)
(18:17)(19:19)(19:24)
(21:11)(39:22)(39:23)
(46:11)(51:10)
**third** (37:6)
**thirty** (59:18)
**though** (8:14)
**thought** (12:1)(35:22)
(52:4)
**threat** (7:14)(7:25)
**threatened** (19:25)
**three** (32:14)
**through** (46:3)(54:10)
**tightness** (44:20)
**till** (46:7)
**time** (5:6)(7:16)(9:19)
(14:17)(17:22)(22:4)
(24:25)(25:3)(25:4)
(25:5)(25:7)(29:24)
(34:8)(34:12)(34:15)
(36:6)(39:15)(44:8)
(45:22)(45:23)(46:7)
(48:17)(53:22)(53:25)
(54:1)(54:7)(56:11)
(57:9)
**times** (28:7)(30:1)
(30:2)(32:10)(32:11)
(32:12)(32:13)(32:15)
(32:16)
**title** (38:21)(49:10)
**today** (4:13)
**told** (18:1)(23:6)
**top** (26:7)(35:17)
(38:20)(39:4)(47:10)
**Towards** (26:7)(36:22)
(51:21)
**training** (8:17)
**transcript** (26:5)(58:19)
(59:11)(59:16)
**transfer** (26:20)
**transporting** (26:24)
**treatment** (23:19)
(42:24)
**triaging** (5:15)
**trigger** (12:6)(43:2)
(48:3)
**Trish** (50:24)
**troubling** (9:13)
**true** (18:12)(57:12)
(58:19)
**truth** (12:10)(35:21)
(57:7)(57:8)
**truthful** (11:21)
**try** (41:21)
**trying** (5:24)(51:23)
**Tuesday** (1:16)(2:5)
(58:3)
**turn** (28:11)(30:12)
**Two** (1:17)(2:4)(2:11)
(5:6)(5:8)(6:1)(6:5)
(13:13)(13:15)(13:21)
(18:18)(24:1)(30:1)
(30:2)(32:11)(36:21)
(46:6)(51:17)
**type** (27:3)
**typically** (30:19)

## U

**Uh-huh** (15:16)(16:11)
(23:8)(23:9)
**unaware** (34:15)(34:20)

**unchecked** (34:19)
**uncommon** (54:13)
**under** (10:1)(30:12)
(36:23)(38:21)(43:7)
(44:11)(57:11)
**understand** (15:5)
**understanding** (6:1)
**unit** (30:9)(37:16)
**UNITED** (1:1)
**unless** (14:22)(14:25)
**unlikely** (35:2)
**until** (7:16)(10:12)
(21:18)(42:17)(43:8)
(45:23)(49:5)
**upper** (53:21)
**upstairs** (36:10)
**urgent** (36:3)(36:7)
**used** (32:20)(32:22)
(32:25)
**usual** (29:24)
**usually** (6:19)(9:19)
(11:2)(11:5)(13:25)
(16:13)(16:15)(26:24)
(29:22)(30:1)(35:16)
(36:14)(36:21)(49:15)

---

## V

**valid** (7:25)
**Valium** (32:9)(32:10)
**verbal** (16:21)(16:24)
(35:24)
**victimization** (28:22)
**videotaped** (19:12)
**violent** (28:21)
**virtually** (39:10)
**Vitamin** (33:3)

---

**-vs-** (1:6)

---

## W

**waived** (57:16)
**want** (8:25)(19:22)
(20:1)(30:20)(40:1)
(44:5)(51:21)
**wanted** (44:16)(45:8)
**warning** (8:21)(8:23)
(9:8)(12:6)
**watch** (43:9)
**wearing** (50:23)
**weekend** (54:12)
**Welsh** (1:21)(2:2)(57:3)
(59:19)
**we're** (16:2)(20:4)
(20:8)(20:10)(24:6)
(51:16)
**WESTERN** (1:1)(8:6)
(8:9)
**We've** (8:18)(24:11)
**whatever** (9:3)(9:12)
(14:22)(21:25)(24:1)
(24:5)(24:7)(56:10)
**whatever's** (24:3)
**What's** (7:3)
**WHEREOF** (57:21)
**whole** (57:7)
**whom** (22:19)
**Whose** (45:17)(47:18)
**wish** (58:3)
**withdraw** (9:15)(32:23)
(33:1)(33:4)
**withdrawal** (24:8)
**withdrawing** (11:22)
(11:23)
**witness** (1:21)(15:23)
(25:19)(31:19)(33:11)

(34:24)(38:6)(43:17)
(46:15)(48:22)(57:5)
(57:13)(57:17)(57:21)
**words**  (54:24)
**work**  (5:2)(5:5)(6:25)
(37:22)
**worked**  (5:4)(49:14)
(54:9)(55:25)
**works**  (55:22)
**worry**  (9:12)
**wound**  (23:17)
**Wright**  (49:8)(49:17)
(55:22)
**write**  (16:7)(30:7)
(35:16)
**writes**  (50:15)
**written**  (16:16)(19:9)
(22:17)(22:22)(35:17)
(35:20)(35:23)
**wrong**  (19:23)
**wrote**  (23:17)(30:13)
(34:11)

## Y

**year**  (28:17)
**years**  (4:24)(5:7)(5:8)
**yeses**  (28:12)

QUALITY