# EXHIBIT T

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEAN LAWNICZAK, Personal )
Representative of the Estate )
of John Orlando, Deceased, )
            Plaintiff, )
    vs.                  ) Case No. 2:17-CV-00185
ALLEGHENY COUNTY, et al., )
            Defendants. )

- - - -

DEPOSITION OF ORLANDO HARPER

- - - -

DATE: April 2, 2018
Monday; 9:30 a.m.

LOCATION: LAW OFFICES OF JOEL SANSONE
Two Gateway Center, Suite 1290
603 Stanwix Street
Pittsburgh, Pennsylvania 15222

TAKEN BY: Plaintiff

REPORTED BY:  Mary Secot
Certified Court Reporter

QUALITY COURT REPORTING
7012 Kevin Drive
Bethel Park, PA
412-833-3434



**Page 2**

DEPOSITION OF ORLANDO HARPER,
a witness herein, called by the Plaintiff for
examination, in accordance with the Pennsylvania
Rules of Civil Procedure, before Mary Secot,
Certified Court Reporter-Notary Public in and for
the Commonwealth of Pennsylvania, at the LAW
OFFICES OF JOEL SANSONE, Two Gateway Center,
Suite 1290, 603 Stanwix Street, Pittsburgh,
Pennsylvania 15222, commencing at approximately
9:30 a.m.

- - -

APPEARANCES:
    FOR THE PLAINTIFF:
Joel Sansone, Esquire
Massimo Terzigni, Esquire
LAW OFFICES OF JOEL SANSONE
Two Gateway Center, Suite 1290
603 Liberty Avenue
Pittsburgh, PA 15222
412-281-9494
terzignim@gmail.com
joelsansonelaw@gmail.com

    FOR THE DEFENDANTS:
John A. Bacharach, Esquire
COUNTY OF ALLEGHENY LAW DEPARTMENT
300 Fort Pitt Commons
445 Fort Pitt Boulevard
Pittsburgh, PA 15219
412-350-1150
John.Bacharach@AlleghenyCounty.us

- - -

**Page 3**

*I N D E X*

Examination by Mr. Sansone ............... 4,127
Examination by Mr. Bacharach ............. 123

Certificate of Court Reporter ........... 133
Errata Sheet ............................. 134
Notice of Non-Waiver of Signature ........ 135

- - -

*INDEX OF EXHIBITS*

PLAINTIFF'S                              PAGE
Deposition Exhibit 1 .....................  56
Deposition Exhibit 2 .....................  59
Deposition Exhibit 3 .....................  63
Deposition Exhibit 4 .....................  65
Deposition Exhibit 5 .....................  68
Deposition Exhibit 6 .....................  74
Deposition Exhibit 7 .....................  79

- - -

**Page 4**

P R O C E E D I N G S

- - -

ORLANDO HARPER,
having been first duly sworn, testified as
follows:

EXAMINATION

BY MR. SANSONE:

Q.   Good morning, Mr. Harper.  How long have you
been a warden at the jail?

A.   Five and a half years.

Q.   And prior to that how much time have you
spent working in jails or prisons?

A.   Twenty-four years.

Q.   Okay.  Prior to coming on board there; is
that right?

A.   Twenty-four years before being a warden here.

Q.   So you're going on 30 years of experience in
the field?

A.   Yes.

Q.   Has it always been with the Bureau of
Corrections.  All your experience here in
Pennsylvania, I should say?

A.   Five and a half years here at the Bureau,
correct.

Q.   And where prior to that did you work?

5

1    A.    Washington, D.C.
2    Q.    How long were you in D.C.?
3    A.    Twenty-four years.
4    Q.    How did you happen to get this job?  What
5  happened?
6    A.    I applied.
7    Q.    Okay.  You applied and did you know anybody
8  here?  What made you apply in Pittsburgh?
9    A.    I was looking for a warden's position.  I
10 applied and I got it.
11   Q.    So you didn't have any previous connection to
12 Pittsburgh?
13   A.    Not at all.
14   Q.    Were you aware of any reputation the jail
15 might have here in Pittsburgh?
16   A.    Of course.  It was before I did my research
17 on the jail prior to coming, of course.
18   Q.    What did your research tell you?
19   A.    Just told me about some of the issues that
20 happened in the past.
21   Q.    Like what?
22   A.    I can't remember exactly what.
23   Q.    Well, did your research uncover any
24 information about previous suicides in the jail?
25   A.    No.

6

1    Q.    No?
2    A.    No.
3    Q.    So you were not aware coming into the job of
4  the reputation of this jail with regard to suicides;
5  is that right?
6    A.    No.
7    Q.    Are you now aware of any reputation this jail
8  might have with respect to the number of suicides or
9  frequency of suicides?
10   A.    We have had some suicides since I have been
11 at the jail.
12   Q.    That's not what I asked you.
13   A.    Rephrase the question.  Restate the question.
14   Q.    Let me reask the question.
15   A.    Yes.
16   Q.    Have you become aware of any reputation this
17 jail might have?
18   A.    I cannot talk about any reputation that this
19 jail may have, but I can just talk about what has
20 happened since I have been here.
21   Q.    Well, I'm asking you about what you know
22 about the reputation.  When you said I can't talk
23 about it, does that mean you don't know anything about
24 this jail's reputation?
25   A.    I don't know anything about this jail's

7

1  reputation.
2    Q.    On May 5th of 2016 I sent you a letter which
3  I'm going to show you.  I'm not going to mark it as an
4  exhibit, but take a quick look at it.  I'm focusing on
5  the second full paragraph.  You're welcome to read it
6  all if you want to.
7    A.    Okay.
8    Q.    May I ask what actions did you take in
9  response to my letter?
10   A.    I don't recall the letter.
11   Q.    Well, do you recall receiving a letter from
12 me whether you recall its contents?
13   A.    I do not.  I receive letters from many
14 lawyers so I do not recall that specific letter, no.
15   Q.    Okay.  Do you recall the first time you
16 learned that the family of Mr. Orlando had contacted
17 an attorney, me, in this case?
18   A.    I don't know about that, no.
19   Q.    Okay.  Well, in this letter I asked you to
20 preserve any documents that might have something to do
21 with this.  Did you do so in this case?
22        Did you preserve documents with respect to
23 the investigation and incident which occurred which
24 resulted in Mr. Orlando's death?
25   A.    I preserved the documents based on my law

8

1  department's recommendations that I preserve the
2  documents.
3    Q.    You did not take any particular action in
4  response to my direction?
5    A.    As I stated before, I do not recall that
6  letter.
7    Q.    I read an article from Rich Lord at the
8  Post-Gazette dated May 5, 2017 that came out online I
9  guess first.  In this letter you are quoted to some
10 degree.
11        I'm going to read you one of the observations
12 from the letter and ask you if this is an accurate
13 representation of something you may have said.
14        The article indicates that you declined an
15 interview request and didn't entertain questions at
16 the jail Oversight Board Meeting but sent a statement
17 regarding this incident.  You made a statement, a
18 written statement.
19        Do you recall making a written statement
20 about this incident?
21   A.    I do not recall.
22   Q.    Okay.  This is the quote that Mr. Lord from
23 the Post-Gazette attributes to you.  He, and the he
24 relates to you, he sent a statement indicating,
25 "Providing for the care of inmates is important to the

```
 1   job we do." That includes, "An initial medical
 2   screening when they come in the door, a full or
 3   medical evaluation," a mental health review and
 4   "observances gathered and made by our employees. All
 5   of that goes into the decision on inmate placement and
 6   treatment."
 7          Does that sound like an accurate
 8   representation of the statement that you made you
 9   produced in this case?
10          MR. BACHARACH: I'm going to object to
11   the form of the question in the sense that is a
12   writing. The writing speaks for itself, but with
13   that objection, the warden can answer to the
14   extent that he can.
15     A.   I make a lot of quotes to the newspaper so I
16   cannot remember every quote I made. So I don't
17   remember the quote, but it's a possibility that I did
18   make.
19     Q.   Did you hear anything in the quote that's
20   attributed with which you disagree?
21     A.   Yes. We provide the best care that we can
22   for our inmates at Allegheny County Jail.
23     Q.   I'm sorry. I don't know what you're
24   responding to. I asked you if you heard anything in
25   those quotations that were attributed to with which
```

```
 1   you disagree?
 2     A.   I disagree with -- I mean agree with
 3   basically everything that's said in that quote.
 4     Q.   Okay. The next line of the article reads
 5   that the jail has a past history of higher than
 6   average suicide rates according to the Federal Bureau
 7   of Justice Statistics and saw two suicides last year.
 8          Is it true your jail holds a higher than
 9   average suicide rate according to the Federal Bureau
10   of Justice Statistics?
11          MR. BACHARACH: Object to the form of
12   the question. You can answer.
13     A.   I have no idea.
14     Q.   Well, does the Federal Bureau of Justice
15   publish statistics on suicide rates of jails?
16     A.   I have no idea.
17     Q.   Do you have any idea where your jail sits on
18   the list, so to speak, compared to other jails with
19   respect to the number of suicides or the rate of
20   suicides in your jail?
21     A.   I do not know.
22     Q.   In this same article, and this article
23   essentially is about firing of a correctional officer
24   named Veronica Brown. Do you know Ms. Brown?
25     A.   I do.
```

```
 1     Q.   Did you know her when she was an employee of
 2   the jail?
 3     A.   I did.
 4     Q.   And I take it you know that she was
 5   terminated from her job?
 6     A.   She was terminated.
 7     Q.   Why?
 8     A.   Not following policy and procedures.
 9     Q.   Would you be more specific, please?
10     A.   Pertaining to a suicide that occurred in the
11   jail.
12     Q.   What policy or procedure did she fail to
13   follow that got her fired? That was plural.
14     A.   Not making rounds as she is supposed to make
15   rounds.
16     Q.   What was she supposed to do and what did she
17   actually do?
18     A.   She did not make the rounds.
19     Q.   I read something about every 15 minutes. I
20   read something about every half hour. What was her
21   duty on this particular incident? Was it every 15
22   minutes or something else?
23     A.   I can't remember exactly the frequency, but
24   it was not within the allotted time period in
25   accordance to our policies and procedures.
```

```
 1     Q.   Ms. Brown is quoted in this article saying
 2   that she did not engage in neglect. She said, "You
 3   can't prevent suicide."
 4          Is she right? Well, on the subject of
 5   whether you can prevent suicide in the jail?
 6          MR. BACHARACH: I'm going to object to
 7   the form of the question. I mean it's so general
 8   that --
 9     Q.   Yes. I would like your opinion on that. Is
10   it true you can't prevent suicide in the jail?
11          MR. BACHARACH: In the sense is it
12   possible? Is it at all possible to do it?
13          MR. SANSONE: I understand why you're
14   trying to help him along here, John, but I want to
15   know his opinion on this question.
16     Q.   This woman, you know, she came out and said
17   clearly we can't prevent suicides. Do you agree with
18   her?
19     A.   You know what. I don't know how to properly
20   answer that question. I'm just going to say this. We
21   do everything in our power to try to prevent suicide.
22     Q.   Okay. That wasn't the question I asked.
23     A.   I don't know how to answer the question.
24     Q.   You don't know how to answer that question.
25          MR. BACHARACH: His answer is what he
```

13

```
1   gave.
2        MR. SANSONE:  Right.  It's not an answer
3   to the question I asked.
4        MR. BACHARACH:  His answer is what it
5   is.
6    Q.  Right.  It's not an answer to the question I
7   asked.  So you can't answer the question of whether or
8   not you're able to prevent suicides at the jail?
9    A.  We do everything in our power to try to.
10   Q.  I heard that but my question is can you
11  prevent it is the question.  What do you try to do?
12   A.  I don't know how to properly answer that
13  question.
14   Q.  Okay.  And then later on in the article, it
15  reads as follows.  The Warden Harper declined to
16  comment for this article in an interview last year
17  which would have been a 2016 interview, so in an
18  interview last year he said that the risk of suicide
19  rises when inmates are facing withdrawal.
20        Is that accurate?  Is that true?  The risk of
21  suicide rises when inmates are facing withdrawal.  Is
22  that accurate?
23   A.  Well, me being a correctional professional
24  and not a medical professional, I think as a
25  correctional professional, yes, it increases when
```

14

```
1   they're withdrawing, yes.
2    Q.  Your article goes on to say, he said, meaning
3   you, "Any new inmate coming into our facility (in a
4   detox process) they will be double-celled with a
5   cellmate."  Is that accurate?
6    A.  That is accurate.
7    Q.  And why is it important to double-cell
8   someone who is in detox?
9    A.  Because then you have somebody in the cell
10  that can watch over them and then prevent them or
11  notify staff if there is a suicide attempt.
12   Q.  In this incident my client, my client's
13  decedent, was initially double-celled, but that guy
14  was sent home earlier that day.  Is that right?
15   A.  That cellmate went somewhere that day, yes.
16        MR. BACHARACH:  Yes.  I object to the
17  form.
18   Q.  I read in the records here somewhere he was
19  sent home.  He was not no longer in my client's cell,
20  in my client's decedent's cell, whether he went home
21  or somewhere else?
22   A.  He wasn't.
23   Q.  He was what?
24   A.  He wasn't in the cell.
25   Q.  I'm sorry.  Wasn't?  I did not quite hear
```

15

```
1   you.  I'm sorry.  Now, in this particular instance
2   we're talking this Gettings' suicide, Ms. Gettings.
3   The article indicates Ms. Gettings was not given a
4   cellmate.  Do you know if that is true?
5        MR. BACHARACH:  I presume all objections
6   other than form are preserved until trial.
7        MR. SANSONE:  Sure.  Sure.
8    Q.  Was Ms. Gettings not given a cellmate prior
9   to her suicide?
10   A.  Ms. Gettings wasn't given a suicide based on
11  medical recommendations for her not to have a
12  cellmate.
13   Q.  Okay.  So she did not have a cellmate, right,
14  if I understand your answer?
15   A.  Ms. Gettings did not have a cellmate based on
16  medical recommendation not to have a cellmate.
17   Q.  Okay.  Ms. Brown is quoted again later in the
18  article, and it reads as follows.  "You can't watch
19  every inmate.  You can't!  Said Ms. Brown.  Rounds are
20  done every half hour or 40 minutes.  It takes five
21  minutes to hang yourself."
22        This says that -- first of all, do you agree
23  with her, that you can't watch every inmate?  Is that
24  true?  Is that an accurate statement of conditions in
25  the jail?
```

16

```
1        MR. BACHARACH:  I object to the form.
2   There is no time period involved in that.
3        MR. SANSONE:  Well, this article came
4   from 2017.
5        MR. BACHARACH:  I don't mean that.  I
6   mean you can't watch every inmate.  Does that mean
7   you can't watch them all the time or you can't
8   watch them every ten minutes?
9        MR. SANSONE:  You know, John, I wouldn't
10  mind if he asks me a few questions to clarify, but
11  this woman came out and said you can't watch every
12  inmate.  You can't.  I want to know his reaction
13  to that and not yours.
14        MR. BACHARACH:  I understand.  I think
15  it's a vague question.
16        MR. SANSONE:  Okay.  But I mean I
17  haven't heard the witness complain yet.
18        MR. BACHARACH:  Okay.
19   A.  I don't know what Ms. Brown thought so I
20  can't speak as to what Ms. Brown thought.
21  BY MR. SANSONE:
22   Q.  I did not ask you what Ms. Brown thought.  I
23  asked you what you thought.
24   A.  I feel as though each inmate can be observed
25  if they follow policies and procedures.
```

17

1    Q.   If who follows policies and procedures?
2    A.   Correctional professionals.
3    Q.   Okay.  Are you confident that in our case,
4  Mr. John Orlando's case, that all policies and
5  procedures were correctly followed?
6    A.   Absolutely.
7    Q.   It also says rounds are done every half hour
8  or 40 minutes.  Is that right?
9    A.   Different pods are different regulations as
10  to how often the rounds are to be conducted so at that
11  time rounds were conducted every 30 to 40 minutes at
12  that time on that pod.
13    Q.   On Ms. Gettings' pod?
14    A.   The incident you're talking about with
15  Ms. Brown, the rounds were conducted in that manner
16  that Ms. Brown talked about at that time.
17    Q.   And after the Gettings' incident did things
18  change?  You're saying at that time.  Is it different
19  now?  On the pod that Ms. Gettings was in, has that
20  policy changed?
21    A.   On that pod, yes.
22    Q.   To what did it change?
23    A.   Every 15 minutes.
24    Q.   Why?  Why did it change?
25    A.   Because of the Gettings' incident.

