IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEAN LAWNICZAK, Personal Representative of the ESTATE OF JOHN ORLANDO, *Deceased* | Civil Action No. 17-00185 |
| Plaintiff, | |
| v. | United States Magistrate Judge Lisa Pupo Lenihan |
| ALLEGHENY COUNTY, et al., | |
| Defendants. | ECF No. 40 |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff Jean Lawniczak ("Plaintiff"), the mother of decedent John Orlando ("Orlando"), filed this action after Orlando committed suicide as while detained at the Allegheny County Jail ("ACJ"). (ECF No. 1). In her amended complaint, Plaintiff asserts claims under 42 U.S.C. § 1983—alleging violations of Orlando's constitutional rights protected by the Eight Amendment[1] of the United States Constitution—along with a state law wrongful death claim.[2] (ECF No. 19). Presently pending before the Court is a motion for summary judgment filed by Defendants Allegheny County ("County"); Orlando Harper ("Warden Harper"), the warden of ACJ; Simon Wainwright ("Deputy Wainwright"), the former deputy warden of ACJ; Correction Officer Marguerite Bonenberger ("CO Bonenberger"); Sergeant Andrew Haburjak ("Sgt. Haburjak"); and

---

[1] "The Eighth Amendment prohibits prison officials from being deliberately indifferent to an inmate's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). But, it is well established in this Circuit "that while the detention of sentenced inmates is governed by the Eighth Amendment, the treatment of pretrial detainees is governed by the Due Process Clause [of the Fourteenth Amendment]." *Wharton v. Danberg*, 854 F.3d 234, 247 (3d Cir. 2017). Therefore, the Court will analyze Plaintiff's claims accordingly.

[2] 42 Pa. C.S. § 8301.

Nurse Tricia Corrado ("Nurse Corrado") (collectively, "Defendants").[3] (ECF No. 41). For reasons that follow, the Court will grant Defendants' motion for summary judgment.[4]

## II. BACKGROUND

### A. Facts[5]

Orlando arrived at the ACJ between 9:00 PM and 10:00 PM on March 24, 2016, following his arrest for simple assault, harassment, and public drunkenness. (Defs.' Concise State of Material Facts ("Defs.' CSMF"), ECF No. 42 ¶¶ 2, 3; Pl.'s Counter Statement of Material Facts ("Pl.'s CSMF"), ECF No. 49 ¶¶ 2, 3).[6] Upon his arrival, Orlando was agitated, uncooperative, and threatening to hurt himself and the correction officers ("COs"). (Defs.' CSMF ¶ 6). Additionally, the arresting officers told CO Bonenberger that Orlando had stated that he wanted to hang himself. (*Id.* ¶¶ 4, 37). Because of his behavior and his self-harm threats, Sgt. Haburjak ordered that Orlando

---

[3] The Court dismissed the remaining defendants in this action pursuant to the parties' Fed. R. Civ. P. 41 stipulation. (ECF Nos. 59, 60); *see* Fed. R. Civ. P. 41(a)(1).

[4] Under the Federal Magistrate Judges Act, "[u]pon consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court." 28 U.S.C. § 636(c)(1). Consent of all parties to a case gives the magistrate judge full "authority over dispositive motions, conduct of trial, and entry of final judgment, all without district court review." *Roell v. Withrow*, 538 U.S. 580, 585 (2003). Both parties consented to the magistrate judge's jurisdiction. (ECF Nos. 26, 28).

[5] The facts are taken from the evidence of record that is either undisputed as indicated by the parties, or not fairly disputed on the record. Disputed facts are viewed in the light most favorable to the nonmoving party in accordance with *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[6] For the remainder of this section, the Court omits separate citations to Pl.'s CSMF, where Plaintiff clearly admits to a fact contained in Defs.' CSMF. Similarly, the Court omits separate citations to Defs.' Response to Pl.'s CSMF where Defendants clearly admit to a fact contained in Pl.'s CSMF. The Court further omits duplicative citations to both parties' statements of facts where the parties allege identical facts.