18

1    Q.   Next in the article there is an observation
2  by Mr. Lord.  In 2011 the Post-Gazette reported that
3  the Allegheny County Jail had the second highest
4  suicide rate among the 50 largest jails in the country
5  at 1.6 suicides per year.  Do you know if that's
6  accurate?
7    A.   I don't know.
8    Q.   And, again, I think I asked you.  I apologize
9  if I'm repeating myself.  Do you know where you stand
10  now if you were number two in 2011?
11    A.   I don't know.
12    Q.   Do you know a Phil Cestra, C-E-S-T-R-A?
13    A.   I think he was a sergeant who used to work at
14  our jail.
15    Q.   My information is he was a lieutenant, but I
16  don't know.  Do you know why he resigned?
17    A.   He retired.
18    Q.   Was he forced to retire or was it voluntary?
19    A.   He voluntarily retired.
20    Q.   Do you know why?
21    A.   Because he wanted to.  I don't know.
22    Q.   I'm sure he wanted to.  Do you know what
23  motivated him to do that?
24    A.   There is no way I would know that.
25    Q.   He never expressed any problems with the way

19

1  you ran the jail?
2    A.   Not to me, no.
3    Q.   Well, I did not ask you that.  Are you aware
4  he expressed his dissatisfaction with how you ran the
5  jail and that's why he resigned?
6    A.   No.
7    Q.   You're not aware of that?
8    A.   No.
9    Q.   You never heard that before this moment?
10    A.   No.
11    Q.   I have a note here about a staff meeting at
12  your jail which occurred in March of 2015 in which a
13  nurse essentially embraced you and said you have to
14  change the way you're running this jail if someone is
15  going to die in here.  You're quoted as saying that
16  it's my jail.  It's my way in response to that
17  complaint.
18         Do you recall such an interaction in or
19  around March of 2015?
20    A.   No.
21    Q.   Does that sound like something you would say?
22    A.   No.
23    Q.   I understand that the suicide occurred around
24  1:00 o'clock in the afternoon.  Is that your
25  understanding?

20

1    A.   Around that time.
2    Q.   And is it true that a nurse observed
3  Mr. Orlando in an agitated state earlier that day?
4    A.   I don't know.
5    Q.   Let me ask.  What did you do to prepare for
6  today's deposition?  I want you to exclude from your
7  conversation, from your answer any conversation that
8  you had with counsel.  I don't want to know what you
9  told your lawyers.
10         What did you do to prepare?  If one of them
11  is talk to lawyers, I understand that, but other than
12  that?
13    A.   Read the three incident packages that took
14  place on the 24th, the 26th and the 29th.
15    Q.   How long did you do that?
16    A.   This weekend.
17    Q.   Now, at the time of this incident on the
18  26th, March 26th -- I'm sorry.  March 31st, 2016.  If
19  my client's decedent died on March 31st, 2016, when
20  did you become --
21         MR. BACHARACH:  I'm sorry.  I'm sorry.
22  You said the 31st but I forgot.  He survived for a
23  while.  Yes.  I'm sorry.  Go ahead.
24    Q.   When did you become involved, if at all, with
25  the incident in this case?  Your first involvement you

21

```
1    had in this case, when was it?
2        A.   I became -- I guess the question is when.  On
3    the 29th when the suicide actually took place is when
4    I became involved.
5        Q.   And what was your involvement at that time?
6        A.   Just being notified about the suicide, being
7    notified about the suicide.
8        Q.   Who did you get notification from, by the
9    way?
10       A.   I am not exactly sure.  From the sergeant or
11   captain or one of the supervisory staff.
12       Q.   Were you on duty at the time?
13       A.   I'm pretty sure that I was.
14       Q.   Your normal working hours are what, 8:00 to
15   5:00 or something?
16       A.   Around that time, yes.
17       Q.   So at 1:00 o'clock in the afternoon you would
18   have been --
19       A.   Yes.
20       Q.   So you were notified of the suicide.  By the
21   way, how long had you been on the job as warden at
22   that point in time?
23       A.   I came on board as a warden October 12, 2012.
24       Q.   How many other suicides have you dealt with
25   prior to the Orlando suicide?
```

22

```
1        A.   I'm not exactly sure.  Two or three.
2        Q.   I meant in the Allegheny County Jail.  I
3    wasn't referring to your work in Washington, D.C.
4        A.   Allegheny County Jail, I think two.  Two or
5    three.
6        Q.   Two.  Two or three.  Okay.  And prior to
7    working at the Allegheny County Jail, have you had any
8    experience with jailhouse suicides?
9        A.   Not to my knowledge.
10       Q.   So in 24 years, 24 or five years prior to
11   coming to Allegheny County you never have been
12   involved in a suicide?
13       A.   I have not, no.
14       Q.   And when you get to Allegheny, you have two
15   in two years before this one?
16       A.   I've experienced two or three suicides since
17   I have been here, yes.
18       Q.   I'm looking at a Complaint --
19            MR. SANSONE:  And I don't know if you
20       have one, John.  I don't know if you need it.
21            MR. BACHARACH:  I did not bring one.
22       Q.   I'm going to read some or all and ask you
23   questions about it.  Paragraph 23 of the Complaint is
24   referring to March 24th when Mr. Orlando was arrested
25   and transported to the jail.  Paragraph 23 says upon
```

23

```
1    arrival the arresting officers informed Bonenberger
2    that the decedent had wanted to hang himself.
3            Is that an accurate statement?
4        A.   What I read on the report was that
5    Mr. Orlando reported to the Millvale police that he
6    was going to harm himself and that they communicated
7    it to the officers in our intake area.
8        Q.   Is that the defendant Bonenberger?  Was that
9    the officer?
10       A.   I'm not sure exactly which officer.  I know
11   there was a core, a group of officers it was reported
12   to I guess.
13       Q.   Let's assume that defendant Bonenberger was
14   on duty in intake that day.  I'm pretty sure the
15   documents say that, but you're acknowledging that the
16   police told the intake personnel that the decedent
17   indicated he wanted to hang himself.  Is that right?
18       A.   That he wanted to harm himself.
19       Q.   Not hang himself?
20       A.   To my knowledge, harm himself.
21       Q.   What is the source of your knowledge on that?
22       A.   Reading through the reports this weekend.
23       Q.   Okay.  Paragraph 24 reads decedent became
24   extremely agitated, emotionally distraught and violent
25   during the ACJ's intake and booking process.  Is that
```

24

```
1    accurate?
2        A.   That's what I read.  Again, that is accurate.
3        Q.   Okay.  Paragraph 25 talks about several
4    statements made by the decedent to various members of
5    the intake staff.  These statements include but are
6    not limited to, "I'm going to die."  "I'm going to die
7    in here."
8            Were those statements made to persons on the
9    intake staff?
10       A.   I did read that in the report.  Yes.
11       Q.   Well, aside from the report did you confirm
12   any of these facts with the people who were there,
13   Bonenberger or these others?
14            Did you go to them and say hey, this says you
15   were told he was going to hang himself?  He says he
16   was going to die in here.
17            Did he tell you those things?  Did you ask
18   those questions?
19       A.   I did not ask those questions.
20       Q.   Do you know if anybody did?
21       A.   I am sure that some -- I'm not sure.
22       Q.   Then paragraph 26 says as a result of
23   decedent's erratic behavior, it names five, six
24   defendants, they confined decedent to a chair with
25   wrist, waist and ankle restraints for the remainder of
```

25

1   the intake process.  Is that accurate?
2       A.   He was placed in a restraint chair, but I'm
3   not going to say for the remainder of the intake
4   process.
5       Q.   That was my next question.  When was he let
6   out of the chair?
7       A.   Around 5:30 in the morning on the 25th.
8       Q.   And I tried to figure out how long he was in
9   that chair.  It looks like to me he was in the chair
10  over ten hours.  Is that accurate, or do you know is
11  that roughly accurate?
12      A.   I'm not sure.  I don't think it was ten
13  hours, no.
14      Q.   I know we're going to come to that.  I will
15  get back to it.  Why was he released from the chair?
16      A.   His behavior was cooperative, and he was not
17  threatening staff anymore.
18      Q.   What precautions were taken after he was
19  released from the chair to ensure he did not commit
20  suicide?
21      A.   To my knowledge, medical did not determine
22  that he was suicidal in the intake department so no
23  measures were taken because our medical staff did not
24  deem it was necessary to place him on suicide.
25      Q.   Who was the medical staff person or persons

26

1   that made that determination?
2       A.   I don't know.  Whomever was assigned on that
3   day.
4       Q.   Are you testifying that he had a mental
5   health evaluation that day?
6       A.   I am not testifying that he had a mental
7   health evaluation.  I'm testifying that he was seen by
8   several healthcare professionals during his stay in
9   the intake department.
10      Q.   Was he seen by any mental health
11  professionals?
12      A.   I'm not sure.
13      Q.   Well, don't your regulations require somebody
14  with suicide ideations be seen by a mental health
15  professional?
16      A.   As I stated before, our healthcare department
17  did not place him on any type of suicide precautions
18  so, no, he would not be seen by a mental health
19  professional at that time.
20      Q.   You missed my question.  Maybe it was my
21  question as it was phrased was the problem.  If an
22  intake person comes into the intake, has expressed
23  suicidal ideations, whether it's to an intake person
24  or to the police that brought him, is that person
25  required to have a mental health review by a mental

27

1   health professional?
2       A.   In accordance to the documents that I read
3   this weekend our healthcare department deemed he was
4   not suicidal and therefore --
5       Q.   I'm going to ask the questions and you're
6   just going to have to answer them.  I'm asking you a
7   different question.
8       A.   Uh-huh.
9       Q.   I'm not asking what happened.  I'm asking
10  what the regulations of the jail require so let's go
11  back.
12           When a person comes into your intake
13  department and has expressed to the police that he has
14  suicidal ideations, he wants to hang himself, do your
15  regulations require that he be given a mental health
16  screening by a mental health professional?
17      A.   Yes, at some time.
18      Q.   In this case was Mr. Orlando ever given a
19  mental health screening by a mental health
20  professional?
21      A.   I'm not sure of that.
22      Q.   Well, I asked you earlier if you are
23  confident all the regulations and procedures of your
24  jail were followed in this case, and you said I think
25  absolutely.  Yet, you can't answer this question.

28

1       A.   I can't answer that question.  I'm not sure
2   about that.
3       Q.   Are you still confident that all the rules
4   and regulations of your jail were followed in this
5   case even though you can't answer the question about
6   that rule?
7       A.   I am pretty sure all our regulations were
8   followed with the exception of I don't know how to
9   answer that question.
10      Q.   Wouldn't that be a pretty important question,
11  whether a mental health person saw a guy who
12  threatened to hang himself before he hung himself?
13      A.   I think what I need to do is go and review
14  the medical documentation to make that determination
15  as to whether or not it was done.  I did not do that
16  over the weekend.
17      Q.   Well, did you do it at any point in time in
18  your investigation of this matter?  Did you go back to
19  the department, ask whether any mental health
20  professional had seen this guy before he killed
21  himself?
22      A.   I don't.  I mean I think that I did, but I'm
23  not positively sure.
24      Q.   At paragraph 28 of the Complaint we allege
25  that defendant Haburjak, H-A-B-U-R-J-A-K, who I think

1  is a sergeant, reported the incident including
2  defendant's suicidal ideations to defendant Piendel,
3  P-I-E-N-D-E-L.  Is that true?
4    A.    Sergeant Haburjak.  Yes.  That's true.
5    Q.    He reported -- and defendant Piendel was a
6  captain at that time; is that right?
7    A.    Yes.
8    Q.    Are they both still with your jail?
9    A.    They are.
10    Q.    And the incident that was reported by
11  defendant Haburjak included the violent, erratic
12  behavior of the plaintiff that caused him to be put in
13  a chair; right?
14    A.    Yes.
15    Q.    And, in fact, defendant Beasom and defendant
16  Williams watched a replay of the surveillance video of
17  that incident at that time; is that right?
18    A.    I know Captain Piendel watched it at that
19  time.
20    Q.    Do you know what measures -- first of all, of
21  Piendel, Beasom and Williams, who is the ranking
22  officer?
23    A.    Williams would have been at that time.
24    Q.    Who would have been responsible after viewing
25  the video and taking the report of suicidal ideations?

1  Who would be responsible at that point for taking
2  further action?  Williams, Beasom, Piendel or somebody
3  else?
4          MR. BACHARACH:  I will object to the
5  form of the question.
6    Q.    Okay.
7    A.    It's everybody's responsibility to review the
8  camera and make recommendations, the captain, the
9  major and the deputy warden.  So all of them would
10  have been responsible.
11    Q.    And what actions did any of them take as a
12  result of the viewing of this video?
13    A.    No action.  Causes were followed.
14    Q.    At the time that they viewed this video, had
15  my client already been released from this chair?
16    A.    I don't know.
17    Q.    After my client was released from the chair,
18  what precautions were taken with respect to his
19  possibly committing suicide?
20    A.    I think I answered that question before, and
21  I am going to answer it again.  No precautions were
22  taken because our healthcare department did not deem
23  that he was suicidal so that's the second time I
24  answered that.
25    Q.    I beg your pardon.  Listen.  I'm not keeping

1  you here any longer than I've got to.  Okay.  I'm just
2  61-years-old, and sometimes you don't remember
3  everything.
4    A.    I got you.
5    Q.    How old are you?
6    A.    Fifty-three.
7    Q.    It's coming.  You'll see.
8          MR. BACHARACH:  You guys are all
9  youngsters.
10    Q.    Who was it in your healthcare department that
11  cleared him, so to speak?  Who was the individual who
12  said he is okay to go, you know, without suicide
13  prevention?
14    A.    Oh, I'm not sure.  I don't know.
15    Q.    Would you have known at the time?
16    A.    I guess I would, yes.
17    Q.    Did you speak to that person about what made
18  them say this guy was okay to be released?
19    A.    No.
20    Q.    Paragraph 31 of the Complaint reads as
21  follows.  During the intake process decedent disclosed
22  to defendant Coradoro, a nurse employed as a member of
23  ACJ's medical staff, that he was under the influence
24  of and experiencing withdrawal from several drugs
25  including, but not limited to, methamphetamine.  Is

1  that true?
2    A.    I did read that.  Yes.
3    Q.    What I'm asking you is is that true and when
4  you answer like that, my question would end up being
5  do you have any reason to disbelieve the truth of that
6  other than you read it, but did you confirm the truth
7  of that in any other way other than you read a report?
8    A.    Did I confirm it when?
9    Q.    At any point in time did you ever talk to
10  Nurse Coradoro and say did this guy tell you he was
11  coming down with methamphetamine?
12    A.    I did not talk to Nurse Coradoro.  No.
13    Q.    Did you talk to anybody that was directly
14  involved in the intake of this prisoner or in his care
15  up until his suicide?
16    A.    I have staff that does that so my staff does
17  that.
18    Q.    Is the answer no to my question?
19    A.    I did not.  No, I did not.
20    Q.    Then it says decedent exhibited signs that
21  such withdrawal affected his mental state and posed a
22  threat to his own safety.  Is that true?  Was he
23  exhibiting signs of withdrawal?
24    A.    Based on the healthcare department placing
25  him on detox protocol, I would think that yes, he was

33

1  suffering from withdrawal.
2      Q.   Paragraph 32 of the Complaint reads during
3  the intake process the decedent also disclosed a
4  history of mental health issues that included a prior
5  suicide attempt.  Is that true?
6      A.   That is what I read so, yes.
7      Q.   Paragraph 34 reads in part that decedent was
8  detained in a holding cell from March 24th to
9  March 26th, 2016.  Is that accurate?
10     A.   That is accurate.
11     Q.   What is a holding cell as distinguished from
12 some other kind of cell?
13     A.   Just a regular cell in our intake area.
14     Q.   So it's not -- well, paragraph 34 goes on to
15 say that the holding cell is not properly equipped to
16 monitor nor protect the safety of inmates who are
17 risk, who are at risk of committing suicide.  Is that
18 true?
19     A.   I'm going to say this.  Again, Orlando was
20 not placed on any type of suicidal watch, and all of
21 our cells in our intake area have cameras in the cell.
22     Q.   My question was is it true that the holding
23 cells are not properly equipped to monitor or protect
24 the safety of inmates.  Now, you've answered there is
25 a camera in the cell.  That doesn't really answer my

34

1  question.  First of all, was the camera on?
2      A.   Our cameras are never turned off unless there
3  is an issue of, an electrical issue or something.
4      Q.   Was it working?
5      A.   Of course, it was working.
6      Q.   It might not have been.
7      A.   Yes, it was working.
8      Q.   And was it working on the day my client
9  committed suicide?
10          MR. BACHARACH:  He wasn't in the intake
11 then.
12     Q.   During the time my client was in this holding
13 cell was he being monitored regularly with respect to
14 his conduct?  Was anybody watching the camera, for
15 example?
16     A.   I'm going to say this.  Correctional officers
17 are responsible for making security inspections in the
18 intake area so they made their rounds as they were
19 supposed to make their rounds.
20          Again, he was not placed on any type of
21 suicidal watch or anything so there was no need for us
22 to pay particular attention to Mr. Orlando.
23     Q.   Right.  If that was the correct designation
24 for it.  However, he should have been placed on
25 suicide watch.