2

be put in a restraint chair and CO Bonenberger assisted in the restraining process. (*Id.* ¶¶ 7, 37; ECF No. 43-2 at 5).[7]

During this process—which was videotaped—Orlando said "I'm sick. I'm dying of liver disease. I'm on high doses of Fentanyl and Xanax. I'm going to die in here. I'm going to fucking die in here. I am going to die in here." (Defs.' CSMF ¶¶ 8, 9). Immediately following those statements, Orlando said "I am going to die in here" and, "I hope I die in here." (*Id.* ¶ 9). Sgt. Haburjak stated on the video that Orlando would be placed in a suicide gown when he was released from the restraint chair. (*Id.* ¶ 13). After he was restrained, the COs were able to directly observe Orlando because Sgt. Haburjak put him in a cell in front of the COs' desk—i.e., the cell where inmates on suicide precautions are placed. (Defs.' CSMF ¶ 44).[8]

All new inmates arriving at the ACJ are seen by a nurse to determine whether they can be admitted to the ACJ. (Defs.' CSMF ¶ 67; ECF No. 50-13 ("Latham Dep.") at 11). Accordingly, Nurse Corrado interviewed Orlando at 10:30 PM on March 24, 2016. (Pl.'s CSMF ¶ 77; Defs.' CSMF ¶ 11). The questions asked during this interview encompassed whether the inmate was contemplating harming himself. (Defs.' CSMF ¶ 54; ECF No. 50-12 ("Corrado Dep.") at 4). Orlando told Nurse Corrado that he had "back" and "mental health" issues and that he was on

---

[7] The ACJ Suicide Prevention and Intervention Policy ("The ACJ Policy") provides, in pertinent part, that COs may "physically restrain an inmate to prevent the inmate from self-injury [and] injury to others . . . ." (ECF No. 50-16 at 13).

[8] Deputy Wainwright testified about the "use of force" incident report recounting Orlando's placement in the restraint chair. (ECF No. 50-15 ("Wainwright Dep.") at 14–16). In reviewing that report, after concluding that "[t]he force used was minimal and appropriate," Deputy Wainwright had commented that "[w]e may need to re-evaluate." (ECF No. 43-2 at 3). Plaintiff cites Deputy Wainwright's testimony about those comments as supporting her assertion that ACJ's "treatment of [its mental health] inmates could be qualified as inadequate" (Pl. CSMF ¶ 117; *see* Pl.'s Brief, ECF No. 48 at 10, 12). The Court finds that Pl. CSMF ¶ 117 is not supported by the record because Deputy Wainwright was specifically testifying about the "use of force" with respect to the ACJ's treatment of mental health inmates. And that testimony cannot, as Plaintiff attempts, be extrapolated to the ACJ's treatment of its mental health inmates in general.

"Klonopin, Xanax, and Fentanyl patch." (ECF No. 50-6 at 2; Pl.'s CSMF ¶ 78). Nobody informed Nurse Corrado that—while he was in the arresting officers' custody—Orlando had said that he wanted to kill himself. (Corrado Dep. at 11).[9] During the interview, Orlando screamed that "he hopes he dies in here" and that "we are all gonna die." (Pl.'s CSMF ¶ 78). Based on his statements and responses, Nurse Corrado felt that—at the time of her interview—Orlando was "a harm to himself" and "suicidal." (*Id.* ¶ 80). But, because he had no medical problems that prevented him from being admitted, Nurse Corrado medically cleared Orlando for admission to the ACJ. (*Id.* ¶ 81; Defs.' Response to Pl.'s CSMF ("Defs.' Resp. Pl.'s CSMF"), ECF No. 58 ¶ 81).