35

1      A.   If my healthcare department determined he was
2  suicidal, of course, protocol would.  It's different
3  with an inmate on suicide watch.
4      Q.   And when you're in a holding cell but you're
5  not on a suicide watch, how often are the rounds made?
6      A.   Every half an hour.
7      Q.   Was that true then back in 2016?
8      A.   I think so.
9      Q.   Paragraph 35 reads on March 26th a medical
10 emergency was called for the decedent as he was
11 experiencing symptoms of withdrawal from various drugs
12 which caused him to fall to the floor and shake.  Is
13 that accurate?
14     A.   Yes.  There was a medical emergency with
15 Mr. Orlando.
16     Q.   Was the basis or the reason, the etiology of
17 the emergency that he was experiencing symptoms of
18 withdrawal from drugs?
19     A.   I just know based on reports that he was
20 shaking on the floor.
21     Q.   You never found out what the reason for that
22 was?
23     A.   No.
24     Q.   Did anybody say it looked like drug
25 withdrawal?

36

1      A.   I did not read that in the reports, no.
2      Q.   And I think I asked this a million times, but
3  I have to sharpen the question.  I asked you if you
4  talked to the personnel involved in intake.
5          Did you discuss this incident with any of
6  your senior leadership or deputy warden or higher
7  ranking people?
8      A.   When?
9      Q.   At any point in time?
10     A.   When the incident happened, yes.
11     Q.   Okay.  You did.  Who did you discuss this
12 with?
13     A.   Williams, Beasom, Dr. Joseph, Laura Williams,
14 Monica Long, a vast array of people.
15     Q.   Is that the entire array or you don't know,
16 or was there more?
17     A.   There could have been more.  I can't remember
18 exactly everybody that I talked to about the incident.
19     Q.   Who is defendant Latham?
20     A.   I don't know the first name.  She's an RN
21 down in our intake area.
22     Q.   Teresa Latham.  In paragraph 36 of the
23 Complaint we allege that on the same day, which is
24 March 26th, 2016, defendant Latham, a nurse employed
25 as a member of ACJ's medical staff, reported that

1  decedent was not currently on suicide precaution and
2  further improperly reported that decedent had no
3  suicidal ideations or prior suicidal attempts.  Let's
4  break that down.
5        Did Nurse Latham report that the decedent was
6  not on suicide precaution on the 26th?
7     A.   He was not on suicide precaution.
8     Q.   I asked if she reported that?
9        MR. BACHARACH:  What?
10    Q.   Our allegation was she reported this.  I
11 don't know who she reports to, but whoever it was, did
12 she report this?
13    A.   Based on the report and the booking
14 observation on page three because every inmate that
15 comes into our facility has to answer a series of
16 questions and they have to sit down with
17 Ms. Latham.  So apparently, Ms. Latham asked him a
18 question about suicide, and he stated that he was
19 not suicidal.
20    Q.   Now, you say apparently.  How do you know
21 that?  Based on the reports?  Is there some other
22 reason you say that he didn't tell her about suicidal
23 ideations?
24    A.   Based on conversations that I had with the
25 people that I just talked about stating he was not

1  suicidal.
2     Q.   These people, and you said it was Williams
3  and Beasom and some others, two other names at least,
4  they told you that the decedent told Ms. Latham he was
5  not suicidal and had no prior suicide attempts.  Is
6  that your testimony?
7     A.   My testimony is this.  I have staff under me
8  that actually investigates these allegations.  I gave
9  you names.  Long, Beasom, Dr. Joseph, Laura Williams,
10 an array of people that questioned these nurses and
11 these individuals to ask questions like that.
12       So they reported to me, and I think it's also
13 in the report that that inmate was not suicidal, and
14 they made the determination not to put him on suicide
15 protocol based on the interviews with my staff.
16    Q.   What kind of discipline does an employee face
17 who improperly indicates a person did not have a prior
18 suicide or did not have suicidal ideations?
19       That person, like Latham, for example, if she
20 made the report that he was not suicidal and had no
21 prior attempts and she made that inaccurately.  For
22 example, she did not ask him.
23       If he said something, she wrote down
24 whatever, what punishment, if any, would somebody face
25 that makes the wrong call there?

1        MR. BACHARACH:  Object to the form of
2  the question.  You can answer.
3     A.   First of all, I don't think Ms. Latham would
4  make a wrong call like that.
5     Q.   Why not?
6     A.   It's based on a face-to-face interview with
7  the defendant, with Mr. Orlando, and a series of
8  questions that was asked at the booking station with
9  the correctional officer where he indicated that he
10 was not suicidal, and also with the three page process
11 he indicated that he was not suicidal.  So there is
12 multiple stations in which he indicated that he was
13 not suicidal.
14    Q.   You're not answering the question I asked.
15    A.   Okay.  What was the question?
16    Q.   What punishment would a person face, if any,
17 if they improperly or inaccurately reported the
18 answers to these questions?  Would they get in
19 trouble?
20    A.   If somebody reports, fails to report
21 accurately, they could face discipline, yes.
22    Q.   In a suicide situation where an inaccurate
23 report, you know, fails to prevent a suicide, what
24 kind of discipline would that person face?
25       MR. BACHARACH:  I'm going to object to

1  the form of the question.  It's totally
2  hypothetical.  It doesn't, you know.
3     Q.   There is nothing hypothetical about it.  The
4  records show I am suicidal.  I'm going to hang myself.
5  She says that did not happen.  I'm wondering what
6  could happen to a person who gives an inaccurate
7  report, and I understand you don't agree that's what
8  happened but that's not the question.
9        The question is if it was an inaccurate
10 report, whether deliberate or accidental, what would
11 happen to that person if the person they're talking
12 about committed suicide?
13       Would they face serious discipline?
14       MR. BACHARACH:  I object to the form of
15 the question.  You know, it is hypothetical in the
16 sense that --
17       MR. SANSONE:  We disagree on the facts,
18 John.
19    Q.   The question is if we're right, if this
20 allegation in the Complaint is correct and that she
21 improperly reported he had no suicidal ideations and
22 no prior suicide attempts, whether she reported that
23 because of neglect, whether she changed the report
24 later or whether she ignored what he said or for
25 whatever reason, if she improperly reported that as we

**41**

1  allege in the Complaint, what discipline would she
2  face is the question.
3      A.   I don't know if she would face any
4  discipline.  How would she actually know whether or
5  not that individual actually committed suicide in the
6  past?  So that defendant is in front of Ms. Latham for
7  the first time.  I think you know what I'm saying.
8          How would my staff actually know unless it's
9  just self-referral?
10     Q.   Well, let me ask this.  Does Ms. Latham have
11 a responsibility when making this determination to
12 consult with other intake personnel who may have
13 talked to this person when they came in?
14         Is there any responsibility for Ms. Latham to
15 go to the intake people and say hey, do you have
16 anything on this guy?  Did he say anything on the way
17 in?
18     A.   We don't have protocol to say she does that
19 at that time.
20     Q.   So it's not automatic that -- well, let me
21 ask it a different way.  If an intake person,
22 Bonenberger or whoever was there, found out from the
23 police and/or found out from the person being intake
24 that they are suicidal, that they threatened to commit
25 suicide or had past suicide attempts, would intake

**42**

1  people have the responsibility to tell the health
2  people?
3      A.   Absolutely.
4      Q.   So did anybody tell Latham that this guy had
5  said on the way in I'm going to kill myself or the
6  police said was going to hang himself?  Did anybody
7  tell that to Latham?
8      A.   I'm pretty sure that they did.
9      Q.   She reported that he had no prior suicide
10 attempts and that he did not have suicidal ideations.
11         MR. BACHARACH:  Well, I'm going to again
12     object to the form of the question.  I think it
13     assumes a fact that I don't agree as a fact.
14     Q.   Okay.  Let me ask that.  Do you know whether
15 Ms. Latham reported that my client, that my client's
16 decedent had had suicidal ideations when he was intake
17 that he expressed that?  Was that told to Ms. Latham
18 and did she report that?
19         MR. BACHARACH:  Again, object to the
20     form of the question.  You can answer.
21     A.   I don't know.
22     Q.   My client was -- when I say that, I meant to
23 say my client's decedent.
24         MR. BACHARACH:  We understand, I think.
25     Q.   Was assigned to a detox unit after intake as

**43**

1  I understand it.  Is that correct?
2      A.   Yes.
3      Q.   What is a detox unit?
4      A.   He was assigned to 5F which was a designated
5  detox unit for male inmates, and those individuals
6  detoxing were placed there to get medical treatment
7  and medications that they need to help them with their
8  withdrawal.
9      Q.   The detox unit, how many cells are in the
10 detox unit?
11     A.   Fifty-two approximately.
12     Q.   Are any of those cells equipped to monitor
13 potential suicide?
14     A.   No.
15     Q.   How often do they take rounds in the detox
16 unit?
17     A.   Regular 15 minute rounds.
18     Q.   What about cameras?  Are there cameras in any
19 of those cells?
20     A.   Not in those cells.
21     Q.   Are any of those cells equipped with, you
22 know, I read something about sheets that are safe to
23 put in cells to help prevent suicide?
24     A.   No.
25     Q.   They're not equipped with any of those?

**44**

1      A.   No.
2      Q.   Paragraph 38 of the Complaint reads the
3  decedent's assignment to ACJ's detox unit was
4  improper, as ACJ's detox unit was not equipped and/or
5  staffed to adequately monitor inmates with particular
6  vulnerability to suicide or self-harm.
7          Is it true that the detox unit was not
8  equipped and/or adequately staffed to monitor inmates
9  with particular vulnerability to suicide or self-harm?
10     A.   That is not true.
11     Q.   So the detox unit is staffed to adequately
12 monitor inmates with particular vulnerability to
13 suicide?
14     A.   Absolutely.
15     Q.   What equipment is offered to monitor that
16 vulnerability in the detox unit?
17     A.   So you went from staffing to equipment.  What
18 are you talking about now, staffing or equipment?
19     Q.   As ACJ's detox unit was not equipped and/or
20 staffed adequately to monitor inmates, was it equipped
21 to monitor inmates that have a suicide vulnerability?
22     A.   Again, I'm going to say this.
23     Q.   You don't need to tell me again that he
24 wasn't suicidal.  I got that.
25     A.   Inmates on 5F are detox inmates so these

45

```
1   individuals are double-celled and security inspections
2   are done at irregular intervals for inmates detoxing.
3        Q.   I asked how are they?
4        A.   And the last thing is it is a suicide
5   protocol to just make security inspections more often,
6   and that unit has nurses assigned to the unit every
7   single day along with correctional officers.
8        Q.   The nurses assigned to the unit, are they on
9   the unit?
10       A.   Yes, they are.
11       Q.   Do the nurses go around and interact with the
12  inmates on a regular basis?
13       A.   I know that if there is an emergency
14  situation, they would.
15       Q.   I'm not asking that.  Is it a general rule
16  that these nurses interact with these detox people on
17  a regular basis?  You said there's a nurse assigned to
18  the unit.
19            What does that do if a nurse is not talking
20  to inmates?
21       A.   Well, 5F was designated as a detox unit, but
22  the majority of that unit was a mental health pod.
23  The majority of the inmates on 5F were mental health
24  general population inmates.
25            We had mental health nurses assigned to that
```

46

```
1   pod back then and even now if an inmate had mental
2   health issues, and even if the detox inmates had
3   mental issues, they had accessibility to the mental
4   health RN or the pod.
5        Q.   Well, this RN on this pod that my client's
6   decedent was put on, this detox unit, is it a he or
7   she, do you happen to know, the nurse?
8        A.   It could be either/or.
9        Q.   On this particular day on the 26th?
10       A.   I don't know.
11       Q.   Did my client have any interaction with this
12  RN on the detox unit?
13       A.   I'm not sure.
14       Q.   I think I asked you this question, but if I
15  did, I apologize.  Paragraph 40 of the Complaint reads
16  on or about March 29th, ACJ's medical staff cleared
17  defendant to be transferred from detox to general
18  population.  That's true; is that right?
19       A.   That is true.
20       Q.   And who was it, and this is the question I
21  may have asked you, who was it that cleared my client,
22  and it says medical staff.  Who was the medical staff
23  that made that clearance?
24       A.   I don't know.
25       Q.   Would you have known at the time you looked
```

47

```
1   into this?
2        A.   Nuh-huh.
3            MR. BACHARACH:  I think the answer is
4   no.
5        A.   No.
6        Q.   My client's mother is the administrator of
7   the estate and is essentially therefore the plaintiff
8   on behalf of her son.  She has previously indicated
9   that she had a conversation with Mr. Wainwright.  Do
10  you know who that is?
11       A.   Yes.  I know Mr. Wainwright.
12       Q.   He was deputy warden at the time of this
13  incident; is that right?
14       A.   Yes.
15       Q.   Is he still, by the way?
16       A.   Is he what?
17       Q.   Is he still the deputy warden?
18       A.   No.  He's no longer working with us.
19       Q.   Why is that?
20       A.   He got another job.
21       Q.   Did this suicide have any, play any role in
22  his leaving the jail?
23       A.   No.
24       Q.   Sorry?
25       A.   No.
```

48

```
1        Q.   Do you know why he wanted to get another job?
2   Was he in any way dissatisfied with work at all?
3        A.   I don't get involved as to why people want to
4   move on.  I am thinking he had a better opportunity.
5        Q.   You're thinking that?
6        A.   I'm thinking that.  Yes.
7        Q.   What is the basis of that thought?  Did he
8   tell you that?
9        A.   He is a warden at another facility.  He had a
10  better opportunity.
11       Q.   He is a warden?
12       A.   Yes.
13       Q.   Anyway, my client, mother of the decedent,
14  indicates that she had a conversation with
15  Mr. Wainwright in which she says that Mr. Wainwright
16  told her that the jail did not possess enough staff
17  members to adequately monitor inmates housed on the
18  floor where the defendant committed suicide.
19            Is it true if Mr. Wainwright actually said
20  this, which my client says he did, is that true, that
21  the jail did not possess enough staff members to
22  adequately monitor inmates housed on the floor where
23  the suicide occurred?
24       A.   The jail had enough staff members to monitor
25  that pod.
```

**49**

```
1      Q.   So if Mr. Wainwright said this, that would
2   not be true?
3      A.   If Mr. Wainwright said that, that is not
4   true.
5      Q.   Have you discussed this allegation with
6   Mr. Wainwright?
7      A.   What allegation?
8           MR. BACHARACH:  The understaffing
9   allegation?
10     Q.   The one we're talking about.  Yes.
11     A.   No, I did not discuss that with Wainwright.
12     Q.   Is this the first you heard this?  Today?
13     A.   It is.
14     Q.   Well, did you read the Complaint in this
15  case?
16     A.   I did not read the entire Complaint, no.
17     Q.   Well, the facts.  Did you read the factual
18  allegations that begin on page five and go through
19  page ten?  Did you read them?
20     A.   I guess I did.  I'm not sure.
21     Q.   Because one of them is this allegation that
22  Wainwright really supposedly told my client that the
23  jail did not have enough people to watch these inmates
24  on this pod.
25     A.   I'm saying that if Mr. Wainwright made that
```

**50**

```
1   statement, that is not a true statement.
2      Q.   Do you have any idea why he would make such a
3   statement?
4      A.   I have no idea.
5      Q.   Did Wainwright ever come to you to tell you
6   he felt that staffing on this pod and others was
7   inadequate?
8           MR. BACHARACH:  Object to form.
9      A.   No, he did not.
10     Q.   Did anyone tell you the staffing levels you
11  had in your jail were inadequate?
12          MR. BACHARACH:  I'm going to object to
13     the form in the sense it is general and doesn't
14     relate to this pod or the intake area which are
15     the only ones relevant, but subject to that you
16     can answer the question.
17     Q.   Did anybody ever come to you and say, look,
18  we don't have enough personnel here?  We need more
19  guards.
20     A.   There have been people that said that, yes.
21     Q.   Who?
22     A.   Correctional officers.
23     Q.   How many roughly?  Was it one person that
24  told you that or more than one?
25     A.   A couple people.
```

**51**

```
1      Q.   Over what period of time?
2      A.   Recently.
3      Q.   Can you be more specific?
4      A.   Maybe the last couple months.
5      Q.   Prior to this incident is it your testimony,
6   sir, that no one ever came to you and said we need to
7   increase our staffing?  We don't have enough people.
8      A.   On 5F.
9      Q.   In any place in the jail?
10          MR. BACHARACH:  Object to the form.
11     Q.   That was my original question.  I'm going to
12  narrow it down, but first I want to hear about any
13  complaints about staffing?
14     A.   There have been complaints about staffing.
15     Q.   I asked prior to this suicide?
16     A.   Yes, there has been.
17     Q.   Okay.  A minute ago you testified about
18  complaints you had recently.  I would like to now ask
19  you about complaints you had prior to Mr. Orlando's
20  suicide.
21          How many such complaints did you receive in
22  your tenure as the warden prior to this suicide?
23     A.   A couple.
24     Q.   From what source or sources?
25     A.   Correctional officer.
```