Charlotte Wright also evaluated and observed Orlando—throughout the evening of March 24, 2016, and into the morning of March 25, 2016—while he was in the restraint chair. (Pl.'s CSMF ¶ 105; ECF No. 50-21 at 2). Ms. Wright works for an external agency that provides various services to individuals suffering from mental health issues. (Pl.'s CSMF ¶¶ 106, 107). She noted that Orlando "continued to threaten and scream at officers" after he was placed in the restraint chair. (ECF No. 50-21 at 2). In her view, Orlando's recent "eating of methamphetamine and all his other Rx . . . were attributing to his behavior at the time," which she classified as "[m]anic with [p]sychosis related to his drug abuse/Rx." (*Id.*).

Orlando was released from the restraint chair at approximately 5:52 AM on March 25, 2016. (Defs.' CSMF ¶ 14). He was neither examined by a mental health specialist prior to his release from the restraint chair, nor placed in a suicide gown afterwards. (Pl.'s CSMF ¶¶ 83, 86). Later that day, Orlando was preliminary arraigned and formally booked into the ACJ. (Defs.'

---

[9] Plaintiff asserts that Nurse Corrado was unaware of Orlando's previous statements to the arresting officers, "despite their preservation in various ACJ reports." (Pl.'s CSMF 79). But the record shows that Sgt. Haburjak and CO Bonenberger drafted their reports after Nurse Corrado had interviewed Orlando. (ECF No. 50-2 at 2–3; 50-4 at 2).

CSMF ¶ 36). During his booking interview, Orlando responded affirmatively when asked whether he has ever attempted suicide but denied having any current suicidal thoughts. (Pl.'s CSMF ¶ 88; Defs.' Resp. Pl.'s CSMF ¶ 88). At approximately, 2:05 AM, on March 26, 2016, Orlando collapsed while walking in the ACJ intake area and was attended by Heather Fisher, RN, and Laura Williams, LPC. (Defs.' CSMF ¶¶ 15, 16). In the ensuing report, Williams recounted not only that Orlando told a CO that he was not suicidal, but also that, upon discussing Orlando's behavior, Nurses Corrado and Fisher concluded that he was not a threat to himself or others. (*Id.* ¶ 17, 18).

If a new inmate is committed to the ACJ after arraignment, he is seen by another nurse— for a comprehensive assessment of his medical needs. (Defs.' CSMF ¶ 68; Latham Dep. at 11). Nurse Theresa Latham ("Nurse Latham") interviewed Orlando at 11:44am, on March 26, 2016, for that assessment. (Defs.' CSMF ¶ 19; Latham Dep. at 11). At the time of this interview, Nurse Latham was unaware of Orlando's prior statements—i.e., one that he made to the arresting officers and those that he made while being placed in the restraint chair. (Pl.'s CSMF ¶ 91; Defs.' Resp. Pl.'s CSMF ¶ 91; Latham Dep. at 5, 7, 12–13). And during the interview, Orlando did not disclose any suicide ideations or any past suicide attempts to Nurse Latham. (Defs.' CSMF ¶¶ 20, 21; Pl.'s CSMF ¶ 91; Defs.' Resp. Pl.'s CSMF ¶ 92). Nonetheless, "because [she] felt that [Orlando] was not telling [her] the truth," Nurse Latham referred Orlando to a mental health specialist "to see what they came up with upon evaluation and what their feeling was after speaking with [Orlando] . . . ." (Latham Dep. at 4). This was in accordance with the ACJ policy which provided that if necessary—and only upon referral by the ACJ's medical staff—a mental health specialist would evaluate an inmate. (Pl.'s CSMF ¶ 68). At the time, Nurse Latham also prescribed detoxification medications for Orlando. (*Id.* ¶ 95).