**52**

```
1      Q.   Anybody ever complain about this particular
2   pod being understaffed, 5F?
3      A.   Not to my knowledge.
4      Q.   Well, to you did anybody complain?  I'm
5   asking about complaints made to you.
6      A.   About 5F.
7      Q.   First it was complaints made to you about the
8   prison in general and now I'm on 5F.
9      A.   Not to my knowledge on 5F.
10     Q.   Okay.  What did you do about the complaints
11  you received about understaffing?
12     A.   We looked at the complaints prior brought to
13  our attention to see whether or not it was valid.
14     Q.   And?
15     A.   And I don't feel it's valid.
16     Q.   So my question is what did you do about the
17  complaint?  Other than looking into it, did you take
18  any action more than one officer told you that it was
19  a problem?
20     A.   We looked into it and we feel as though the
21  jail is properly staffed.
22     Q.   Other than that, did you do anything about
23  these complaints?
24     A.   No.
25     Q.   Looking at this situation with the suicide of
```

53

```
1    Mr. Orlando, looking back at it, can you tell me
2    whether or not you can think of anything that should
3    have been done differently to prevent this?
4         MR. BACHARACH:  Object to the form of
5    the question.  Too broad.  You can answer if you
6    can.
7    A.   The policy at that time was once an inmate
8    was classified and cleared medically that, and he was
9    going to be transferred, there was no need to have the
10   inmate double-celled, and we changed that after this
11   incident.
12        As long as they are on the pod, they are to
13   be double-celled, and if their roomy should leave for
14   whatever reason, then that inmate is brought out to
15   the day room instead of being in the cell by
16   themselves.
17   Q.   If you are double-celling people for their
18   safety and the inmate loses the roommate, why wasn't
19   there a procedure in place prior to this suicide to do
20   something about the guy you just left alone?  You
21   changed it after the guy killed himself.
22        Why wasn't there a procedure prior to his
23   suicide?  If it's dangerous to double-cell these
24   people when they took the guy out of his cell, why
25   wasn't something done then?
```

54

```
1    A.   Because --
2         MR. BACHARACH:  You can answer.
3    A.   Because normally during the classification
4    period gives the inmate time to adjust to jail life,
5    and we felt as though at that time that the inmate
6    having to wait two, three days for the classification
7    and to be medically cleared reduced the chances of him
8    committing suicide.
9    Q.   Well, you didn't answer the question I asked,
10   sir.  You double-celled this guy; correct?
11   A.   We did.
12   Q.   Because it's dangerous to leave somebody in
13   detox alone; right?
14   A.   Yes.
15   Q.   And then you left him alone?
16   A.   After he was medically cleared he was left
17   alone.
18   Q.   He was still double-celled at the time that
19   the guy was released; right?  He was double-celled and
20   then they sent his roommate somewhere else, whether it
21   was out of the jail or somewhere else in the jail?
22   A.   Uh-huh.
23   Q.   Why was that done?
24   A.   Why was what done?
25   Q.   Why was he no longer double-celled at that
```

55

```
1    point?
2    A.   Because he was medically cleared to be
3    transferred to general population.  So if he is
4    medically cleared, that is the reason why he was in
5    the cell by himself because he was cleared to be moved
6    to another pod.
7    Q.   If I asked you this question, I apologize.  I
8    will ask it in a different form or something.  How
9    long after -- strike that.
10        You were on duty, I think you said, when this
11   incident occurred, the suicide attempt, the suicide.
12   I don't know if I asked you this.
13        How long after the actual suicide attempt or
14   incident were you contacted?  Was it minutes or hours
15   or days?
16   A.   Minutes.
17   Q.   Minutes.  When did you actively begin to
18   participate in some way in this investigation?
19   A.   Minutes.
20   Q.   And I think I asked these questions.  I don't
21   remember exactly the answer.  What was your first
22   action?  What actions did you take as soon as you
23   learned about this?
24   A.   First of all, what I normally do when we have
25   an incident like that is get the team together, and we
```

56

```
1    actually go look at it on the camera on real time.  I
2    think we did it on that day.  I'm not sure.
3         I try to observe the scene to see what was
4    going on and to make sure I've got appropriate medical
5    staff response to the scene and to see whether or not
6    correctional officers are doing what they are supposed
7    to do.  So that's what I did.  From that, I make
8    decisions as to what is to be done next.
9    Q.   What are your initials, sir?
10   A.   OLH.
11   Q.   OLH.
12        (Harper Deposition Exhibit No. 1 was
13   marked for identification.)
14   Q.   I'm showing you what has been marked as
15   Harper Exhibit 1 which bears the stamp of defendants'
16   0003.  This is entitled Review Checklist: Unplanned
17   Use of Force.
18        Do you know what the incident is that's
19   referred to here?
20   A.   Yes.
21   Q.   What is the incident that is referred to
22   here?
23   A.   When he first came into our jail.
24   Q.   When you first placed him in a chair, do you
25   mean?
```

1    A.   Yes.

2    Q.   In the follow-up action recommended area, do

3  you see that down there?

4    A.   Uh-huh.

5    Q.   The reporting officer, how do you pronounce

6  his name, Piendel?

7    A.   Piendel.  Yes.

8    Q.   Captain Jonathan Piendel?

9    A.   Captain Piendel.

10    Q.   Piendel.  Captain Piendel.  It says we may

11  need to reevaluate.

12    A.   Piendel did not write that.  That is

13  Wainwright's writing.

14    Q.   Oh!  How do you know that?

15    A.   I worked with Wainwright for many years.  I

16  know his writing, and if you see up here, it says

17  concur STW on 3-30.  That's Wainwright's writing.

18  Wainwright made that recommendation.

19    Q.   Okay.  What did he mean?

20    A.   I really don't know what he meant.

21    Q.   Well, was this the first you have seen this

22  paper?

23    A.   No, of course not.

24    Q.   You say of course not.  I have no idea what

25  you looked at.  When you saw this comment, we may need

1  to reevaluate, did you ask him what he meant?

2    A.   I did not.

3    Q.   Why not?

4    A.   Because I mean I didn't.  I didn't ask.

5    Q.   But you didn't know what he meant by that?

6    A.   I'm going to put it like this.  When I

7  reviewed this, everything looked proper, and that's

8  why I put my --

9    Q.   Well, you have your deputy warden saying that

10  it may need to be reevaluated.  Why didn't you ask him

11  what he meant?

12    A.   Like I said, I don't remember.  I don't think

13  that I asked him, and it's been two years ago so I

14  don't remember whether I asked him or not.

15    Q.   Well, do you have any documentation that as a

16  result of this recommendation or what looks like a

17  recommendation, do you have any documentation he did

18  anything about it?

19         MR. BACHARACH:  Object to the form.  Go

20  ahead.

21    A.   As I stated before, even though he says we

22  may need to reevaluate, I also reviewed the packet and

23  the incident, and I signed off on it, and it is a good

24  use of the restraints here.

25    Q.   I'm asking do you know why he said this?

1    A.   I'm saying again that I don't know.

2    Q.   Okay.

3         (Harper Deposition Exhibit No. 2 was

4  marked for identification.)

5    Q.   Okay.  I'm showing you what has been marked

6  as Harper Exhibit 2 which is Bates stamps, defendants'

7  Bates stamps 0005 and 06.  Can you tell me, this is

8  entitled Employee Report of Incident, tell me who

9  labeled this report?

10    A.   The first incident is Haburjak.

11    Q.   What do you mean by that?  This is a two page

12  report.  Did Haburjak do the whole thing?

13    A.   It looks like you got --

14         MR. BACHARACH:  It's this one.  Just

15  don't worry about the other thing.

16    A.   Haburjak's signature is on the first page and

17  Piendel's signature is on the second page.

18    Q.   I understand that.  I didn't ask that.  I

19  asked who prepared the report.  Why isn't the shift

20  commander's signature on there on top of Haburjak?

21         Does that say the shift commander reviewed it

22  or what?

23    A.   Yes.  The shift commander reviewed what

24  Haburjak is saying.

25    Q.   Is it fair to say this report was prepared by

1  Captain Piendel?  I mean Sergeant Haburjak.  I

2  apologize.

3    A.   It was reviewed by Haburjak.  Yes.

4    Q.   Is that Piendel's signature?

5    A.   On the second page.

6    Q.   Yes.  On the first line or detailed

7  description it says that Haburjak was notified by

8  Officer Faherty that Mr. Orlando was making threats of

9  killing himself.

10         What was Haburjak's position in this?  Was he

11  intake?  Was he working intake that day?

12    A.   He was.

13    Q.   Okay.  So your intake sergeant immediately

14  upon Mr. Orlando being brought in had information that

15  Mr. Orlando was threatening to kill himself; is that

16  right?

17    A.   According to the report, yes.

18    Q.   Do you have any reason to believe the report

19  is inaccurate?

20    A.   I do not.

21    Q.   Apparently, it further went on to say, line

22  four, that he wanted to die.  Mr. Orlando said he just

23  wanted to die.  Right?

24    A.   Yes.

25    Q.   That would be a suicidal ideation, wouldn't

61

1  it?
2      A.   Yes.
3      Q.   Also, his comment that he was threatening to
4  kill himself would be evidence of suicidal ideation;
5  right?
6      A.   Yes.
7      Q.   Now, Mr. Orlando told intake that he was on
8  crystal meth; right?
9      A.   Yes.
10     Q.   Do you have any familiarity with the way
11  people behave when they are on crystal meth?
12     A.   I do.
13     Q.   And Mr. Orlando's actions as reported by your
14  staff at intake, are they consistent with what people
15  sometimes do when they are on crystal meth?
16     A.   Not just on crystal meth but other drugs,
17  yes, but people do act irrational while they're under
18  the influence.
19     Q.   This particular individual, Mr. Orlando, was
20  so bad that Mr. Haburjak threatened to taser him;
21  isn't that right? His conduct was so over the top?
22     A.   He did draw his taser, yes.
23     Q.   Is that normal in an intake situation, normal
24  that intake personnel are required to draw their
25  taser, or is that fairly unusual?

62

1      A.   If an inmate is uncooperative, threatening
2  himself or others, yes.
3      Q.   I didn't ask that. Is it usual or unusual?
4  Not why it is done. Is it usual or unusual?
5           MR. BACHARACH: I will object to the
6      form. You can answer if you can answer.
7      A.   It is usual.
8      Q.   It's normal that an inmate has a taser drawn
9  on him at intake. That's normal?
10     A.   It is normal.
11     Q.   So that happens what? The majority of
12  intakes you have to draw a taser?
13     A.   We have tasers drawn often.
14     Q.   Now, on the second page under part two it
15  indicates actions taken if force was used, apparently
16  why. The first two notes under that section say new
17  arrest Orlando was making threats of hurting himself
18  and others. New arrest made statements of killing
19  himself while in the arresting officer's custody.
20          When I read this, it suggested to me it said
21  he was going to kill himself to the officers and that
22  he said that to the intake personnel.
23          Is that what your understanding is that he
24  told both police officers and intake personnel he was
25  going to kill himself?

63

1      A.   What I am reading on page two is that yes, he
2  will hurt himself and others. Yes.
3      Q.   My question was poor. Let me ask it more
4  pointedly. I understand that he told the police that
5  he was going to kill himself. I read the first page
6  of this report where it says Officer Faherty told
7  Sergeant Haburjak that Mr. Orlando was going to kill
8  himself.
9           Faherty is one of your officers; right?
10     A.   Yes.
11     Q.   And Faherty is the one that told Haburjak?
12     A.   According to the report, yes.
13          (Harper Deposition Exhibit No. 3 was
14      marked for identification.)
15     Q.   Looking at Harper Exhibit 3, this is an
16  Allegheny County Incident Report. It indicates that
17  it was Correctional Officer Marguerite Bonenberger who
18  filed this report. Is that right, that it was Officer
19  Bonenberger?
20     A.   Yes.
21     Q.   This report seems to indicate that Officer
22  Bonenberger was on intake on March 24, 2016; is that
23  right?
24     A.   Yes.
25     Q.   According to this report, Bonenberger

64

1  observes that Mr. Orlando was very agitated and
2  appeared to be under the influence. What does that
3  mean, do you know, under the influence?
4      A.   Of alcohol or drugs.
5      Q.   Was any determination made as to whether it
6  was alcohol or drugs?
7      A.   He stated in his report that he was on
8  crystal meth I think is what was said or in the report
9  or he reported himself that he was under crystal meth.
10     Q.   This says crystal myth but I assume that
11  means crystal meth. Do you see that down there?
12     A.   Yes.
13     Q.   That should be crystal meth?
14     A.   Meth, right.
15     Q.   Now, this says that the Millvale police told
16  Ms. Bonenberger that Mr. Orlando wanted to hang
17  himself.
18          MR. BACHARACH: Could you repeat that?
19     Q.   Actually, I haven't formulated my question
20  yet. The report by Ms. Bonenberger indicates that she
21  was told by the Millvale police that Mr. Orlando
22  wanted to hang himself. Is that accurate?
23     A.   According to the report, yes.
24     Q.   And Ms. Bonenberger, has she ever recanted
25  that, or does she agree with that?

65

1    A.   This is what she wrote and signed off on so
2  this is what she said happened.
3    Q.   Do you know what time he was intake?  2230 is
4  what?
5    A.   10:30 on the 24th.
6    Q.   Okay.
7         (Harper Deposition Exhibit No. 4 was
8    marked for identification.)
9    Q.   Exhibit 4 is Bates stamp 14.  Exhibit 3 was
10 Bates stamp five and six.  So looking at Exhibit 4,
11 this appears to be a report by a Tricia Coradoro,
12 C-O-R-A-D-O-R-O.  Is it Coradoro?  Is that how you
13 pronounce it?
14   A.   Coradoro.
15   Q.   Ms. Coradoro, who is she?
16   A.   R.N.
17   Q.   A registered nurse working for the Bureau of
18 Corrections?
19   A.   Yes.
20   Q.   And what was her job on the 24th of March,
21 2016?  Why was she involved?
22   A.   Because every inmate that comes to our
23 facility is seen by our mental healthcare department.
24 She was the nurse that was required to see inmate
25 Orlando.

66

1    Q.   And would that have been during the intake
2  process or at some other time?
3    A.   The intake process.
4    Q.   And the report says, and I assume IM means
5  inmate?
6    A.   Yes.
7    Q.   Inmate screaming.  He hopes he dies in here.
8  Inmate shouting that we are all going to die.  Inmate
9  has possible seizure history.
10        And then below it says inmate states back
11 issues and mental health issues.  What does back
12 issues mean?  Is it a bad back or just a previous?
13   A.   Something wrong with his back.
14   Q.   That doesn't mean previous issues?
15   A.   Something's wrong with his back.
16   Q.   Okay.  How do you know that's what it means?
17   A.   I'm just assuming that is what it means based
18 on what she wrote.
19   Q.   When I read it, I thought that meant back
20 issues meaning previous issues.  You don't know
21 exactly what she meant?
22   A.   To me, it is his back.  If it was a previous
23 issue, she would have wrote previous.
24   Q.   Okay.  Well, do you know Ms. Coradoro?
25   A.   I do.

67

1    Q.   How do you know what she would have written
2  if it was something else?  Is that just a guess on
3  your part?
4    A.   That is.
5    Q.   Okay.  This indicates that Mr. Orlando, that
6  John Orlando said that in prior mental issues.  Is
7  that one of the risk factors for suicide, prior mental
8  health issues?
9         MR. BACHARACH:  I'm sorry.  Where are
10   you referring to?
11        MR. SANSONE:  Mental health issues.
12        MR. BACHARACH:  Okay.
13   Q.   Prior mental health issues, is that one of
14 the triggers or warning signs or indicators of
15 possible suicide?
16   A.   I'm not a medical professional.  I'm a
17 correctional officer.  I would think having mental
18 health issues could lead to suicide.
19   Q.   But you don't know whether or not that is a
20 recognized indicator for suicide?
21   A.   I don't know.  Plenty of people have mental
22 health issues who don't commit suicide.
23   Q.   Okay.  Have you received training in risk
24 factors for suicide in the jail?
25   A.   I have not received training, no.