5

As a result of Nurse Latham's referral, a mental health specialist needed to evaluate Orlando before he could be assigned to a housing pod. (Pl.'s CSMF ¶ 97). On March 26, 2016, at or about noon, Orlando was seen and "cleared to population" by mental health specialist Ruth Harrison. (Defs.' CSMF ¶ 23). He was then assigned to housing Pod 5F which is not only a mental health unit, but also a designated detoxification unit for male inmates. (Pl.'s CSMF ¶ 101; ECF No. 50-20 ("Harper Dep.") at 12). Inmates housed on Pod 5F—including Orlando—are "double celled," that is, they are assigned a cell mate. (Pl.'s CSMF ¶ 103). Guard rounds are done every 15 minutes. (Defs.' CSMF ¶ 25). Both policies are inmate suicide precautions. (*Id.*)

Orlando arrived at Pod 5F at about 7:36 PM on March 26, 2016. (*Id.* ¶ 24). There is no evidence in the record that Orlando made any threats to harm himself or attempts to harm himself while he was on Pod 5F. (*Id.* ¶ 33). D.W. Stechschulte, MD, saw Orlando on March 28 and March 29, 2016. (*Id.* ¶ 34). According to Dr. Stechschulte, on March 28, 2016, Orlando "looked well and . . . needed another day or two on the detox medications . . . ." and on March 29, 2016, "he was in good spirits and wanted to be off the detox pod . . . ." (ECF No. 43-11 at 26). Dr. Stechschulte discontinued Orlando's detoxification treatment and cleared him to be transferred to general population at 10:00 AM on March 29, 2016. (Defs.' CSMF ¶ 27; Pl.'s CSMF ¶ 109). That same day, Orlando's cellmate was removed from their shared cell to be released or transferred. (Pl.'s CSMF ¶ 110). Alone in his cell, Orlando hanged himself at approximately 1:30 PM on March 29, 2016. (*Id.* ¶ 111). At the time of Orlando's hanging there were three COs on Pod 5F. (Defs.' CSMF ¶¶ 31, 49). Orlando died in the hospital the next day. (*Id.* ¶ 32).

Plaintiff spoke to Deputy Wainwright on or about March 31, 2016. (Pl.'s CSMF ¶ 114).[10] During that conversation, Plaintiff inquired "how could something like this [i.e., Orlando's death] happen?" (ECF No. 50-22 ("Plaintiff Dep.") at 11). In response, Deputy Wainwright stated "we wish we had more manpower than we do." (*Id.*).[11] Prior to Orlando's suicide, Warden Harper had received complaints from a couple of COs indicating that staffing levels at the ACJ in general were inadequate, but he found these complaints to be invalid and did not take any action to increase staff at the ACJ. (Pl.'s CSMF ¶ 114).[12]

  **B.**  **Procedural History**

Based upon the foregoing, Plaintiff initiated this action by filing a Complaint on February 8, 2017, followed by an Amended Complaint which was docketed on October 4, 2017. (ECF Nos. 1, 19). Plaintiff asserts that Defendants violated Orlando's constitutional rights triggering liability under § 1983 and state law. (ECF No. 19 ¶ 57) More specifically, Count I of the Amended Complaint alleges a municipal liability claim premised on the County's failure to prevent self-harm and/or suicide amongst at-risk inmates due to inadequate staffing and a related claim for a failure to train its employees "in the proper practice and procedures necessary to protect an inmate who is at risk to commit suicide." (ECF No. 19 ¶ 57). Count II alleges that the individual Defendants acted with reckless indifference by failing to take reasonable measures to ensure Orlando's safety. (*Id.* ¶ 65). Count III alleges a wrongful death claim under Pennsylvania law. (*Id.* ¶ 72).

---

[10] In his deposition, however, Deputy Wainwright testified that he did not recall talking to Plaintiff. (Wainwright Dep. at 12).

[11] Deputy Wainwright denied ever stating that Pod 5F was understaffed. (Wainwright Dep. at 12).

[12] Warden Harper testified that he never received any complaints about understaffing specifically regarding Pod 5F prior to, or after Orlando's suicide. (Harper Dep. at 14).