68

1    Q.   Are your intake people trained in how to
2  recognize potential suicide?
3    A.   We have in-service, and we do have mental
4  health and suicide training in our in-service academy.
5  So I would say the majority of them should have the
6  training.
7    Q.   But you don't know if they do.  You said
8  should have?
9    A.   Right.
10   Q.   But you're not aware of whether all your
11 intake people are properly trained in suicide
12 prevention?
13   A.   At this time, no.
14   Q.   Well, the training that you, that they do
15 receive which apparently you didn't get but they
16 receive, does it identify the risk factors for
17 suicide?
18   A.   Yes.
19   Q.   In that training is one of the risk factors
20 that's identified as a possible suicide indication
21 prior mental health problems?
22   A.   I'm not sure.
23        (Harper Deposition Exhibit No. 5 was
24   marked for identification.)
25   Q.   I'm showing you what has been marked as

```
 1  Exhibit 5 which is Bates stamp 053.  This appears to
 2  be an incident report by someone named Charlotte
 3  Wright.  Who is Charlotte Wright?
 4      A.   It looks like Charlotte Wright works for JRS,
 5  Justice Related Services.
 6      Q.   Do you know Ms. Wright?
 7      A.   I don't know her, no.
 8      Q.   Did you know her at the time of this incident
 9  in 2016?
10      A.   No.
11      Q.   Okay.  She is not employed by the jail; is
12  that right?
13      A.   She is not.
14      Q.   She is employed by who?
15      A.   She works for JRS so I don't know who they
16  work for.
17      Q.   Independent of the jail, though?
18      A.   Somebody other than the jail, yes.
19      Q.   What does JRS stand for?
20      A.   Justice Related Services.
21      Q.   She is a specialist for that organization who
22  if it is that signs her paycheck; right?
23      A.   I guess, yes.
24      Q.   She does not answer to you?
25      A.   No, she does not.
```

```
 1      Q.   Okay.  In the third line, at the end of the
 2  third line under what happened, it reads RN-Trish,
 3  began to ask John Orlando his medical intake screen.
 4  Who is Trish in this report?
 5      A.   Ms. Coradoro.
 6      Q.   Ms. Coradoro.  Mr. Orlando told Ms. Coradoro
 7  about his medical/mental health medications; is that
 8  right?
 9      A.   According to the report, yes.
10      Q.   Do you have any reason to believe this report
11  is inaccurate?
12      A.   No.
13      Q.   Have you ever looked at this report before?
14      A.   Yes.
15      Q.   Okay.  So Mr. Orlando told this nurse,
16  Ms. Coradoro, he had a Fentanyl patch which she
17  removed; is that right?
18      A.   Yes, according to the report.
19      Q.   Fentanyl is a pretty strong drug; isn't it?
20      A.   I guess, yes.
21      Q.   What happens when you take the Fentanyl patch
22  off of somebody?  I take it they stop getting their
23  Fentanyl; right?
24      A.   I don't know.
25      Q.   Well, do you know what the effect on an
```

```
 1  individual is who was on Fentanyl when it's taken from
 2  that individual?
 3      A.   I don't know.
 4      Q.   You don't know what happens to a person that
 5  happens to?
 6      A.   No.
 7      Q.   He also indicated that he had, that his
 8  recent eating of methamphetamine, that he recently ate
 9  methamphetamine.  So that was told to Nurse Coradoro
10  that he had been on methamphetamine, is that right,
11  recently?
12      A.   No, it don't say anything about RN Trish
13  knowing about it.  She is saying her observation was
14  that Orlando was placed in cell nine and his recent
15  eating of methamphetamine and all his other Rx were
16  attributing to his behavior at the time.
17      Q.   Well, I read this.  It says RN Trish began to
18  ask his medical screen.  I assume this information
19  came out during that medical screen.  Did you assume
20  something else?
21           MR. BACHARACH:  Well --
22      Q.   There is no indication here.
23           MR. BACHARACH:  I don't think he needs
24  to assume what happened.  If he knows or doesn't
25  know, he can say.
```

```
 1      Q.   Well, you said that you couldn't tell this
 2  was asked by Ms. Coradoro.  I'm reading during the
 3  medical screen this information came out.  Is that
 4  what you read?
 5      A.   That's not what I read.  It states right here
 6  my observation after John Orlando was placed in cell
 7  nine was that his recent eating of methamphetamine and
 8  all his other Rx, such as Fentanyl, Xanax, Klonopin --
 9      Q.   Klonopin.
10      A.   Klonopin were contributing to his behavior at
11  the time.
12      Q.   Yes.
13      A.   So I'm thinking this is what Ms. Wright is
14  observing.
15      Q.   She's observing his behavior.  Where did she
16  learn about him eating methamphetamine, Fentanyl,
17  Xanax and Klonopin?  Was that during the medical
18  screen, or did she have a separate interview with him?
19      A.   I don't know.
20      Q.   Does Ms. Wright indicate Mr. Orlando's
21  behavior could best be classified as manic with
22  psychosis related to his drug abuse?  Do you see that?
23      A.   She continued to attempt to calm him down so
24  he could be released.
25      Q.   Keep going down.
```

73

1    A.   I'm just reading it.
2    Q.   It says his behavior could best be classified
3  as manic with psychosis related to his drug abuse.  Do
4  you see that?
5    A.   That is what it says.  Yes.
6    Q.   Do you have any reason to believe that is not
7  an accurate diagnosis?
8    A.   No.
9    Q.   It indicates that Ms. Wright ran Mr. Orlando
10 on a database called CIPS, C-I-P-S.  Do you know what
11 CIPS is?
12   A.   Yes.
13   Q.   Do you have any experience with this database
14 called CIPS?
15   A.   Yes.  I have heard about this database.
16   Q.   You've heard about it, but you never actually
17 utilized it yourself?
18   A.   I have not.
19   Q.   Ms. Wright utilized it here and discovered
20 that John Orlando had a long mental health history.
21 Didn't she?
22   A.   That's what she writes.
23   Q.   Now, did she communicate that with
24 Ms. Coradoro or anybody else who was involved in the
25 intake?

74

1    A.   I don't know.
2    Q.   Would you have known at the time whether that
3  was communicated to the intake staff?
4    A.   No, I wouldn't know.
5    Q.   There is an indication at the bottom where it
6  says witnesses.  It says most, if not all, officers in
7  the intake department, as well as the Captain Terry,
8  who were all present when medics were called for the
9  main in a suicide gown having a seizure in cell ten.
10 Do you have any idea what that refers to?
11   A.   No.
12   Q.   Was my client in cell ten?
13   A.   No.  It says that he was in cell nine, if you
14 look up earlier in the paragraph.
15   Q.   Yes, I saw that.  I didn't know whether or
16 not he was moved to cell ten or whether this was
17 somebody else we're talking about.
18   A.   It looks like somebody else.
19   Q.   Okay.  Was my client issued a suicide gown?
20   A.   No.
21        (Harper Deposition Exhibit No. 6 was
22   marked for identification.)
23   Q.   I'm showing you what's been marked as Exhibit
24 6 which is Bates stamp 0084 of defense.  This is
25 called a Mental Health Referral.  Do you see that at

75

1  the top there?
2    A.   I do.  I see it at the top.
3    Q.   What is a Mental Health Referral?
4    A.   So they're referring the patient to a
5  psychiatrist, and that was done on 3-26.  It looks
6  like a mental health specialist, Ruth Harrison, did
7  see him at 12:00 o'clock on 3-26 and referred this
8  individual to a psychiatrist.  So that did answer the
9  question.  He was seen by mental health.
10   Q.   Well, okay.  First of all, who is
11 Ruth Harrison?
12   A.   She is a mental health specialist at our
13 jail.
14   Q.   And do you know what her recommendation was?
15   A.   She referred him to see a psychiatrist.
16   Q.   And was he seen by a psychiatrist?
17   A.   I don't know.
18   Q.   Ms. Harrison indicates in this document that
19 the reason for the referral is twofold.  One is a
20 prior mental health history and two is the use of
21 psychotropic medication.  Do you see that?
22   A.   I see that.
23   Q.   My client was present at intake at 10:30 in
24 the evening; is that right?
25   A.   On the 24th.

76

1    Q.   On the 24th.  This referral occurred on the
2  26th; is that right?
3    A.   On the 26th by a mental health specialist,
4  and that mental health specialist determined that he
5  was not suicidal.
6    Q.   Do you know whether or not Ms. Harrison had
7  any information in her possession at the time of
8  making this opinion that indicated that my client's
9  decedent had expressed a desire to kill himself while
10 he was in jail?
11   A.   I don't know.
12   Q.   So this was two days after he was led in the
13 jail, is that right, the 26th, and led in on the 24th;
14 right?
15   A.   He came in on the 24th around 10:30, and this
16 was done at 12:00 o'clock on the 26th.  So I stand to
17 what I said before, that all policies were followed
18 because the mental health specialist did see him in
19 the intake area.
20   Q.   They did everything they needed to do?
21   A.   Huh?
22   Q.   They did everything they needed to do.  Is
23 that what you're saying?
24   A.   I'm just saying before.
25   Q.   He was seen by a mental health specialist I

1  know, but I asked you if all the procedures were
2  followed.
3      A.   And I said yes.
4      Q.   Is there a requirement that intake pass along
5  to mental health that this guy came into the jail
6  saying that he was going to kill himself?  Is there a
7  requirement that information be passed along?
8      A.   You would think that it would be, but I am
9  quite sure with this individual's training that she
10  would have inquired from individuals I hope.
11      Q.   But you don't know if that happened?
12      A.   I don't know for sure.
13      Q.   In fact, you don't have any information that
14  it did happen?
15      A.   I don't.
16      Q.   There's nothing in the file that suggests she
17  went and talked to anybody?
18      A.   I have to trust my staff credentials, and
19  she's a mental health specialist.
20      Q.   Well, I understand that.  I'm asking if she
21  was given the specific information that this guy came
22  into the jail saying he was going to kill himself?
23      A.   I don't know.
24      Q.   I want to ask it both ways.  Does she have a
25  requirement to check with intake if there's any

1  particular issues?  When she goes two days later to
2  sit down with him, is it her job to call up intake and
3  say I got a guy in here?  I'm referring him for a
4  mental health referral.
5          Was there anything that happened in intake
6  that happened that I don't know about?  Is she
7  required to do that?
8      A.   I don't know.
9      Q.   Okay.  Is there any requirement by the intake
10  people who had this information about his suicidal
11  information, any requirement that they contact mental
12  health and say hey, this guy is saying he's going to
13  kill himself?  You ought to know that.
14      A.   It's a requirement for the medical personnel
15  that was there on the scene which was Ms. Coradoro to
16  make an indication, and she would refer it to the
17  mental health department and apparently, yes, she did.
18      Q.   Okay.  I understand she referred it.  My
19  question was did Ms. Coradoro have a responsibility to
20  tell the mental health people this guy came in here
21  saying he's going to kill himself?
22          MR. BACHARACH:  I'm going to object to
23  the form of the question, but you can answer it if
24  you can.
25      Q.   Did she have any responsibility?

1          MR. BACHARACH:  Responsibility, just to
2  make it clear, is a pretty general term.  That's
3  my problem.
4      Q.   I will ask it another way.  Was it her duty
5  once she was in possession of the knowledge that this
6  guy had said he wanted to hang himself, was it her
7  duty to pass that along to the mental health people?
8      A.   You would think that it would be, but I'm not
9  sure.
10          (Harper Deposition Exhibit No. 7 was
11  marked for identification.)
12      Q.   I'm showing you Exhibit 7 which is
13  defendants' Bates stamp 107 through 125.  We had asked
14  for the policy related to suicide prevention that was
15  in place at the time of the incident, and I believe we
16  received this from the defense.
17          Is this the policy on suicide prevention and
18  intervention which was in effect at the time of the
19  suicide of John Orlando?
20      A.   Yes.
21      Q.   You are the authorized signatory of this
22  policy.  Are you not?
23      A.   I am.
24      Q.   Okay.  Based on your knowledge of what
25  occurred here when my client came into the jail, did

1  he fit your definition of actively suicidal?
2      A.   According to the definition, an inmate
3  determined by a medical or mental health professional
4  to be in imminent danger of committing suicide.
5          Our medical and mental health professionals
6  did not deem him of being in danger of committing
7  suicide.
8      Q.   You stopped right where I wanted you to keep
9  on reading.  What's the reasons that might cause a
10  person to be defined as actively suicidal?
11      A.   Because of a recent suicide attempt, a
12  verbalized threat to commit suicide, or other suicide
13  risk indicator.
14      Q.   Isn't it true that there was a verbalized
15  threat to commit suicide that was communicated to your
16  intake personnel?
17      A.   It was.
18      Q.   Why wasn't he considered active suicidal?
19      A.   Because our medical and our mental health
20  professionals didn't deem it was necessary.
21      Q.   Do you agree with that as we look back?
22      A.   I do.
23      Q.   Nothing about what happened here would have
24  caused you to change your opinion?
25      A.   Absolutely not.  I had to rely on what my --

81

1    Q.    You've got to let me finish the question.
2  Did anything that happen here cause you to question
3  whether or not Mr. Orlando should have been deemed
4  actively suicidal?
5    A.    No.
6    Q.    How about potential suicide on page two?  Was
7  my client's decedent potentially suicidal?
8    A.    Okay.  So what was the question?
9    Q.    Was my client potentially suicidal according
10  to the definition in your policy?
11    A.    To me as a correctional professional, it
12  seems like he was potentially suicidal, but I rely on
13  the expert's recommendation at my healthcare
14  department to determine whether or not he was
15  potentially suicidal.
16    Q.    Was he deemed not potentially suicidal by
17  your healthcare department?
18    A.    Yes.
19    Q.    Now, whether or not you're wrong or at fault
20  or they are, can we agree that my client at least fit
21  your definition of potentially suicidal no matter what
22  they said at least based on your definition of
23  potentially suicidal?
24    A.    On my?
25    Q.    Your definition as you signed off on number

82

1  nine says inmates that express suicidal ideations
2  and/or a recent history of self-destructive behavior
3  are potentially suicidal.
4          Didn't my client's decedent, John Orlando,
5  exhibit both suicidal ideation and recent destructive
6  behavior?
7          MR. BACHARACH:  Object to the form.
8    A.    He did.
9    Q.    Why wasn't he deemed potentially suicidal?
10    A.    Because the healthcare department didn't deem
11  that he was.
12    Q.    Why didn't they?
13    A.    I don't know.
14    Q.    Well, when you found out what happened, did
15  you ask somebody hey, why wasn't this guy labeled
16  suicidal?
17    A.    Absolutely.
18    Q.    What was the answer?
19    A.    They said that based on their recommendation
20  and their years of experience and qualifications that
21  they did not deem him suicidal.
22    Q.    Well, you knew he came in with suicidal
23  ideations; right?
24    A.    He made some allegations to some statement,
25  yes.

83

1    Q.    You also knew he came in admitting to recent
2  self-destructive behavior, methamphetamines and all
3  this drug abuse; right?
4    A.    Yes.
5    Q.    Well, no matter what your mental health
6  people said to you, why didn't you just agree with
7  that?  Your definition says this is potentially
8  suicidal, and he exhibited both of those
9  characteristics, didn't he?
10          MR. BACHARACH:  I'm going to object to
11  form.  I think the witness answered.
12    Q.    You answered that the mental health people
13  told me he wasn't suicidal.  Why did you accept that?
14    A.    Because they are the professionals and
15  trained to make that recommendation based on their
16  expertise.
17    Q.    Would you agree that their recommendation
18  flies in the face of your definition?  They
19  recommended he wasn't suicidal when he exhibited both
20  of these characteristics?
21    A.    Uh-huh.
22    Q.    Why did you accept that?
23    A.    This is my third time saying the same.  I
24  accepted it because they are the professionals.  Even
25  though I have it in writing, I make my decision based

84

1  on what the professionals say.
2    Q.    As we sit here today, do you think the
3  professionals were right?
4    A.    I do.
5    Q.    My client could have been placed on suicide
6  watch; right?
7    A.    If the medical professionals deemed he
8  should have been on suicide watch.
9    Q.    And you have facilities in your jail where
10  people can be placed on suicide watch; right?
11    A.    I do.
12    Q.    And that includes constant observation;
13  right?
14    A.    It's based on whatever the psychiatrist makes
15  a recommendation as to constant or 15 minute checks,
16  whatever the psychiatrist recommends.
17    Q.    Well, this says suicide watch.  It's number
18  15 on page two.  I asked if my client could be put on
19  suicide watch.  Your answer was if mental health said
20  to; right?
21    A.    Uh-huh.
22    Q.    This says a measure utilized for the inmate
23  who is actively suicidal.  Inmates on constant
24  observation are housed in an observation bed/cell.
25  That could have been done here.

85

1   You have such facilities, right, where you
2  can constantly observe somebody?
3   A.   We do.
4   Q.   In those cells where there's continuous
5  observation, those require documentation every 15
6  minutes.  Don't they?
7   A.   Yes.
8   Q.   Now, you had suicide watch paraphernalia that
9  could have been used in this instance; right?
10   A.   If the healthcare department deemed it
11  necessary, yes.
12   Q.   Now, those include what I read to be at least
13  three pieces of paraphernalia, a suicide garment or
14  gown I guess it's sometimes called, safety blankets,
15  and safety mattresses.  What is a suicide garment or
16  gown?
17   A.   That is a garment that is thick that the
18  inmate cannot tear, and that is used to clothe the
19  individual while they're on suicide watch.
20   Q.   And you had such garments available the day
21  Mr. Orlando was brought into the jail; right?
22   A.   Yeah.
23   Q.   He was not issued a suicide garment; right?
24   A.   He was not.
25   Q.   Why not?