7

Defendants filed an Answer on November 3, 2017. (ECF No. 29). On June 29, 2018, Defendants filed the pending motion for summary judgment, a supporting brief ("Defs.' Br.") Defs.' CSMF, and an appendix. (ECF Nos. 40, 41, 42, 43). Plaintiff responded with a brief in opposition ("Pl.'s Br."), Pl.'s CSMF, and an appendix on September 26, 2018. (ECF No. 48, 49, 50). Defendants then filed a reply brief ("Defs.' Reply Br."), a supplement to Defs.' appendix, and Defs.' Resp. Pl.'s CSMF on November 12, 2018. (ECF Nos. 55, 57, 58). As the present motion for summary judgment has been fully briefed, it is now ripe for disposition.

### III. STANDARD OF REVIEW

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a) & (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. *Id.* Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for

the non-moving party." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249–50 (internal citations omitted).

## IV. DISCUSSION

In this Circuit, "the vulnerability to suicide framework applies when a plaintiff seeks to hold prison officials accountable for failing to prevent a prison suicide." *Palakovic v. Wetzel*, 854 F.3d 209, 224 (3d Cir. 2017). Under this framework—to recover under the Due Process Clause of the Fourteenth Amendment in a pretrial detainee suicide case—a § 1983 plaintiff must show:

> (1) that the individual had a particular vulnerability to suicide, meaning that there was a 'strong likelihood, rather than a mere possibility,' that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

*Id.* at 223–24. Additionally, "a detainee's 'strong likelihood' of suicide 'must be so obvious that a lay person would easily recognize the necessity for preventative action.'" *Id.* at 222 (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1025 (3d Cir. 1991)). Situations where prison officials "ha[ve] been found to 'know' of a particular vulnerability to suicide—include[e], for example, where 'they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities.'" *Id.* at 222–23 (quoting *Colburn*, 946 F.2d at 1025 n.1). As explained below, the Court concludes that no

reasonable jury could find that Plaintiff's claims satisfy the very high standards set forth in the vulnerability to suicide framework.

### A. CO Bonenberger, Sgt. Haburjak, and Nurse Corrado

Defendants argue that Plaintiff's claims necessarily fail under the third element of the vulnerability to suicide framework. Specifically, Defendants assert that the individual Defendants who interacted with Orlando prior to his suicide—i.e., CO Bonenberger, Sgt. Haburjak, and Nurse Corrado—were not deliberately indifferent to his particular vulnerability to suicide. (Defs.' Br. at 8–9, 10–11). Plaintiff counters that CO Bonenberger and Sgt. Haburjak acted with deliberate indifference by failing to inform Nurse Corrado of the statement that Orlando had made to the arresting officers—i.e., that he wanted to hang himself (the "Statement"). (Pl.'s Br. at 5). And Nurse Corrado was deliberately indifferent, Plaintiff contends, because—after determining that Orlando was "a harm to himself" and "suicidal"—she neither referred Orlando to an outside facility for mental health treatment, nor placed him on suicide precautions. (*Id.* at 6).

Deliberate indifference[13] requires a level of culpability "beyond mere negligence, to the individual's particular vulnerability." *Palakovic*, 854 F.3d at 224. It is well established that a prison official acts with deliberate indifference when "the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Moreover, "[t]he Court of Appeals for the Third Circuit has clearly and repeatedly held that the increased risk of suicide due to intoxication or drug withdrawal cannot support a deliberate indifference claim." *Ferencz v.*

---

[13] When analyzing Fourteenth Amendment violations, the Third Circuit Court of Appeals has "not attempted to draw distinctions among terms like 'reckless indifference,' 'deliberate indifference,' 'gross negligence,' or 'reckless disregard.'" *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 464 n.10 (3d Cir. 1989). Therefore, the Court will use the term "deliberate indifference" in discussing the third element under the vulnerability to suicide framework.

*Medlock*, No. 11–1130, 2014 WL 3339639, at *4 (E.D. Pa. July 8, 2014) (citing *Woloszyn v. County of Lawrence*, 396 F.3d 314, 322–23 (3d Cir. 2005), *Colburn*, 946 F.2d at 1026–27), and *Wargo v. Schuylkill County*, 348 F. App'x 756 (3d Cir. 2009)).