86

1   A.   Because the medical department did not deem
2  it necessary.
3   Q.   Well, you keep saying the medical department.
4  Are we talking about Nurse Coradoro?
5   A.   She is part of our medical department.
6   Q.   Is that who we are talking about?  A
7  department cannot speak.  It has to be somebody within
8  that department.
9   Is it Nurse Coradoro who made the decision
10  not to give him that garment?
11   A.   It was multiple.  It could have been multiple
12  people.  It could have been Nurse Coradoro, Harrison,
13  as you see is referred to.
14   Q.   Two days later, though?
15   A.   Mental health specialist.
16   Q.   I'm talking about at intake was my question.
17  Who made the decision at intake not to put him in a
18  gown?
19   A.   It looks like initially it was Coradoro
20  backed up by the mental health specialist two days
21  later, Ms. Harrison.
22   Q.   Is it fair to say if you look at item 17 on
23  page three that my client expressed suicidal
24  ideations?  I think we have an answer, but I want to
25  make sure based on this definition.

87

1   A.   Seventeen.
2   Q.   Does he fit your definition?  Do the remarks
3  fit the definition of suicidal ideation?
4   A.   Yes.
5   Q.   Was a determination made about the frequency,
6  intensity and the duration of suicidal thoughts?  Was
7  that determination made?
8   A.   Not to my knowledge.
9   Q.   At page six of the policy, the first section
10  under the first point under Section 4 which is the
11  Intake Mental Health Screening section, it indicates
12  intake nurse.  That would be Nurse Coradoro in this
13  case; right?
14   A.   Yes.  I would think so.
15   Q.   Well, is that a yes?  I'm not trying to --
16  it's not a trick question.
17   A.   I understand Nurse Coradoro is the one
18  responsible to intake this inmate, Mr. Orlando.  I'm
19  not going to say because later on in the process you
20  see Terri Latham did something with that inmate so I
21  can't say it's just one particular nurse.
22   Q.   When did Ms. Latham them enter the picture?
23  Nurse Coradoro did the initial screening according to
24  the report we just read.
25   A.   Right.  This policy says an intake nurse.  It

88

1  don't specify that at the beginning or the end.
2   Q.   During health screening?
3   A.   So it don't determine where.
4   Q.   It said she performed health screening.
5  Didn't it?
6   A.   No.  The health screening was done with
7  Ms. Latham at that time.
8   Q.   Well, what would we call questioning by
9  Nurse Coradoro?
10   A.   It was just an initial determination as to
11  whether or not that individual was going to be
12  accepted.  At that time the health screening was done
13  in the back.
14   Q.   So Ms. Coradoro, a registered nurse, screened
15  the patient before the health screening.  Is that what
16  you're saying?
17   A.   I'm saying Nurse Coradoro did an intake of
18  the individual prior to the health screening.
19   Q.   Would Nurse Coradoro have been responsible to
20  follow the directions of Section 1 here?
21   A.   That would not be done until in the back.
22   Q.   So you're saying Ms. Latham would have had
23  these responsibilities; is that right?
24   A.   That's what I'm saying.
25   Q.   She would have been responsible to determine

89

```
1   whether an inmate had a history of suicide behavior?
2        A.  I'm going to say this.  Ms. Coradoro would
3   have made the initial assessment as to whether or not
4   the person was suicidal, but according to number one,
5   it specifically says review inmate's medical record
6   and interviewed inmate so that is done in the back.
7        Q.  Nurse Coradoro did not review the medical
8   records of the inmate nor interview the inmate to
9   determine a history of suicide?
10       A.  I'm going to say Nurse Coradoro did not
11  review the inmate's medical record.  Now, she may have
12  asked him some questions but did not review the
13  medical record.  That was done in the back at that
14  time.
15       Q.  Would it be fair to say Nurse Coradoro should
16  have been able to observe self-destructive activity at
17  the time the guy was screening and carrying on to the
18  point where he almost had to be tasered?
19            MR. BACHARACH:  Object to form.  You can
20       answer.
21       A.  She would have observed him being
22  non-compliant and possibly could have heard him say
23  things, but that's it.
24       Q.  When was the inmate's mental health screening
25  done that is referred to in Section 2 here?
```

90

```
1        A.  It says on the 26th of March at 12:00 p.m.
2        Q.  So a couple days later he has a mental health
3   screening; right?
4        A.  On 3-26-16 at 12:00 p.m.
5        Q.  A couple days later; right?  I'm not trying
6   to trick you, sir.  I'm just asking.  Was there a
7   mental health screening done on the 24th?
8        A.  A mental health screening was not done on the
9   24th.  It was done on the 26th.
10       Q.  Why wasn't it done on the 24th?
11       A.  I'm thinking that.  I'm not exactly sure.
12       A.  So it says in number two when an inmate
13  responds affirmatively to any four or more questions
14  on the Inmate Mental Health Screening that he should
15  receive further assessment.
16            Are the questions that are referred to in
17  number two contained in number three?
18       A.  Yes.
19       Q.  Okay.  Now, did my client answer
20  affirmatively to four or more of those questions at
21  his intake?
22       A.  I don't know.
23       Q.  Was he referred for, as this indicates,
24  further mental health assessment?
25       A.  According to the mental health specialist,
```

91

```
1   Ruth Harrison, yes, he was referred.
2        Q.  Her recommendation, and this is Exhibit 6,
3   Nurse Harrison, Ruth Harrison recommends further
4   mental health screening; is that right?
5        A.  Yes.
6        Q.  Did my client receive further mental health
7   screening as required or as suggested by Nurse
8   Harrison?
9        A.  I don't know.
10       Q.  A suicide attempt is three days after this
11  recommendation; right?
12       A.  After the referral, yes.
13       Q.  And in those three days was my client given
14  further mental health screening?
15       A.  I don't know.
16       Q.  Have you seen any evidence in the file of
17  that?
18       A.  In what file?
19       Q.  In any file?  Have you seen a piece of paper,
20  sir, that suggests that he went to any further mental
21  health screening after this Harrison woman suggested
22  he be further screened?
23       A.  I don't see any documentation with the
24  documents that you have in front of me.
25       Q.  Well, I didn't ask you about any documents
```

92

```
1   that are in front of you.  Have you ever seen any
2   indication in any document that my client was given
3   further mental health screening after Ms. Harrison
4   suggested it happen?
5        A.  I have not at this time.
6        Q.  Are you aware of any further mental health
7   screening my client received as a result of a
8   recommendation by Nurse Harrison?
9        A.  Not at this time.
10       Q.  Go to Section 5 which is on page seven.  It
11  talks about Section 5, which is Mental Health
12  Assessment.  Do you see that?
13       A.  Yes.
14       Q.  Apparently, Nurse Harrison determined that my
15  client needed further mental health screening.  We saw
16  that in Exhibit 6; correct?
17       A.  Yes.
18       Q.  Point two says -- well, it says when an
19  inmate answers yes to any of the above screening,
20  mental health screening shall refer inmate for further
21  mental health assessment.  That's what we have here in
22  Exhibit 6.
23            That's mental health referring for further
24  assessment; correct?
25       A.  Yes.
```

93

```
1        Q.  And what is supposed to happen then is a
2    licensed medical health professional shall evaluate an
3    inmate referred for a more comprehensive assessment.
4            What does the phrase more comprehensive
5    assessment mean?
6        A.  Normally what happens with a mental health
7    referral, that referral goes to a psychiatrist, and
8    that psychiatrist would do a further mental health
9    evaluation.
10       Q.  So more comprehensive means reviewed by a
11   psychiatrist; is that right?
12       A.  I'm going to say right now yes.
13       Q.  You don't know the answer to that question,
14   do you, as to what this means?
15       A.  Yes.
16       Q.  Yes, you do know?  Yes, you do know or yes,
17   you don't know?
18       A.  I'm going to say a mental health referral is
19   made to a psychiatrist.
20       Q.  So in point two here, it says that a mental
21   health professional shall evaluate any inmate referred
22   for a more comprehensive assessment.  That means that
23   a psychiatrist needs to make an assessment; is that
24   correct?
25       A.  That's normally what happens, yes.
```

94

```
1        Q.  So Nurse Harrison's Exhibit 6, her referral,
2    that was to a psychiatrist; is that right?
3        A.  To a psychiatrist, yes.
4        Q.  And that did not happen?
5        A.  I did not say that.  I don't know at this
6    time.
7        Q.  Do you have any reason to think it did
8    happen?
9            MR. BACHARACH:  I object.  He said he
10   doesn't know.
11           MR. SANSONE:  I know, John, but there is
12   not a psychiatrist's report in here.  There's not
13   a piece of paper that says he saw a psychiatrist.
14       Q.  Do you have any reason to believe he did see
15   a psychiatrist?
16       A.  I would believe that he did see a
17   psychiatrist.  I would have to go back and look at my
18   records to see.
19       Q.  Well, when you did the investigation of this,
20   did you come across any evidence that a psychiatrist
21   looked at my client?
22       A.  I did not at that time, no.
23       Q.  Have you seen any such evidence since that
24   time?
25       A.  I haven't tried to look to, for that
```

95

```
1    evidence, but I'm going to try to look when I go back.
2        Q.  Is the answer to my question no, I have seen
3    no such evidence even though I've looked at various
4    reports?
5            MR. BACHARACH:  I think he answered he
6    said he did not know at this time.  Don't put
7    words in his mouth.
8            MR. SANSONE:  He also said I think that
9    he did see a psychiatrist, and I don't know why he
10   thinks that.
11           MR. BACHARACH:  No.  I don't think he
12   did say that.
13   BY MR. SANSONE:
14       Q.  Let me ask you that.  Do you believe that my
15   client was sent to a psychiatrist?
16           MR. BACHARACH:  I object to form when
17   you say does he believe that.
18           MR. SANSONE:  What's wrong with that?
19           MR. BACHARACH:  Because it doesn't
20   matter what he believes.
21           MR. SANSONE:  Well, yes, because if he
22   says I believe that because I've got a report that
23   said so or I talked to somebody who told me that,
24   then it might be relevant.
25           MR. BACHARACH:  I think he answered that
```

96

```
1    he doesn't know the answer to that at this time.
2            MR. SANSONE:  Why don't you let him
3    answer that?  I didn't hear that.
4            MR. BACHARACH:  I think he did.
5            MR. SANSONE:  Well, I want to make sure
6    because I think he said something different.
7            MR. BACHARACH:  All right.
8    BY MR. SANSONE:
9        Q.  Do you have any reason to believe he saw a
10   psychiatrist?  You testified you thought he did.
11       A.  I would hope with this mental health referral
12   that he saw a psychiatrist but at this time, I do not
13   know.
14       Q.  Okay.  At part three of the same policy that
15   you signed off on it says under 3a), within four hours
16   or less of a referral.  That refers to Exhibit 6 here;
17   right?
18       A.  Uh-huh.
19       Q.  By the way, answer with words.
20       A.  I mean yes.
21       Q.  Thank you.  A qualified mental health
22   professional shall retrieve the referral form and
23   conduct the mental health assessment when the inmate
24   has answered yes to any question indicated above.
25           MR. BACHARACH:  I object to the form of
```

1    the question.
2              MR. SANSONE:  I haven't asked the
3    question yet.
4              MR. BACHARACH:  I know.  I object to the
5    form because you started in the middle of three.
6    You didn't say, you know.
7              MR. SANSONE:  I'm sorry.  I thought I
8    did.  Let me read it again.
9    BY MR. SANSONE:
10        Q.   Paragraph 3a) reads within four hours or less
11   of a referral, a qualified mental health professional
12   shall retrieve the referral form and conduct the
13   mental health assessment when the inmate has answered
14   yes to any question indicated above.
15             MR. SANSONE:  Did I read that right?
16             MR. BACHARACH:  You read that right, but
17   I don't think you read three.  It says above.
18        Q.   Emergency referral.  Yes.  Part 3 is
19   emergency referral.
20             MR. BACHARACH:  Emergency referral.  And
21   then you read it correctly.  I agree.
22        Q.   Yes.  Did this retrieval of the form and
23   conducting of a second mental health assessment occur
24   within four hours of the referral?
25        A.   It wasn't an emergency referral so why would

1    it have to be referred within four hours?
2        Q.   How do you know it wasn't an emergency
3    referral?
4        A.   Because it would be indicated whether or not
5    it was an emergency referral.  It's just a regular
6    referral.
7        Q.   I see.  I missed that.  On Exhibit 6 there
8    are four referral classifications; emergent, urgent,
9    routine or mental health evaluation.  Those are the
10   four that I see.  Which one was my client?
11        A.   I don't see a checkmark by anything.
12        Q.   So unclassified?
13        A.   It does not comply with the three which you
14   were just reading.
15        Q.   I'm asking this, sir.  How was my client's
16   referral classified?  Emergency, urgent, routine or
17   whatever that last one was?
18        A.   I can't answer that.  There is nothing
19   checked.
20        Q.   What do the words say that appear under there
21   in the writing apparently of Ms. Harrison?
22             MR. BACHARACH:  I think he's referring
23   to, you're right, to the handwriting below that.
24        Q.   That handwriting?  I'm sorry.  What does that
25   say?

1        A.   I have no idea.
2        Q.   Well, how do you know this wasn't an emergent
3    referral?
4        A.   I don't see anything checked in the box.
5        Q.   No box is checked.  How do you know what kind
6    of referral it was?
7        A.   I mean if it was an emergent referral, I
8    would think she would have checked emergency referral.
9        Q.   Don't you think if it was a standard referral
10   she would have checked the fourth one or if it was a
11   routine one, she would have checked the third one, or
12   if it was an urgent one, she would have checked the
13   second one?
14             Since there is no checkmark there, can you
15   tell what this nurse thought about the necessity for
16   this referral; emergency, urgent, routine or
17   otherwise?  Do you have any idea what she thought?
18        A.   I don't think it was an emergency referral.
19        Q.   Why don't you think that?  Nothing is
20   checked.  How do you know?
21        A.   Because an emergency referral would have --
22        Q.   Required people to do more than they did?
23        A.   Would have required more attention, yes.
24        Q.   And that did not happen?
25        A.   Because it was not an emergency.