Measured against this high standard, there is no evidence from which a reasonable jury could conclude that CO Bonenberger, Sgt. Haburjak and Nurse Corrado were deliberately indifferent to Orlando's particular vulnerability to suicide throughout their interactions with him. Rather, even in the light most favorable to Plaintiff, the record reflects that all three Defendants "were sensitive to a potential that [Orlando] was suicidal and took more than necessary precautions based on the available information and circumstances as they appeared." *Baez v. Lancaster Cty.*, 487 F. App'x 30, 32 (3d Cir. 2012).

Upon Orlando's arrival at the ACJ, CO Bonenberger learned about the Statement from the arresting officers and she conveyed it to Sgt. Haburjak. Based on the Statement and because of Orlando's uncooperative behavior, Sgt. Haburjak decided to put Orlando in a restraint chair and CO Bonenberger assisted in that process. After he was retrained, Sgt. Haburjak put Orlando in a cell where inmates on suicide precautions are placed. And, Sgt. Haburjak stated that, upon release from the restraint chair, Orlando would be placed in suicide gown.[14]

Nurse Corrado's interaction with Orlando was limited to determining whether there was a medical reason that precluded him from being admitted to the ACJ and she found none. When she medically cleared Orlando for admission to the ACJ, Nurse Corrado thought that he was suicidal. But, at the time, he was safe from self-harm—i.e., restrained and in a cell from where the COs

---

[14] That Orlando was not placed in a suicide gown does not warrant an inference of deliberate indifference because the record reflects that Orlando neither made any threats of self-harm, nor did he attempt to harm himself upon release from the restraint chair. Therefore, it was not a disregard of an excessive risk to Orlando to forgo the suicide gown.

could directly monitor him. And, Nurse Corrado knew that after his arraignment, Orlando would be seen not only by another nurse—for a comprehensive assessment of his medical needs—but, if necessary, also by a mental health specialist.

Plaintiff contends that CO Bonenberger and Sgt. Haburjak were deliberately indifferent to Orlando particular vulnerability to suicide because they failed to inform Nurse Corrado of the Statement. But Plaintiff points to no evidence suggesting that CO Bonenberger and Sgt. Haburjak attempted to conceal the Statement. To the contrary, the record reflects, and Plaintiff concedes, that the Statement was documented and preserved in various ACJ reports, including those complied by CO Bonenberger and Sgt. Haburjak. (*See supra* n.8). The record also reflects that Nurse Corrado examined Orlando moments after he was placed in the restraint chair. At the time, Orlando was extremely agitated and was threatening to harm everyone present, including himself. Given the volatile nature of this episode—coupled with Nurse Corrado determination that Orlando was suicidal based on her own observations—the Court concludes that no reasonable jury could find that CO Bonenberger and Sgt. Haburjak' failure to inform Nurse Corrado of the Statement constituted deliberate indifference to Orlando's particular vulnerability to suicide.

Equally unavailing are Plaintiff's assertions that Nurse Corrado was deliberately indifferent to Orlando's particular vulnerability to suicide. First, Plaintiff asserts that Nurse Corrado failed to refer Orlando to an outside mental health facility after determining that he was suicidal. In support of this assertion, Plaintiff offers Nurse Latham's testimony that a potential inmate could be referred to such a facility after the initial interview—i.e., the one conducted by Nurse Corrado—if it was "something [the ACJ] couldn't handle . . . ." (Latham Dep. at 3; *see* Pl.'s CSMF at 10 n.3) However, Plaintiff does not point to any evidence suggesting that Orlando's

12

condition—whether medical or mental—could not be handled by the ACJ medical staff.[15] And Plaintiff's second assertion, that Nurse Corrado failed to place Orlando on suicide precautions, is simply not supported by the record. At the time of Nurse Corrado's interview, Orlando was in a restraint chair—which is a suicide precaution. (Corrado Dep. at 6).

In sum, the Court concludes that no reasonable jury could find that CO Bonenberger, Sgt. Haburjak, or Nurse Corrado were deliberately indifferent to Orlando's particular vulnerability to suicide.[16] Because Plaintiff cannot establish a viable claim under the vulnerability to suicide framework, she cannot recover under the Due Process Clause of the Fourteenth Amendment.