1        Q.   How do you know that, just because they did
2    not know what was required under emergency, or do you
3    know it from some other way?
4        A.   I'm going to say it was not emergency because
5    medical staff did not put the individual on suicide
6    watch so it must not have been emergency because they
7    did not put the person under suicide watch.
8        Q.   If you go to page 9 of the policy under
9    Section 6: Observed Behavior-General Population?
10             MR. BACHARACH:  Nine.
11        Q.   Go to page 8 first.  I'm sorry.  Under
12   Section 6: Observed Behavior-General Population?
13        A.   Uh-huh.
14        Q.   The first thing it talks about is risk of
15   potential suicide.  Do you see that in number one
16   there?
17        A.   Yes.
18        Q.   Under number two, in the second line, the
19   second sentence reads detoxing from drug or alcohol
20   increases the risk of suicide.
21             So my client was detoxing from drugs at the
22   time of the suicide, wasn't he?
23        A.   He was.
24        Q.   Under four, my client did talk of suicide.
25   That's number a, right, letter a; right?  You

101

```
 1   qualified under letter a?
 2        A.   I want to read the whole thing.  Hold on.
 3        Q.   Sure.
 4        A.   He did talk of suicide.
 5        Q.   D, is it fair to say he qualified under d) as
 6   acting in a strange manner?
 7        A.   He did.
 8        Q.   Did he qualify under e) that he appeared
 9   overly anxious?  You're fighting that one, aren't you?
10        A.   I don't know if I agree with that.
11        Q.   They had to strap him in a chair.  Didn't
12   they?
13        A.   That don't mean he was overly anxious.  They
14   strapped him to a chair because he was threatening
15   behavior to himself and to others.
16        Q.   Okay.  Did Mr. Orlando over the course of
17   time before his suicide demonstrate sudden behavioral
18   changes?
19        A.   I don't think so, no.
20        Q.   He didn't go from needing to be restrained to
21   being calm in a relatively short period of time.
22   You're aware of that, aren't you?
23        A.   Yes.  I would agree with that, yes.
24        Q.   Wouldn't you call that a sudden change in
25   behavior?
```

102

```
 1        A.   Yes.
 2        Q.   And doesn't he literally under Section H,
 3   doesn't that talk about he became unusually calm after
 4   being seriously agitated?  Isn't that what the
 5   documentation reported?
 6        A.   Okay.  Yes.
 7        Q.   Did his behavior qualify under Section G?
 8        A.   Section G.
 9        Q.   J.  I'm sorry.  I apologize.
10        A.   I don't know if that's the case, no.  He is
11   engaged in unusual behavior, but I don't know if it is
12   a cry for help or to obtain needed attention.
13        Q.   So that might apply to him?
14        A.   I don't think it does.
15        Q.   You don't think his conduct was a cry for
16   help?
17        A.   I don't.
18        Q.   Weren't there reports he was crying for help
19   right before the suicide, that he was heard, overheard
20   crying for help?
21        A.   I don't remember reading anything like that.
22        Q.   If you go to page 11 of your policy under
23   Observed Behavior-Segregation Housing?
24        A.   Page 11?
25        Q.   Yes.  Well, start on page 10.  I'm looking at
```

103

```
 1   page 11 at the moment.
 2        A.   Okay.
 3        Q.   Was he in segregated housing or not?
 4        A.   He was on a detox pod.
 5        Q.   Answer my question, please.  Was he in
 6   segregated housing?  Is that segregated housing?
 7        A.   No, I don't think he was in segregated
 8   housing.
 9        Q.   What does the phrase segregated housing mean?
10        A.   Lockdown 24 hours a day.  I mean 23 hours a
11   day.  Hour recreation.  He was out way more than that.
12        Q.   Three c) says inmates taking psychotropic
13   medication may be at increased risk for suicide.
14   Mr. Orlando had been taking psychotropic
15   medication; isn't that right?
16        A.   Not -- I mean.
17             MR. BACHARACH:  Wait.  Where are you?
18   I'm sorry.  All right.  I got it.
19        A.   He reported he was taking psychotropic
20   medications, but we don't know whether or not that's
21   true or not.
22        Q.   Well, when somebody reports they're taking
23   psychotropic medication, do people make the assumption
24   that is true or assume it is not true?  Do they
25   operate on the assumption that what he said was true
```

104

```
 1   for the purposes of determining whether he is a
 2   suicide risk?
 3             MR. BACHARACH:  Well, I'm going to
 4   object, first of all, because this relates to
 5   segregated housing, and he is not in segregated
 6   housing.  I think this particular section relates
 7   to protective custody.
 8             MR. SANSONE:  It may or may not, but
 9   whether or not it does or not, the statement there
10   in 3 c) is inmates taking psychotropic medication
11   may be at an increased risk for suicide depending
12   on their mental illness and their risk factors and
13   may refuse, hoard or not take their medication.
14             Is it true inmates taking psychotropic
15   medication may be at an increased risk for
16   suicide?
17             MR. BACHARACH:  I object to the form of
18   the question.
19   BY MR. SANSONE:
20        Q.   That's what the policy says.  Is that
21   accurate or true?
22             MR. BACHARACH:  I object to the form of
23   your question.
24             MR. SANSONE:  I heard you.
25             MR. BACHARACH:  Again, I think you're
```

```
 1        taking the quote out of context.
 2              MR. SANSONE:  I read the whole context.
 3   BY MR. SANSONE:
 4        Q.   I'm asking this question, sir.  Is it true
 5   that inmates who take psychotropic medication are at
 6   increased risk for suicide?
 7        A.   If it's proven they are actually taking
 8   psychotropic medication.
 9        Q.   How do you go about proving that?
10        A.   Well, a lot of times if inmates are inside
11   the jail, we have documentation as to whether or not
12   they're taking psychotropic meds.
13        Q.   Would Ms. Harrison have had access to that
14   documentation?
15        A.   I would think that the healthcare department
16   would have had access to that information.
17        Q.   Didn't Ms. Harrison say that Mr. Orlando was
18   on psychotropic medication?
19        A.   Based on what he reported to me.
20        Q.   How do you know that is what it was based on?
21        A.   He came in on the 24th, and this was done on
22   the 26th.
23        Q.   You just got done telling me you think the
24   mental health people had his records.  I asked you
25   that.  I said would she have had access to the records
```

```
 1   to determine this.
 2              You said yes, and she checks off psychotropic
 3   medication, and then you tell me that is because of
 4   what he said, not because of the records.  How do you
 5   know that?  Apparently, you don't.
 6        A.   Good point.
 7        Q.   Thank you.  Number five of page 11 says upon
 8   receiving notification of an inmate displaying signs
 9   of potential suicidal behavior.  That happened here;
10   right?  There was signs of potential suicidal behavior
11   on intake?
12        A.   You're reading the segregation portion of the
13   policy, though.
14        Q.   I understand.  I'm asking about the intake.
15   Wasn't it the fact that there was evidence that he was
16   displaying suicidal ideation?
17              MR. BACHARACH:  Again, I object to the
18   form of the question.
19        Q.   You can stop reading what we're looking at.
20   I'm asking a separate question.  Isn't it true that he
21   appeared at intake with suicidal ideations?
22        A.   He made statements to the Millvale police
23   that he was going to harm himself and that was
24   communicated to my staff.
25        Q.   How long after he made those statements or
```

```
 1   those statements were relayed to staff was a mental
 2   health person assigned to talk to my client?  How long
 3   of a time period was that?  Was it more or less than
 4   15 minutes?
 5        A.   Mr. Orlando was seen by the mental health
 6   specialist on 3-26.
 7        Q.   So that was two days later; right?  Not 15
 8   minutes later; right?
 9              MR. BACHARACH:  He's not asking
10   questions about the policy.
11        A.   So what was the question again?
12        Q.   He wasn't seen by mental health for two days.
13   It was not 15 minutes after he expressed this or was
14   expressed to your people.  It was two days later;
15   right?
16        A.   He was seen by the healthcare department
17   right there when he came in when he made these
18   allegations.
19        Q.   What is a safety blanket?
20        A.   It's a blanket that is really thick.  They
21   can't be torn up by inmates to be used to harm
22   themself or to hang themself.
23        Q.   What is a safety mattress?
24        A.   A safety mattress is a mattress that cannot
25   be torn up.
```

```
 1        Q.   Okay.  Was my client issued either a safety
 2   mattress or a safety blanket?
 3        A.   No, he was not.
 4        Q.   Were they generally available to be issued if
 5   personnel decided to do that?
 6        A.   If our healthcare department deemed that he
 7   was suicidal, yes.
 8              MR. BACHARACH:  Off the record.
 9              (A short recess was taken.)
10              MR. SANSONE:  Let's go back on the
11   record.
12   BY MR. SANSONE:
13        Q.   I'm skipping some of these because I already
14   asked you some of the questions.
15              MR. BACHARACH:  I appreciate that.
16        Q.   When my client's decedent, John Orlando, was
17   placed in this chair, did that chair have a name or a
18   restraint chair or something?
19        A.   It's called a restraint chair.
20        Q.   Okay.  Was he placed in that chair as a
21   suicide precaution?
22        A.   He was placed in a chair because he was
23   threatening himself and others.
24        Q.   Is the answer to my question yes?  Was he
25   placed in a chair as a suicide precaution?
```

109

```
1    A.   No.  He was placed in a chair because he was
2  a threat to himself and others.
3    Q.   Okay.  In the testimony of Mr. Wainwright at
4  page 21 of his deposition, Mr. Terzigni asked, after
5  Mr. Wainwright testified that Mr. Orlando was getting
6  belligerent and resistant, Mr. Terzigni asked, so he
7  was being placed in a chair for bad behavior or as a
8  suicide precaution?  Answer:  My understanding was as
9  a suicide precaution.
10      Was Mr. Wainwright right or wrong?
11    A.   Mr. Wainwright was wrong.  Only our medical
12  staff can determine whether a person can be placed on
13  any type of suicide or whatever.  The restraints here
14  are used to protect an individual from himself or
15  harming others.
16    Q.   Is there a distinction in your jail between a
17  mental health unit and an acute mental health unit?
18    A.   We have an acute mental health unit, and we
19  have stepdown.  We have a stepdown from our mental
20  health unit to another stepdown, and we have a general
21  population mental health unit.
22    Q.   When you testified about the detox unit being
23  contained, I think you said mostly mental health, but
24  I don't know exactly what the word was, is that
25  different than the mental health unit or the acute
```

110

```
1  mental health unit you were just talking about?
2    A.   The mental health unit that was used when
3  Mr. Orlando had this incident was a general
4  population mental health unit which is 5F, not our
5  acute mental health.
6    Q.   Okay.  I'm sorry.  Let me ask the question
7  better.  Is 5F both the general population mental
8  health unit and the detox unit?
9    A.   It was both.
10    Q.   Okay.  At the time of this incident was there
11  room on the mental, of the acute mental health unit to
12  house my client if a determination was made that he
13  was a danger to himself?
14    A.   I am not sure.
15    Q.   I assume that whoever was doing the intake
16  would have known the answer to that question, would
17  have the ability to know of space on the acute mental
18  health unit?
19    A.   If they didn't know, they could find out.
20    Q.   Okay.  In reading from Mr. Wainwright's
21  testimony on pages 98 and 99, the question at that
22  time by Mr. Terzigni essentially was did Mr. Orlando
23  have a cellmate at the time of his hanging.
24      And Mr. Wainwright answered he was assigned a
25  cellmate.  I'm not real sure of all the details, but I
```

111

```
1  think his cellmate was released that morning.
2      Is that consistent with your understanding,
3  that his cellmate was released that day?
4    A.   Mr. Orlando's cellmate was not in the unit at
5  the time of the hanging.
6    Q.   Have you noticed that sometimes you answer a
7  question that I didn't ask?
8    A.   Because my thing is this.  I don't know
9  whether he was released or not.
10    Q.   Well, I don't know is the answer to that.
11  Okay.  I got you.
12      MR. BACHARACH:  No.  No.  I think
13  released is sort of a different term than if you
14  are in a jail.
15    Q.   I would think when a guy from the jail says
16  the guy was released means they let him go.  Wouldn't
17  you think that?
18    A.   I would think that, but I don't know for sure
19  what it was.
20    Q.   Is there any reason to think Mr. Wainwright
21  was inaccurate that he was not released?  I don't know
22  it matters, but I am wondering why we're fighting
23  about this for some reason.
24      MR. BACHARACH:  I don't know whether it
25  matters.
```

112

```
1      MR. SANSONE:  You guys keep saying he
2  was released.
3      MR. BACHARACH:  I just meant somebody
4  can be transferred to some other place and not
5  necessarily be released.
6    A.   Right.
7      MR. SANSONE:  Because I read the word
8  released from the guy who was running, who was in
9  charge of the jail.
10      MR. BACHARACH:  Yes.  He said that
11  but --
12      MR. SANSONE:  But he might not be right.
13      MR. BACHARACH:  We agree he was not in
14  the cell with Mr. Orlando when this happened.
15  That's for sure.
16  BY MR. SANSONE:
17    Q.   I'm not understanding something that occurred
18  at the time of the incident.  You had the police come
19  in and say that this guy is threatening to hang
20  himself.  There's evidence if you read it one way that
21  Mr. Orlando also said in intake that he was planning
22  on hanging himself or doing harm to himself.  You can
23  read it one way or the other.
24      When was it determined?  When was a
25  determination made vis-a-vis intake that Mr. Orlando
```

113

```
 1   was not going to be sent to the acute unit, was not
 2   going to be issued a gown, was not going to be given
 3   sheets and a mattress, was not going to be constantly
 4   observed?
 5            When was that determination made and by whom
 6   initially?
 7       A.   I reviewed the mental health referral, and I
 8   have looked at the writing, and it looks like that
 9   Ms. Harrison, the mental health specialist, on the
10   26th said client was released to population, general
11   population.  So I'm thinking the mental health
12   specialist made that determination in intake to
13   release him to general population.
14       Q.   So who would that have been at intake?  Who
15   would be the person at intake that made the
16   determination?
17       A.   Ruth Harrison, signature, mental health
18   specialist, made that determination to release him to
19   population in intake.
20       Q.   Wait a minute.  Two days later it says
21   intake.  When I said what happened at intake, I meant
22   when they brought the guy in.  I don't mean two days
23   later.
24            I'm talking about when they brought the guy
25   in, when the police were saying he was going to kill
```

114

```
 1   himself, when the inmate says he's going to kill
 2   himself, with him acting like a fool, he's in detox
 3   from drugs, at that point, not two days later, but at
 4   that point who made the determination that he did not
 5   need suicide precautions?
 6            MR. BACHARACH:  I object to form.  You
 7       can still answer it, but just to the people in the
 8       jail, intake has a specific meaning, so that's
 9       all.
10       Q.   I'm focusing you on the time in which he was
11   brought in on the 24th, not two lays later, but that
12   time when he was seen by this Nurse Coradoro and this
13   other nurse, who was it that made the determination
14   that this guy, John Orlando, did not need suicide
15   precaution?
16       A.   I would think that our healthcare department
17   made that determination.
18       Q.   Departments cannot speak.  I'm asking about
19   the name of the individual who made that
20   determination?
21       A.   I can't give you the name of the individual
22   because I don't know the name of the individual, but
23   somebody from my healthcare department made that
24   determination.
25       Q.   Well, in your investigation of this matter
```

115

```
 1   didn't you determine who it was that made that
 2   determination?
 3       A.   In my investigation it was revealed that a
 4   mental health specialist made the determination.
 5       Q.   I didn't ask that, sir.  I'm talking about
 6   two days before.  I just told you that.  Did you find
 7   out in your investigation who failed in that first,
 8   when he first came in, who failed to put him on a
 9   suicide watch?
10            MR. BACHARACH:  I object to the form of
11       the question.  It assumes that was a failure which
12       we don't agree with.
13            MR. SANSONE:  We can agree he wasn't put
14       on a suicide watch.
15            MR. BACHARACH:  We can agree with that.
16   BY MR. SANSONE:
17       Q.   Right?
18       A.   He wasn't.
19       Q.   Who made the determination whether or not to
20   put him on a suicide watch after being told he says
21   he's going to hang himself?
22       A.   Our healthcare department.
23       Q.   I'm sorry.
24       A.   Somebody from our healthcare department.
25       Q.   But you don't know who that was?
```

116

```
 1       A.   I don't.
 2       Q.   To this day, you don't?
 3       A.   I know two days later it was by Harrison.
 4       Q.   I am not asking you two days later but this
 5   particular incident on the 24th.  Today you don't know
 6   who made that determination.  Did you ever know?
 7       A.   On the 24th I know somebody from our
 8   healthcare department.
 9       Q.   I'm asking who?
10       A.   I don't know.
11       Q.   Did you ever know the answer to that
12   question?
13       A.   I don't know.
14       Q.   Would you pull out Exhibit 4 which is this
15   right here (indicating)?  Now, this is the report by
16   Ms. Coradoro; right?
17       A.   Yes.
18       Q.   And this occurred at the time he was brought
19   in, 2230 of the 24th; right?
20       A.   It is.
21       Q.   In the second section it says inmate is
22   cleared for segregation.  Do you see that?
23       A.   I see that.
24       Q.   What does that mean?
25       A.   I don't know what that means because he was
```

117

```
1   never segregated.
2        Q.   What does it mean to be cleared for
3   segregation?
4        A.   That's normally an individual that is placed
5   in one of our segregation units, and inmates in
6   segregation have to be cleared before they're
7   segregated.
8        Q.   I think you may have said a little bit about
9   this before.  I apologize.  First of all, would you
10  ever put a person that is suicidal in a segregation
11  unit?
12       A.   Inmates that are suicidal are acute mental
13  health pod is a segregated unit.
14       Q.   So this Nurse Coradoro cleared him to go to a
15  segregated unit; right?
16       A.   She put her initials.  I mean she put her
17  signature there, but it doesn't say that, whether he
18  was approved to go to segregation or not.
19       Q.   I don't understand.  It says inmate is
20  cleared for segregation: signature/printed/date/time.
21  Doesn't her signature further indicate clearance for
22  segregation?
23       A.   Yes.
24       Q.   Why wasn't he sent to segregation?  Why
25  wasn't he sent to acute mental health?
```

118

```
1        A.   An individual wasn't sent to segregation
2   because someone else felt as though he didn't need to
3   go to segregation.
4        Q.   Who would that have been?
5        A.   I'm thinking now that would have been
6   Harrison, Ms. Harrison.
7        Q.   Two days later?
8        A.   Two days later.
9        Q.   Well, what about the two days?
10       A.   Nothing happened in the two days so what are
11  you talking about?
12       Q.   I didn't ask you that.  This was done on the
13  24th.  This clearance for segregation was done on the
14  24th.  Why wasn't the inmate sent to segregation on
15  the 24th?
16       A.   If you look at when this was done on 3-24 at
17  2230, there's still a process that he had to go
18  through.  He had to go through the arraignment
19  process.  He had to go through the ID process, et
20  cetera, et cetera.  You're not going to put an inmate
21  on segregation.  Well, you could put him on
22  segregation before that.
23       Q.   Why didn't you?  The inmate was cleared for
24  segregation.  Why didn't he go in segregated housing?
25  Why was he put in the acute mental health ward?
```