---

[15] Even if such evidence existed, "because the deliberate indifference standard 'affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients,' [the Court] must 'disavow any attempt to second-guess the propriety or adequacy of [Nurse Corrado's] particular course of treatment' so long as it 'remains a question of sound professional judgment.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017) (quoting *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)). And, there is nothing in the record from which a reasonable jury could conclude that Nurse Corrado "actually did not base [her] decision on such judgment." *Id.* at 539 (quoting *Youngberg v. Romeo*, 457 U.S. 307 (1982)).

[16] Although not briefed by the parties, in this Court's estimation, no reasonable jury could find that Plaintiff has presented evidence sufficient to establish the second element the under the vulnerability to suicide framework—i.e., the requirement that "the prison official knew or should have known of the individual's particular vulnerability . . . ." *Palakovic*, 854 F.3d at 224. "Even assuming that [Orlando] had a 'particular vulnerability to suicide,' no reasonable juror could conclude, based on the evidence, that the likelihood of suicide was 'so obvious' or 'easily recognized' to a layperson that [Defendants] 'knew or should have known' of that vulnerability." *Baez*, 487 F. App'x at 31 (quoting *Woloszyn v. County of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005)). The record reflects that Orlando made self-harm statements on March 24, 2016, i.e., the night he arrived at the ACJ. He denied having any suicidal thoughts during his booking interview the next day on March 25, 2016. He was attended by the ACJ medical staff at 2:05 AM on March 26, 2016, and there is no indication that he was a threat to himself or others at that time. Orlando did not disclose any suicidal ideations to Nurse Latham when she examined him the same day. Later that day, Orlando was cleared by Ruth Harrison—a mental health specialist—and assigned to Pod 5F for detoxification. And, the parties agree that there is no evidence of any threats of self-harm or suicide attempts while he was on Pod 5F. Finally, the physician who cleared Orlando to be transferred to general population on March 29, 2016, recalled that Orlando was in good spirits and wanted to be off the detoxification pod. This record "does not support a 'strong likelihood of suicide . . . so obvious that a lay person would easily recognize it.' Indeed, the likelihood that [Orlando] would harm himself was not obvious to the [physician who examined Orlando a few

### B. Remaining Claims

Plaintiff also asserts claims, on secondary theories of liability,[17] against the County and supervisory Defendants—i.e., Warden Harper and Deputy Wainwright. However, the Court has determined that Orlando's constitutional rights were not violated. Accordingly, the claims against the County and the supervisory Defendants necessarily fail.[18] The Court declines to exercise supplemental jurisdiction on Plaintiff's remaining state law claim. 28 U.S.C. § 1367(c)(3).

### V. CONCLUSION

Based upon the foregoing, the court will GRANT Defendants' motion for summary judgment. An appropriate order follows.

Lisa Pupo Lenihan
United States Magistrate Judge

Date:     April 30, 2019

---

hours before he committed suicide], let alone a layperson." *Id.* (quoting *Woloszyn*, 396 F.3d at 320).

[17] Plaintiff's § 1983 claims against the County arise under *Monell*, which requires proof that the constitutional injury was caused by "'action pursuant to official municipal policy[,]'" which "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (quoting *Monell v. Dept. of Soc. Svcs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978)). Plaintiff appears to be asserting a supervisory liability claim based on the theory that Warden Harper and Deputy Wainwright "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989)). (*see* Pl.'s Br. at 10).

[18] *See Leisure v. Lancaster County Prison*, 750 F. App'x 89, 92 n.3 (3d Cir. 2018) ("Because we find no constitutional violation, it follows that any possible supervisory liability claim cannot stand."); *Hammon v. Kennett Township*, 746 F. App'x 146, 150 (3d Cir. 2018) ("A municipality cannot be held liable where the plaintiff has experienced no violation of her constitutional rights.")