119

```
1        A.   Well, I am going to put it like this.  The
2   inmate was restrained to a restraint chair for eight
3   to ten hours so that was probably for that inmate
4   being restrained in that restraint chair.  I don't
5   know.
6        Q.   Is that the same thing as segregation, being
7   put in a restraint chair?
8        A.   I don't know.
9        Q.   I am asking you why wasn't this inmate sent
10  to the segregated acute mental health place?  He said
11  he was going to, wanted to hang himself.  He said he
12  was detoxing from serious drugs.
13            This nurse cleared him to go to segregation.
14  Why wasn't he sent immediately there?
15       A.   I want to answer.
16       Q.   Okay.
17       A.   Because the inmate still had a process to go
18  through.  The inmate just came to our jail.
19       Q.   Just a minute ago you just got done saying
20  that could have been done.
21            MR. BACHARACH:  Wait.  Let him answer.
22       Q.   So I am wondering why you said it could have
23  been done and now you're not answering why it wasn't
24  done.
25            MR. BACHARACH:  He was answering, and
```

120

```
1   you interrupted his answer.  He was answering.
2        Q.   It's just that simple.  Is it?  Well, let's
3   hear the answer.  Tell me why it wasn't done.
4        A.   It was not done because he just came into the
5   jail.  You don't send an inmate to a segregated unit
6   when he just comes into the jail.
7            The paperwork has to be processed.  He has to
8   be arraigned.  He has to be fingerprinted, and once
9   he's arraigned and processed and three paged, then he
10  goes to a segregated unit.  That is the answer as to
11  why he didn't go to a segregated unit.
12       Q.   I'm sorry.
13       A.   So that is the answer.
14       Q.   Except a minute ago you said, but he could
15  have been.  You said he could have been sent to a
16  segregated unit even before all those things occurred.
17  You just said that on the record.  Do you remember
18  saying that?
19       A.   No; I do not remember saying that.
20       Q.   Okay.  Could he have?  Could that all have
21  been done some other way while still sending this guy
22  who said I'm going to kill myself to the segregated
23  unit?
24       A.   Absolutely not.
25       Q.   How long does it take to go through the
```

121

```
1    process you just described?
2         A.   It depends on when the arraigning judge has
3    availability to arraign the defendant.  This
4    individual is in a restraint chair for ten hours,
5    eight to ten hours.  So that will delay the process
6    even more.
7         Q.   But then he is let out of the chair?
8         A.   Eight to ten hours later.
9         Q.   And not put in segregation?
10        A.   Because he still had to be ID'ed, pretrial,
11   arraigned.
12        Q.   Then why was he taken out of the chair?
13        A.   Because his behavior calmed down.
14        Q.   So he was no longer suicidal?
15        A.   I'm going to say this.  He was placed in the
16   chair because he was threatening towards staff and to
17   himself.
18        Q.   Well, wait a minute.  Wainwright said he was
19   placed as a suicidal precaution.
20        A.   I'm saying what I said.
21        Q.   Why do you know he was placed in a chair?
22   Wainwright said he was placed in a chair for suicide
23   prevention.
24             Why are you contradicting him?  What is your
25   basis for that?  Can you answer the question?  What
```

122

```
1    is your basis for saying that Wainwright was wrong
2    about the reason for placing him in that chair?
3         A.   A restraint chair is used for inmates that
4    are a threat to themself and to others.  Only our
5    healthcare department can make a determination as to
6    whether an inmate is suicidal or not.
7         Q.   When Wainwright said he was placed in that
8    chair for suicide prevention, what was his basis for
9    saying that?
10        A.   You would have to ask Mr. Wainwright.
11        Q.   Well, we did.  He said it was for suicide.
12   I'm asking you why you're contradicting him.
13             For example, do you know whether or not
14   Wainwright spoke to the health professionals that were
15   on scene?  Do you know whether or not he made the
16   determination to place him there for suicide
17   prevention?
18        A.   I do not know.
19        Q.   What is Justice Related Service?
20        A.   Those individuals that come into the jail to
21   try to divert individuals to programs outside of the
22   jail based off a judge's recommendation.
23        Q.   Why was my client -- strike that.  I think
24   we're finished, but I would like to take five minutes
25   with my colleague.
```

123

```
1              MR. SANSONE:  Let's go off the record
2    for a second.
3              (A short recess was taken.)
4              MR. SANSONE:  That's all we have.
5              MR. BACHARACH:  I do have a few
6    questions.
7                   EXAMINATION
8    BY MR. BACHARACH:
9         Q.   Referring to Harper Exhibit 6 of the
10   statement, you indicated that, I think you said that,
11   in that third section there is some words, was client
12   or cleared to population or cleared.  What does that
13   first line read?
14        A.   It looks like to me cleared to population.
15        Q.   What does cleared to population mean?
16        A.   That means he has no mental health issues, no
17   suicidal ideations.  He's cleared to go to general
18   population.
19        Q.   Okay.  And referring again to Harper, not
20   again referring to, but to Exhibit 4, if you look at
21   about halfway down that paper there is a sentence that
22   begins straps.  Can you read what that says?
23        A.   Straps checked to all extremities and above
24   to insert a finger between him and strap.
25        Q.   And this referenced a date and time.  3-24 at
```

124

```
1    10:30 it looks like?
2         A.   Yes.
3         Q.   If somebody is placed in a restraint chair,
4    does medical have to look at them?
5         A.   Yes.  Medical is supposed to come and make
6    sure the straps are not too tight and make an
7    evaluation.
8         Q.   I'm going to refer you to Harper Exhibit 7.
9    If you can go to the policy on page 7 of 19 of the
10   policy?  Down below there is Section 5, sub paragraph
11   five.
12             If you look at the second sentence of that,
13   it begins licensed under clinician?
14        A.   Uh-huh.
15        Q.   What is a licensed -- what is the definition
16   in this policy of a licensed clinician?
17             MR. SANSONE:  What page are you on?
18             MR. BACHARACH:  I'm sorry.  It's 7 of
19   19, Section 5.
20             MR. SANSONE:  I apologize.  What was
21   your question?  I could not hear it.
22   BY MR. BACHARACH:
23        Q.   I'm just asking Section 5, sub paragraph
24   five, there's a sentence that says defines, begins
25   licensed clinician.  What does the term licensed
```

```
 1   clinician mean at least in terms of this policy?
 2              MR. SANSONE:  Doesn't it state right
 3   here?
 4              MR. BACHARACH:  It does.  I just want
 5   him to read it.
 6        A.   A mental health nurse, independent clinical
 7   social worker, licensed graduate social worker,
 8   licensed professional counselor physician assistant,
 9   psychiatrist and physician.
10        Q.   Now, there were actually three packets of
11   investigations relating to Mr. Orlando when he came in
12   on the 24th until the suicide on March 29th.  Do you
13   recall that?
14        A.   Yes.
15        Q.   And in each of these were statements taken
16   from people who were involved?
17        A.   Yes.
18        Q.   And were those statements reviewed by
19   officers in the chain of command above the corrections
20   officers?
21        A.   Absolutely.  The package reviewed by the
22   captain, majors, deputy warden and myself.
23        Q.   And was that true as to all three packets?
24        A.   All three.
25        Q.   In any of those packets was it determined
```

```
 1   that something was done that was incorrect in any
 2   material way?
 3        A.   No.  Policies and procedures were followed in
 4   all three instances.
 5        Q.   Mr. Orlando, of course, when he came in on
 6   the 24th, he walked about, he showed some violent and
 7   erratic behavior or at least threatening and erratic
 8   behavior.  We all agree with that; correct?
 9        A.   Correct.  I do.
10        Q.   After he was placed, after he was released
11   from the restraint chair which was about some eight to
12   ten hours later, from that point in time did he
13   display that behavior again?
14        A.   No.
15        Q.   If someone outside the jail has reason to
16   believe that an inmate is suicidal or potentially
17   suicidal, is there a way that they can notify the
18   jail?
19        A.   We do have a hotline in which individuals can
20   report anything that they think or they have a report
21   that an inmate is suicidal.
22        Q.   Are you aware of any such reports being made
23   from outside the jail to include the Millvale police
24   by anyone?
25        A.   No.
```

```
 1        Q.   Mr. Orlando was on 5F when he --
 2              MR. SANSONE:  On what, John?
 3              MR. BACHARACH:  5F.
 4        Q.   Are you aware were there any staffing issues
 5   that occurred on that that existed on that pod at or
 6   about the time he committed suicide?
 7        A.   No.
 8        Q.   Can you tell us about how many inmates, new
 9   admissions there are to the Allegheny County Jail in a
10   year?
11        A.   Twenty-two to 25,000.
12        Q.   And based on your experience are you able to
13   give any estimate of the percentage of those inmates
14   that have either substance abuse issues or mental
15   health issues or both?
16        A.   At least 30 to 40 percent.
17        Q.   Do corrections officers have the authority to
18   place an inmate, on their own authority to place an
19   inmate on a suicide gown or on suicide watch?
20        A.   No.
21              MR. BACHARACH:  I don't have any other
22   questions.
23                   EXAMINATION
24   BY MR. SANSONE:
25        Q.   You testified that there were no staffing
```

```
 1   issues on 5F that day, the day of the suicide; is that
 2   correct?
 3        A.   That is correct.
 4        Q.   What is your basis for making that
 5   observation?
 6        A.   Knowing that I meet the complement of
 7   officers on pod every day.
 8        Q.   I'm not asking what was supposed to be.  You
 9   said that there were no issues indicating what was
10   supposed to happen happened.  Now, how do you know
11   what the staffing was on 5F that day?
12        A.   Because I know how many officers and medical
13   staff are supposed to be on the pod.
14        Q.   I understand what is supposed to happen.  I
15   understand what is scheduled to be done.  How do you
16   know what actually was the case that day other than
17   this is what is supposed to have happened?
18        A.   Because we did a review as to the event that
19   took place on that day, and everything was done the
20   way it was supposed to be done.
21        Q.   So you reviewed the staffing situation at 5F
22   that day?
23        A.   We reviewed the staffing issues.  We made
24   sure the officers were making their security
25   inspections and that the proper amount of nursing
```

1  staff was on there on that day.
2      Q.  I'm not asking about we.  I'm asking about
3  you.
4      A.  Me.
5      Q.  I'm asking you.  Did you personally review
6  the staffing of 5F that day?
7      A.  I watched the video myself, and I saw that
8  there was proper staffing on the pod that day.
9      Q.  How long did you watch a video?  How long was
10 the video you watched?
11     A.  I watched about a half hour, 40 minutes.
12     Q.  And in that half hour or 40 minutes, you
13 watched 40 minutes of tape?
14     A.  I did.
15     Q.  And in that 40 minutes you were able to
16 determine what the staffing on the pod was?
17     A.  I saw the staffing on the pod, yes.
18     Q.  You saw everybody that was on duty that day?
19     A.  I did.
20     Q.  When you said you watched 40 minutes of the
21 video, can you tell me was it the time leading up to
22 the incident or was it the incident and then later, or
23 what was it?
24     A.  I reviewed the video about 15, 20 minutes
25 prior, before the incident and 15, 20 minutes after an

1  incident.
2      Q.  Okay.  You said that you intake about 20 to
3  25,000 inmates a year; is that right?
4      A.  I did say that.
5      Q.  If I am doing the math right, that looks like
6  roughly 70 a day?
7      A.  Absolutely.
8      Q.  Is that about right?
9      A.  Absolutely.
10     Q.  Is there one intake area only?  Let's say,
11 for example, that you have three people come in by
12 three different police departments at the same time.
13         Would they have to wait for the same intake
14 person, or is there three people there doing the
15 intake?
16     A.  We have three people doing the intake but
17 everybody comes in one way.
18     Q.  I don't understand.  What do you mean one
19 way?
20     A.  There's only one way you can bring an inmate
21 into our jail.
22     Q.  Which is how?  I don't understand your
23 answer.
24         MR. SANSONE:  We'll go off the record.
25         (Discussion off the record.)

1          MR. SANSONE:  Let's go back on the
2  record.
3  BY MR. SANSONE:
4      Q.  What I am trying to understand is this.  If
5  there are three potential inmates brought in at the
6  same time by three different police departments, okay,
7  that's a possibility, I take it?
8      A.  Yes.
9      Q.  Do each of those inmates get seen one at a
10 time by the same intake personnel, or do all three go
11 to -- like when you come into a bank, sometimes you go
12 to different windows.  Is that how it works, or how
13 does it work?
14     A.  Everybody comes in one way and is seen by the
15 same officer through that one entrance.
16     Q.  What about the other two that came in at the
17 same time?
18     A.  They have to wait outside until that person
19 is done.
20     Q.  And so it's the same intake personnel that
21 would see all three of them; is that right?
22     A.  Not unless they are on a lunch break or
23 something like that.
24     Q.  Sure.  And when Mr. Orlando came in, was it
25 at a time of a lunch break or a change in shift?  When

1  does shift change?
2      A.  11:00.
3      Q.  2230.  So this was not a shift change.  He
4  was seen at 2230 before a shift change; right?
5      A.  Right.  Before shift change.
6      Q.  Was there anybody waiting to be intake after
7  Mr. Orlando?
8      A.  I don't know.
9      Q.  How long did he have to wait, if at all?  In
10 other words, when he came in, was intake busy?  Did he
11 have to wait?
12     A.  I don't know.
13         MR. SANSONE:  That's all I have.
14         MR. BACHARACH:  I don't have anything
15 else.  We'll read it.
16         (Witness excused.)
17         (Signature not waived.)
18         (Deposition concluded at 12:55 o'clock
19 p.m.)
20
21
22                    - - -
23
24
25

133

```
 1    COMMONWEALTH OF PENNSYLVANIA)
 2    COUNTY OF BEAVER          )
 3
 4          I, Mary Secot, a notary public in and for
      the Commonwealth of Pennsylvania, do hereby
 5    certify that the deponent, ORLANDO HARPER, was by
      me first duly sworn to tell the truth
 6    the whole truth, and nothing but the truth; that
      the foregoing deposition was taken at the time
 7    and place stated herein; and that the said
      deposition was recorded stenographically by me
 8    and then reduced to typewriting under my
      direction, and constitutes a true record of the
 9    testimony given by said deponent.
10          I further certify that the inspection,
      reading and signing of said deposition were not
11    waived by counsel for the respective parties and
      by the deponent.
12
13          I further certify that I am not a
      relative, or employee of either counsel, and that
14    I am in no way interested, directly or
      indirectly, in this action.
15
16          IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office at Baden,
17    Pennsylvania, this 15th day of April, 2018.
18
19                     Mary Secot
20                     MARY SECOT
21
22          COMMONWEALTH OF PENNSYLVANIA
23              NOTARIAL SEAL
24              MARY E SECOT
                Notary Public
25        ECONOMY BORO., BEAVER COUNTY
          My Commission Expires Nov 18, 2018
```

134

```
 1      STATE OF PENNSYLVANIA ERRATA SHEET
 2
 3         I, ORLANDO HARPER, have read the
 4    foregoing pages of my deposition given on April 2,
 5    2018, and wish to make the following, if any,
 6    amendments, additions, deletions or corrections:
 7    PAGE/LINE     CORRECTION      REASON FOR CHANGE
 8    ---------     ----------      -------------------
 9    ---------     ----------      -------------------
10    ---------     ----------      -------------------
11    ---------     ----------      -------------------
12    ---------     ----------      -------------------
13    ---------     ----------      -------------------
14    ---------     ----------      -------------------
15    ---------     ----------      -------------------
16    ---------     ----------      -------------------
17    ---------     ----------      -------------------
18    In all other respects the transcript is true and
19    correct------------------------------------
20            ORLANDO HARPER
21       Subscribed and sworn to before me this___ day of
22    _____ 2018.
23
24       ------------------------
25       Notary Public
```

135

```
 1         QUALITY COURT REPORTING SERVICE
                7012 Kevin Drive
 2         Bethel Park, Pennsylvania 15102
                 412-833-3434
 3
 4    April 15, 2018
      TO:  John A. Bacharach, Esquire
 5
 6         RE: DEPOSITION OF ORLANDO HARPER
 7         NOTICE OF NON-WAIVER OF SIGNATURE
 8
 9
10         Please have the Deponent read the
      deposition transcript.  All corrections are to be
11    noted on the preceding Errata Sheet.
12         Upon completion of the above, the Deponent
      must affix their signature on the Errata Sheet,
13    and it is to then be notarized.
14         Please FORWARD the SIGNED ORIGINAL of the
      Errata Sheet to Joel Sansone, Esquire for
15    attachment to the original transcript, which is
      in their possession.  Please ATTACH A COPY of the
16    SIGNED ORIGINAL Errata Sheet to your transcript
      copy.
17
18         Please return the completed Errata Sheet to
      the designated party within 30 days of the
19    receipt hereof.
20
21
22              Mary Secot
23    Mary Secot
      Certified Court Reporter
24
25
```